IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPANSION INC., *et al.*,[1] | Case No.: 09-10690 |
| | [Joint Administration Pending] |
| Debtors. | |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 366 (I) PROHIBITING UTILITY PROVIDERS FROM DISCONTINUING, ALTERING, OR REFUSING UTILITY SERVICES, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

hereby move the Court (the "**Motion**") for entry of an order (the "**Order**"), in substantially the

form attached hereto as Exhibit A, (i) prohibiting Utility Providers (as defined herein) from

altering, refusing, or discontinuing service to, or discriminating against, the Debtors, (ii) deeming

the Utility Providers adequately assured of future performance, and (iii) establishing procedures

for determining adequate assurance of payment. The facts and circumstances supporting this

Motion are set forth in the Affidavit of Dario Sacomani, Executive Vice President and Chief

Financial Officer of Spansion Inc., in Support of First Day Motions (the "**First Day Affidavit**"),

filed contemporaneously herewith. In support of this Motion, the Debtors respectfully state as

follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Spansion Inc., a Delaware corporation (8239); Spansion Technology LLC, a Delaware limited liability company (3982); Spansion LLC, a Delaware limited liability company (0482); Cerium Laboratories LLC, a Delaware limited liability company (0482), and Spansion International, Inc., a Delaware corporation (7542). The mailing address for each Debtor is 915 DeGuigne Dr., Sunnyvale, CA 94085.

## JURISDICTION

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 366 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

## BACKGROUND

**A.     Introduction**

3. On the date hereof (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4. Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") seeking joint administration of the Debtors' estates.

**B.     Overview of the Debtors' Businesses**

5. The Debtors design, develop, manufacture, market, license and sell flash memory solutions ("**Flash Memory**"). The Debtors sell Flash Memory to leading equipment manufacturers in the mobile phone, consumer electronics and automotive electronics markets, such as Nokia, Samsung and Continental Automotive. The Debtors sell Flash Memory directly to customers and through distributors. The Debtors and the foreign subsidiaries of Spansion LLC ("**Spansion LLC**"), a Delaware limited liability company (the "**Foreign Subsidiaries**"),

2

## JURISDICTION

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 366 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

## BACKGROUND

**A.     Introduction**

3. On the date hereof (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4. Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") seeking joint administration of the Debtors' estates.

**B.     Overview of the Debtors' Businesses**

5. The Debtors design, develop, manufacture, market, license and sell flash memory solutions ("**Flash Memory**"). The Debtors sell Flash Memory to leading equipment manufacturers in the mobile phone, consumer electronics and automotive electronics markets, such as Nokia, Samsung and Continental Automotive. The Debtors sell Flash Memory directly to customers and through distributors. The Debtors and the foreign subsidiaries of Spansion LLC ("**Spansion LLC**"), a Delaware limited liability company (the "**Foreign Subsidiaries**"),

LA\1936096.10

manufacture products through three fabrication facilities and four assembly, test and pack facilities (collectively, the "**Manufacturing Facilities**") located in Texas, Japan, China, Thailand and Malaysia. Additionally, the Debtors and the Foreign Subsidiaries maintain design centers and research & development facilities in ten locations around the world. The Debtors administer operations from their executive headquarters in Sunnyvale, California with operational support from additional locations in Japan and Malaysia. The Debtors have employees in various locations throughout the United States and in Finland, Germany, Italy, Korea, the Netherlands, Sweden, Taiwan and the United Kingdom.

C.     **Corporate and Debt Structure**

6.     Spansion Inc. ("**Spansion**") is a publicly traded Delaware corporation. Spansion is a holding company that owns 100% of the membership interests in Spansion Technology LLC ("**Spansion Technology**"), a Delaware limited liability company. Spansion and Spansion Technology own 60% and 40%, respectively, of the membership interests in Spansion LLC, the Debtors' principal operating entity. Spansion LLC owns 100% of the common stock of Spansion International, Inc. ("**Spansion International**"), a Delaware corporation, and 100% of the membership interests in Cerium Laboratories LLC ("**Cerium**"), a Delaware limited liability company. Spansion LLC is also the direct or indirect parent of a number of companies organized under the laws of various foreign countries. An organizational chart is attached as Exhibit B to the First Day Affidavit. On or about February 10, 2009 Spansion Japan Limited filed a petition under the Corporate Reorganization Law of Japan. None of the other Foreign Subsidiaries has commenced reorganization or other insolvency proceedings.

