**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | : | CHAPTER 11 |
|  | : |  |
| **SPANSION, INC.,** *et al.*[1] | : |  |
| Debtors | : | Case No. 09-10690 (KJC) |

## MEMORANDUM[2]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On March 1, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the

U.S. Bankruptcy Code.  The Debtors are operating their businesses and managing their properties

as debtors-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

Currently before the Court is the Debtors' Motion for an order pursuant to 11 U.S.C.

§§105(a) and 363(b) and Fed.R.Bankr.P. 9019 authorizing settlement of litigation with, and

license of intellectual property to, Samsung Electronics Co., Inc. (docket no. 225)(the

"Settlement Motion").  On May 12, 2009, an *ad hoc* consortium of certain Senior Secured

Floating Rate Notes Due 2013 (the "Ad Hoc Consortium") filed an objection to the Settlement

Motion (docket no. 423).  On May 13, 2009, the Official Committee of Unsecured Creditors (the

"Committee") filed a limited objection to the Settlement Motion (docket no. 429).

On May 13, 2009, the Debtors, the Ad Hoc Consortium, and the Committee filed a Joint

---

[1]The Debtors being jointly administered in this case pursuant to an Order dated March 4, 2009, are: Spansion, Inc., a Delaware corporation; Spansion Technology, LLC, a Delaware limited liability company; Spansion LLC, a Delaware limited liability company; Cerium Laboratories, LLC, as Delaware limited liability company; and Spansion International, Inc., a Delaware corporation (the "Debtors").

[2]This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  Venue is proper pursuant to 28 U.S.C. § 1409.  This contested matter involves a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A), (M) and (O).

Pre-Trial Memorandum related to the Settlement Motion (docket no. 443), which was amended on May 15, 2009 (docket no. 480). A hearing on the Settlement Motion was held on May 18, 2009.[3]

BACKGROUND

<u>The Patent Infringement Actions.</u>[4]

In November 2008, the Debtors filed a patent infringement action against Samsung Electronics Co., Ltd. ("Samsung") with the International Trade Commission (the "ITC"), seeking the exclusion from the United States market of well over one hundred million mp3 players, cell phones, digital cameras and other consumer electronic devises containing Samsung's flash memory components. The Debtors' action against Samsung with the ITC is referred to as International Trade Commission Investigation No. 337-TA-664 (the "ITC Action"). The Debtors allege in the ITC Action that these components infringe on four of the Debtor's patents relating to "floating gate" technology.[5] In the ITC Action, the Debtors were required to name, and did

---

[3]At the hearing on May 18, 2009, the Court granted the Debtors' request in the motion to lodge certain exhibits under seal and to close certain portions of the hearing on the Settlement Motion (docket no. 444) (the "Seal Motion") filed on May 13, 2009, which was supported by the Ad Hoc Consortium. The parties asked to seal the exhibits and close portions of the hearing pursuant to Bankruptcy Code §107(b), which provides that a bankruptcy court has authority "protect an entity with respect to a trade secret or confidential research, development, or commercial information." No objections were filed to the Seal Motion. (Tr. 5/18/09 at 90:19- 93:18).

While the hearing record remains sealed, it is necessary for the Court to discuss certain portions of it in this Memorandum to explain its decision. Efforts have been made to exclude specific discussion of that which may be considered most sensitive.

[4]The parties stipulated to the facts regarding the patent infringement actions in their Amended Joint Pre-trial Memorandum.

[5]The Declaration of Ali Pourkeramati, an Executive Vic President and the Chief Technology Officer of Spansion, Inc., provides that:

As of the end of 2008, the Debtors were the third largest provider of Flash memory in the world, behind Samsung and Toshiba. In order to attain that market share, the Debtors invested

2

name, the downstream users of Samsung's allegedly infringing devices, many of which are

customers of the Debtors.

Simultaneously with the ITC Action, the Debtors filed a patent infringement action

against Samsung in the United States District Court for the District of Delaware, designated as

Civil Action No. 08-855-SLR, seeking both an injunction and damages for alleged patent

violations relating to Samsung flash memory (the "Delaware Action").   The Debtors asserted six

patents in the Delaware Action, all of which are different from those in the ITC Action.

Samsung has filed counter-claims against the Debtor in the Delaware Action, alleging

that the Debtors are infringing on five Samsung patents and seeking an injunction and damages

for such alleged infringement.

