THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11 Cases** |
| **SPANSION INC.,** *et al.*[1] | **Case No. 09-10690 (KJC)** |
| **Debtors.** | **(Jointly Administered)** |

---

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION DATED OCTOBER 26, 2009

---

LATHAM & WATKINS LLP
Michael S. Lurey
Gregory O. Lunt
Kimberly A. Posin
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

DUANE MORRIS, LLP
Michael R. Lastowski
Richard W. Riley
Sommer L. Ross
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Spansion Inc., a Delaware corporation (8239); Spansion Technology LLC, a Delaware limited liability company (3982); Spansion LLC, a Delaware limited liability company (0482); Cerium Laboratories LLC, a Delaware limited liability company (0482), and Spansion International, Inc., a Delaware corporation (7542). The mailing address for each Debtor is 915 DeGuigne Dr., Sunnyvale, California 94085.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ...................................................................................................3
    A.    Defined Terms ........................................................................................................3
    B.    Overview.................................................................................................................4
    C.    Purpose of the Plan ...............................................................................................4
    D.    Summary of the Plan .............................................................................................4
    E.    Debtors' Principal Assets and Indebtedness .........................................................5
    F.    Treatment of Claims and Interests ........................................................................5
    G.    Voting and Confirmation Procedures ....................................................................7
        1.    Who May Vote ..........................................................................................8
        2.    Certain Risk Factors to Be Considered Prior to Voting............................9
        3.    Voting Instructions and Voting Deadline ................................................9
        4.    Voting Procedures...................................................................................10
        5.    Who to Contact for More Information......................................................11
        6.    Acceptance or Rejection of the Plan .......................................................12
        7.    Time and Place of the Confirmation Hearing .........................................12
        8.    Objections to the Plan ............................................................................12
ARTICLE II. GENERAL INFORMATION REGARDING THE DEBTORS............................13
    A.    Formation and History of the Debtors .................................................................13
    B.    The Debtors' Business Operations........................................................................14
        1.    Products...................................................................................................14
        2.    Customers ...............................................................................................18
        3.    Manufacturing.........................................................................................18
    C.    Employees............................................................................................................19
    D.    Competitive Factors Affecting the Debtors' Businesses ......................................19
    E.    Pre-Petition Capital Structure of the Debtors .....................................................20
        1.    Secured Credit Facility ...........................................................................21
        2.    The FRNs ................................................................................................21
        3.    The Senior Notes.....................................................................................22
        4.    The Exchangeable Debentures................................................................22
        5.    UBS Credit Facility.................................................................................23
    F.    Litigation.............................................................................................................23
ARTICLE III. THE CHAPTER 11 CASES .............................................................................32
    A.    Events Leading to the Filing of the Chapter 11 Cases.........................................32
    B.    Spansion Japan's Corporate Reorganization Proceeding. ...................................34
    C.    Commencement of Chapter 11 Cases. .................................................................35
    D.    Corporate Governance of the Debtors During the Chapter 11 Cases ..................35
        1.    Boards of Directors..................................................................................35
        2.    Senior Management .................................................................................35
    E.    Significant Developments in the Chapter 11 Cases.............................................37
        1.    "First Day" Orders ..................................................................................37
        2.    Employment of Brincko Associates, Inc. and Retention of
            Professionals ..........................................................................................38

LA\2030380.1

| | 3. | Appointment of the Official Committee of Unsecured Creditors ..................................................................40 |
|---|---|---|
| | 4. | Approval of Employment Agreements with Messrs. Kispert, Furr and Sarkisian. ..................................................40 |
| | 5. | Final Authorization to Use Cash Collateral ..................40 |
| | 6. | Samsung Settlement and Postpetition Samsung Actions..........41 |
| | 7. | Trading in Spansion Equity Securities and Claims...............42 |
| | 8. | Dissemination of Information About the Chapter 11 Cases ......43 |
| | 9. | Rejection and Assumption of Executory Contracts and Unexpired Leases .....................................................43 |
| | 10. | Key Executive Retention and Inventive Plans.....................44 |
| | 11. | Claims Bar Date and Claims Summary ............................46 |
| | 12. | WARN Litigation.......................................................46 |
| | 13. | Motion for Appointment of Equity Committee. ..................47 |
| | 14. | Suzhou Sale. ...........................................................47 |
| F. | | Business Operations During the Chapter 11 Cases..........................47 |
| | 1. | Business Restructuring..................................................47 |
| | 2. | Business Relationship with Spansion Japan. ......................48 |
| | 3. | Results of Operations. ................................................50 |
| | 4. | The Debtors' Business Plan and Forecasts. ......................51 |
| ARTICLE IV. | | SUMMARY OF THE PLAN .................................................54 |
| A. | | Overview of Chapter 11 ....................................................55 |
| B. | | Classification of Claims and Interests......................................57 |
| | 1. | Introduction. ..........................................................57 |
| | 2. | Settlement of Intercompany Claims and Treatment of Claims Generally. .....................................................57 |
| | 3. | Treatment of Multiple Claims and Guaranty and Joint Liability Claims Against Multiple Debtors............................57 |
| | 4. | Impairment Controversies. ............................................57 |
| C. | | Treatment of Claims and Interests .........................................57 |
| | 1. | Class 1 – Secured Credit Facility Claims. ..........................58 |
| | 2. | Class 2 – UBS Credit Facility Claims...............................58 |
| | 3. | Class 3 – FRN Claims. ................................................58 |
| | 4. | Class 4 – Other Secured Claims.....................................59 |
| | 5. | Class 5 – General Unsecured Claims................................60 |
| | 6. | Class 6 – Convenience Class Claims. ................................60 |
| | 7. | Class 7 – Non-Compensatory Damages Claims. ..................60 |
| | 8. | Class 8 – Interdebtor Claims. ........................................60 |
| | 9. | Class 9 – Old Spansion Interests....................................60 |
| | 10. | Class 10 – Other Old Equity. ........................................60 |
| | 11. | Class 11 – Other Old Equity Rights.................................61 |
| | 12. | Class 12 – Securities Claims..........................................61 |
| | 13. | Class 13 – Non-Debtor Intercompany Claims. ....................61 |
| | 14. | Class 14 – Spansion Thailand Claims...............................61 |
| | 15. | Preservation of Subordination Rights. ..............................61 |
| D. | | Treatment of Unclassified Claims .........................................62 |

LA\2030380.1

|   |   |   |   |
|---|---|---|---|
|   | 1. | Generally................................................................................ | 62 |
|   | 2. | Unclassified Claims. ............................................................. | 62 |
| E. | Treatment of Executory Contracts and Unexpired Leases ................... | | 65 |
|   | 1. | Assumption and Cure of Executory Contracts and Unexpired Leases. ................................................................... | 65 |
|   | 2. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. ................................................................... | 66 |
|   | 3. | Consent Rights. ..................................................................... | 66 |
|   | 4. | Effect of Assumption and/or Assignment ............................. | 67 |
|   | 5. | Rejection of Executory Contracts and Unexpired Leases ......... | 67 |
|   | 6. | Employment Agreements and Other Benefits. ....................... | 67 |
|   | 7. | Insurance Policies. ................................................................ | 68 |
|   | 8. | Rejection Damages Claims Bar Date; Approval of Rejection. ............................................................................. | 69 |
| F. | Means for Implementation of the Plan ................................................ | | 69 |
|   | 1. | Continued Corporate Existence and Vesting of Assets in Reorganized Debtors. ............................................................. | 69 |
|   | 2. | Sources of Cash for Distribution. ......................................... | 69 |
|   | 3. | Corporate and Limited Liability Company Action. ................. | 70 |
|   | 4. | Effectuating Documents; Further Transactions. ..................... | 70 |
|   | 5. | Exemption from Certain Transfer Taxes and Recording Fees. ...................................................................................... | 70 |
|   | 6. | Retained Actions. .................................................................. | 70 |
|   | 7. | Employee Claims. .................................................................. | 71 |
|   | 8. | Executory Contracts and Unexpired Leases Entered Into, and Other Obligations Incurred After, the Petition Date. ......... | 72 |
|   | 9. | Operations Between Confirmation Date and the Effective Date. ....................................................................................... | 72 |
| G. | Corporate Governance of the Reorganized Debtors ............................ | | 72 |
|   | 1. | New Governing Documents. .................................................. | 72 |
|   | 2. | Directors and Officers of Reorganized Debtors. ..................... | 72 |
|   | 3. | New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs. ....................................................................................... | 73 |
|   | 4. | Authorization and Issuance of New Equity; Securities Laws. ....................................................................................... | 73 |
|   | 5. | Holdback from Common Stock Distribution. .......................... | 73 |
|   | 6. | Listing of New Spansion Common Stock ................................ | 73 |
|   | 7. | Old Spansion Interests. ......................................................... | 74 |
| H. | Distributions ..................................................................................... | | 74 |
|   | 1. | Distributions of Cash on Account of Claims Allowed as of the Effective Date. ................................................................. | 74 |
|   | 2. | Disbursing Agent. .................................................................. | 74 |
|   | 3. | Distributions of Cash. ............................................................ | 74 |
|   | 4. | No Interest on Claims or Interests. ......................................... | 75 |
|   | 5. | Delivery of Distributions. ....................................................... | 75 |

iii

| | 6. | Distributions to Holders as of the Record Date. | 75 |
|---|---|---|---|
| | 7. | Indenture Trustees as Claim Holders. | 76 |
| | 8. | Payments and Distributions to Holders of Disputed Claims Which Become Allowed Claims. | 76 |
| | 9. | Distributions of Stock to Holders of Allowed Class 5 Claims. | 76 |
| | 10. | Reserve for Disputed Claims. | 77 |
| | 11. | De Minimis Distributions. | 78 |
| | 12. | No Fractional Securities; No Fractional Dollars. | 78 |
| | 13. | Surrender of Instruments. | 78 |
| | 14. | Procedures for Distributions to Holders of FRN Claims, Senior Notes Claims, and Allowed Exchangeable Debentures Claims. | 79 |
| | 15. | Allocation of Distributions Between Principal and Interest. | 79 |
| | 16. | Compliance With Tax Requirements. | 79 |
| | 17. | Saturday, Sunday or Legal Holiday. | 79 |
| I. | | Procedures for Treating and Resolving Disputed Claims | 79 |
| | 1. | Objections to Claims. | 79 |
| | 2. | Designation of Claims Agent; Authority to Prosecute Objections. | 80 |
| | 3. | No Distributions Pending Allowance. | 83 |
| | 4. | Estimation of Claims. | 83 |
| | 5. | Distributions After Allowance. | 83 |
| | 6. | Claims Covered by Insurance Policy. | 84 |
| J. | | Conditions Precedent to Confirmation and the Effective Date of the Plan | 84 |
| | 1. | Conditions to Confirmation. | 84 |
| | 2. | Conditions to the Effective Date. | 85 |
| | 3. | Waiver of Conditions. | 86 |
| | 4. | Effect of Failure of Conditions. | 86 |
| | 5. | Order Denying Confirmation. | 86 |
| | 6. | Revocation of the Plan. | 87 |
| K. | | Effect of Plan on Claims and Interests | 87 |
| | 1. | Discharge of Claims and Termination of Interests. | 87 |
| | 2. | Cancellation of Claims and Interests. | 88 |
| | 3. | Release by Debtors of Certain Parties. | 88 |
| | 4. | Release by Holders of Claims and Interests. | 90 |
| | 5. | California Civil Code § 1542 Waiver. | 90 |
| | 6. | Jurisdiction Related to the Plan. | 91 |
| | 7. | Setoffs. | 91 |
| | 8. | Exculpation and Limitation of Liability. | 91 |
| | 9. | Injunction. | 91 |
| | 10. | Effect of Confirmation. | 92 |
| L. | | Retention and Scope of Jurisdiction of the Bankruptcy Court | 92 |
| | 1. | Retention of Jurisdiction. | 92 |
| | 2. | Final Decree. | 94 |
| M. | | Miscellaneous Provisions | 94 |

