# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | CHAPTER 11 |
|  | : |  |
| **SPANSION, INC.,** *et al.*[1] | : |  |
| Debtors | : | Case No. 09-10690 (KJC) |
|  | : |  |

## MEMORANDUM[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On November 30, 2009, a hearing was held in connection with the Motion for

Appointment of an Official Committee of Equity Security Holders (the "Motion") brought by the

Ad Hoc Committee of Equity Security Holders (the "Ad Hoc Equity Committee).[3]  The Motion

is opposed by the Debtors (D.I. 821), the Official Committee of Unsecured Creditors (the

"Creditors' Committee") (D.I. 814), the Ad Hoc Consortium of Floating Rate Noteholders (the

"FRNs") (D.I. 812), HSBC Bank USA, National Association (D.I. 848),  and the United States

---

[1]The Debtors being jointly administered in this case pursuant to an Order dated March 4, 2009, are: Spansion, Inc., a Delaware corporation; Spansion Technology, LLC, a Delaware limited liability company; Spansion LLC, a Delaware limited liability company; Cerium Laboratories, LLC, as Delaware limited liability company; and Spansion International, Inc., a Delaware corporation (the "Debtors" or "Spansion").

[2]This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  Venue is proper pursuant to 28 U.S.C. § 1409.  This contested matter involves a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A)and (O).

[3]The original Motion for Appointment of an Equity Security Holders Committee (D.I. 602) was filed on June 8, 2009 by Philip Mathers, but dismissed with prejudice by Order dated October 22, 2009 (D.I. 1422).  However, joinders to the original motion were filed by The John Gorman 401(K) (D.I. 1044, and, as amended, docket no. 1104), Esopus Creek Value L.P., Schottenfeld Associates, L.P. and Plainfield Asset Management, LLC (D.I. 1250), and Orange Capital LLC (D.I. 1265). The Joinders are the basis for the motion moving forward at this time.

Trustee (D.I. 820).[4]

The Ad Hoc Equity Committee asserts that an official committee is needed to ensure that the equity security holders are adequately represented in this bankruptcy case, particularly with respect to the upcoming plan confirmation process.   The Objecting Parties argue that an official committee should not be appointed under Bankruptcy Code §1102, because the equity security holders can adequately represent themselves without causing the estate to incur the cost of an official committee and, further, the Ad Hoc Equity Committee cannot demonstrate a substantial likelihood that equity will  receive a meaningful distribution in this case.  At the November 30, 2009 hearing, the Ad Hoc Equity Committee and the Objecting Parties presented evidence and argument in support of their positions.[5]

For the reasons set forth herein, the Motion will be denied.

Undisputed Facts.

In the Joint Pretrial Memorandum filed by the parties (D.I. 1781), the parties agreed to the following undisputed facts:

On March 1, 2009 (the "Petition Date"),  the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors-in-possession

---

[4]The Debtors, Creditors' Committee, FRNs, HSBC Bank USA, N.A., and United States Trustee may be jointly referred to herein as the "Objecting Parties."

[5]The transcript of the November 30, 2009 hearing is cited to herein as "Tr. at __." The exhibits that were admitted at the hearing are cited to herein as "Debtors' Ex. _", "FRN Ex. __," or "Ad Hoc Equity Committee Ex.__." Certain limited portions of the transcript and of some of the exhibits, by agreement of the parties and with the approval of the Court (Order dated December 14, 2009, D.I. 1986) are sealed or redacted.

pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  On March 4, 2009, the Court

entered an order directing the joint administration of the Chapter 11 Cases under the case of

Spansion Inc., Case No. 09-10690 (D.I. 58).  On March 12, 2009, the Office of the United States

Trustee appointed an official committee of unsecured creditors for the Chapter 11 Cases (D.I.

106).

The Debtors filed a disclosure statement (the "Disclosure Statement") on October 26,

2009.  Attached to the Disclosure Statement as Exhibit A was a draft chapter 11 plan of

reorganization (the "Chapter 11 Plan").  The Chapter 11 Plan proposes no distribution to existing

common equity holders, whose interests will be cancelled.

The Disclosure Statement states that the Gordian Group, the Debtors' financial advisor,

has estimated that the mid-point of the total value for distribution under the plan is approximately

$1.07 billion.[6]

Overview of the Debtors' Business.

The Debtors are semiconductor device companies which design, develop, manufacture,

market and sell Flash memory products and solutions.  Spansion's products are integrated into a

broad range of electronic products, including mobile phones, consumer electronics, automotive

electronics, networking and telecommunications equipment, servers and computer peripherals.