7.     The Debtors are indebted under the following prepetition credit arrangements:

a.     Spansion LLC is the borrower under a secured credit facility (the "**Credit Facility**") pursuant to that certain Credit Agreement (hereinafter defined), dated September 19,

3

2005, by and among Bank of America, N.A., as Agent (the "**Agent**"), Banc of America Securities LLC, as the Sole Lead Arranger and the Sole Book Manager, Spansion LLC and the lenders party thereto from time to time (the "**Lenders**") (as amended, extended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Spansion, Spansion International, Spansion Technology and Cerium have guaranteed the Credit Facility. The Credit Facility is secured by a first priority lien on all of Spansion LLC's assets other than (1) collateral secured in favor of the FRNs as described below (in which the Credit Facility gives rise to a second priority lien); (2) the collateral securing the UBS Credit Line as described below; and (3) its intellectual property (together with the FRN Priority Collateral (hereinafter defined), the "**Collateral**"). The Credit Facility's collateral includes 100% of the capital stock or membership interests of Spansion LLC's domestic wholly-owned subsidiaries, and up to 65% of the capital stock or membership interests of Spansion LLC's foreign wholly-owned subsidiaries. As of February 22, 2009, no advances remain outstanding under the Credit Facility, approximately $2 million in letter of credit obligations, which have been cash collateralized, remain outstanding and approximately $16 million is outstanding, though for the most part not presently due and payable, under equipment leases which became secured by the prepetition lender collateral under an amendment to the Credit Agreement.

        b.      Spansion LLC is the issuer of those certain Senior Secured Floating Rate Notes Due 2013 (the "**FRNs**"). The FRNs are secured by a first priority lien on all of Spansion LLC's inventory, equipment and real property and any proceeds from the sales of such collateral (excluding sales of inventory in the ordinary course of business) (the "**FRN Priority Collateral**") and a second priority lien on the collateral that is securing the first priority lien under the Credit Facility (excluding the capital stock of Spansion LLC's subsidiaries). The

LA\1936096.10

FRNs are not secured by Spansion LLC's intellectual property. As of February 22, 2009, the obligations under the FRNs were $625 million plus accrued interest of approximately $8 million.

            c.      Spansion LLC is the issuer of those certain 11.25% Senior Notes Due 2016 (the "**Senior Notes**"). Spansion Technology and Spansion have guaranteed the Senior Notes. The Senior Notes are unsecured. As of February 22, 2009, approximately $250 million was outstanding in aggregate principal amount of Senior Notes and total accrued and unpaid interest under the Senior Notes was approximately $17 million.

            d.      Spansion LLC is the issuer of those certain 2.25% Exchangeable Senior Subordinated Debentures Due 2016 (the "**Debentures**"). Spansion Technology and Spansion have guaranteed the Debentures. The Debentures are unsecured. The Debentures are subordinated in right of payment to the Debtors' senior debt, including the Credit Facility, the FRNs and the Senior Notes. As of February 22, 2009, approximately $207 million was outstanding in aggregate principal amount of Debentures and total accrued and unpaid interest under the Debentures was approximately $1 million.

            e.      Spansion LLC entered into a Credit Line Agreement (the "**UBS Credit Line**") with UBS Bank USA that provides up to $85 million in the form of an uncommitted revolving line of credit, which is secured by certain auction rate securities owned by Spansion LLC. As of February 25, 2009, approximately $79 million of principal and accrued interest is outstanding under the UBS Credit Line.

**D.    Events Leading to the Debtors' Bankruptcy Filing**

        8.      A variety of external economic factors have contributed to the decline in the Debtors' operating performance, such as persistent oversupply in the flash memory industry compounded by the global economic recession, which significantly reduced demand for the Debtors' products in the fourth quarter of 2008 and continues to negatively impact current

LA\1936096.10

demand. These two factors are further complicated by the Debtors' inability to obtain the additional external financing necessary to meet capital expenditure needs and operational costs in a market characterized by swift technological advances and constantly changing manufacturing processes.