In January 2009, Samsung filed a patent infringement action against the Debtors'

Japanese subsidiary, Spansion Japan Limited ("Spansion Japan"), in Tokyo District Court,

entitled H21 (WA) 1989 and H21 (WA) 1986, seeking (i) an injunction against Spansion Japan

from manufacturing and selling certain products that allegedly infringe on Samsung's intellectual

property as well as (ii) the destruction of all such products (the "Japan Action").[6]

---

approximately $2 billion in research and development.  The Debtors currently hold
approximately 4,000 patents and patent applications.  Among other things, the Debtors' patents
include those which are fundamental to so-called "floating gate" technology, which is the
foundation for approximately 90 percent of the current Flash memory market."
See Exhibit C to the Settlement Motion, ¶2.

[6]Spansion Japan Limited, a Japanese corporation, commenced its own proceeding under the
Corporate Reorganization Law (Kaisha Kosei Ho) of Japan on February 10, 2009, and its foreign
representative commenced a chapter 15 proceeding in this Court on April 30, 2009 (Case no. 09-11480).

The Settlement Agreement.

On March 16, 2009, the Debtors and Samsung entered into the Settlement Agreement.

(Exhibit B to the Settlement Motion).  The main terms of the Settlement Agreement are:

(i)      The parties agree to dismiss, with prejudice, the ITC Action, the Delaware Action and the Japan Action.

(ii)     The Debtors will grant Samsung a non-exclusive, worldwide, fully paid-up, royalty-free, perpetual and irrevocable license to all of the Debtors' existing and future patents and patent applications (referred to in the Settlement Agreement as the "Licensed Patents").  The Licensed Patents include all patents involved in the ITC Action and the Delaware Action, all foreign counterparts, and all patents acquired or controlled as a result of the acquisition of Saifun Semiconductor by the Debtors.

(iii)    The Debtors covenant not to sue Samsung or its subsidiaries, distributors, retailers or customers for, or in connection with, the use by Samsung or its subsidiaries of the Licensed Patents in connection with any products or services of Samsung or its subsidiaries.  The Debtors' license and covenant not to sue in the Settlement Agreement is binding on its successors and assigns, including any acquirer or assignee of any of the Licensed Patents.

(iv)    In exchange, Samsung will pay the Debtors $70 million.  Of this amount, $40 million will be paid within ten days after an Order approving the Settlement Motion becomes a final, non-appealable Order and the ITC Action, the Delaware Action, and the Japan Action have been dismissed.  The remaining $30 million will be paid over six months in monthly increments of $5,000,000, commencing thirty days after such initial payment is made.

(v)     Samsung covenants not to assert the patent and patent applications owned by it and controlled by its Semiconductor Division[7] against the Debtors and their subsidiaries personally with respect to any product they make (or which is exclusively made for them) and sell exclusively under a brand they own or control.  This covenant by Samsung immediately terminates on a Change in control(as defined in the Settlement Agreement) of the Debtors, which would encompass any substantial sale of the Debtors or their assets, but would not include the exchange of debt for equity of the Debtors so long as the debt being converted to equity is held by financial or financial service entities and not other

---

[7]Although the term "Semiconductor Division" is capitalized in the Settlement Agreement, the agreement did not include a definition or further description of this term.

types of entities, including entities that make and/or sell products that include semiconductor products or services related to semiconductor products.[8]

The Objections to the Settlement Agreement.

The Ad Hoc Consortium objects to the Settlement Motion asserting, generally, that the Settlement Agreement has (i) "structural" flaws, including a lack of mutuality in many provisions, and (ii) insufficient information with which to evaluate the "settlement quantum" of $70 million (or net about $55 million to the estate, after payment of certain attorney fees and costs).