LA\2030380.1

| | | | |
|---|---|---|---|
| | 1. | Modification of the Plan. | 95 |
| | 2. | Deadlines | 95 |
| | 3. | Applicable Law | 95 |
| | 4. | Plan Supplement | 95 |
| | 5. | Dissolution of Creditors' Committee | 95 |
| | 6. | Preparation of Estates' Returns and Resolution of Tax Claims | 96 |
| | 7. | Confirmation of Plans for Separate Debtors | 96 |
| | 8. | No Admissions; Objection to Claims | 96 |
| | 9. | No Waiver | 96 |
| | 10. | No Bar to Suits | 96 |
| | 11. | Successors and Assigns | 97 |
| | 12. | Post-Effective Date Effect of Evidence of Claims or Interests | 97 |
| | 13. | Conflicts | 97 |
| | 14. | Exhibits/Schedules | 97 |
| | 15. | No Injunctive Relief | 97 |
| | 16. | Binding Effect. | 97 |
| | 17. | Entire Agreement | 97 |
| ARTICLE V. | REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 98 |
| A. | General Information | | 98 |
| B. | Solicitation of Acceptances | | 98 |
| C. | Acceptances Necessary to Confirm the Plan | | 98 |
| D. | Confirmation of Plan Pursuant to Section 1129(b) | | 98 |
| E. | Considerations Relevant to Acceptance of the Plan | | 99 |
| ARTICLE VI. | FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST | | 99 |
| A. | Feasibility of the Plan | | 99 |
| B. | Best Interest of Creditors Test | | 101 |
| C. | Application of Best Interests of Creditors Test to the Liquidation Analysis and Valuation of the Reorganized Debtors | | 101 |
| | 1. | Liquidation Analysis | 102 |
| | 2. | The Debtors' Reorganized Value Analysis | 103 |
| ARTICLE VII. | CERTAIN RISK FACTORS TO CONSIDER | | 109 |
| A. | Certain Bankruptcy Law Considerations | | 110 |
| B. | Financial Information; Disclaimer | | 113 |
| C. | Factors Affecting The Value Of The Securities To Be Issued Under The Plan | | 115 |
| D. | Risk Factors Associated With the Business | | 115 |
| E. | Factors Affecting the Reorganized Debtors | | 118 |
| ARTICLE VIII. | CERTAIN SECURITIES LAW MATTERS | | 121 |
| A. | Issuance of New Common Stock | | 121 |
| B. | Subsequent Transfers of New Spansion Common Stock | | 121 |
| ARTICLE IX. | CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES | | 122 |
| A. | Introduction | | 123 |
| B. | United States Federal Income Tax Consequences to the Debtors | | 124 |

|   |   |   |   |
|---|---|---|---|
|   | 1. | Cancellation of Indebtedness Income and Reduction of Tax Attributes..............................................................................124 |
|   | 2. | Section 382 Limitations on Net Operating Losses ...................125 |
| C. | | United States Federal Income Tax Consequences to Holders of Claims Who Are Entitled to Vote to Accept or Reject the Plan......................................127 |
|   | 1. | Modifications to the Secured Credit Facility ...........................128 |
|   | 2. | Exchange of FRNs For Cash, New Senior Notes, New Convertible Notes and New Spansion Common Stock ...........129 |
|   | 3. | New Secured Credit Facility, New Senior Notes and New Convertible Notes ..................................................................131 |
|   | 4. | New Spansion Common Stock ..............................................136 |
|   | 5. | Exchange of General Unsecured Claims for New Spansion Common Stock.......................................................................137 |
|   | 6. | Accrued Interest .................................................................138 |
|   | 7. | Backup Withholding ...........................................................138 |

ARTICLE X. RECOMMENDATION ........................................................................139

EXHIBITS TO DISCLOSURE STATEMENT...........................................................141

LA\2030380.1

# DISCLAIMER

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS IN THE VOTING CLASSES TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN OR A RECOMMENDATION BY THE BANKRUPTCY COURT AS TO WHETHER HOLDERS OF CLAIMS IN VOTING CLASSES SHOULD VOTE TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF, AMONG OTHER THINGS, (i) THE DEBTORS AND THEIR BUSINESSES, ASSETS AND LIABILITIES, (ii) THE EVENTS LEADING UP TO THE CHAPTER 11 CASES AND CERTAIN EVENTS THAT HAVE OCCURRED DURING THE CHAPTER 11 CASES (iii) CERTAIN PROVISIONS OF THE PLAN, (iv) THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT AND THE PLAN, (v) CERTAIN RISK FACTORS RELATING TO THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER AND (vi) CERTAIN FINANCIAL AND OTHER DOCUMENTS AND INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS AND INFORMATION SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS OR INFORMATION. FURTHERMORE, ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS OF THE PLAN, ON THE ONE HAND, AND THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL AND OTHER INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, ON THE OTHER HAND, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS IN VOTING CLASSES SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE STATEMENTS AND INFORMATION SET FORTH HEREIN, UNLESS EXPRESSLY SPECIFIED HEREIN TO THE CONTRARY. ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY TO HOLDERS OF

1

CLAIMS UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT ANY OF THOSE CIRCUMSTANCES OR ANY OTHER CIRCUMSTANCES OR EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT CONTAINS CERTAIN PROJECTED FINANCIAL INFORMATION RELATING TO THE REORGANIZED DEBTORS, AS WELL AS CERTAIN OTHER STATEMENTS THAT CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH PROJECTIONS AND STATEMENTS ARE BASED ON CERTAIN ESTIMATES AND ASSUMPTIONS MADE BY, AND ON INFORMATION AVAILABLE TO, THE DEBTORS AS OF THE DATE HEREOF OR AS OF SUCH OTHER DATE OR DATES AS SPECIFIED HEREIN. WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "EXPECT," "INTEND," "PLAN," "PROJECT," "FORECAST," "MAY," "PREDICT," "TARGET," "POTENTIAL," "PROPOSED," "CONTEMPLATED," "WILL," "SHOULD," "COULD," "WOULD" AND SIMILAR EXPRESSIONS, AS THEY RELATE TO THE DEBTORS, THE REORGANIZED DEBTORS, THEIR MANAGEMENT AND THEIR PROFESSIONAL ADVISORS, ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THE DEBTORS INTEND FOR SUCH FORWARD-LOOKING STATEMENTS TO BE COVERED BY THE SAFE HARBOR PROVISIONS FOR FORWARD-LOOKING STATEMENTS CONTAINED IN THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AND THE DEBTORS SET FORTH THIS STATEMENT AND THE RISK FACTORS CONTAINED HEREIN TO COMPLY WITH SUCH SAFE HARBOR PROVISIONS. SUCH PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS REFLECT THE CURRENT VIEWS OF THE DEBTORS AND ARE SUBJECT TO CERTAIN RISKS, UNCERTAINTIES AND ASSUMPTIONS. MANY FACTORS COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE DEBTORS AND THE REORGANIZED DEBTORS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS THAT MAY BE EXPRESSED OR IMPLIED BY SUCH PROJECTED FINANCIAL INFORMATION AND FORWARD-LOOKING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, THE RISKS DISCUSSED IN ARTICLE VII OF THIS DISCLOSURE STATEMENT (ENTITLED "CERTAIN RISK FACTORS TO CONSIDER") AND RISKS, UNCERTAINTIES AND OTHER FACTORS DISCUSSED FROM TIME TO TIME IN FILINGS MADE BY CERTAIN OF THE DEBTORS WITH THE SECURITIES AND EXCHANGE COMMISSION AND OTHER REGULATORY AUTHORITIES. SHOULD ONE OR MORE OF THESE RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD ANY ASSUMPTIONS UNDERLYING THE PROJECTED FINANCIAL INFORMATION OR OTHER FORWARD-LOOKING STATEMENTS PROVE INCORRECT, ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE DESCRIBED HEREIN. THE DEBTORS DO NOT INTEND, AND DO NOT ASSUME ANY DUTY OR OBLIGATION, TO UPDATE OR REVISE THESE FORWARD-LOOKING STATEMENTS, WHETHER AS THE RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS OTHERWISE REQUIRED BY LAW.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS. THIS DISCLOSURE STATEMENT SHALL NOT BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AND SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, THE REORGANIZED DEBTORS OR ANY OTHER PARTY-IN-INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE REGARDING THE TAX, SECURITIES LAW OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. INTERESTED PARTIES SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL AND FINANCIAL ADVISORS IN EVALUATING THIS DISCLOSURE STATEMENT, THE PLAN, THE PROPOSED TREATMENT OF SUCH PARTIES THEREUNDER AND THE POTENTIAL TAX, SECURITIES LAWS AND OTHER LEGAL EFFECTS OF THE PLAN BASED ON THEIR INDIVIDUAL CIRCUMSTANCES.

## ARTICLE I.
### INTRODUCTION

A.    **Defined Terms**

All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to such terms in the Debtors' Joint Plan of Reorganization Dated October 26, 2009 (as amended or modified, the "Plan"), unless otherwise noted. A copy of the Plan is attached hereto as Exhibit A.

LA\2030380.1

**B. Overview**

Spansion Inc., Spansion Technology LLC, Spansion LLC, Spansion International, Inc. and Cerium Laboratories LLC, the Debtors and Debtors in Possession in the Chapter 11 Cases, hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code, and Bankruptcy Rule 3017, in connection with the Plan. References in this Disclosure Statement to "Spansion" shall mean Spansion Inc. and its consolidated subsidiaries, unless the context indicates otherwise.

The Board of Directors or Managers of each of the Debtors reserves the right, in the exercise of its fiduciary duties to the applicable Estate, to cause such Debtor to withdraw its support of the Plan. In the event any Debtor withdraws its support of the Plan, the remaining Debtors may proceed to seek Confirmation of the Plan without delay.

The purpose of this Disclosure Statement is to enable you, as a Holder of a Claim in a Voting Class, to make an informed decision in exercising your right to accept or reject the Plan.

By order dated November [__], 2009 (the "Disclosure Statement Approval Order"), the Bankruptcy Court has found that this Disclosure Statement provides adequate information to enable Holders of Claims in Voting Classes to make an informed judgment in exercising their right to vote.

**C. Purpose of the Plan**

The Plan provides for an equitable Distribution to Holders of Allowed Claims in certain Classes, preserves the value of the Debtors' businesses as going concerns and preserves many jobs of the Debtors' employees. Moreover, the Debtors believe that most Holders of Allowed Claims will receive greater and earlier recoveries under the Plan than they would receive in a Chapter 7 liquidation and that all Holders of Allowed Claims will receive at least as much as they would receive in a Chapter 7 liquidation of the Debtors.

The Plan is sponsored by the Debtors and supported by the Creditors' Committee and the Ad Hoc Consortium. The Debtors believe that the Plan will lead to reorganization, the satisfaction of billions of dollars of claims and the preservation of jobs and commercial relationships.