(Redlined Amended Disclosure Statement at 17).

---

[6]The Debtors filed a First Amended Disclosure Statement for Debtor's First Amended Joint Plan
of Reorganization Dated November 25, 2009, which increased the Gordian Group's estimate of the mid-
point of the total value for distribution from approximately $1.07 billion to $1.09 billion. *See* Notice of
Filing of Redline Of First Amended Disclosure Statement For Debtors' First Amended Joint Plan of
Reorganization Dated November 25, 2009, p. 119. (D.I. 1819) (the "Redlined Amended Disclosure
Statement").

Flash memory is a "non-volatile" memory solution, meaning that it retains its contents even after power is shut off, allowing memory contents be retrieved at a later time. (*Id.* at 18). There are two main types of Flash memory: NOR and NAND.[7] (*Id.* at 20). Spansion designs, develops, manufactures, markets and sells NOR Flash memory products and solutions, and together with Numonyx, accounts for 63% of the NOR Flash memory market. (Houlihan Lokey Expert Report for Spansion, Inc., dated November 20, 2009 (the "H&L Report"), FRN Ex. 156, at 29).

Spansion is headquartered in Sunnyvale, California, with research and development, manufacturing and assembly operations in the United States, Middle East, Europe and Asia. In fiscal year 2008, the net sales of wireless applications (such as mobile phones), and embedded

---

[7]The Debtors' Amended Disclosure Statement describes the two types of semiconductor memory as follows:

> The terms NOR and NAND refer to the architecture of the connections between the memory cells of the device which produce the different characteristics of the two memory types... . NAND offers a number of desirable attributes: it is relatively inexpensive, a small device can hold a great amount of information, and its performance characteristics are particularly well suited to data storage such as music, pictures, video, etc. The market for NAND Flash memory has grown rapidly in recent years owing to the growing popularity of devices that consumers can use to access their personal media in a portable, batter-powered format.
>
> . . . .
>
> NOR Flash memory has different characteristics than NAND Flash memory. . . . Though NOR Flash memory is more expensive than NAND for comparable densities, it is also available in much lower densities with lower prices than NAND and for this reason alone is preferred in many applications that do not require the greater storage capacity of NAND. At higher densities similar to NAND, the high reliability and ease of use of NOR, in addition to its ability to support a more efficient and cost effective memory sub-system in certain applications, make it a favored solution. These characteristics continue to drive NOR Flash memory use in embedded applications. For example modern automobiles are dependent on NOR Flash memory for engine control, transmission control, ABS systems, anti roll systems and a multitude of other operations in the vehicle. The majority of cell phones continue to use NOR Flash memory. The telecommunication, networking, consumer electronics, and industrial control industries rely on NOR Flash memory.

Debtors' Amended Disclosure Statement at 20.

applications (gaming, set top boxes, DVD players, automotive) each represented approximately

50% of the Debtors' total net sales. (H&L Report at 15).

The Debtors' Business Transition.

The Debtors are currently restructuring their business to focus their energies on the

embedded market, while winding down their participation in the less profitable wireless market.

The Debtors have started implementing the following operational initiatives: reducing the overall

workforce by 40% and management structure by 45%; divesting non-key assets, such as closing

and/or selling facilities in Thailand and Malaysia; closing its research and development (R&D)

fabrication facility in Sunnyvale, CA; and consolidating manufacturing capacity in its fabrication

facility in Austin, TX. (H&L Report, at 17).

Legal Standard.

A bankruptcy court may appoint an additional committee in a bankruptcy case pursuant to

Bankruptcy Code §1102(a)(2), which provides:

> On request of a party in interest, the court may order the appointment of additional
> committees of creditors or of equity security holders if necessary to assure
> adequate representation of creditors or of equity security holders. The United
> States Trustee shall appoint any such committee.

11 U.S.C. §1102(a)(2). The Ad Hoc Equity Committee, as the moving party, has the burden of

proving that an additional committee is needed for adequate representation. *Victor v. Edison*

*Bros. Stores (In re Edison Bros. Stores, Inc.)*, 1996 WL 534853, *4 (D.Del. September 17,

1996). The Code does not define "adequate representation," and the Court has discretion to

appoint an additional committee based upon the facts of the case. *Edison Bros.*, 1996 WL

534853, *3. *See also In re Dana Corp.*, 344 B.R. 35, 38 (Bankr.S.D.N.Y. 2006) ("Bankruptcy

courts have discretion to examine the circumstances on a case-by-case basis to determine if additional committees are warranted.")