9. The Debtors' strategy was historically based on aggressive revenue and market share growth, leveraging superior technology, and low cost, high-volume manufacturing. In the Debtors' 2006 long range planning cycle, forecasted revenue growth supported the construction of a $1.2 billion advanced wafer fabrication facility ("**SP1**"). Debt financing was arranged and construction on SP1 commenced in early 2007.

10. Although the Debtors continued to increase their NOR memory market segment share according to third-party industry sources, steep average selling price ("**ASP**") declines during the first half of 2007 negatively affected revenue, profitability, and operating cash flow. At that time, the Debtors anticipated an improvement in the market environment for the second half of 2007 and aggressively continued the construction of SP1 and incurred associated capital expenditures with the ultimate goal of significant cost reductions that would enhance the Debtors' competitive advantage.

11. During the second half of 2007, the ASP environment stabilized relative to earlier in the year. However, the Debtors faced customer qualification issues resulting in a shortfall in anticipated revenue and increased inventory levels which contributed to the Debtors' failure to meet financial performance targets in the second half of 2007. For fiscal year 2007, cash flow from operations was approximately $200 million, which was significantly lower than anticipated. Driven by the facilitization of SP1 and investments in their research and development facility, the Debtors' capital spending in 2007 reached $1.1 billion.

6

12. The Debtors' 2008 operating plan included capital expenditures of $535 million, of which approximately 80% were expected to occur in the first half of the year in order to complete the phase 1 facilitization of SP1. Upon completion of this first phase, SP1 was anticipated to generate approximately $300 million in revenue in 2008.

13. In the first quarter of 2008, the Debtors lost liquidity in their investment in approximately $122 million of AAA rated auction rate securities (the "**ARS**"). Throughout the second and third quarters of 2008, the credit markets continued to deteriorate and the Debtors intensified their cash management processes. Operationally, the ramp-up of SP1 was delayed due to slower than expected customer qualifications and a sharp decline in the Japanese wireless market. In the third quarter of 2008, the Debtors engaged investment bankers and capital restructuring advisors to evaluate the situation and to accelerate plans to improve liquidity. Multiple initiatives were launched and/or accelerated, including efforts to sell production facilities, raise capital, and seek liquidity options for the ARS.

14. In the fourth quarter of 2008, the macroeconomic environment deteriorated significantly, causing a sharp decline in worldwide demand for consumer goods, and consequently a sharp reduction of demand for the Debtors' products. Furthermore, continued tightening of credit availability and general market liquidity concerns curtailed the Debtors' ability to execute the liquidity initiatives launched in the third quarter of 2008. As these events unfolded, the Debtors intensified their strategic restructuring efforts to include pursuing a potential sale of the entire company. The sharp decline in demand, coupled with the inability of the Debtors to execute liquidity initiatives limited the Debtors' ability to generate sufficient funding for their operations and meet their debt servicing requirements, ultimately leading to the commencement of these Chapter 11 Cases.

7

## THE UTILITY PROVIDERS

15.     In the operation of their facilities, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, natural gas, and telephone and internet service (collectively, the "**Utility Services**") in the ordinary course of business.  These Utility Services are provided by approximately 34 providers (collectively, the "**Utility Providers**"), including those listed on Exhibit 1 (the "**Utility Service List**")[2] as annexed to Exhibit A.  On average, the Debtors spend approximately $2,384,461 each month on Utility Services.  The Debtors have historically paid the Utility Providers promptly and in full.  As of the Petition Date, the Debtors do not owe any past due amounts to the Utility Providers.  In light of this, the Debtors believe that the proposed Adequate Assurance Deposit (as defined below) is more than sufficient to provide the Utility Providers with adequate assurance of payment.

16.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, therefore, to the success of their reorganization.  Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  In particular, such discontinuation would irreparably disrupt the Debtors' ability to operate their facilities, which would negatively affect customers, cash flow and, ultimately, value and creditor recoveries.  Simply put, without Utility Services, the Debtors' operations will shut down. It is, therefore, critical that Utility Services continue uninterrupted.