The Ad Hoc Consortium argues that there are three primary structural problems with the Settlement Agreement. First, the rights granted to each party to end the litigation are unbalanced. The Debtors provide Samsung with an all-encompassing, royalty free, world-wide license in perpetuity, covering all intellectual property now owned or created or acquired by Spansion in the future. In return, Samsung grants the Debtors only a "covenant not to assert" that is limited to intellectual property held by Samsung's semiconductor business unit.[9]

---

[8] "Change-in-Control" is defined in the Settlement Agreement as "a transaction or series of related transactions in which (i) one or more related entities or persons who did not previously own at least a fifty percent (50%) interest in the Party in question obtain at least a fifty percent (50%) interest in such Party or (ii) the acquisition of all or substantially all assets of the Party in question or (iii) a merger as a result of which the stockholders of the Party in question prior to the transaction do not thereafter own a majority of the Party in question or of the ultimate parent of the such [sic] Party. Notwithstanding the foregoing, circumstances in which existing debt holders of a Party exchange debt for equity in such Party shall not by itself be considered a Change-in-Control for purposes of this definition, provided that such debt holders are strictly financial or financial services entities (e.g., banks, lenders, investors, etc.) and not, e.g,. entities which make and/or sell products that include semiconductor products or services related thereto. (Exhibit 4, p.1).

[9] The "covenant not to assert" provision of the Settlement Agreement is described in more detail in paragraph (v) *supra.* The parties dispute whether a "covenant not to assert" has the same effect as a "covenant not to sue." *See Transcore, L.P. v. Electronic Transaction Consultants Corp.,* 563 F.3d 1271 (Fed. Cir. 2009). This issue is not dispositive of my decision.

Second, Spansion covenants not to sue "Samsung or its Subsidiaries, or the distributors, resellers, retailers and customers of Samsung or its Subsidiaries." In return, Samsung agrees not to assert certain of its patents against Spansion and its Subsidiaries "personally", but the Settlement Agreement does not preclude Samsung from suing any distributor, reseller, retailer or customer of a Spansion product employing an element that allegedly infringes on a Samsung patent.

Third, Samsung's covenant not to assert terminates by its terms upon a "Change in Control" in Spansion, which the Ad Hoc Consortium argues is defined to include a broad spectrum of merger and acquisition transactions. There is no similar "Change of Control" termination provision of the broad license granted to Samsung. Further, the Ad Hoc Consortium argues that the disintegration of the covenant not to assert upon a change in control is far too restrictive at this stage of the chapter 11 process.

Finally, the Ad Hoc Committee argues that both the Court and the Debtors' management should have more information before deciding whether the amount to be paid by Samsung to the Debtors in the Settlement Agreement is in the best interest of the estate.

The Committee also objected to the lack of mutuality and the change in control provisions in the Settlement Agreement. Moreover, the Committee's limited objection sought to add provisions to the Settlement Agreement that would provide (i) for Samsung's agreement that it had no right to setoff or recoupment regarding the amount being paid under the Settlement Agreement; (ii) that the fees of Debtors' attorneys for litigating the Actions would be subject to this Court's review and approval for reasonableness; (iii) that the entire settlement amount would be paid directly to the Debtors, subject to a charging lien by the Debtors' attorneys for fees and

costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive

information from Samsung regarding the calculation and amount of withholding taxes payable to

Korean tax authorities.  At the hearing, the Committee stated that its concerns regarding the

additional provisions were resolved.  (Tr. 5/18/09 at 28 - 29).  While the Committee continued to

express concern over the lack of mutuality and change in control provisions of the settlement

agreement, it decided not to press its objection to the settlement on any remaining grounds. (Tr.

5/18/09 at 167).

## APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

Approval of a settlement pursuant to Bankruptcy Rule 9019 is committed to the

discretion of the court.  *Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group,*

*Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005).  The court must decide whether "the compromise is

fair, reasonable, and in the best interest of the estate." *In re TSIC, Inc.*, 393 B.R. 71, 78

(Bankr.D.Del. 2008) quoting *In re Louise's, Inc.*, 211 B.R 798, 801 (D.Del. 1997).  "Under the

'fair and equitable' standard, [the court looks] to the fairness of the settlement to the other

persons, i.e., the parties who did not settle." *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,

434 F.3d 639, 645 (3d Cir. 2006).

When considering the best interest of the estate, the Court must "assess and balance the

value of the claim that is being compromised against the value to the estate of the acceptance of

the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)

citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 91968).  In striking this balance,

the court should consider:  (1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393. See also *Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation possibilities. *Key3Media Group*, 336 B.R. at 93. "While a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *Id.*

Here, for the reasons set forth below, the Debtors have failed to meet their burden of proving that the Settlement Agreement is fair and equitable, and in the best interest of the estate.