**D. Summary of the Plan**

Under the Plan, the Debtors will be reorganized through, among other things, the consummation of the following transactions: (i) the Distribution of Cash, New Senior Notes, New Convertible Notes and New Spansion Common Stock to Holders of FRNs in satisfaction of all Claims arising under the FRNs; (ii) the Distribution of New Spansion Common Stock to Holders of General Unsecured Claims in satisfaction of such Claims; (iii) the cancellation of the Old Spansion Interests; and (iv) the revesting of the Assets of the Debtors in the Reorganized Debtors. As a result of these transactions, the Reorganized Debtors will have significantly less liabilities and debts than the Debtors had as of the Petition Date.

4

## E. Debtors' Principal Assets and Indebtedness

Spansion Inc.'s principal Assets are 100% of the membership interests of Spansion Technology LLC, 60% of the membership interests of Spansion LLC and certain Interdebtor Claims. Spansion Technology LLC's principal Asset is 40% of the membership interests of Spansion LLC. The principal assets of Spansion LLC include its Flash memory business, intellectual property, the real and personal property assets used in that business and the stock, membership or other equity interests of Spansion International, Inc., Cerium Laboratories LLC and the Non-Debtor Affiliates. The principal assets of Cerium Laboratories LLC includes certain machinery and equipment, leasehold improvements, accounts receivable and Interdebtor Claims. As of the Petition Date, the principal Assets of Spansion International, Inc. included cash held in banking accounts, deposits paid to utilities, certain miscellaneous equipment, Interdebtor Claims and certain other miscellaneous assets. The operations of the Debtors are described more fully in Article II hereof. An organizational chart of the Debtors and the Non-Debtor Affiliates is set forth in Exhibit B hereto.

The principal indebtedness of the Debtors includes the following: (1) the Secured Credit Facility; (2) the UBS Credit Facility; (3) the FRNs; (4) the Senior Notes; (5) the Exchangeable Debentures; (6) other General Unsecured Claims; (7) Interdebtor Claims; (8) Non-Debtor Intercompany Claims; (9) Spansion Thailand Claims; (10) Interdebtor Claims; and (11) Administrative Expense Claims.

## F. Treatment of Claims and Interests

The Plan contemplates the reorganization and ongoing business operations of the Debtors, and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1129(a) and 1123 of the Bankruptcy Code. Section 1123 of the Bankruptcy Code requires that a plan of reorganization classify the claims against and equity interests in a debtor. The Plan classifies all Claims against and Interests in the Debtors into 13 Classes. A brief summary of each of the Classes, including the voting rights and treatment of such Class under the Plan, is set forth in the table below. A more detailed description of the treatment of each Class is set forth in Articles III and IV of the Plan and Section IV.C. of this Disclosure Statement.

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Impairment | Entitled to Vote | Estimate Recovery % |
|-------|-------------|-----------------------------------|-----------------|-----------|-----------------|---------------------|
| 1 | Secured Credit Facility Claims | $7.0 million | Claims held by the Holders of Class 1 Claims based on any contingent or other obligations shall be extinguished. The Debtors will enter into documentation with the Holder of the Class 1 Claims reflecting the post-Effective Date relationship between such parties, which treatment and documentation hereunder shall be | Impaired | Yes | 100% |

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Impairment | Entitled to Vote | Estimate Recovery % |
|---|---|---|---|---|---|---|
| | | | satisfactory to the Ad Hoc Consortium and the Creditors' Committee. The obligations of the Reorganized Debtors on account of the Allowed Class 1 Claims will be secured by the Class 1 Collateral. | | | |
| 2 | UBS Credit Facility Claims | $68.4 million | Reinstatement | Unimpaired | No | 100% |
| 3 | FRN Claims | $633.3 Million | (i) $100 million plus postpetition interest in Cash; (ii) $225 million of New Senior Notes; (iii) $250 million of New Convertible Notes; and (iv) 6,703,933 shares of New Spansion Common Stock (subject to certain election rights set forth in Section 3.3 of the Plan; *see* Section IV.C.3. below) | Impaired | Yes | 100% |
| 4 | Other Secured Claims | $1.0 million | At option of Debtors: (i) Reinstatement, (ii) Cash in an amount equal to the Allowed Amount of such Claim, or (iii) the collateral securing such Claim | Unimpaired | No | 100% |
| 5 | General Unsecured Claims | $900 million to $1.4 billion[2] | 39,546,691 share of New Spansion Common Stock | Impaired | Yes | 25% to 40%[3] |
| 6 | Convenience Class Claims | $2 million to $2.5 million | Payment in full in Cash up to $2,000 per Convenience Class Claim | Unimpaired | No | 100% |

[2] At the high end of this estimated range, the Debtors have estimated that Claims filed in unliquidated, unstated or unknown amounts total, in the aggregate, $100 million. At the low end of this estimated range, the Debtors have estimated that these Claims will be disallowed in their entirety.

[3] This range of recovery percentages does not give effect to, among other things, (i) the potentially dilutive impact of any shares of New Spansion Common Stock issued pursuant to an employee equity incentive plan (ii) the conversion of the New Convertible Notes into New Spansion Common Stock, (iii) any incremental value arising from the tax benefits of any net operating loss carry-forwards and similar items that the Reorganized Debtors might be able to assert and (iv) any litigation recoveries.

LA\2030380.1

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Impairment | Entitled to Vote | Estimate Recovery % |
|---|---|---|---|---|---|---|
| 7 | Non-Compensatory Damages Claims | $0 million | No Distribution | Impaired | No | 0% |
| 8 | Interdebtor Claims | $19.2 million | No Distribution | Impaired | No | 0% |
| 9 | Old Spansion Interests | N/A | No Distribution | Impaired | No | 0% |
| 10 | Other Old Equity | N/A | Reinstatement | Unimpaired | No | 100% |
| 11 | Other Old Equity Rights | N/A | No Distribution | Impaired | No | 0% |
| 12 | Securities Claims | Unknown | No Distribution | Impaired | No | 0% |
| 13 | Non-Debtor Intercompany Claims | $150 million | No Distribution; provided that the Debtors reserve the right (with the consent of the Creditors' Committee and the Ad Hoc Consortium) to amend the Plan prior to the hearing on the Disclosure Statement to leave all Class 13 Claims Unimpaired. | Impaired or Unimpaired | No | 0%/100% |
| 14 | Spansion Thailand Claims | $70 million | No Distribution; provided that the Debtors reserve the right (with the consent of the Creditors' Committee and the Ad Hoc Consortium) to amend the Plan prior to the hearing on the Disclosure Statement to leave all Class 14 Claims Unimpaired. | Impaired or Unimpaired | No | 0%/100% |

## G.    Voting and Confirmation Procedures

For the Holders of Claims in Voting Classes, accompanying this Disclosure Statement are copies of the following documents (collectively with this Disclosure Statement, the "Solicitation Package"): (1) the Plan, which is annexed to this Disclosure Statement as Exhibit A; (2) a Notice to Voting Classes; and (3) for Holders of Allowed Claims in the Voting Classes, a Ballot to accept or reject the Plan. The Solicitation Package is being furnished to Holders of Allowed Claims in the Voting Classes for the purpose of soliciting their votes on the Plan. This Disclosure Statement is also being furnished to certain other Creditors, Holders of Interests and other Entities for notice or informational purposes.

7

If you did not receive a Ballot, and believe that you should have received one, please contact the Claims and Voting Agent, Epiq Bankruptcy Solutions, LLC ("Epiq"). Epiq can be reached at 757 Third Avenue, Third Floor, New York, NY 10017, by facsimile transmission at (646) 282-2501 or by e-mail at Spansion@epiqsystems.com. Alternatively, you can contact counsel to the Debtors, Duane Morris, LLP, at 110 North Market Street, Suite 1200, Wilmington, DE 19801, attn: Stacie Wolfenden, or by facsimile transmission at (302) 657-2901, or Latham & Watkins LLP, at 355 South Grand Avenue, Los Angeles, CA 90071, attn: Kathryn Bowman, or by facsimile transmission at (213) 891-8763.

## 1. Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only certain Impaired Classes of Claims are entitled to vote to accept or reject the Plan. As set forth in section 1124 of the Bankruptcy Code, a Class is Impaired if the legal, equitable and/or contractual rights attaching to the Claims or Interests of that Class are modified or altered. Under section 1126(g), an Impaired Class is deemed to have rejected the Plan if Holders of Allowed Claims or Interests in that Class are not entitled to receive any Distribution on account of such Claims or Interests. **Accordingly, Classes 7, 8, 9, 11 and potentially Classes 13 and 14 (depending on the treatment afforded to Class 13 Claims pursuant to Section 3.13 of the Plan and the treatment afforded to Class 14 Claims pursuant to Section 3.14 of the Plan) are deemed to have rejected the Plan and are not entitled to vote on the Plan.**

Any Class that is Unimpaired within the meaning set forth in section 1124 of the Bankruptcy Code is not entitled to vote to accept or reject the Plan and is conclusively presumed to have accepted the Plan. **Accordingly, Classes 2, 4, 6, 10 and potentially Classes 13 and 14 (depending on the treatment afforded to Class 13 Claims pursuant to Section 3.13 of the Plan and Class 14 Claims pursuant to Section 3.14 of the Plan) are deemed to have accepted the Plan and are not entitled to vote on the Plan.**

Only Holders of Allowed Claims in the Voting Classes are Impaired **and** entitled to a Distribution. Thus, only Holders of Allowed Claims in the Voting Classes are entitled to vote on the Plan. **Under the Plan, the Voting Classes are Class 1 (Secured Credit Facility Claims), Class 3 (FRN Claims) and Class 5 (General Unsecured Claims).**

A Claim in a Voting Class must be "allowed" for purposes of voting in order for the Holder of such Claim to have the right to vote on the Plan. Generally, for voting purposes a Claim is deemed to be "allowed" if (i) a Proof of Claim was timely Filed and was not Filed in an unliquidated or undetermined amount and is not contingent as to amount or liability or, if no Proof of Claim was Filed, the Claim is listed in the Debtors' Schedules as other than "disputed," "contingent," or "unliquidated," and in an amount greater than $0 (in which case the Claim will be deemed "allowed" for voting purposes in the scheduled amount) and (ii) no objection has been Filed to such Claim or no Order has been entered by the Bankruptcy Court Disallowing such Claim. Generally, if an objection to a Claim is Filed, the Holder of such Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or deems the Claim to be "allowed" for voting purposes. *See* Section I.G.4. below.

8

If you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must either (a) obtain a Ballot pursuant to the instructions set forth above and timely submit such Ballot by the Voting Deadline, or (b) file a Motion pursuant to Federal Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by [____], 2009, or you will not be entitled to vote to accept or reject the Plan.

EXCEPT AS OTHERWISE SET FORTH IN THE PLAN, EACH OF THE CLAIMS AGENT, THE DEBTORS AND THE REORGANIZED DEBTORS IN ALL EVENTS RESERVE THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN, EVEN IF THE HOLDER OF SUCH CLAIM VOTED TO ACCEPT OR REJECT THE PLAN AND/OR SUCH HOLDER'S CLAIM WAS "ALLOWED" FOR VOTING PURPOSES.