In determining whether to appoint an additional committee, the factors a court will consider may include the number of shareholders, the complexity of the case, and whether the cost of an additional committee significantly outweighs the concern for adequate representation. *In re Williams Commc'n Group, Inc.*, 281 B.R. 216, 220 (Bankr.S.D.N.Y. 2002). In particular, the moving party must show that:

> (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

*Exide Tech. v. State of Wisconsin Inv. Bd.*, 1996 WL 534853, *1 (D.Del. Dec. 23, 2002) citing *Williams*, 281 B.R. at 223. *See also In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr.N.D.Tex. 2009) (Courts will also consider the following factors in determining whether to appoint an equity committee under §1102(a)(2): "(i) whether Debtors are likely to prove solvent; (ii) whether equity is adequately represented by stakeholders already at the table; (iii) the complexity of the Debtors' cases; and (iv) the likely cost to Debtors' estates of an equity committee.")

The court's appointment of an additional committee is considered "extraordinary relief" and should be "the rare exception." *Dana Corp.*, 344 B.R. at 38, *Exide Tech.*, 1996 WL 534853 at *1.

Discussion.

(A)    Whether there is a substantial likelihood that equity security holders will receive a distribution in this case under a strict application of the "absolute priority rule?"

Section 1102 of the Bankruptcy Code provides for the appointment of creditors' and equity security holders' committees to supervise the debtor in possession and to protect their constituents' interests. H.R. Rep. No. 95-595, at 401 (Sept. 8, 1977). The committees' powers and duties include participation in the formulation of a plan. *Id.*, 11 U.S.C. 1103(c)(3). However, if equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan. *See Williams*, 281 B.R. at 220 (If equity holders have no economic interest left to protect, neither the debtors nor the creditors should have to bear the expense of negotiating what would be, in essence, a "gift" for the equity holders.) Therefore, in weighing the cost of appointing an official committee of equity security holders against the potential benefit of such a committee, a court should consider whether there is a substantial likelihood that the equity security holders will receive a distribution.

The Objecting Parties argue that the Debtors' insolvency, and application of the absolute priority rule of Bankruptcy Code §1129(b)(2)(B), preclude the equity security holders from receiving any distribution on account of their interests in the chapter 11 plan. Under the balance sheet test, a corporation is insolvent if the fair market value of its assets is less than its liabilities. *See* 11 U.S.C. §101(32). The Debtors argue that their insolvency has been shown throughout this case. First, the Schedules of Assets and Liabilities (D.I. 719, 721, 723-25, 727 and 729)(the "Schedules"), listed approximately $1 billion in assets and approximately $1.6 billion in

liabilities.[8]   More recently, the Amended Disclosure Statement For the Debtors' First Amended

Joint Plan of Reorganization Dated November 25, 2009 (the "Amended Disclosure

Statement")(D.I. 1817)[9] includes an analysis of the Debtors' reorganized value prepared for the

Debtors by the Gordian Group, which concludes that "the Enterprise Value of the Reorganized

Debtors ranges from $625 to $900 million, with a midpoint of $762.5 million as of an assumed

Effective Date of January 1, 2010." (Amended Disclosure Statement at 113).[10]   The Gordian

Group analysis also estimates a mid-point Distributable Value for the Debtors of approximately

$1.09 billion.[11]  (Id.). In its analyses, the Ad Hoc Equity Committee estimated the Debtors' total

claims  to be in a range of $1.6 to $2.2 billion, although the Debtors argued that the amount will

---

[8]The Debtors noted that the Schedules listed the net book value of the Debtors' assets as listed in
their books and records.  Further, the amount of liabilities is adjusted to include liabilities owed by more
than one Debtor only once.  See Memorandum of Law in Further Support of the Debtors' Objection, D.I.
1798, at 7.

[9]On October 26, 2009, the Debtors filed a Joint Plan of Reorganization (D.I. 1477) and a
Disclosure Statement for the Debtors' Joint Plan of Reorganization (D.I. 1479).  On November 25, 2009,
the Debtors filed the First Amended Joint Plan of Reorganization (D.I. 1816) and the Amended
Disclosure Statement.
        I take judicial notice that the Debtors have since filed yet another joint plan (filed on December
9, 2009) and disclosure statement (filed on December 10, 2009) (D.I. 1919 and 1921, respectively),
which are not a part of this record.  A hearing to consider approval of the amended disclosure statement
was held and concluded on December 14, 2009, at which hearing the Ad Hoc Equity Committee was
represented by counsel and participated in support of its objection to the proposed disclosure statement.
An order approving the most recent amended disclosure statement was entered on December 18, 2009.
(D.I. 2042).