## RELIEF REQUESTED

17.     Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering or refusing service to a debtor during the first twenty days of a bankruptcy case.  However, thirty days from the petition date, a utility company may discontinue its services,

---

[2]     Although the Debtors believe that Exhibit 1 encompasses all entities that could qualify as a Utility Provider, the Debtors reserve the right, without further order of the Court, to supplement the list if any Utility Provider has been omitted.  Additionally, the listing of an entity on Exhibit 1 is not an admission that any particular entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

LA\1936096.10

pursuant to section 366(c)(2) of the Bankruptcy Code, if a debtor has not furnished adequate assurance of payment.

18.     By this Motion, the Debtors seek entry of an order, in substantially the form attached hereto as Exhibit A, (i) prohibiting Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors, including the making of demands for security deposits or accelerated payment terms, on account of prepetition invoices or on account of any perceived inadequacy of the Debtors' proposed adequate assurance or the commencement of these Chapter 11 Cases, (ii) deeming the Utility Providers adequately assured of future performance within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to the cost of two weeks of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors on account of any closed business locations; and (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Debtors' Utility Providers.

## BASIS FOR RELIEF REQUESTED

19.     Congress enacted section 366 of the Bankruptcy Code to protect debtors from utility service cutoffs upon a bankruptcy filing while, at the same time, providing utility companies or providers with adequate assurance that the debtors will pay for postpetition services. *See* H.R. REP. NO. 95-595, at 350 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6306. Accordingly, section 366 protects debtors by enjoining utilities from altering, refusing or discontinuing services solely on account of unpaid prepetition amounts or commencement of a bankruptcy case for a period of 30 days after the bankruptcy filing. Section 366 additionally

LA\1936096.10

protects utilities by permitting them to alter, refuse or discontinue service after 30 days if the debtor has not furnished "adequate assurance" of payment in a form "satisfactory" to the utility.

20. Section 366(c) of the Bankruptcy Code, which was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, significantly modified the existing statutory framework. It has two primary purposes. First, it permits a utility to alter, refuse or discontinue utility service if a debtor has not provided satisfactory adequate assurance within 30 days of its bankruptcy filing, subject to the court's ability to modify the amount of adequate assurance. Second, it also restricts the factors that a court can consider when determining whether an adequate assurance payment is, in fact, adequate. Specifically, courts may no longer consider (i) the absence of a security deposit before the debtor's petition date, (ii) the debtor's history of timely payments or (iii) the availability of an administrative expense priority when determining the amount of a deposit. Notwithstanding these changes, it does not appear that Congress intended to — or did — abrogate this Court's right to determine the amount of adequate assurance necessary or change the fundamental requirement that assurance of payment must simply be "adequate."

21. While section 366(c) of the Bankruptcy Code does limit the factors a court can consider when determining whether a debtor has provided adequate assurance of payment, it does not limit the court's ability to determine the amount of payment necessary, if any, to provide such adequate assurance. Instead, section 366(c) of the Bankruptcy Code gives courts the same discretion in determining the amount of payment necessary for adequate assurance as they previously had under section 366(b) of the Bankruptcy Code. *Compare* 11 U.S.C. § 366(b) (2004) (pre-BAPCPA) ("On request of a party-in-interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance") *with* 11 U.S.C. § 366(c)(3)(A) (2005) (post-BAPCPA) ("On

10

request of a party-in-interest and after notice and a hearing, the court may order modification of the amount of an assurance payment under paragraph (2)"); *see also* Richard Levin & Alesia Ramley-Marinelli, *The Creeping Repeal of Chapter 11: The Significant Business Provisions of the Bankruptcy Abuse Protection and Consumer Protection Act of 2005*, 79 Am. Bankr. L.J. 603, 608-09 (2005) (stating that courts would likely continue to determine the amount and form of adequate protection after the implementation of the BAPCPA). Further, it is well established that section 366(b) of the Bankruptcy Code permits a court to find that no adequate assurance payment at all is necessary to provide a utility with adequate assurance of payment. *See Virginia Elec. & Power Co. v. Caldor, Inc.*, 117 F.3d 646, 650 (2d Cir. 1997) ("Even assuming that 'other security' should be interpreted narrowly, we agree with the appellees that a bankruptcy court's authority to 'modify' the level of the 'deposit or other security,' provided for under § 366(b), includes the power to require no 'deposit or other security' where none is necessary to provide a utility supplier with 'adequate assurance of payment.'"); *In re Penn Jersey Corp.*, 72 B.R. 981, 986 (Bankr. E.D. Pa. 1987) (utility company's request for additional security denied because debtor had never been delinquent prior to bankruptcy). This may be particularly true in cases where the debtor has made prepetition deposits or prepayments for services that utilities will ultimately render post-petition. 11 U.S.C. § 366(c)(1)(A)(v) (recognizing a prepayment for post-petition services as adequate assurance). Accordingly, courts continue to have discretion to determine the amount of adequate assurance payments and, where appropriate, to determine that no such payment is necessary. *See In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 20, 2005) (approving adequate protection equal to the amount necessary for two weeks of utility service); *In re Refco, Inc.*, Case No. 05-60006 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2005) (approving adequate protection equal to the amount necessary for two weeks of utility service).