## DISCUSSION

The Debtors argue that the Settlement Agreement meets the standard for approval under Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel. The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky. Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations. The Actions would also consume a significant amount of

time and energy of the Debtors' senior management, thus taking them from other pressing needs, such as stabilizing and supporting the Debtors' on-going business operations and formulating a successful reorganization strategy.  Moreover, the Debtors were required to name several important customers in the ITC Action, which they assert could impact negatively the Debtors' ability to solidify and strengthen those customer relationships.

In support of their arguments, the Debtors submitted the transcript of the telephonic deposition of Dr. Boaz Eitan, taken on May 14, 2009.[10]  Dr. Eitan is a member of the Debtors' Board of Directors and he supervised the settlement with Samsung.  He testified about his reasons for voting in favor of accepting the Samsung settlement, which included the infusion of cash it provided to the Debtors, and the termination of the Japan Action and the counterclaims against the Debtors.  He spoke to the advantage of getting the cash settlement now, rather than years down the road if the litigation was successful. Dr. Eitan also spoke of the difficulties of continuing the Actions due to the cost of pursuing the litigation and the loss of certain key technical employees and the management team who were overseeing the litigation at its inception. Dr. Eitan further testified that he believed the Settlement Agreement was an important validation from Samsung that Samsung was infringing on the Debtor's patents.  (Ex. 9 at 28-30).

---

[10]Because the Eitan Deposition was labeled as "confidential," the Ad Hoc Consortium filed a motion to file the Eitan Deposition under seal pursuant to Bankruptcy Code §107(c) (*see* docket no. 477), which was not opposed by the Debtors. The Court granted that request by Order dated May 18, 2009 (docket no. 504). The Ad Hoc Consortium also filed a motion in limine to prevent the Debtor from presenting certain evidence at trial that, the Ad Hoc Consortium argues, was withheld from them on the basis of privilege. (*See* docket no. 476). At the May 18, 2009 hearing, the Debtors advised that they did not intend to rely on any information considered privileged and the Court entered an unopposed Order granting the motion in limine. (*See* docket no. 503).  Post-hearing, the Ad Hoc Committee designated certain portions of Dr. Eitan's Deposition which it argued should not be considered in light of the Order granting the motion in limine. The Debtor responded to the designation. Because the testimony included information provided by counsel, I will not consider the designated portions of Dr. Eitan's deposition in making my decision.

Further, in support of their arguments, the Debtors elicited the testimony of John Brincko at the May 18, 2009 hearing. Mr. Brincko is a restructuring consultant for the Debtors, who testified that he has experience with evaluating intellectual property litigation settlements. (Tr. 5/18/09 at 41-42). After the Board of Directors approved the Settlement Agreement, the Debtors made a tentative plan outline presentation to the Ad Hoc Consortium and the Committee, who "expressed a great deal of displeasure" about the proposed Samsung settlement. (*Id.* at 42). At that point, Mr. Brincko was asked to evaluate the Settlement Agreement in light of the concerns and report back to the Board with his views. (*Id.* at 42-43).

After completing his review, Mr. Brincko supported the Settlement Agreement because (i) the payment of $70 million, or net $55 million, to the Debtor would be an extremely helpful cash infusion to the Debtors and, in his experience, was a large amount for a patent settlement; (ii) the settlement made sense in light of the cost and expense of maintaining or defending three separate pieces of complex litigation, (iii) the settlement would prevent management from being distracted at a time when they are attempting to reorganize the business; and (iv) engineers with institutional knowledge who were needed for the litigation were no longer with the Debtors and would need to be rehired. (Tr. 5/18/09 at 55-57). Mr. Brincko testified that although the settlement was not perfect, he believed its strengths far outweighed its weaknesses. (*Id.* at 57).

In response, the Ad Hoc Consortium argued that the Settlement Agreement is not fair, reasonable or in the best interest of the estate. The Ad Hoc Consortium presented the testimony of David Yurkerwich, a consultant with experience in patent infringement trials, who was admitted (without objection) as an expert in the assessment of patent rights both in the context of litigation and negotiated transactions, and in market practices relating to patent rights

10

transactions. (Tr. 5/18/09 at 100-103). Mr. Yurkerwich testified about the need to understand

certain inputs to evaluate the patent litigation properly, rather than on a superficial basis. Those

inputs include (i) the companies' respective sales levels, and (ii) the availability or cost to

develop workarounds or substitute products. He testified that it would be important to know the

Debtors' and Samsung's royalty basis or the sales levels of the allegedly infringing products in

the past to determine prior damages and to help determine a value for rights given up or paid for

in the future. (*Id.* at 104-05). Also, Mr. Yurkerwich testified that the ability to easily design

around a patent or develop a substitute would impact the amount that would be paid as a royalty.