   2.      **Certain Risk Factors to Be Considered Prior to Voting**

   **HOLDERS OF CLAIMS IN VOTING CLASSES SHOULD CAREFULLY CONSIDER THE RISKS SET FORTH IN ARTICLE VII HEREIN PRIOR TO VOTING ON THE PLAN.**

   3.      **Voting Instructions and Voting Deadline**

   To vote to accept or reject the Plan, you must use the Ballot enclosed with this Disclosure Statement.  No votes other than ones using Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed [____], 2009 as the Voting Record Date for determining the Holders of Claims who are entitled to (a) receive a Solicitation Package and (b) vote to accept or reject the Plan.  Accordingly, each Holder of a Claim in a Voting Class as of the Voting Record Date that is not deemed to be disallowed for voting purposes shall be entitled to vote to accept or reject the Plan.  Any Entity that becomes the Holder of a Claim in a Voting Class after the Voting Record Date shall not be entitled to vote such Claim.  After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, **please indicate your acceptance or rejection of the Plan on the Ballot and return your Ballot in the enclosed envelope so as to ensure receipt by no later than 4:00 p.m. Eastern Standard Time on [____], 2009, which is the Voting Deadline, to Epiq, the Claims and Voting Agent, at the following address:**

   **By first class mail:**
   **Spansion Inc. Ballot Processing Center**
   **c/o Epiq Bankruptcy Solutions, LLC**
   **FDR Station, P.O. Box 5285**
   **New York, NY 10150-5285**

   **By hand delivery or overnight mail:**
   **Spansion Inc. Ballot Processing Center**
   **c/o Epiq Bankruptcy Solutions, LLC**
   **757 Third Avenue, Third Floor**
   **New York, NY 10017**

LA\2030380.1

**BALLOTS MUST BE COMPLETED AND RECEIVED NO LATER THAN 4:00 P.M. (EASTERN TIME) ON THE VOTING DEADLINE. ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE. ANY BALLOT THAT IS RECEIVED BY TELECOPIER, FACSIMILE OR OTHER ELECTRONIC COMMUNICATIONS SHALL NOT BE COUNTED IN TABULATING VOTES FOR OR AGAINST THE PLAN, UNLESS THAT BALLOT IS ACCEPTED IN THE DEBTORS' DISCRETION. IF A HOLDER OF A CLAIM CASTS MORE THAN ONE BALLOT VOTING THE SAME CLAIM PRIOR TO THE VOTING DEADLINE, ONLY THE LAST TIMELY BALLOT RECEIVED BY THE CLAIMS AND VOTING AGENT WILL BE COUNTED. IF A HOLDER OF A CLAIM SIMULTANEOUSLY CASTS MORE THAN ONE BALLOT FOR THE SAME CLAIM WITH INCONSISTENT INSTRUCTIONS (I.E. AT LEAST ONE BALLOT VOTES TO ACCEPT THE PLAN AND ONE BALLOT VOTES TO REJECT THE PLAN), ALL SUCH BALLOTS SHALL COUNT AS ONE VOTE ACCEPTING THE PLAN.**

4.      **Voting Procedures**

The Debtors have proposed that the Bankruptcy Court approve certain procedures regarding temporary allowance of claims for voting purposes only. Specifically, the Debtors have requested that if an objection to a Claim is pending on the Voting Record Date or the proof of Claim for such Claim (i) was Filed after the applicable Bar Date, (ii) was Filed in an unliquidated or undetermined amount or (iii) states that such Claim is contingent as to amount or liability, the Holder of such Claim shall receive a copy of the "Confirmation Hearing Notice and Notice of Non-Voting Status With Respect To Disputed Claims" ("Disputed Claim Notice") in lieu of a Ballot. The Disputed Claim Notice shall inform such Entity that it cannot vote absent any of the following taking place prior to the Voting Deadline (each, a "Resolution Event") (i) an order is entered by the Bankruptcy Court temporarily allowing such Claim for voting purposes pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (ii) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving such objection and allowing the Holder to vote such Claim in an agreed upon amount; or (iii) the pending objection to such Claim is voluntarily withdrawn by the Debtors. No later than two (2) business days after a Resolution Event, the Voting Agent shall distribute a Ballot to the relevant Holder, which must be received by the Voting Agent by no later than the Voting Deadline, unless such deadline is extended by the Debtors to facilitate a reasonable opportunity for such Holder to vote for or against the Plan after the occurrence of a Resolution Event.

If an objection to a Claim is Filed by the Debtors after the Voting Record Date but before fifteen (15) days prior to the Confirmation Hearing, the Ballot of the Holder of such Claim will not be counted unless a Resolution Event takes place on or before the Confirmation Hearing. If an objection to a Claim is Filed within fifteen (15) days prior to the Confirmation Hearing, the Ballot of the Holder of such Claim will be counted unless the Bankruptcy Court orders otherwise.

LA\2030380.1

Nothing in the solicitation procedures set forth in this Disclosure Statement, the Ballot or the Disclosure Statement Approval Order shall affect the right of the Claims Agent, the Debtors and/or the Reorganized Debtors, as applicable, to object to any proof of Claim on any other ground or for any other purpose.

The Indenture Trustees are authorized by the Bankruptcy Court to obtain the votes of the owners of any securities or debts for which they serve as indenture trustee, trustee, collateral agent or administrative agent as follows: the Indenture Trustee may either (i) forward the Solicitation Package to each beneficial owner of the applicable debt security for voting and include a postage-prepaid, return envelope provided by and addressed to the Indenture Trustee so that the beneficial owner may return the completed beneficial owner Ballot for inclusion in the appropriate master ballot; or (ii) prevalidate a Ballot by (a) signing it and by indicating on the Ballot the record holder of the debt securities voted, the principal amount and the appropriate account number and (b) forwarding the Solicitation Package along with the prevalidated Ballot to the beneficial owner of the debt security for voting, so that the beneficial owner may return the completed Ballot directly to the Balloting Agent in the return envelope provided in the Solicitation Package. The Ballots of Indenture Trustees must be completed and received by the Claims and Voting Agent at the address set forth above by the Voting Deadline.

### 5.    Who to Contact for More Information

If you have any questions about the procedure for voting your Claim or the Solicitation Package, please contact Epiq at the address indicated above or by telephone at (646) 282-2400. Unless certain documents are specifically required to be provided to you by Bankruptcy Rule 3017(d), you may obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense by contacting Epiq at (646) 282-2400.    Copies can also be obtained on the website http://chapter11.epiqsystems.com under the link for "Spansion Inc."

Spansion Inc. files periodic and current reports, proxy statements and/or other information with the Securities and Exchange Commission. Should you want more information regarding the Debtors, please refer to the reports and other statements filed by Spansion Inc. with the Securities and Exchange Commission. Specifically, you are encouraged to read the following documents, which are incorporated herein by reference:

- Annual Report on Form 10-K for the fiscal year ended December 28, 2008;

- Other Reports on Form 8-K filed with the Securities and Exchange Commission on January 5, 2009, January 16, 2009, February 4, 2009, February 5, 2009, February 13, 2009, February 17, 2009, February 20, 2009, February, 24, 2009, March 2, 2009, March 10, 2009, March 11, 2009, March 20, 2009, March 24, 2009, April 8, 2009, April 10, 2009, April 16, 2009, April 20, 2009, April 30, 2009, May 6, 2009, May 13, 2009 (with respect to Item 5.02 only), June 4, 2009, June 29, 2009, July 9, 2009, August 5, 2009, August 25, 2009, August 28, 2009, September 9, 2009, October 2, 2009, October 9, 2009 and October 15, 2009.

You may read and copy any document Spansion Inc. files with the Securities and Exchange Commission at the Securities and Exchange Commission's public reference room located at: 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the Securities and Exchange Commission at 1-800-SEC-0330 for further information on the public reference room and its copy charges. SEC filings for Spansion Inc. are also available to the public on the Securities and Exchange Commission's website at http://www.sec.gov.

## 6. Acceptance or Rejection of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the "allowed" claims in that class that cast ballots for acceptance or rejection of the plan. Assuming that at least one Impaired Class votes to accept the Plan, the Debtors will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, referred to as the "cramdown" provisions, which permits the confirmation of a plan notwithstanding the non-acceptance by one or more Impaired classes of claims or equity interests. Under section 1129(b) of the Bankruptcy Code, the Plan may be confirmed if, among other things, (a) it has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting Classes. A more detailed discussion of these requirements is provided in Article V of this Disclosure Statement.

## 7. Time and Place of the Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing on the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [＿＿＿], 2009 at [＿＿＿] a.m. (Eastern time), before the Honorable Kevin J. Carey, of the United States Bankruptcy Court for the District of Delaware, in Courtroom 5, United States Courthouse, 824 Market Street, 5th Floor, Wilmington, Delaware 19801. A notice setting forth the time and date of the Confirmation Hearing has been included in the Solicitation Package. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

## 8. Objections to the Plan

Any objection to Confirmation of the Plan must be in writing, must comply with the Bankruptcy Code and the Bankruptcy Rules and must be Filed with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, DE 19801, and served upon the following parties, so as to be received no later than [＿＿＿], 2009 at 4:00 p.m. (Eastern time): (a) Michael S. Lurey and Gregory O. Lunt, Latham & Watkins LLP, 355 S. Grand Avenue, Los Angeles, California 90071 (counsel for Debtors); (b) Michael R. Lastowski, Duane Morris, LLP, 1100 North Market Street, Suite 1200, Wilmington, DE 19801

(counsel for Debtors); (c) Patrick Tinker, Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801; (d) James L. Patton, Jr., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801 (counsel for the Creditors' Committee); (e) Luc A. Despins, Paul, Hastings, Janofsky & Walker, LLP, 75 East 55th Street, New York, NY 10022 (counsel for the Creditors' Committee); (f) Robert J. Stark, Brown Rudnick LLP, Seven Times Square, New York, NY 10036 (counsel to the Ad Hoc Consortium); (g) Steven K. Kortanek, Esq., Womble, Carlyle, Sandridge & Rice PLLC, 222 Delaware Avenue, 15th Floor, Wilmington, Delaware 19801 (counsel to the Ad Hoc Consortium); (h) Pamela K. Webster, Buchalter Nemer, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, California, 90017 (counsel for Bank of America, N.A.); and (i) Jason Madron, Richards, Layton & Finger PA, One Rodney Square, 920 North King Street, Wilmington, Delaware, 19801 (counsel for Bank of America, N.A.).

FOR THE REASONS SET FORTH BELOW, THE DEBTORS, THE CREDITORS' COMMITTEE AND THE AD HOC CONSORTIUM URGE YOU TO RETURN YOUR BALLOT "ACCEPTING" THE PLAN.

## ARTICLE II.
## GENERAL INFORMATION REGARDING THE DEBTORS

FOR MORE DETAILED INFORMATION ABOUT THE DEBTORS, PLEASE ALSO REVIEW THE SECURITIES AND EXCHANGE COMMISSION FILINGS REFERENCED IN SECTION I.G.5. ABOVE

### A.    Formation and History of the Debtors

The Debtors are semiconductor device companies which through their worldwide operations are exclusively dedicated to designing, developing, manufacturing, marketing, licensing and selling Flash memory solutions. Their Flash memory is integrated into a broad range of electronic products, including mobile phones, consumer electronics, automotive electronics, networking and telecommunications equipment, servers and computer peripherals. Their Flash memory solutions are incorporated in products from original equipment manufacturers ("OEMs").

The Debtors are headquartered in Sunnyvale, California, with research and development, manufacturing and assembly operations (some of which are owned and operated by the Non-Debtor Affiliates) in North America, Europe, and Asia. Spansion LLC operates a Flash memory fabrication facility located in Austin, Texas, which has approximately 114,000 square feet of clean room space. This facility produces 200 millimeter wafers, and its process technology is 65 to 110 manometers. Through the Non-Debtor Affiliates, the Debtors also operate two assembly and test facilities. As discussed in greater detail in Section III.B below, Spansion Japan Limited ("Spansion Japan"), a wholly-owned subsidiary of Spansion LLC, owns and operates two Flash memory wafer fabrication facilities in Aizu, Japan.