[10]See Redlined Amended Disclosure Statement at 119.

[11]The Gordian Group prepared a valuation analysis "for the purpose of determining value
available for Distribution to Holders of Allowed Claims and Allowed Interests [as those terms are
defined in the Amended Plan] pursuant to the compromises embodied in the Plan and to analyze the
relative recoveries to such Holders thereunder." (Redlined Disclosure Statement at 118).  The term
"Distributable Value" is defined in the Amended Disclosure Statement to mean the value available for
Distribution to Holders of Allowed Claims and Allowed Interests, which is derived from the "Enterprise
Value," which is an estimated value of the Reorganized Debtors' operations on a going-concern basis.
Id.

be even higher after adding administrative and priority claims, and the potential claims of

Spansion Japan Limited.[12] (*See* Expert Report of Henry Owsley, Debtors' Ex. 101 at 5 (the

"Owsley Report")).

Unsecured creditors are impaired under the Debtors' proposed Amended Plan, and will

not receive full payment of their claims. Equity security holders are also impaired under the

Debtors' proposed Amended Plan, and will not receive any distribution on their interests.

(Redlined Amended Disclosure Statement at 68-70).

The Ad Hoc Equity Committee argues that the Debtors' reorganization value is based

upon projections that are too conservative and extend out only as far as fiscal year 2012. In

particular, the Ad Hoc Equity Committee criticizes the Debtors' adoption of a "steady state"

(sometimes also described as "asset-light") long-term profitability scenario, which anticipates

future declines in the Debtors' revenues and profit margins.[13] The Ad Hoc Equity Committee

argues that under a proper analysis that accounts for growth in the memory market and proper

---

[12]Spansion Japan Limited, a Japanese corporation and wholly-owned subsidiary of the Spansion LLC, commenced its own proceeding under the Corporate Reorganization Law (Kaisha Kosei Ho) of Japan on February 10, 2009, and its foreign representative commenced a chapter 15 proceeding in this Court on April 30, 2009 (Case no. 09-11480). *See* Redlined Amended Disclosure Statement at 40.

[13]Section VI of Exhibit C to the Debtors' Amended Disclosure Statement describes the "steady state" portion of the Debtors' projections as follows:

> [The] Gordian Group worked with Management to develop a "steady state" long term profitability scenario . . . . Management anticipates fulfilling future demand for products produced with advanced technologies with wafers manufactured by third parties. This transition will reduce capital expenditure needs, but will also lower profit margins because of the higher costs of purchasing wafers from outside fabrication facilities. . . .
>
> A significant portion of the decline in EBITDA between 2012 and the "steady state" year is due to an anticipated sharp decline in revenues in the wireless segment. In conjunction with the above, steady state capital expenditures are expected to fall from $100 million as projected for 2012 in the Base Case to $30 million in subsequent years.

(Redlined Amended Disclosure Statement, Exhibit C at C-6).

valuation of all of the Debtors' assets, there is sufficient value for the equity security holders to receive a distribution under the plan. As the moving party, the Ad Hoc Equity Committee has the burden of persuasion on this issue.

In support of its position, the Ad Hoc Equity Committee introduced an expert report prepared by Oppenheimer & Co, Inc. (the "Oppenheimer Report") (Ad Hoc Equity Committee Ex. 6), together with the oral testimony of Oppenheimer's F. John Stark, III, and Ido Stern. The Ad Hoc Equity Committee acknowledges that the Oppenheimer Report is not a "full blown valuation," but includes a "sensitivity analysis" to demonstrate that a forward-looking analysis of the Debtors' future business would support a finding of increased value. (*See* Tr. at 40:12-18, 109:1-9). The summary in the Oppenheimer Report shows the Debtors' value to be as high as $3.2 billion, with each of the different valuation methodologies placing the Debtors' value to be sufficient to pay - - at least - - the amount of the Debtors' estimated total claims.[14] (*See* Oppenheimer Report at 8). Thus, the Ad Hoc Equity Committee argues that it has met its burden of showing that there is a substantial likelihood of a distribution to equity security interests in this case.

The Objecting Parties challenge the Oppenheimer Report and claim that it is based on a number of inappropriate assumptions. The main areas of the parties' disagreement are discussed below.

(1)    The future of the NOR memory market and its effect on comparables.