LA\1936096.10

22.     Additionally, section 366(c) of the Bankruptcy Code, like section 366(b), simply requires that a utility's assurance of payment be "adequate." Courts have long recognized that adequate assurance of performance does not require an absolute guarantee of a debtor's ability to pay. *See In re Adelphia Bus. Solutions. Inc.*, 280 B.R. 63, 80 (Bankr. S.D.N.Y. 2002); *In re Caldor*, 199 B.R. 1, 3 (S.D.N.Y. 1996) (Section 366(b) of the Bankruptcy Code "does not require an 'absolute guarantee of payment'"), *aff'd by Virginia Elec. & Power Co. v. Caldor, Inc.*, 117 F.3d 646 (2nd Cir. 1997). *See also In re Steinebach*, 303 B.R. 634, 641 (Bankr. D. Ariz. 2004) ("Adequate assurance of payment is not, however, absolute assurance . . . all § 366(b) requires is that a utility receive only such assurance of payment as is necessary to protect its interests given the facts of the debtor's financial circumstances"); *In re Santa Clara Circuits W., Inc.*, 27 B.R. 680, 685 (Bankr. D. Utah 1982); *In re George C. Frye Co.*, 7 B.R. 856, 858 (Bankr. D. Me. 1980). Courts have also recognized that in determining the amount of adequate assurance, bankruptcy courts should focus "on the need of the utility for assurance, and to require that the debtor supply *no more than that*, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." *In re Caldor*, 117 F.2d at 665 (emphasis in original); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 103-04 (3d Cir. 1972) (affirming bankruptcy court's ruling that no utility deposits were necessary where such deposits would likely "jeopardize the continuing operating of the [debtor] merely to give further security to suppliers who are already reasonably protected"). Accordingly, demands by a utility for a guarantee of payment when they already have adequate assurance of payment in light of the debtor's specific circumstances should be refused.

## PROPOSED ADEQUATE ASSURANCE

23.     To provide adequate assurance of payment to the Utility Providers, the Debtors propose to deposit a sum equal to the cost of two weeks of the Debtors' Utility Services,

LA\1936096.10

calculated as a historical average (the "**Adequate Assurance Deposit**"), into an interest-bearing, newly created segregated account within twenty (20) days of the Petition Date.

24.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.  If any Utility Provider believes additional assurance is required, they may request such assurance pursuant to the procedures described below.

**PROPOSED ADEQUATE ASSURANCE PROCEDURES**

25.     If a Utility Provider is not satisfied with the adequate assurance and believes additional assurance is required, it may request such assurance in accordance with the following procedures (the "**Adequate Assurance Procedures**"):

a.      A Utility Provider desiring additional assurances of payment in the form of deposits, security or otherwise must serve a written request (an "**Additional Assurance Request**") upon the Debtors at the following addresses:  (i) Spansion Inc., 915 DeGuigne Dr., Sunnyvale, CA 94085, Attn: Robert Melendres; and (ii) counsel to the Debtors, Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, CA 90071-1560, Attn: Gregory O. Lunt and Kimberly A. Posin (together, the "**Service Parties**").  The Additional Assurance Request must be sent to both Service Parties to be deemed valid.

b.      The Additional Assurance Request must be made and **actually received** by all of the Service Parties listed above by **no later than thirty (30) days after entry of the Order by this Court**.  If a Utility Provider fails to timely serve its request, it shall be:  (i) forbidden to discontinue, alter or refuse service to, or discriminate against, the Debtors on account of any unpaid prepetition charges or the commencement of these Chapter 11 Cases, or require additional adequate assurance of payment other than the Proposed Adequate Assurance described above; and (ii) deemed to have received adequate assurance of payment in compliance with section 366 of the Bankruptcy Code.