(*Id.* At 105-06). These inputs are an important part of the negotiation process to be considered in

determining damages in patent infringement litigation. (*Id.* at 107).

Mr. Yurkerwich testified that he reviewed the Settlement Agreement and could not make

an evaluation as to the proposed payment terms because there was no information about the

royalty bases, sales levels, or ability to create workarounds. (*Id.* at 108). Also, he concluded that

the Settlement Agreement contained four areas of risk. First, he testified that the nonexclusive,

worldwide, royalty free, perpetual license from the Debtors to Samsung of the Debtors' existing

patents and all patents it might own or control in the future was overly broad and practically

created a joint venture between the companies, because Samsung had a continuing right to

everything Spansion invents without further payment. (*Id.* at 109). In his experience, the

perpetual license in the Settlement Agreement was atypical. (*Id.*). Second, he found it odd that

the Debtors' provided a release to Samsung's customers in the Settlement Agreement, without

getting a release of the Debtors' customers in return. (*Id.* at 110). Third, the covenant not to

assert given by Samsung to the Debtors was limited to patents held by Samsung's

11

"Semiconductor Division," with little or no definition of the "Semiconductor Division" or the scope of those patents. (*Id.*) He testified that the lack of specificity would make the provision very difficult to enforce or manage. Finally, he testified that the covenant not to assert given by Samsung to the Debtors would terminate upon "change of control," as defined in the Settlement Agreement. (*Id.* at 111). He testified that the change in control provision represented a significant risk to the Debtors because, if there were a sale of the Debtors, then Samsung could assert its patents against Spansion. (*Id.*).

The Ad Hoc Consortium also introduced testimony of Adam Dunayer, a consultant for the Ad Hoc Consortium, whose company has reviewed potential merger and acquisition transactions that could arise out of the Debtors' reorganization. (*Id.* at 128). Mr. Dunayer testified that he had preliminary discussions with potential strategic acquirers (i.e., competitors of the Debtors) in an attempt to put together a price and structure for a merger and acquisition transaction. (*Id.* at 128-29). In his opinion, the change in control provision would effectively be a "poison pill" for the Debtors. (*Id.* at 131). The change in control provision terminates the covenant not to assert provided to the Debtors from Samsung, which could open the Debtors up to future litigation by Samsung after the Debtors have given up their rights against Samsung by granting the broad, perpetual license.

Application of the *Martin* Factors

Obviously, the cash infusion that the settlement would provide to the Debtors is significant. However, to determine whether the Settlement Agreement *in its entirety* is fair and in the best interest of the estate, I must view the evidence provided in light of the *Martin* factors.

The first factor to consider is the Debtors' probability of success in the outstanding litigation. "In evaluating this aspect of the proposed settlement, the Court's task is not to 'decide issues of law or fact raised by the [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." *In re Exide Technologies,* 303 B.R. 48, 68 (Bankr.D.Del. 2003) quoting *In re Neshaminy Office Bldg. Assoc.,* 62 B.R. 798, 803 (E.D.Pa. 1986). *See also In re Cellular Information Systems, Inc.,* 171 B.R. 926, 950 (Bankr.S.D.N.Y. 1994) (The purpose in addressing the first *Martin* factor is "not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the [litigation].")

There are three actions that will be settled as a result of this settlement. However, the Debtors have provided little information as to the specifics of the Actions to provide a basis for evaluating the strengths and weaknesses of the litigation. Dr. Eitan testified that, in his opinion, the counterclaims and action asserted by Samsung against the Debtors in response to the litigation were "marginal." (Ex. 9, at 73-76). He also testified that the initial evaluation of the potential damages that could be recovered in this litigation was significantly higher than the payment amount contained in the Settlement Agreement. (Ex. 9, at 36, 65-66). However, shortly after the Debtors filed the ITC Action and the Delaware Action, they attempted to negotiate with Samsung. (Ex. 9, at 12-13, 37). It appears from the record made that the Debtors' motivation for entering into the Settlement Agreement was based less on an evaluation of the merits of the Actions, than due to a desire to negotiate a quick settlement because of the then-rapid deterioration of the Debtors' financial condition.