The Debtors' predecessor was Fujitsu AMD Semiconductor Limited ("FASL"), which was originally organized as a Flash memory manufacturing venture of Advanced Micro Devices, Inc. ("AMD") and Fujitsu Limited ("Fujitsu") in 1993. The primary function of FASL was to

13

manufacture and sell Flash memory wafers to AMD and Fujitsu, who in turn converted the Flash memory wafers into finished Flash memory products and sold them to their customers. AMD and Fujitsu were also responsible for all research and development and marketing activities and provided FASL with various support and administrative services.

By 2003, AMD and Fujitsu desired to expand the operations of FASL to: achieve economies of scale; add additional Flash memory wafer fabrication capacity; include assembly, test, mark and pack operations; include research and development capabilities and include various marketing and administrative functions. To accomplish these goals, in 2003, AMD and Fujitsu reorganized FASL's business as a Flash memory company called FASL LLC, later renamed Spansion LLC ("Former Spansion LLC"), by integrating the manufacturing venture with other Flash memory assets of AMD and Fujitsu. From this reorganization until the beginning of the second quarter of fiscal 2006, Former Spansion LLC manufactured and sold finished Flash memory devices to customers worldwide through its two sole distributors, AMD and Fujitsu. Former Spansion LLC was reorganized into Spansion Inc., a Delaware corporation, in connection with Spansion Inc.'s initial public offering in December 2005.

Spansion Inc. is a holding company and the ultimate parent company of all of the other Debtors and the Non-Debtor Affiliate. Spansion Inc. has four direct or indirect subsidiaries, all of which are Debtors: Spansion Technology LLC, Spansion LLC, Spansion International, Inc. and Cerium Laboratories LLC. Spansion Inc. owns 100% of the membership interests of Spansion Technology LLC and 60% of the membership interests of Spansion LLC. Spansion Technology owns the other 40% of the membership interests of Spansion LLC. Spansion LLC owns all of the stock and membership interests of, respectively Spansion International, Inc. and Cerium Laboratories LLC. Spansion LLC is also the direct or indirect parent of the Non-Debtor Affiliates, which are organized under the laws of various foreign countries. Spansion LLC is the Debtors' principal operating entity. Attached hereto as <u>Exhibit B</u> is an organization chart showing the ownership structure of the Debtors and their Non-Debtor Affiliates.

## B.    The Debtors' Business Operations

### 1.    Products

Three principal types of integrated circuits are used in most digital electronic systems: processors, logic, and memory.

- Processors, which include microprocessors, microcontrollers, and digital signal processors, are typically used for control, central computing tasks, and signal processing;

- Logic is typically used to manage the interchange and manipulation of electronic signals within a system; and

- Memory is used to store programming instructions and data.

Spansion designs, develops, manufactures, markets and sells NOR Flash memory products and solutions. The memory market can be divided into "volatile" and "non-volatile" sub-segments. Volatile memory loses its contents when the system is powered down, while non-

volatile memory retains its contents even after power is shut off, allowing memory contents to be retrieved at a later time. Flash memory is a non-volatile memory solution.

Many familiar products function as non-volatile memory: hard drives on personal computers, digital video discs or DVDs, magnetic tape, vinyl records, punch cards, and even books are all examples of non-volatile storage. Some of these storage technologies continue to be mainstream solutions. Others are largely obsolete, made so by advances in technology. Still others occupy a middle ground increasingly impacted by Flash memory solutions as electro-mechanical storage solutions are replaced by solid state semiconductor Flash memory solutions.

In the last five to ten years the emergence of non-volatile Flash memory storage for common everyday applications such as Flash memory cards for digital cameras, "memory sticks" for computer files and Flash memory in portable "MP3" music players has made Flash memory a household word. However, Flash memory is also a critical component that has been "embedded" in other less familiar applications for a much longer period, almost two decades. Flash memory is a ubiquitous and necessary technology used in almost all electronic systems. It is this type of embedded Flash memory, specifically NOR Flash memory, that Spansion provides.

Memory solutions are primarily differentiated on the basis of:

- performance - how quickly information can be stored and/or accessed;

- price - measured in cost per unit of information stored;

- form factor - size of system relative to amount of information stored;

- ease and flexibility of use; and

- quality and reliability.

The relative importance of these factors in different applications can vary leading to the development of different types of both volatile and non-volatile memory technology, where the attributes of the memory used depend on the characteristics and requirements of the application and the stored information.

Many electronic systems employ several memory solutions to achieve a balance between all of the intrinsic attributes discussed above. For example, a personal computer usually has a disk drive to store large amounts of information at a relatively low cost, for a long time, but with a relatively large physical space requirement, relatively slow performance, and significant energy consumption. Information stored on the hard disk is mostly "user data" but also includes the operating system software, such as Microsoft Windows or a user's application software such as a word processor. The amount of time a user has to wait to store or read documents to or from a disk drive (seconds or less) is usually acceptable. However, in order to provide acceptable performance while operating, a computer has to copy parts of the operating system and software applications into a faster memory technology. So personal computers also use Dynamic Random Access Memory, or DRAM, to store programming instructions ("code") and data that the computer's processor is actively using for calculations or manipulations. DRAM is a semiconductor integrated circuit, and the dominant volatile memory architecture used in nearly

15

all electronic systems that also contain a microprocessor. The principal advantage of DRAM is its very high performance; to achieve acceptable levels of performance, the processor or controller must be able to read and write code and/or data from memory at very fast rates (millions of "writes" and "reads" per second). However, if the circuit loses power (intentionally or not) the information stored in the DRAM is lost.

Most electronic systems do not require the large storage of a hard drive. Their non-volatile memory requirements may be many orders of magnitude smaller and are frequently satisfied by a single Flash memory device. In addition these systems may require the higher performance and reliability that only solid state semiconductor solutions can provide and the lower cost of a memory sub-system sized appropriately for the application. For these systems Flash memory replaces the functionality of the hard drive. The system can boot from Flash memory and then depending on the type of Flash memory used, the operating system and applications may run directly from the Flash memory without requiring contents to be copied first into DRAM, or alternatively and similarly to the example of the PC, code may be copied from Flash memory into DRAM before the processor uses it.

Memory selection for a system is based on a number of criteria. Just as these criteria will determine a choice between storage solutions such as hard drive versus solid state semiconductor storage, the criteria will also determine the choice between different types of semiconductor memory and even the different types of non-volatile semiconductor memory including different types of Flash memory. There are two main types of Flash memory, NOR and NAND. The terms NOR and NAND refer to the architecture of the connections between the memory cells of the device which produce the different characteristics of the two memory types. The largest and fastest growing sub-segment of the Flash memory market is NAND Flash memory. NAND offers a number of desirable attributes: it is relatively inexpensive, a small device can hold a great amount of information, and its performance characteristics are particularly well suited to data storage such as music, pictures, video, etc. The market for NAND Flash memory has grown rapidly in recent years owing to the growing popularity of devices that consumers can use to access their personal media in a portable, battery-powered format. Of all non-volatile memory technologies, NAND Flash memory has had the most obvious impact on the everyday consumer through the use of these types of application.

NOR Flash memory has different characteristics than NAND Flash memory. NOR can, for example, support the operation or execution of software code directly from the device as its read times are very fast and its architecture supports the way software needs to execute, a capability that can enable a more efficient and cost effective design. Though NOR Flash memory is more expensive than NAND for comparable densities, it is also available in much lower densities with lower prices than NAND and for this reason alone is preferred in many applications that do not require the greater storage capacity of NAND. At higher densities similar to NAND, the high reliability and ease of use of NOR, in addition to its ability to support a more efficient and cost effective memory sub-system in certain applications, make it a favored solution. These characteristics continue to drive NOR Flash memory use in embedded applications. For example modern automobiles are dependent on NOR Flash memory for engine control, transmission control, ABS systems, anti roll systems and a multitude of other operations in the vehicle. The majority of cell phones continue to use NOR Flash memory. The telecommunication, networking, consumer electronics, and industrial control industries rely on

16

NOR Flash memory. While NOR applications are not as obvious to the consumer, the modern world is dependent on NOR Flash memory.

Another solution for storing code is various forms of programmable memory devices referred to as "one-time programmable." One time programmable devices offer the non-volatility, performance, and low error rates of NOR Flash at a lower cost. However, once the device has been loaded with information, it can never be reloaded again with different information. While this is often not an issue for storing code in many applications, it significantly limits the usefulness of the device in other respects. NOR Flash is a suitable platform for storing the code, and, extra capacity on the same device above and beyond what is required to store the code can be used to store user data – permanently and with high quality and without power. Thus NOR Flash can be used to fulfill two functions with one device: 1) storage of the code, and 2) temporary or permanent storage of user data. Accomplishing both functions with one device, versus two, lowers system cost and reduces design complexity.

The total market for memory systems and devices used in electronic systems is quite large, typically in excess of $50 billion per year (ignoring the depressed market conditions of the last year). Large, well-entrenched suppliers compete vigorously within a number of segments and across segments. Technology advances rapidly and suppliers have active development programs to enhance the features and capabilities of their respective product offerings. Thus, the characteristics that divide these segments can dissolve through time as evidenced by the incursion of solid state drives into the hard drive market. In the case of Flash memory, system designers have devised systems where NAND Flash memory can replace traditional NOR Flash memory, which in certain applications yields acceptable reliability and performance at a lower overall cost. These examples illustrate a general characteristic of technology-centric industries and the memory industry in particular: advancing technology creates market share dislocations. Thus, while NOR Flash has well-established positions in certain applications, it may be possible in the future to expand its use into other applications, and, conversely, there is no guarantee that existing positions will endure forever. The challenge for the Debtors, and all of their competitors, is to leverage their existing capabilities in creative ways to create value for their customers.

The Debtors' current product portfolio ranges from 1-megabit to 2-gigabits in terms of capacity and is offered with a broad array of interfaces and features. Historically the Debtors' products were based on floating gate technology; however, the majority of the Debtors' new product designs use MirrorBit technology, a proprietary charge trapping non-volatile memory technology.

On March 18, 2008, Spansion LLC completed the acquisition of all of the outstanding shares of Saifun Semiconductor Ltd. ("Saifun"), a provider of intellectual property solutions for the non-volatile memory market located in Israel. Historically, Saifun licensed its intellectual property to semiconductor manufacturers that used this technology to develop and manufacture memory products. To date, Saifun has provided technology, designs and technology licensing revenues that have contributed to the Debtors' product portfolio and revenue and in the future may provide a platform for the Debtors to increase their technology licensing business.

In fiscal 2008, the net sales of wireless applications, such as mobile phones, and embedded applications (gaming, set top boxes, DVD players and automotive and industrial

17

electronics) each represented approximately 50% of the Debtors' total net sales. Sales of MirrorBit technology-based products increased from approximately 71% in fiscal 2007 to approximately 79% in fiscal 2008. The remainder of the Debtors' sales has been based on floating gate technology.

## 2. Customers

The Debtors serve their customers worldwide directly or through their distributors, who buy products from the Debtors and resell them to their customers, either directly or through other distributors. Customers for the Debtors' products consist of OEMs, original design manufacturers ("ODMs") and contract manufacturers. Among those customers, Nokia Corporation accounted for approximately 18% and 10% of the Debtors' net sales in fiscal 2008 and fiscal 2007, respectively. For fiscal 2008, fiscal 2007 and fiscal 2006, Fujitsu (as defined below), as a distributor of the Debtors' products, accounted for approximately 29%, 35% and 36% of the Debtors' net sales, respectively.