An overall critique of the Oppenheimer Report is its failure to incorporate into its

---

[14]The valuation methods considered in the Oppenheimer Report include a precedent transaction analysis, a comparable trading multiple analysis, and a discounted cash flow analysis.

analyses the projected decline in revenue and market shrinkage for NOR memory products. All

of the experts, relying on industry sources such as Gartner and iSuppli (research firms that

regularly publish historical and projected statistics for the semiconductor industry), project a

continuing decline in NOR flash memory revenue through 2012. (*See* H&L Report at 30;

Oppenheimer Report at 18 ("Memory Semiconductor Revenue CAGRs"),[15] and Owsley Report,

Appendix E).[16] Gartner forecasts a decline in NOR memory revenue despite the projected

growth in the overall memory market. (*See* Oppenheimer Report at 18 ("Memory Semiconductor

Revenue Forecast"), Owsley Report, Appendix E). In particular, the experts' reports show a

dramatic difference between the forecasted growth in revenues for NAND memory and the

decrease in revenues for NOR memory. (*See* H&L Report at 30, Owsley Report, Appendix E.

*See also* Tr. at 216:20 - 217:8). The Oppenheimer Report also shows revenue growth in DRAM

memory market.[17] (*See* Oppenheimer Report at 18, "Memory Semiconductor Revenue

CAGRs").

It is important, therefore, to distinguish between future prospects for companies in the

NOR memory market in particular, and the overall semiconductor memory market. The

Objecting Parties claim that Oppenheimer fails to make this distinction in many of its analyses.

---

[15]"CAGRs" means compound annual growth rates.

[16]*See also* Ad Hoc Equity Committee Ex. 40 at 13 (Gartner Semiconductor DQ Monday Report, Issue 42 dated Oct. 26, 2009 discussing pricing declines for NOR Flash).

[17]DRAM (or Dynamic Random Access Memory) is a semiconductor integrated circuit, and the dominant volatile memory architecture used in nearly all electronic systems that also contain a microprocessor. (Redlined Amended Disclosure Statement at 19). The principal advantage of DRAM is very high performance, but if the circuit loses power (intentionally or not) the information stored on the DRAM is lost. (*Id.*). Many electronic systems employ several types of memory to achieve a balance of the different memory attributes. (*Id.*).

For example, in its comparable trading multiple analysis, Oppenheimer selects comparable

companies that are highly concentrated in the DRAM and NAND memory markets (with the

exception of one company, Macronix). Using the DRAM and NAND "comparable" companies

to derive a median trading multiple effectively inflates the valuation multiples. (*See* H&L Report

at 8; Owsley Report at 4, ¶11 and at 9-12. *See also* Tr. at 230:3-24).

The Objecting Parties similarly critique the Precedent Transaction Analysis in the

Oppenheimer Report for failing to focus on transactions in the NOR industry. (*See* H&L Report

at 11, Owsley Report at 5-6). The Oppenheimer Report distinguishes between "all

semiconductor" and "memory only" comparables, but fails to limit the comparisons to other

NOR transactions, which skews the multiples upward to create a higher valuation. (*See*

Oppenheimer Report at 35-37, H&L Report at 11, Owsley Report at 5-6).

While there may be no easy comparables for the Debtors, it does not necessarily follow

(as argued by the Ad Hoc Equity Committee) that the entire semiconductor industry, or even the

other players in the memory portion of the semiconductor industry, can be used in the absence of

"good" comparables.

(2)    Discounted Cash Flow - Terminal Value.

The Ad Hoc Equity Committee's expert prepared four valuations of the Debtors using a

discounted cash flow ("DCF") analysis. The first two DCF analyses are based upon the Base

Case and Contingency Case projections prepared by the Debtors.[18]  The Oppenheimer Report,

_____

[18]The Debtors prepared two sets of projections. In April and May 2009, the Debtors developed
the "Base Case" forecast of its financial statements, which represented management's best estimate as of
May 2009 of the future performance of the Debtors over the 2010 to 2012 period. (Redlined Amended
Disclosure Statement at 60). In preparing the Base Case, the Debtors' management identified a number
of risks and opportunities that could impact the Debtors' ability to perform consistently with the Base

however, claims that the Debtors' projections "undervalue the true cash flow potential of the business" and, therefore, Oppenheimer developed a "sensitivity case" that it applied to the Debtors' projections to prepare a third DCF analysis. (*See* Oppenheimer Report at 46-47). The fourth DCF analysis assumes a sale of the Debtors' wireless business and a cash flow projection for the remaining business of Spansion. (*Id.* at 54).