13

c.   Any Additional Assurance Request must: (i) be made in writing; (ii) set forth the location(s) for which Utility Services are provided and the account number(s) for such location(s); (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits, and the outstanding balance for each account; and (iv) set forth why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

d.   Upon the Debtors' and other Service Parties' receipt of any Additional Assurance Request at the addresses set forth above, the Debtors shall have the greater of (a) fourteen (14) days from the receipt of any such Additional Assurance Request or (b) thirty (30) days from the Petition Date (collectively, the "**Resolution Period**") to negotiate with the Utility Provider to endeavor to resolve that Utility Provider's Additional Assurance Request. During this period, Utility Providers may · not discontinue, alter or refuse service to, or discriminate against, the Debtors on account of any unpaid prepetition charges or the commencement of these Chapter 11 Cases.

e.   The Debtors may, in their discretion, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court, and may, in connection with any such agreement, in their discretion, provide a Utility Provider with additional adequate assurance of future payment including, but not limited to, cash deposits, prepayments and/or other forms of security, without further order of this Court, if the Debtors believe such additional assurance is reasonable.

f.   If the Debtors determine that the Additional Assurance Request is not reasonable and are not able to reach an alternative resolution with the Utility Provider during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will request a hearing before this Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "**Determination Hearing**") pursuant to section 366(c)(3) of the Bankruptcy Code.

g.   Pending resolution of any such Determination Hearing, such particular Utility Provider shall be restrained from discontinuing, altering, or refusing service to, or discriminating against, the Debtors on account of unpaid charges for prepetition services or the commencement of these Chapter 11 Cases.

26.   The proposed procedures are necessary for the Debtors to carry out their reorganization efforts. If the Court does not approve the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by their Utility Providers in a disorganized manner at a critical point in their reorganization. Moreover, the Debtors could be blindsided by a

14

Utility Provider unilaterally deciding — on the thirty-first day — that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. As set forth above, discontinuation of service, particularly electricity, would essentially halt the Debtors' operations, putting the Debtors' reorganization efforts in extreme jeopardy. The proposed procedures set forth a fair process that will enable all parties to negotiate their respective positions and, where necessary, seek Court intervention without jeopardizing the Debtors' reorganization efforts.[3]

## THE UTILITY PROVIDERS WILL NOT BE PREJUDICED BY THE REQUESTED RELIEF

27.     On a monthly basis the Debtors receive hundreds of individual invoices for Utility Services from their Utility Providers, with whom the Debtors have multiple utility accounts. To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to undisputed Utility Service invoices, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.

28.     The Debtors' proposed method of furnishing adequate assurance of payment for postpetition Utility Service is not prejudicial to the rights of any Utility Provider, and is in the best interest of the Debtors' estates. This Court has granted similar relief to that requested herein following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *See, e.g., In re Am. Home Mortgage Holdings, Inc.,* No. 07-11047 (CSS) (Bankr. D. Del. Sept. 4, 2007) (deeming utilities adequately assured where the debtors established segregated account containing an amount equal to 50% of the debtors' estimated monthly cost of utility

---

[3]     The proposed procedures allow the Debtors to negotiate or seek a hearing after the 30-day deadline set forth in section 366(c) of the Bankruptcy Code where a Utility Provider does not submit its demand within 16 days of the filing. For example, where a Utility Provider files its request on the twentieth day, the Debtors will have 14 days — or until the thirty-fourth day after the filing — to negotiate with that Utility Provider or to seek a court determination. The Debtors believe that this process is fair and necessary to avoid the unfortunate possibility that all of the Debtors' Utility Providers make last minute demands, leaving the Debtors without the ability to address those demands before services may be cut off. If Utility Providers wish to have their matter determined within 30 days of the bankruptcy filing, they need only file their request within 16 days thereof — something they are undoubtedly capable of doing in light of the amendments to section 366 of the Bankruptcy Code.