Mr. Brincko testified that he was in favor of the settlement agreement because "$70

13

million, or net of $55 million, is a significant amount of money, particularly for a company in bankruptcy." (Tr. 5/18/09 at 55-56). While this may have been understandable early in this case, the Ad Hoc Consortium has argued (and the Debtors have not disputed) that the Debtors' liquidity position has improved considerably since the bankruptcy filing. Mr. Brincko also considered the adverse response from customers who were named in the ITC Action, but did not explain any impact of their unhappiness on the Debtors' business.

Incredibly, Mr. Brincko testified that in reviewing the Settlement Agreement and making his proposal to the Board of Directors, he did not rely upon advice received from counsel - - either the Debtors' in-house counsel or the outside attorneys responsible for litigating the Action. He stated:

> I certainly had conversations with them, but I'm always hesitant to take input from someone who may not be objective in that given instance, and that is a lawyer who would stand to gain by litigation, particularly from a litigation standpoint as opposed to asking a lawyer an opinion on a fact of law. And I have been involved in enough litigation to try to push that aside and reach my own conclusions from a business standpoint having been in a ton of litigation. And so, from my viewpoint, I talked to them, but I didn't get anything meaningful out of it that helped me frame a decision, because, in fact, to me it's a business decision, it's not a legal decision.

(Tr. 5/18/09 at 48). Under these circumstances, it seems unlikely that a reasonable evaluation of the merits of litigation of this nature and extent could have been made without taking into account the advice of patent litigation counsel.

The second factor to consider in the *Martin* analysis is the likely difficulties in collection. There is no evidence to suggest that collection of a judgment against Samsung would be a problem.

The third *Martin* factor to consider is the complexity of the litigation involved, and the

expense, inconvenience, and delay necessarily attending it.   The Debtors argue, generally, as to the significant cost, complexity, and inconvenience of the patent litigation. The *Nutraquest* Court noted that '[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation. . . . The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646.   There is insufficient information upon which to make a reasoned decision as to the likelihood of success of the Actions.   This likewise makes it difficult to conclude that the settlement is preferable to the expense, inconvenience and delay of litigation.

The final *Martin* factor to consider is the paramount interest of creditors.   The Ad Hoc Consortium has vigorously opposed the Settlement Agreement, and has done so since it was first presented with an outline of the proposed settlement at a meeting in April 2009.   In addition to the lack of information needed to make a determination as to the reasonableness of the settlement payment amount, the Ad Hoc Consortium's witnesses testified convincingly about the Settlement Agreement's risks which could negatively impact the estate.   Of particular concern is the effect of the broad, perpetual license to Samsung of the Debtors' future patents and the "change in control" provision that could harm the Debtors' ability to reorganize.   Samsung's vague covenant not to assert any patent or patent applications owned or controlled by its "Semiconductor Division" and the lack of mutuality of the releases raise additional concerns as to the fairness of the settlement.

At the hearing, the Committee advised that it no longer opposes the proposed settlement. However, its "support" of the settlement appears based primarily upon an unwillingness to let go of a "bird in the hand" (Tr. 5/18/09 at 166): that accepting the payment of a $70 million

settlement now is better than taking the risk of the patent litigation. However, because this record does not allow a proper evaluation of the strengths and weaknesses of the Actions or the appropriateness of the proposed settlement payment, I cannot weigh heavily the Committee's position.

In the *TMT Trailer* decision, the Supreme Court wrote:

> It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. Here there is no explanation of how the strengths and weaknesses of the debtors' causes of action were evaluated or upon what grounds it was concluded that a settlement which allowed the creditor's claims in major part was 'fair and equitable.' Although we are told that the alternative to settlement was 'extensive litigation at heavy expense' and 'unnecessary delay,' there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation. Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.

*TMT Trailer*, 390 U.S. at 434.

In summary, given the above reasons and the largely conclusory record with which I am presented to evaluate likelihood of success of the Actions, there is not enough evidence before me to conclude whether the proposed settlement amount is within the "range of reasonableness." I am unconvinced that, taken as a whole, the process undertaken involved the sound exercise of the Debtors' business judgment. Therefore, I cannot conclude, on the basis of the record before me, that the Settlement Agreement is fair, reasonable and in the best interest of the estate.

An appropriate order will be entered.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: June 2, 2009

17