The Debtors sell directly to large multi-national customers, certain larger regional accounts, and targeted customers using a direct sales force and third-party representatives with an expertise in memory circuits and established relationships at important accounts.

Sales to the Debtors' distributors are typically made pursuant to agreements that provide return rights for discontinued products or for products that are not more than twelve months older than their manufacturing date code. In addition, some of the Debtors' agreements with distributors may contain standard stock rotation provisions permitting limited levels of product returns. The Debtors currently rely on Fujitsu Microelectronics Limited ("FML"), through its subsidiary Fujitsu Electronics Inc. ("FEI," together with FML and Fujitsu Limited, "Fujitsu"), to act as the largest distributor of their products to customers in Japan and also as a nonexclusive distributor throughout the rest of the world, other than Europe and the Americas with limited exceptions. *See* Section III.F.2 below.

The Debtors generally warrant that products sold to their customers and their distributors will, at the time of shipment, be free from defects in workmanship and materials and conform to their approved specifications. Subject to specific exceptions, the Debtors offer a one-year limited warranty.

## 3. Manufacturing

Spansion LLC owns a wafer fabrication facility in Austin, Texas (Fab 25), which has approximately 114,000 square feet of clean room space. This facility produces 200 millimeter wafers, and its process technology is 65 to 110 manometers. The Non-Debtor Affiliates own two assembly and test facilities in Bangkok, Thailand and in Kuala Lumpur, Malaysia. Spansion Japan, a wholly-owned subsidiary of Spansion LLC, owns two wafer fabrication facilities in Aizu, Japan (JV3 and SP1). Fab 25 and JV3 are in production with 200-millimeter wafers, and Spansion Japan began production of 300-millimeter wafers at SP1 in fiscal 2008. As described in Section III.B below, Spansion Japan has commenced corporate reorganization proceedings under Japanese law that are being separately administered from the Chapter 11 Cases.

To augment their internal wafer fabrication capacity, the Debtors have foundry agreements with Semiconductor Manufacturing International Corporation ("SMIC") and Fujitsu. The Debtors believe that the arrangement with SMIC provides flexibility to support customer demand for advanced technology products if they are unable to support such demand from their own in-house capacity. The Debtors believe that the arrangement with Fujitsu provides it with the ability to efficiently support the declining customer demand for products manufactured on legacy production process nodes. However, in the future the Debtors may change the locations where their products are manufactured. The Debtors have in the past, and may in the future, obtain foundry, subcontractor and other arrangements with third parties to meet demand.

The Debtors' manufacturing processes require many raw materials, such as silicon wafers, mold compound, substrates and various chemicals and gases, and the necessary equipment for manufacturing. The Debtors obtain these materials and equipment from a large number of suppliers located throughout the world.

## C. Employees

As of September 30, 2009, the Debtors had approximately 1,600 active employees. In addition, the Non-Debtor Affiliates (excluding Spansion Japan) had approximately 1,900 active employees. As of September 30, 2009, Spansion Japan had approximately 1,300 active employees.

## D. Competitive Factors Affecting the Debtors' Businesses

The Debtors' principal NOR Flash memory competitors are Numonyx B.V., Samsung Electronics Co., Ltd. and Macronix International Co., Ltd. The Debtors also increasingly compete with NAND Flash memory manufacturers where NAND Flash memory has the ability to replace NOR Flash memory in certain customer applications. The Debtors' principal NAND Flash memory competitors include Samsung Electronics Co., Ltd., Numonyx B.V. and Micron Technology, Inc. In the future, the Debtors' principal NAND Flash memory competitors may include Hynix Semiconductor Inc., Toshiba Semiconductor Company, and SanDisk Corporation.

The Debtors believe Flash memory providers must possess the following attributes to remain competitive:

- strong relationships with OEMs, ODMs and contract manufacturers that are acknowledged leaders within their respective industries;

- discipline to continually reduce costs ahead of historically declining semiconductor market prices;

- strong market focus to identify emerging Flash memory applications;

- leadership in research and development;

- flexibility in manufacturing capacity and utilization so as to take advantage of industry conditions through market cycles;

LA\2030380.1

- access to the financial resources needed to maintain a highly competitive technological position;

- focus on sustainable and profitable segments;

- the ability to establish and sustain strategic relationships and alliances with key industry participants; and

- rapid time to market for new products, measured by the time elapsed from first conception of a new product to its commercialization.

The Debtors' success also depends in part on their proprietary technology. While the Debtors attempt to protect their proprietary technology through patents, copyrights and trade secrets, the Debtors believe that their success will depend more upon technological expertise, continued development of new products, and successful cost reductions achievable by improving process technologies. In addition, the Debtors have access to intellectual property through certain cross-license arrangements with AMD and Fujitsu. There can be no assurance that the Debtors will be able to protect their technology or that competitors will not be able to develop similar technology independently. The Debtors currently have a number of United States and foreign patents and patent applications. There can be no assurance that the claims allowed on any patents the Debtors hold will be sufficiently broad to protect their technology, or that any patents will issue from any application pending or filed by the Debtors. In addition, there can be no assurance that any patents issued to the Debtors will not be challenged, invalidated or circumvented or that the rights granted thereunder will provide competitive advantages to the Debtors.

Research and development is critical to the Debtors' success and is focused on process, product and system level development. The Debtors conduct their product and system engineering activities primarily in Sunnyvale, California with additional design and development engineering teams located in the United States, Asia and Europe. The Debtors' primary development focus is on MirrorBit products for the embedded category of the Flash memory market. The Debtors conduct their process development primarily in Sunnyvale, California, at their Fab 25 facility located in Austin, Texas and at Spansion Japan's facilities in Aizu-Wakamatsu, Japan, and third party foundries. Currently, the Debtors are developing new non-volatile memory process technologies with continuing refinement of their 65-nanometer process technology and plans for development of 45-nanometer and more advanced technology. In April 2009, the Debtors stopped further production of development wafers at its research and development manufacturing facility known as the Sub-micron Development Center, or SDC, in Sunnyvale, California, as part of their strategy to reduce research and development costs.

**E.    Pre-Petition Capital Structure of the Debtors**

As of the September 27, 2009, the Debtors owed approximately $1.2 billion in outstanding funded debt and between approximately $450 million and $950 million in trade and other unsecured liabilities. The Debtors' funded debt was comprised primarily of approximately $7.0 million under the Secured Credit Facility, approximately $633.3 million in FRNs,

approximately $251.1 million in Senior Notes,[4] approximately $208 million in Exchangeable Debentures and approximately $68.4 million under the UBS Credit Facility.

### 1. Secured Credit Facility

Spansion LLC is the borrower under the Secured Credit Facility pursuant to a credit agreement, dated September 19, 2005 (as amended), by and among Bank of America, N.A., as Agent, Banc of America Securities LLC, Spansion LLC and the lenders party thereto from time to time. Spansion Inc., Spansion International, Inc., Spansion Technology LLC and Cerium Laboratories LLC have guaranteed the Secured Credit Facility. The Secured Credit Facility is secured by a first priority lien on substantially all of Spansion LLC's Assets other than (1) the collateral subject to the first-priority liens in favor of the FRNs as described below (as to which the Secured Credit Facility has a second priority lien); (2) the collateral securing the UBS Credit Facility; and (3) the Debtors' intellectual property. The Secured Credit Facility's collateral includes 100% of the capital stock or membership interests of Spansion LLC's domestic wholly-owned subsidiaries, and up to 65% of the capital stock or membership interests of the Non-Debtor Affiliates that are first-tier subsidiaries of Spansion LLC. As of September 27, 2009, no advances remain outstanding under the Secured Credit Facility, approximately $1.6 million in letter of credit obligations, which have been cash collateralized, remain outstanding and approximately $5.4 million is outstanding, though not presently due and payable, under equipment leases which became secured by the Secured Credit Facility's collateral under an amendment to the credit agreement entered into in December 2008.

### 2. The FRNs

In May 2007, Spansion LLC issued $625.0 million aggregate principal amount of FRNs. Interest on the FRNs accrues at a rate per annum, reset quarterly, equal to the 3-month LIBOR plus 3.125%. Interest is payable on March 1, June 1, September 1 and December 1 of each year beginning September 1, 2007 until the maturity date of June 1, 2013. As of September 27, 2009, the FRNs bear interest at approximately 3.47% for the period from September through November 2009. The FRNs are secured by a first priority lien on all of Spansion LLC's inventory, equipment and real property and any proceeds from the sales of such collateral (excluding (i) returned inventory and receivables, and proceeds arising therefrom, and (ii) sales of inventory in the ordinary course of business consistent with past practices, as to which the Secured Credit Facility has a first priority lien and the FRNs have a second priority lien) and a second priority lien on all of the other collateral that secures the Secured Credit Facility other than the capital stock of the Non-Debtors Affiliates that are first-tier subsidiaries of Spansion LLC. The FRNs are not secured by Spansion LLC's intellectual property. Spansion Inc. and Spansion Technology LLC have also guaranteed the FRNs. The FRN's collateral includes all of Spansion Inc. and Spansion Technology LLC's assets, excluding (i) certain general intangibles, chattel paper, instruments and accounts, (ii) any permit, lease, license or franchise, (iii) any equipment that is subject to a lien securing a purchase money obligation or capital lease obligation, (iv) copyrights, patents, trademarks and other intellectual property and intellectual property rights, and (v) equity interests in any foreign subsidiary of such entity. With respect to

---

[4] The Indenture Trustee for the Senior Notes has Filed a proof of Claim in the amount of approximately $267.9 million.

(i) through (iii), above, such assets are only excluded for so long as the creation of a lien in favor of the collateral agent for the FRNs is, and remains, validly prohibited. As of the Petition Date, approximately $625 million in principal amount and approximately $8.3 million in interest was outstanding under the FRNs.

### 3. The Senior Notes

On December 21, 2005, Spansion LLC completed an offering of $250 million aggregate principal amount of Senior Notes. Interest on the Senior Notes accrued at a rate per annum of 11.25%. The Senior Notes were issued at 90.302% of face value, resulting in net proceeds of approximately $218.1 million after deducting the initial purchasers' discount and estimated offering expenses. The Senior Notes are general unsecured senior obligations of Spansion LLC and rank equal in right of payment with Spansion LLC's existing and future senior debt.

Spansion Technology LLC and Spansion Inc. have guaranteed the Senior Notes. According to the Debtors' books and records, as of the Petition Date, approximately $251 million in the aggregate was outstanding under the Senior Notes, though the Indenture Trustee for the Senior Notes has Filed a proof of Claim in the amount of approximately $267.9 million.

### 4. The Exchangeable Debentures

In June 2006, Spansion LLC issued $207.0 million of aggregate principal amount of Exchangeable Debentures. The Exchangeable Debentures bear interest at 2.25% per annum. Interest is payable on June 15 and December 15 of each year beginning December 15, 2006 until the maturity date of June 15, 2016. The indenture governing the Exchangeable Debentures provides that the Exchangeable Debentures are subordinated in right of payment, to the extent and in the manner provided in the indenture, to the priority payment of certain senior indebtedness, which includes the FRNS and the Senior Notes; however, pursuant to Section 3.16 of the Plan and Section IV.C.15. below, the FRNs have agreed to waive the subordination provisions governing the Exchangeable Debentures. Further, a dispute exists between the Indenture Trustee for the Holders of the Senior Notes and the Indenture Trustee for the Holders of Exchangeable Debentures as to the effect of the subordination provisions of the governing indentures, set forth in Article 11 of the indenture governing the Exchangeable Debentures (including, without limitation, Section 11.10 of such indenture), with respect to the distributions contemplated under the Plan. The outcome of such dispute likely will have a material impact on the recoveries of the Holders of Exchangeable Debentures Claims or Holders of Senior Notes Claims, as the case may be.