The Objecting Parties' main criticism of the Oppenheimer DCF analyses is based upon the "terminal value" used by Oppenheimer, or the present value of the Debtors' anticipated cash flows to be generated beyond 2012. (*See* Owsley Report at 13). The Objecting Parties noted that the terminal value accounts for over 70% of the calculated DCF enterprise valuations. (*See* H&L Report at 9). As stated in the Owsley Report:

> When using an exit EBITDA multiple in conjunction with a DCF analysis, it is important to determine what the analysis implicitly assumes with respect to estimates of after-tax cash flow and growth rates - - two critical drivers - - to determine the reasonableness of the multiples used.

Owsley Report at 14.[19]

In determining the terminal value, Oppenheimer applied an EBITDA multiple range of 5.5x to 8.5x to projected 2012 EBITDA. (*See* Oppenheimer Report at 51-54, Owsley Report at

---

Case. (*Id.* at 61).

    After completing the Base Case, the Debtors had meetings and discussions with the Creditors' Committee and FRNs, who asked the Debtors to quantify the potential downsides and explore and quantify any potential upsides to the Debtors' financial forecast in the Base Case. (*Id.*). The Debtors considered the extent certain issues could result in potential downside risks to the Debtors' ability to perform consistent with the Base Case and developed an alternate scenario. (*Id.*). The Debtors' financial advisors, the Gordian Group, worked with management to develop a "Contingency Case" forecast by refining the Debtors' view of potential downsides to the 2010 business plan, as well as extending the downside analyses to the 2011 and 2012 forecast years. (*Id., see also* Exhibit C to the Amended Disclosure Statement).

[19]EBITDA is short-hand for earnings before interest, taxes, depreciation and amortization.

13). The Objecting Parties argue that the terminal growth multiples used in the Oppenheimer DCF analyses assume perpetual cash flow growth rates for the Debtors' business, despite the Debtors' plans to exit the wireless part of their business and, as discussed above, industry forecasts for substantial declines in the NOR flash market. (*See* Owsley Report at 15, H&L Report at 9-10, Tr. at 229:1-10). The Oppenheimer DCF terminal value calculations ignore the Debtors' "steady-state" projections. (Tr. at 228:25 - 229:1, Tr. 115:24 - 116:7). The Objecting Parties claim that these terminal value multiples inappropriately inflate the Oppenheimer valuations. (H&L Report at 9). The Owsley Report adjusts the Oppenheimer DCF analyses two ways: first, Owsley uses "more appropriate and supportable terminal growth rates of between negative 2.5% and 0.0%," and second, he further adjusts the DCF analysis to take into account the Debtors' "asset-light strategy and the corresponding impact on steady-state cash flows." The variations in the Debtors' total distributable value, which are caused by changing the assumptions, are shown in the following chart:

|  | Oppenheimer DCF Value Range | Owsley 1st Adjusted DCF Value Range | Owsley 2nd Adjusted DCF Value Range (for steady-state/asset-light strategy) |
|---|---|---|---|
| Base Case | $1.795 - $2.686* | $1.277 to $1.481 | $1.208 to $1.383 |
| Contingency Case | $1.466 to $2.197 | $997 to $1.116 | $967 to $1.073 |
| Oppenheimer Case | $2.164 to $3.231 | $1.539 to $1.818 | $1.300 to $1.479 |

*All figures are expressed in $billions.

(Oppenheimer Report at 8; Owsley Report at 15-16). This chart demonstrates how changes in the underlying assumptions - - no surprise - - affect the valuation. The assumptions underlying the terminal value calculation in the Oppenheimer Report are not supportable on this record and cannot serve as a basis to demonstrate asserted higher value(s).

(3)    <u>Valuation of all assets</u>

The Ad Hoc Equity Committee argues that the total distributable value set forth in the

Debtors' proposed Amended Plan and Amended Disclosure Statement excludes several assets

that could "significantly" increase Spansion's value. (Oppenheimer Report at 58). The

Oppenheimer Report, therefore, adds the value of these "missing" assets to its analyses. First, it

adds $200 million of additional value to each of its valuation methodologies, because it assumes

"conservatively" a value of $100 million each for the Debtors' patent infringement litigation with

Samsung Electronics Co., Ltd. ("Samsung")[20] and for the Debtors' net operating losses. (*Id.* at 8

and 58). The Oppenheimer Report also adds almost $307 million of assets to the "base value,"

which is determined by each valuation methodology, consisting of $239.1 million in cash, $42.9

million from the proceeds of the expected sale of certain auction rate securities, and $24.7

million from the sale of a subsidiary which owned and operated a manufacturing facility in

Suzhou, China. (Tr. at 93:14-23, Oppenheimer Report at 8, n.3). Finally, the Ad Hoc Equity

Committee argues that the Debtors' have failed to include a value for its intellectual property

portfolio. Although the Oppenheimer Report does not place a value on the intellectual property

portfolio, the Ad Hoc Equity Committee argues that the intellectual property was another source

of incremental value that has been excluded by the Debtors. (*See* Tr. at 90:5-13).