LA\1936096.10

service); *In re Global Home Products LLC*, No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006) (same); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. D. Del. Apr. 24, 2007) (deeming utilities adequately assured where debtor provided two weeks deposit for utilities); *In re Pliant*, No. 06-10001 (MFW) (Bankr. D. Del. Jan. 5, 2006); *In re Nobex Corp.*, No. 05-20050 (MFW) (Bankr. D. Del. Dec. 21, 2005); *In re FLYi, Inc.*, No. 0520011 (MFW) (Bankr. D. Del. Dec. 2, 2005).

29.     Conversely, if the Utility Providers are permitted to refuse or discontinue service, even if for a brief period, the Debtors' business operations would be severely disrupted.  In particular, such discontinuation would irreparably disrupt the Debtors' ability to operate their facilities, negatively affecting customers, cash flow and, ultimately, value and creditor recoveries. Simply put, without Utility Services, the Debtors operations will shut down.  It is, therefore, critical that Utility Services continue uninterrupted.

30.     Based on the foregoing, the Debtors believe that the Motion should be granted.

## SUBSEQUENT MODIFICATIONS OF UTILITY SERVICE LIST

31.     The Debtors have made an extensive and good faith effort to identify their Utility Providers and include them on the Utility Service List.  Nonetheless, it is possible that the Debtors have not yet identified or included certain Utility Providers on the Utility Service List. To the extent that the Debtors identify additional Utility Providers (the "**Additional Utility Providers**"), the Debtors will file amendments to the Utility Service List, and shall serve a copy of the Order on such Additional Utility Providers.  The Debtors request that the Order be binding on all Utility Providers, including the Additional Utility Providers, regardless of when such Utility Provider was added to the Utility Service List; provided that, with respect to any Additional Utility Provider, the thirty (30) day and twenty (20) day periods described in paragraphs 23 and 25, respectively, of the above procedures shall commence as of the date that

16

the Debtors serve the Order on such Additional Utility Provider as opposed to entry of the Order. Any Additional Assurance Request by such Additional Utility Provider must otherwise comply with the requirements set forth in the Motion and Order or shall be deemed an invalid Additional Assurance Request.

## NOTICE

32.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee; (b) counsel to the administrative agent for the Debtors' prepetition lenders; (c) counsel to the *ad-hoc* committee of holders of Spansion LLC's Senior Secured Floating Rate Notes due 2013, Robert J. Stark, Brown Rudnick LLP, Seven Times Square, New York, NY 10036; (d) the Trustee for Spansion LLC's Senior Secured Floating Rate Notes due 2013; (e) the Trustee for Spansion LLC's 2.25% Exchangeable Senior Subordinated Debentures Due 2016; (f) the Trustee for Spansion LLC's 11.25% Senior Notes Due 2016; (g) the administrative agent for the UBS Bank USA line of credit; (h) the creditors listed on the Debtors' consolidated list of 65 largest unsecured creditors, as filed with the chapter 11 petitions; (i) the Securities and Exchange Commission; (j) the Internal Revenue Service; (k) local taxing authorities, and (l) the Utility Providers. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

33.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available by contacting Kathy Bowman, Senior Paralegal, Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, CA 90071-1560, Kathryn.Bowman@lw.com.

LA\1936096.10

## NO PRIOR REQUEST

34.     No prior motion for the relief requested herein has been made to this Court or any

other court.


**[Remainder of Page Intentionally Left Blank]**

LA\1936096.10

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit A, (i) determining that Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (ii) approving the Debtors' Proposed Adequate Assurance and the Adequate Assurance Procedures, (iii) prohibiting Utility Providers from discontinuing, altering, or refusing service to, or discriminating against, the Debtors, (iv) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by this Motion, and (v) granting such other and further relief as the Court deems appropriate.

Dated: March 1, 2009
Wilmington, Delaware

Respectfully Submitted,

_____
Michael R. Lastowski (No. 3892)
Richard W. Riley (No. 4052)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: mlastowski@duanemorris.com
            rwriley@duanemorris.com
            slross@duanemorris.com

and

Michael S. Lurey
Gregory O. Lunt
Kimberly A. Posin
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: Michael.Lurey@lw.com;
            Gregory.Lunt@lw.com; Kim.Posin@lw.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

LA\1936096.10