Pursuant to Section 3.16 of the Plan and Section IV.C.15. below, on the Effective Date, any Distribution attributable to the Holders of Exchangeable Debentures Claims shall be held in escrow with an agent and on terms reasonably acceptable to each of the Debtors, the Indenture Trustee for the Exchangeable Debentures, and the Indenture Trustee for the Senior Notes, and such escrow shall be maintained pending entry of a final and non-appealable order directing the release from the escrow of the Distribution attributable to the Holders of Exchangeable Debentures Claims.

The Exchangeable Debentures bear interest at 2.25% per annum. Interest is payable on June 15 and December 15 of each year beginning December 15, 2006 until the maturity date of June 15, 2016.

The Exchangeable Debentures were not exchangeable prior to January 6, 2007. On January 6, 2007, the Exchangeable Debentures became exchangeable for shares of Spansion Inc.'s Class A common stock, cash or a combination of cash and shares of such Class A common stock, at the Debtors' option. Full conversion of the Exchangeable Debentures into shares would result in an initial exchange rate of 56.7621 shares of Class A common stock per debenture representing an initial exchange price of approximately $17.6174 per share of Spansion Class A common stock. As of the Petition Date, the Exchangeable Debentures had not been exchanged for Spansion Inc.'s Class A common stock.

Spansion Technology LLC and Spansion Inc. have guaranteed the Exchangeable Debentures. As of the Petition Date, approximately $207 million in aggregate principal amount and approximately $1 million in interest was outstanding under the Exchangeable Debentures.

### 5. UBS Credit Facility

In December 2008, Spansion LLC entered into the UBS Credit Facility with UBS Bank USA, which provided up to $85 million in the form of an uncommitted revolving line of credit, which is secured by certain auction rate securities owned by Spansion LLC. The UBS Credit Facility is structured so that interest earned from the ARS is used to offset the interest expense of the credit facility. As of the Petition Date, approximately $79.2 million of principal and accrued interest was outstanding under the UBS Credit Facility. As of September 27, 2009, $68.4 million is outstanding under the UBS Credit Facility.

## F. Litigation

The Debtors were party to a number of litigations as of the Petition Date. Set forth below is a summary of certain of the material litigations involving one or more of the Debtors:

### *Tessera v. Spansion LLC, et al.*

On October 7, 2005, Tessera, Inc. ("Tessera") filed a complaint, Civil Action No. 05-04063, for alleged patent infringement against Advanced Micro Devices ("AMD") and Spansion LLC in the United States District Court for the Northern District of California under the patent laws of the United States of America, 35 U.S.C. section 1, et seq., including 35 U.S.C. section 271. The complaint alleges that Spansion LLC's Ball Grid Array ("BGA") and multichip packages infringe the following Tessera patents: United States Patent No. 5,679,977, United States Patent No. 5,852,326, United States Patent No. 6,433,419 and United States Patent No. 6,465,893. On December 16, 2005, Tessera filed a First Amended Complaint adding Spansion Inc. and Spansion Technology Inc. as defendants. On January 31, 2006, Tessera filed a Second Amended Complaint adding Advanced Semiconductor Engineering, Inc., Chipmos Technologies, Inc., Chipmos U.S.A., Inc., Silicon Precision Industries Co., Ltd., Siliconware USA, Inc., STMicroelectronics N.V., STMicroelectronics, Inc., Stats Chippac Ltd., Stats Chippac, Inc., and Stats Chippac (BVI) Limited as defendants. The Second Amended Complaint alleges that Spansion LLC's BGA and multichip packages infringe the four Tessera patents

identified above. The Second Amended Complaint further alleges that the newly named defendants are in breach of a Tessera license agreement, and that Silicon Precision Industries Co., Ltd. is infringing a fifth Tessera patent, United States Patent No. 6,133,627. The Second Amended Complaint seeks unspecified damages, injunctive relief, a trebling of damages for alleged willful conduct and attorneys' fees (the "Tessera District Court Action"). On February 9, 2006, Spansion filed an answer to the Second Amended Complaint and asserted counterclaims against Tessera. On April 18, 2006, U.S. District Court Judge Claudia Wilken issued a Case Management Order that set a trial date of January 28, 2008. On March 13, 2007, Judge Wilken issued an order vacating the trial date. On April 12, 2007, Judge Wilken issued an order referring case management scheduling issues to a Special Master, and directing that the court will appoint an expert in the case to testify on the ultimate merits of the technical issues relating to infringement and patent validity. On April 26, 2007, Spansion, STMicroelectronics and AMD filed a motion to stay the Tessera District Court Action pending resolution of an United States International Trade Commission ("ITC") investigation that is described below. On May 24, 2007, Judge Wilken issued an order staying the Tessera District Court Action until final resolution of the ITC action.

Tessera has filed proofs of Claim against Spansion Inc., Spansion LLC and Spansion Technology LLC, each in an alleged amount of not less than $25 million, relating to the Tessera District Court Action. The Debtors dispute, among other things, the validity and alleged amount of these Claims. Tessera has also stated that it might have or assert Administrative Expense Claims against one or more the Debtors arising from any alleged infringement or related conduct occurring from and after the Petition Date. At the present time, the Debtors do not know the total amount that might ultimately be asserted by Tessera on account of its Claims, including any Administrative Expense Claims that it might assert against the Debtors.

### *Tessera ITC Action*

On April 17, 2007, Tessera filed a complaint under section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the ITC against respondents ATI Technologies, Inc., Freescale Semiconductor, Inc., Motorola, Inc., Qualcomm, Inc., Spansion Inc., Spansion LLC and STMicroelectronics N.V. Tessera claims that "face up" and "stacked-chip" small format laminate Ball Grid Array ("BGA") packages, including the Spansion 5185941F60 chip assembly, infringe certain specified claims of United States Patent Nos. 5,852,326 and 6,433,419 ("Asserted Patents"). The complaint requests that the ITC institute an investigation into the matter. The complaint seeks a permanent exclusion order pursuant to section 337(d) of the Tariff Act of 1930, as amended, excluding from entry into the United States all semiconductor chips with small format laminate BGA semiconductor packaging that infringe any of the Asserted Patents, and all products containing such infringing small format laminate BGA semiconductor packaged chips. The complaint also seeks a permanent cease and desist order pursuant to section 337(f) of the Tariff Act of 1930, as amended, directing respondents with respect to their domestic inventories to cease and desist from marketing, advertising, demonstrating, sampling, warehousing inventory for distribution, offering for sale, selling, distributing, licensing, or using any semiconductor chips with small format laminate BGA semiconductor packaging that infringe any of the Asserted Patents, and/or products containing such semiconductor chips.

On May 15, 2007, the ITC instituted an investigation pursuant to 19 U.S.C. § 1337, entitled *In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-605, identifying ATI Technologies, ULC, Freescale Semiconductor, Inc., Motorola, Inc., Spansion Inc., Spansion LLC and STMicroelectronics N.V. (collectively, "Respondents") as respondents. On June 8, 2007, Respondents filed a motion to stay the ITC investigation pending reexamination of the Asserted Patents by the U.S. Patent and Trademark Office. On July 11, 2007, Administrative Law Judge Carl C. Charneski set an Initial Determination date of May 21, 2008 and a target date for completion of the ITC Investigation of August 21, 2008. On October 17, 2007, the ITC investigation was reassigned to Administrative Law Judge Theodore Essex, who set a hearing for February 25, 2008.

On February 26, 2008, Judge Essex issued an Initial Determination granting respondents' motion for a stay of the ITC investigation pending completion of the re-examination of the Asserted Patents by the U.S. Patent and Trademark Office. On March 4, 2008, Tessera filed, with the ITC, a Petition for Review of the Initial Determination Ordering Stay. On March 27, 2008, the ITC issued an order reversing Judge Essex's Initial Determination, and denying Respondents' motion for a stay of the ITC investigation pending reexamination of the Asserted Patents.

On May 13, 2008, Judge Essex set an Initial Determination date of October 20, 2008, with a hearing date of July 14, 2008, and a target date for completion of the ITC investigation of February 20, 2009. On July 14, 2008, Judge Essex held an evidentiary hearing in the ITC investigation, and completed the hearing on July 18, 2008. On October 16, 2008, Judge Essex issued an order resetting the Initial Determination date to December 1, 2008, and the target date for completion of the ITC investigation to April 3, 2009. On December 1, 2008, Judge Essex issued an Initial Determination, ruling that the accused small-format BGA packages of Spansion Inc. and Spansion LLC and the other Respondents did not infringe the asserted claims of the Asserted Patents and, therefore, Spansion Inc. and Spansion LLC and the other Respondents were not in violation of section 337 of the Tariff Act of 1930.

On December 15, 2008, Tessera filed with the ITC a petition to review the Initial Determination. On January 30, 2009, the ITC issued a notice to review in part Judge Essex's decision finding no violation of section 337. On February 10, 2009, the ITC issued an order resetting the target date for completion of the ITC Investigation to April 14, 2009. On March 31, 2009 the ITC issued an order requesting additional briefing on certain remedy issues and resetting the target date for completion of the ITC Investigation to May 20, 2009.

On May 20, 2009 the ITC issued a Final Determination reversing the Initial Determination by finding that there was a violation of 19 U.S.C. § 1337 by Spansion Inc. and Spansion LLC, Qualcomm, Inc., ATI Technologies, Motorola, Inc. STMicroelectronics N.V. and Freescale Semiconductor, Inc., and determined that the appropriate form of relief is (1) a limited exclusion order under 19 U.S.C. § 1337(d)(1) prohibiting the unlicensed entry of semiconductor chips with minimized chip package size and products incorporating these chips that infringe one or more of claims 1, 2, 6, 12, 16-19, 21, 24-26, and 29 of the '326 patent and claims 1-11, 14, 15,19, and 22-24 of the '419 patent, and are manufactured abroad by or on behalf of, or imported by or on behalf of, Spansion Inc., Spansion LLC, Qualcomm, ATI, Motorola,

STMicroelectronics N.V. and Freescale; and (2) cease and desist orders directed to Motorola, Qualcomm, Freescale, Spansion Inc. and Spansion LLC. The cease and desist order directed to Spansion Inc. and Spansion LLC (the "Tessera ITC Order") prohibits importing, selling, marketing, advertising, distributing, offering for sale, transferring (except for exportation) and soliciting U.S. agents or distributors for certain semiconductor chips that are covered by the patents asserted in the action. The ITC further determined that the bond for temporary importation during the period of Presidential review which expires 60 days after May 20, 2009 shall be in the amount of 3.5 percent of the value of the imported articles that are subject to the order.

On June 2, 2009, Spansion and the other Respondents to the investigation jointly filed with the ITC a motion to stay the effect of the ITC decision pending appeal to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"). On July 17, 2009, the ITC denied that motion. On July 20, 2009, Spansion appealed the ITC decision to the Federal Circuit and also filed an emergency motion for stay pending appeal and immediate temporary stay. The Federal Circuit denied the stay motions on September 8, 2009. The principal brief in the Federal Circuit appeal is due October 30, 2009. *See* Section III.E.14 below.