The Debtors agree that it is appropriate to add the value of the cash, and the proceeds

from the sale of the auction rate securities and Suzhou facility. The Debtors' Amended

Disclosure Statement revised the estimated mid-point Distributable Value to include those assets.

---

[20]For a description of the patent infringement litigation, see *In re Spansion, Inc.*, 2009 WL 3170304 (Bankr.D.Del. Oct. 1, 2009).

(*See* Redlined Disclosure Statement at 119). However, the Debtors argue that the other assets identified by the Ad Hoc Equity Committee are appropriately excluded from a valuation analysis because the value of those assets is speculative or insignificant.

The Oppenheimer Report values the Samsung litigation at $100 million (*see* Oppenheimer Report at 59), but the Objecting Parties argue - - correctly - - that Oppenheimer did not perform a meaningful evaluation of the litigation and did not analyze factors that would affect a settlement, such as additional litigation, expenses, timing, uncertainty, taxes, and the present value of a settlement. (Owsley Report at 17, *see also* Tr. at 67:8 - 68:3). Therefore, the value given to the Samsung litigation in the Oppenheimer Report can be accorded no evidentiary weight.

The Oppenheimer Report also sets the present value of the benefit of using the Debtors' NOLs at $100 million. The Oppenheimer Report's value was based upon an NOL analysis performed on August 3, 2009. (Oppenheimer Report at 60). The NOL analysis was updated and revised in October 2009 (Owsley Report at 18, Tr. 86:3 - 86:8), but the Oppenheimer Report did not use the revised numbers and there is a difference of opinion on how the more recent NOL numbers would affect the valuation. (Owsley Report at 18, Tr. at 86:9 - 87:5). I conclude that the NOL value asserted in the Oppenheimer Report is not sufficiently supported to be of material evidentiary value.

Finally, the parties disagree about whether the Debtors' Intellectual Property portfolio adds value. The Ad Hoc Equity Committee's expert believes that the intellectual property could provide an additional source of incremental value for the Debtors, but could not quantify that amount. (Tr. at 90:5- 90:13). The Debtors, however, have not been able to monetize their

intellectual property. (*See* Owsley Deposition, Nov. 25, 2009, at 57:19 - 59:13). The Debtors

decided against attributing value to their intellectual property, due to the length of time needed to

do so and the uncertainties of realizing any revenues, especially from any "piecemeal"

disposition of such property. (*Id.* at 59:20 - 60:2, Tr. at 191:23 - 192:13).

(4)    Total amount of estimated claims against the Debtors.

The Ad Hoc Equity Committee relies on the Oppenheimer Report to show that the

Debtors' value, as compared to the amount of estimated claims against the Debtors, provides a

substantial likelihood that equity security holders could receive a distribution. However, the

Objecting Parties also take issue with the amount of "total claims" used in the Oppenheimer

Report.

The "Summary of Valuation Analyses Compared to Liabilities" in the Oppenheimer

Report sets total claims between $1.6 billion and $2.1 billion. (Tr. at 53:12 - 53:16,

Oppenheimer Report at 8). Oppenheimer did not perform an independent analysis of the amount

of claims against the Debtors, but relied upon figures in the Debtors' disclosure statement. (Tr.

at 54:19 - 54:22). However, the "total claims" amount does not include administrative and

priority claims (Tr. at 77:6 - 77:8), or the cash needed by the Debtors to exit bankruptcy (Tr. at

77:9 - 77:11). Furthermore, the Debtors note that there may be significant claims filed by

Spansion Japan Limited arising from the rejection of a contract and post-petition administrative

claims, which were not included in the "total claims" amount since those claims have not yet

been filed. (Tr. at 79:15 - 79:25, *see* Amended Disclosure Statement, pp. 55-56).[21] The amount

---

[21]There is also a disputed request by GE Financial Services Corporation, Spansion Japan
Limited's lender, for payment of a potentially large, but as yet undetermined, administrative expense
claim. (D.I. 1213).

of "total claims" in the Oppenheimer Report, therefore, is, in all likelihood, substantially too low.