### *Fast Memory Erase LLC v. Spansion Inc., et al.*

On June 9, 2008, Fast Memory Erase LLC ("Fast Memory Erase") filed a complaint in the U.S. District Court for the Northern District of Texas alleging patent infringement against Spansion Inc., Spansion LLC, Intel Corp., Numonyx B.V., Numonyx, Inc., Nokia Corp., Nokia Inc., Sony Ericsson Mobile Communications AB, Sony Ericsson Mobile Communications (USA), Inc., and Motorola, Inc. The case is styled, Fast Memory Erase, LLC v. Spansion Inc., Spansion LLC, et al., Case No. 3:08-CV-00977-M (N.D. Tex.). Fast Memory Erase's complaint alleges that the Debtors' NOR Flash products using floating gate technology infringe one or more claims of U.S. Patent No. 6,236,608 (the "'608 patent"). Fast Memory Erase has also asserted U.S. Patent No. 6,303,959 (the "'959 patent") in its complaint against the products of other defendants, namely Intel and Numonyx, but it has not asserted the '959 patent against any of the Debtors' products.

On December 22, 2008, Fast Memory Erase filed an amended complaint. In its amended complaint, Fast Memory Erase added Apple, Inc. as a defendant. In their answer to Fast Memory Erase's amended complaint, Spansion Inc. and Spansion LLC asserted that that they do not infringe the '608 patent and that the '608 patent is invalid. They also asserted counterclaims against Fast Memory Erase for declaratory judgments of non-infringement and invalidity. The case was stayed against Spansion Inc. and Spansion LLC as a result of the Chapter 11 Cases. The parties agreed to lift the stay so that the U.S. District Court could proceed with a Markman hearing. The Markman hearing was held on September 16, 2009.

Fast Memory Erase has filed proofs of Claim against Spansion Inc. and Spansion LLC, each in an unliquidated amount, relating to the litigation described above. Fast Memory Erase has also stated that it might have or assert Administrative Expense Claims against one or more the Debtors arising from any alleged infringement or related conduct occurring from and after the Petition Date. At the present time, the Debtors do not know the total amount that might

26

ultimately be asserted by Fast Memory Erase on account of its Claims, including any Administrative Expense Claims that it might assert against the Debtors.

### *LSI, Agere v. Spansion, Inc., et al.*

On April 18, 2008, LSI Corporation and Agere Systems, Inc. filed a complaint, Civil Action No. 2 - 08 CV -165, in the United States District Court for the Eastern District of Texas, against defendants United Microelectronics Corporation, Integrated Device Technology, Inc., AMIC Technology Corporation, Elpida Memory, Inc., Freescale Semiconductor, Inc., Grace Semiconductor Manufacturing Corporation, Microchip Technology, Inc., Micromas Semiconductor Holding, AG, National Semiconductor Corporation, Nanya Technology Corporation, NXP B.V., ON Semiconductor Corporation, Powerchip Semiconductor Corporation, ProMOS Technologies, Inc., Spansion, Inc., STMicroelectronics NV and Vanguard International Semiconductor Corporation ("Defendants").

The complaint alleges that certain Spansion Flash products, including Spansion's 4 Mb CMOS 3.0 Volt-only Simultaneous Read/Write Flash Memory and 1 Gb MirrorBit NOR Flash products, infringe at least claim 1 of U.S. Patent No. 5,227, 335 (the "Asserted Patent"). The complaint seeks a declaration that Spansion infringes the Asserted Patent, permanent injunctive relief and unspecified reasonable royalty and other damages, a trebling of damages for alleged willful conduct and attorney's fees.

On June 13, 2008 Defendants filed an unopposed motion to stay the Eastern District of Texas action pending resolution of an ITC investigation that is described below. On June 13, 2008, Judge T. John Ward issued an order staying the Eastern District of Texas action until a final determination of the ITC investigation described below.

LSI Corporation and Agere Systems, Inc. filed a proof of Claim against Spansion Inc. in an unliquidated amount relating to this litigation.

### *LSI, Agere ITC Investigation*

On April 18, 2008, LSI Corporation and Agere Systems, Inc. (collectively the "LSI Complainants") filed a complaint under section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the ITC against respondents United Microelectronics Corporation, Integrated Device Technology, Inc., AMIC Technology Corporation, Elpida Memory, Inc., Freescale Semiconductor, Inc., Grace Semiconductor Manufacturing Corporation, Microchip Technology, Inc., Micromas Semiconductor Holding, AG, National Semiconductor Corporation, Nanya Technology Corporation, NXP B.V., ON Semiconductor Corporation, Powerchip Semiconductor Corporation, ProMOS Technologies, Inc., Spansion, Inc., STMicroelectronics NV and Vanguard International Semiconductor Corporation.

The complaint alleges that certain Spansion Flash products, including Spansion's 4 Mb CMOS 3.0 Volt-only Simultaneous Read/Write Flash Memory and 1 Gb MirrorBit NOR Flash products, infringe at least claim 1 of U.S. Patent No. 5,227,335 (the "Asserted Patent"). The complaint identifies, under the heading "Related Litigations," other lawsuits involving the Asserted Patent, including Agere Systems, Inc. v Atmel Corporation, Civil Action No. 2:02-CV-864 (E.D. Pa.) (the "Atmel case"). The complaint requests that the ITC institute an investigation

27

into the matter. The LSI Complainants seek a permanent exclusion order pursuant to section 337(d) of the Tariff Act of 1930, as amended, excluding from entry into the United States all semiconductor IC devices and products containing same, made by a method that infringes one or more claims of the Asserted Patent. The LSI Complainants also seek a permanent cease and desist order pursuant to section 337(1) of the Tariff Act of 1930, as amended, directing respondents to cease and desist from importing, selling, offering for sale, using, demonstrating, promoting, marketing, and/or advertising in the United States, or otherwise transferring outside the United States for sale in the United States, semiconductor IC devices and products containing same made by a method that infringes one or more claims of the Asserted Patent.

On May 16, 2008, the ITC instituted an investigation pursuant to 19 U.S.C. § 1337, entitled In the Matter of Certain Semiconductor Integrated Circuits Using Tungsten Metallization and Products Containing Same No. 337-TA-648, identifying United Microelectronics Corporation, Integrated Device Technology, Inc., AMIC Technology Corporation, Elpida Memory, Inc., Freescale Semiconductor, Inc., Grace Semiconductor Manufacturing Corporation, Microchip Technology, Inc., Micromas Semiconductor Holding, AG, National Semiconductor Corporation, Nanya Technology Corporation, NXP B.V., ON Semiconductor Corporation, Powerchip Semiconductor Corporation, ProMOS Technologies, Inc., Spansion, Inc., STMicroelectronics NV and Vanguard International Semiconductor Corporation ("LSI Respondents") as respondents.

On June 5, 2008, respondents Elpida Memory, Inc., Freescale Semiconductor, Inc., Grace Semiconductor Manufacturing Corporation, Integrated Device Technology, Microchip Technology, Inc., Nanya Technology Corp., Powerchip Semiconductor Corp., Spansion Inc. and ST Microelectronics N.V. filed a joint motion for summary determination that the LSI Complainants are precluded from re-litigating an invalid patent, based upon the jury finding of invalidity and the court ruling affirming the invalidity finding of the Asserted Patent in the Atmel case.

On June 27, 2008, Administrative Law Judge Carl L. Charneski set an Initial Determination date of May 21, 2009, with a hearing to be completed by March 13, 2009, and a target date for completion of the ITC investigation of August 21, 2009. On September 18, 2008, Judge Charneski granted the LSI Complainants' motion to add five respondents, Dongbu HiTek Semiconductor Business; Jazz Semiconductor, Magnachip Semiconductor; Qimonda AG, and Tower Semiconductor, Ltd. On October 30, 2008, Judge Charneski denied the LSI Complainants' request to add additional claims of infringement against Spansion, and also suspended the current procedural schedule.

On November 5, 2008, Judge Charneski issued a modified procedural schedule, rescheduled the hearing to be completed by July 24, 2009, set an Initial Determination date of September 21, 2009, and a target date for completion of the ITC investigation of January 21, 2010. On February 3, 2009, the ITC issued an opinion affirming the ITC determination that the LSI Complainant are not precluded from re-litigating the validity of the patent.

A hearing was held before Judge Charneski July 20 through July 27, 2009. The Initial Determination ("ID") of Judge Charneski, which was issued on September 21, 2009, held that

the patent asserted by LSI/Agere is invalid and that Spansion Inc. is not a proper party to the action.

### *Spansion v. Samsung Patent Infringement Litigation*

As of the Petition Date, the Debtors were party to patent infringement proceedings involving Samsung, and Spansion Japan was party to a patent infringement action by Samsung in Japan. As described in Section III.E.6. below, subsequent to the Petition Date, Samsung or its affiliates have commenced two new patent infringement actions against the Debtors.

#### *Spansion ITC Investigation*

On November 17, 2008 Spansion Inc. and Spansion LLC filed a complaint under section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the ITC against respondents Samsung, Samsung Electronics America, Inc., Samsung International, Inc., Samsung Semiconductor, Inc., and Samsung Telecommunications America, LLC and Apple, Inc., Hon Hai Precision Industry Co., Ltd., AsusTek Computer Inc., Asus Computer International, Inc., Kingston Technology Company, Inc., Kingston Technology (Shanghai) Co. Ltd., Kingston Technology Far East Co., Kingston Technology Far East (Malaysia) Sdn. Bhd., Lenovo Group Limited, Lenovo (United States) Inc., Lenovo (Beijing) Limited, Lenovo Information Products (Shenzhen) Co., Ltd., Lenovo (Huiyang) Electronic Industrial Co., Ltd., Shanghai Lenovo Electronic Co., Ltd., PNY Technologies, Inc., Research In Motion, Ltd., Research In Motion Corporation, Sony Corporation, Sony Corporation of America, Sony Ericsson Mobile Communications AB, Sony Ericsson Mobile Communications (USA), Inc., Beijing SE Putian Mobile Communication Co., Ltd., Transcend Information Inc., Transcend Information Inc. (US), Transcend Information Inc. (Shanghai Factory), Verbatim Americas LLC, and Verbatim Corporation (collectively "Downstream Respondents"). In the complaint, Spansion Inc. and Spansion LLC allege that Samsung and Downstream Respondents infringe United States Patent Nos. 6,380,029, 6,080,639, 6,376,877, and 5,715,194 (the "Asserted Patents"), which are owned by Spansion LLC, through the unlawful importation into the United States of certain Samsung flash memory chips. The complaint seeks a permanent general exclusion order pursuant to section 337(d) of the Tariff Act of 1930, as amended, excluding from entry into the United States the Samsung chips that infringe any of the Asserted Patents, and all products produced by Downstream Respondents that contain such chips. The complaint also seeks a permanent cease and desist order pursuant to section 337(f) of the Tariff Act of 1930, as amended, prohibiting Samsung and Downstream Respondents from importing, selling for importation, using, offering for sale, selling after importation, building inventory for distribution, distributing, licensing, or otherwise transferring within the United States, Samsung chips that the Asserted Patents, and/or products containing such chips.

On December 18, 2008 the ITC instituted an investigation pursuant to 19 U.S.C. § 1337, entitled *In the Matter of Certain Flash Memory Chips and Products Containing Same*, Inv. No. 337-TA-664 (the "Spansion ITC Action"), identifying Samsung and Downstream Respondents ("Respondents") as respondents. On December 19, 2008, Administrative Law Judge Charles E. Bullock set a target date for completion of the ITC Investigation of April 19, 2010, and set the hearing to begin July 27, 2009. Subsequently, on February 9, 2009, Judge Bullock extended the target date for the investigation to June 18, 2010, and re-set the hearing to begin on September