The only thing certain from the record before me is the uncertainty of the proffered valuations. The Ad Hoc Equity Committee has the burden of proving a substantial likelihood that equity security holders will receive a distribution from the Debtors, but this record does not support such a conclusion.

(B)   Whether the equity security holders are unable to represent themselves in this bankruptcy case without an official committee?

The second factor to consider is whether the equity security holders will have adequate representation in this bankruptcy case without the aid of an official committee. "[T]he statutory focus of §1102(a)(2) is not whether the equity holders are 'exclusively' represented, but whether they are 'adequately' represented." *Edison Bros.*, 1996 WL 534853 at *4. It is expected that management would normally represent, among other interests, the interests of equity security holders. *See, id.* at *5. However, as discussed by the Court in *Pilgrim's Pride*:

> While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management. The principal concern of Debtors and their managers . . . must be preservation of Debtors' going concern value and their successful emergence from chapter 11. That will occur through confirmation of a plan of reorganization. Confirmation of a plan, in turn, is heavily dependent upon Debtors reaching an accord with the [creditors' committee] and the Banks.

*Pilgrim's Pride*, 407 B.R. at 218 (citations omitted). The *Pilgrim's Pride* Court noted that the duty to maximize estate value does not equate to adequate representation of equity's interests. *Id.* at 219.

18

The Ad Hoc Equity Committee argues that the Debtors' management and some of the

Objecting Parties, together, have stone-walled its attempts to seek discovery in connection with

this Motion and the proposed plan.  The proposed plan has been negotiated between the Debtors,

the Creditors' Committee and the FRNs.[22]  The Ad Hoc Equity Committee argues that the

Debtors' proposed plan and disclosure statement are based upon a "negotiated value" of the

reorganized debtors that is "designed to disenfranchise existing shareholders and enrich a select

group of creditors and the Debtors' senior management." *See* Ad Hoc Equity Comm. Brief, D.I.

1759, at 2.  Even if I were to conclude on this record that neither the Debtors, its management,

nor the Creditors' Committee are adequately representing the interest of the equity security

holders, the Ad Hoc Equity Committee is well organized, well represented by counsel, and

adequate to the task of representing its interests without "official" status.

While the Ad Hoc Equity Committee also appears to be well-funded, it argues that the

willingness and ability to continue to fund this matter is coming to an end.   The hearing on the

disclosure statement was held and concluded on December 14, 2009.[23]  The hearing on

confirmation of the Debtors' proposed joint plan is set for February 11 and 12, 2010.  If the main

controversy in the confirmation process is the Debtors' value, much of the groundwork has been

laid by the experts in connection with the Motion.  Even though there is still work to do in

---

[22]The Creditors' Committee has since withdrawn its support for the most current proposed plan.

[23]Although the original motion for appointment of an equity committee was filed in June 2009, the hearing on this matter was continued a number of times and was not held until November 30, 2009. At this late time, there is little purpose to forming an official equity committee and requiring the estate to bear the associated costs. *In re Kalvar Microfilm, Inc.,* 195 B.R. 599, 601 (Bankr.D.Del. 1996) ("The late timing of the motion ties in to the only remaining purpose of an equity committee in this case, which would be to object to confirmation and litigate the valuation issue. The aforementioned costs associated with the formation of an equity committee cannot be justified in light of this purpose.") *See also In re eToys, Inc.,* 331 B.R. 176, 186 (Bankr.D.Del. 2005).

connection with the valuation, the Ad Hoc Equity Committee is well able to proceed and, if it

makes a substantial contribution, relief can be sought under Bankruptcy Code §503(b)(3)(D).

*See Williams*, 281 B.R. at 223 (deciding that: "[t]he second factor is critical because, in most

cases, even those equity holders who do expect a distribution in the case can adequately represent

their interest without an official committee and can seek compensation if they make a substantial

contribution in the case." )

Conclusion.

For the reasons set forth above, I conclude that the Ad Hoc Equity Committee did not

sustain its burden of demonstrating that there is a substantial likelihood that equity security

holders will receive a distribution in this case. I further conclude that the equity security holders

are adequately represented in this case without the need for an "official" committee and, if they

make a substantial contribution in this case, there exists a remedy under Bankruptcy Code

§503(b)(3)(D).

Accordingly, the Motion will be denied. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: December 18 , 2009