# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPANSION INC., *et al.*,[1] | Case No. 09-10690 (KJC) |
| Debtors. | Jointly Administered |
| | **Requested Hearing Date: January 20, 2010 at 10:00 a.m. (ET)**<br>**Requested Objection Deadline: January 15, 2010 at 4:00 p.m. (ET)** |
| | Related to D.I. 2052 |

## MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 364 FOR AN ORDER AUTHORIZING THE DEBTORS TO (I) ENTER INTO A SENIOR SECURED DEBT FACILITY WITH BARCLAYS CAPITAL AND MORGAN STANLEY SENIOR FUNDING, INC. AS JOINT LEAD ARRANGERS AND BARCLAYS BANK PLC AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT, (II) PAY FEES AND EXPENSES IN CONNECTION THEREWITH, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby file this motion (the "**Motion**") for entry of an interim order, in substantially the form attached hereto as Exhibit A (the "**Interim Order**"), and a final order (the "**Final Order**") authorizing the Debtors pursuant to sections 105, 363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") to (i) enter into a senior secured credit facility (the "**New Credit Facility**") with Barclays Capital, the investment banking division of Barclays Bank PLC ("**Barclays**") and Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**") as joint lead arrangers (collectively, the "**Arrangers**") and Barclays Bank PLC as Administrative Agent and Collateral Agent (the "**Collateral Agent**") and the lenders thereunder (the "**Lenders**") on

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Spansion Inc., a Delaware corporation (8239); Spansion Technology LLC, a Delaware limited liability company (3982); Spansion LLC, a Delaware limited liability company (0482); Cerium Laboratories LLC, a Delaware limited liability company (0482), and Spansion International, Inc., a Delaware corporation (7542). The mailing address for each Debtor is 915 DeGuigne Dr., Sunnyvale, CA 94085.

substantially the terms set forth in the Fee Letter (the "**Fee Letter**") term sheet (the "**Term Sheet**") attached hereto as Exhibit B; (ii) pay fees and expenses in connection therewith as set forth in the Fee Letter[2] between the Debtors, on the one hand, and the Arrangers, on the other hand; and (iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Federal Rules**"), and respectfully state as follows:

**JURISDICTION**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

**BACKGROUND**

**A.      Introduction**

3.      On March 1, 2009 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") with the Court. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      Due to the sensitive pricing and other proprietary information contained in the Fee Letter and Term Sheet, the Debtors have submitted to the Court an application under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 for an order authorizing them to file certain confidential information in the Fee Letter and Term Sheet, under seal (the "Seal Motion"). The Debtors will disclose the complete terms and substance of the Term Sheet, the annexes thereto and Fee Letter to the United States Trustee, counsel to the Official Committee of Unsecured Creditors, counsel to the Ad Hoc Consortium of Holders of Floating Rate Notes, counsel to the Ad Hoc Consortium of Convertible Noteholders, counsel to the Informal Group of Senior Note Holders, counsel to Bank of America, N.A. and counsel to Silver Lake Sumeru, L.P. so long as each party's respective counsel has signed an appropriate confidentiality agreement.

4. On March 4, 2009, the Court entered an interim order directing the joint administration of the Chapter 11 Cases under the case of Spansion Inc., Case No. 09-10690 [D.I. 58]. On March 12, 2009, the Office of the United States Trustee appointed an official committee of unsecured creditors for the Chapter 11 Cases (the "**Creditors Committee**") [D.I. 106].

**B.    The Debtors' Business**

5. The Debtors design, develop, manufacture, market, license and sell flash memory solutions ("**Flash Memory**"). The Debtors sell Flash Memory to leading equipment manufacturers in the mobile phone, consumer electronics and automotive electronics markets. The Debtors sell Flash Memory directly to customers and through distributors. The Debtors and the foreign subsidiaries of Spansion have facilities in the United States, the United Kingdom, Japan, China, Thailand, Malaysia, Finland, Germany, Italy, Korea, the Netherlands, Sweden, and Taiwan.

**C.    The Plan**

6. The Debtors firmly believe that the value of their estates will be maximized by an expeditious conclusion to the Chapter 11 Cases. The Debtors operate throughout the world with more than seventy percent of their revenues coming from outside the United States. While the commencement and continuation of the Chapter 11 Cases has understandably caused significant concerns among the Debtors' customers, vendors and employees in the United States, these constituencies generally have some passing familiarity with chapter 11 proceedings and realize that such proceedings are different from liquidations. Many of the Debtors' customers, vendors and employees outside of the United States, however, have no familiarity with chapter 11 and live in countries that do not have any sort of analogous reorganization proceeding. As a result, these foreign constituencies are extremely skittish about these proceedings, a fact that the Debtors' competitors continue to try to exploit.

7.    The Debtors continue to spend significant time and resources to reassure these constituencies that their business operations will continue and that the Debtors will continue to supply their needs without interruption. The Debtors have lost a number of customers and have had other customers who previously used the Debtors as a sole source for product begin to order product from the Debtors' competitors in order to hedge their exposure in the event that the Debtors' business operations are discontinued. Though the Debtors have been reasonably successful in allaying the fears of their customers, vendors and employees these stakeholders have become increasingly concerned given the duration of these cases. The best way to address these concerns is through an expeditious and successful conclusion to the Chapter 11 Cases. On the other hand, any unnecessary delay will lead to greater customer erosion, increased costs of goods and lower employee morale, thereby further eroding the value of the Debtors' estates.

8.    In addition, the administrative expenses being incurred in the Chapter 11 Cases continue to be significant, totaling more than $30 million, thus far. The indirect costs of the Chapter 11 Cases, in terms of internal time and resources, are even more significant. Senior management and many employees necessarily spend a substantial portion of each day focused on matters relating to the Chapter 11 Cases diverting their focus from the Debtors' business, including strategic planning, developing new products, securing new customers and further improving business operations. While the Debtors' senior management is spending significant time focused on bankruptcy matters, the Debtors' competitors are looking for ways to take advantage of the Debtors' bankruptcy. This also favors a speedy resolution to these Chapter 11 Cases.

9.    Since commencing the Chapter 11 Cases, the Debtors have been guided by the twin goals of maximizing the value of their estates for their creditor constituencies and

ensuring their long-term viability. In consultation with their professional advisors, the Debtors have considered a number of restructuring options, including options presented to them by their various creditor constituencies. The Debtors and their professional advisors have had numerous meetings and discussions with the Ad Hoc Consortium of Floating Rate Noteholders, the Creditors Committee and other constituencies in the Chapter 11 Cases regarding the terms of a proposed plan of reorganization.

10.     Ultimately, the Debtors filed their Second Amended Joint Plan of Reorganization Dated December 16, 2009 [D.I. 2032] (the "**Plan**") and accompanying disclosure statement on December 17, 2009.[3]  The Court entered an order approving the disclosure statement for the Plan on December 18, 2009 [D.I. 2042].  A hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") has been scheduled to commence on February 11, 2010, at 10:00 a.m.

11.     The Plan provides the Debtors with the option to select between two (2) alternatives in dealing with the claims of holders of the Debtors' prepetition floating rate notes (the "**FRNs**"). First, the Debtors can distribute cash, new senior notes in the aggregate principal amount of $237,500,000 (the "**New Senior Notes**") and new convertible notes in the aggregate principal amount of $237,500,000 (the "**New Convertible Notes**") to holders of the FRNs (the "**Restructured Debt Option**").  Alternatively, upon the satisfaction of certain conditions, the Debtors can distribute additional cash to holders of the FRNs to reduce in part or in full the principal amount of the New Senior Notes and New Convertible Notes that would otherwise be distributed to them under the first alternative (the "**Cash Out Option**").

---

[3]     The circumstances leading up to the filing of the Plan are set forth in detail in the "Debtors Opposition To Official Committee Of Unsecured Creditors Cross-Motion To Terminate Exclusive Period During Which Debtors May Solicit Votes For First Amended Joint Plan Of Reorganization Pursuant To Bankruptcy Code Section 1121(d) To Allow Committee To File Plan Of Reorganization And Solicit Acceptances Thereof" [D.I. 1956].

12. The Debtors' anticipated cash balances as of the effective date of the Plan will be hundreds of millions of dollars less than the amounts needed for them to exercise the Cash Out Option to repay the FRN claims in full. Thus, the Debtors will be in a position to exercise the Cash Out Option only if they are able to raise a significant amount of additional cash. The Plan provides two (2) mechanisms for them to raise such cash. First, the Plan provides for a rights offering pursuant to which the Debtors' unsecured creditors can acquire new common stock of Reorganized Spansion Inc. for an aggregate purchase price of approximately $109 million (the "**Rights Offering**"). Second, the Plan permits the Debtors to incur additional debt in an amount of up to $500 million through either the issuance of new debt securities or through a new term loan facility (in either case, the "**New Spansion Debt**").[4]

13. So long as they can consummate the Rights Offering and the New Spansion Debt and satisfy the applicable requirements of the Plan, the Debtors intend to exercise the Cash Out Option and payoff the FRN claims in full. The Debtors believe that they will have a more sound and flexible capital structure post-emergence form the Chapter 11 Cases if they are able to exercise the Cash Out Option, paying the FRN holders cash instead of issuing the New Convertible Notes and the New Senior Notes to them. A number of unsecured creditors, including the Informal Senior Noteholders' Group, have also indicated that they greatly favor the Cash Out Option, because the conversion of the New Convertible Notes by the FRN holders would be more dilutive than the Rights Offering in which the unsecured creditors would also have the right to participate on a pro rata basis. Therefore, the Debtors believe that it is in the best interests of their estates and creditors that they attempt to exercise the Cash Out Option if possible. At the same time, because expeditiously concluding the Chapter 11 Cases is critical to

---

[4] The Plan also contemplates that the Debtors might obtain a new revolving credit facility in addition to the New Spansion Debt. The Term Sheet and the Fee Letter do not relate to that new revolving credit facility.

maximizing the value of the estates and enhancing the Debtors' competitive position, the Debtors believe that the Restructured Debt Option represents a sound and feasible alternative if they are unable to exercise the Cash Out Option for any reason.

**D.     The Term Sheet and Fee Letter**

14.     The Debtors have entered into a mandate letter (the "**Mandate Letter**") with Barclays Capital, Inc., under which Barclays was engaged to act as sole bookrunner, administrative agent and/or lead arranger and as the entity to provide the services and receive fees for services customarily provided by an entity in such roles (as applicable). The Court approved the Mandate Letter pursuant to an Order dated January 7, 2010 [D.I. 2199].

15.     Before filing the Plan and entering into the Mandate Letter, the Debtors discussed the New Spansion Debt as well as similar transactions with a number of potential lenders, arrangers and other transaction parties, including Barclays and Morgan Stanley. The Debtors entered into non-disclosure agreements with several of these parties.

16.     Ultimately the Debtors determined that it was in their best interest to enter into the Mandate Letter with Barclays, and to retain Morgan Stanley, for a number reasons including, without limitation, given the Arrangers' familiarity with the Debtors' business and financial situation, and their capital markets and loan market expertise in structuring and arranging financings similar to the New Spansion Debt, the Arrangers were in the best position of all of the potential transaction parties to structure, arrange and syndicate the New Spansion Debt on the terms of, and the timeframe necessitated by, the Plan.

17.     After entering into the Mandate Letter and retaining Morgan Stanley, the Debtors had numerous discussions with the Arrangers concerning the potential structuring of the New Spansion Debt. For a number of reasons, including the timeframe for securing the New Spansion Debt, the Debtors, in consultation with the Arrangers, concluded that the best option

available to them to attempt to secure the necessary funds to consummate the Cash Out Option was to structure the New Spansion Debt as a secured, syndicated term loan credit facility.

18.     In addition, the Debtors have determined, based on their own internal analyses and their discussions with the Arrangers and others, that the maximum principal amount of New Credit Facility should be no more than $450 million. The Debtors believe that their long-term viability could be imperiled if they were to incur New Spansion Debt in excess of this amount, particularly given the cyclical nature of the Flash memory industry and the need of Flash memory companies like the Debtors to have sufficient available cash resources to respond immediately to technological changes as well as changes in the marketplace for their products.

19.     The Debtors have had lengthy and intense negotiations over the past several weeks with Barclays regarding the terms of the New Credit Facility. Each of the Debtors and the Arrangers were represented by separate counsel in these negotiations and the negotiations were characterized by a spirited "give and take." The Term Sheet is the culmination of these negotiations.[5]

20.     In negotiating the Term Sheet, the Debtors were cognizant of the requirements for the New Spansion Debt under the Plan. Under the Plan, the Debtors cannot exercise the Cash Out Option unless cash has actually been deposited into an escrow or segregated account (the "**Escrow Account**") on or before February 12, 2010, in a sufficient amount to satisfy the requirements of the Plan. In other words, in order to exercise the Cash Out Option, the Debtors need more than just a commitment for the New Spansion Debt. They need the proceeds of the New Credit Facility ("**Facility Proceeds**") escrowed or segregated by February 12, 2010. Consequently, the Debtors need to actually close the New Credit Facility

---

[5]     The terms of the New Credit Facility as reflected in the Credit Documents may change from those set forth in the Term Sheet after the New Credit Facility is syndicated to reflect the views and comments of the Lenders.

prior to the commencement of the Confirmation Hearing, and the Facility Proceeds must be deposited in the Escrow Account in a sufficient amount to satisfy the requirements of the Plan, on or before February 12, 2010.[6]

21.     Because of these requirements, the Debtors must enter into the Credit Documents substantially on the terms set forth in the Term Sheet, close the New Credit Facility, and deposit the Facility Proceeds into the Escrow Account, prior to the Confirmation Hearing. Under the Term Sheet, the Facility Proceeds will be released from the Escrow Account to the Debtors for distribution to the holders of the FRNs on the Effective Date of the Plan only if (i) this Court confirms the Plan, (ii) the other requirements for the Cash Out Option are satisfied or waived, (iii) the conditions for release from the Escrow Account set forth in the Credit Documents are satisfied **and** (iv) a Termination Date (as defined below) has not occurred. The Facility Proceeds funded into the Escrow Account will be returned to the Lenders if (i) the Court does not confirm the Plan, (ii) any of the requirements for the Cash Out Option are not satisfied or waived, (iii) any of the other conditions for release from the Escrow Account set forth in the Credit Documents are not satisfied **or** (iv) a Termination Date (as defined below) has occurred.

22.     Because the Arrangers will be required to arrange and syndicate the New Credit Facility and the Lenders will be required to fund the New Credit Facility on or prior to February 12, 2010, well in advance of the effective date of the Plan and likely before an order confirming the Plan has been entered, the Debtors believe that it is reasonable and appropriate for the Arrangers and the Lenders to be paid certain fees upon closing of the New Credit Facility (*i.e.*, at such time that the Facility Proceeds are deposited in the Escrow Account, but before such

---

[6]     As the Court is aware, normally a debtor does not seek approval to enter into an exit financing facility because the facility is to be with the reorganized debtor. Instead, a debtor requests the Court to approve the payments it has to make to the exit lender in connection with obtaining the facility under Bankruptcy Code section 363. Because of the Plan requirement that the Facility Proceeds be deposited in the Segregated Account prior to confirmation, the Debtors also request relief under Bankruptcy Code section 364.

Proceeds are released to the Debtors), even though this Court will not likely yet have had a chance to consider the Plan at the Confirmation Hearing.[7] At the same time, the Debtors believe that a portion of the fees payable to the Arrangers and the Lenders should be conditioned on release of the Facility Proceeds to the Debtors from the Escrow Account (assuming confirmation of the Plan and satisfaction of other conditions precedent). Accordingly, the Debtors negotiated with the Arrangers (i) fees payable to the Arrangers to compensate them for arranging and syndicating the New Credit Facility, and (ii) fees payable to the Lenders for the efforts that they will need to undertake and the commitments that they will need to make before the Confirmation Hearing while also ensuring that the estates are not required to pay all of the fees associated with the New Credit Facility unless and until the Plan has been confirmed and the Facility Proceeds are released from the Escrow Account.

23. Set forth below is a summary of the principal terms of the Term Sheet:[8]

| | |
|---|---|
| Nature of Facility: | Senior secured term loan facility in an aggregate principal amount of up to $450,000,000 (the "**Term Facility**"). |
| Borrower: | Spansion LLC (and if the Plan become effective, reorganized Spansion LLC) |
| Guarantors: | Spansion Inc., Spansion Technology LLC and each of their existing and subsequently acquired or organized wholly-owned, direct or indirect, domestic subsidiaries (other than Borrower) |
| Administrative and Collateral Agent: | Barclays Bank PLC, acting through one or more of its branches or affiliates |
| Lenders: | Syndicate of banks, financial institutions and other institutional lenders selected by the Arrangers in |

---

[7] In addition, as set forth in the summary of significant terms below, the Debtors are required to pre-fund sixty (60) days of interest into the Segregated Account holding the proceeds of the New Credit Facility. The Lenders will be entitled to the payment of interest on the proceeds of the New Credit Facility held in the Segregated Account.

[8] The following is intended only as a summary of certain of the material terms of the Term Sheet and is subject in all respects to the actual terms of the Term Sheet. To the extent, there is any conflict between the description of the Term Sheet contained herein and the actual terms of the Term Sheet, the actual terms of the Term Sheet shall govern for all purposes.

| | |
|---|---|
| | consultation with the Borrower |
| Availability: | Upon the closing and satisfaction of the closing conditions contained in the Credit Documents, the Lenders will fund into the Escrow Account the gross proceeds of the Loans in accordance with the terms of the Credit Documents, and the fees payable to the Arrangers and the Lenders on the closing date will be withdrawn on the closing date from the Escrow Account to pay such fees. |
| Borrower Deposits | On the closing date, the Borrower is required to deposit additional cash into the Escrow Account in an amount sufficient to cover the maximum amount of interest that could accrue on the loans through such date as is 60 days after the closing date |
| Termination: | If (a) the conditions for release of the Facility Proceeds from the Escrow Account are not met within 60 days of the closing date, (b) the Borrower, prior to such date, informs the Lenders in writing that such conditions shall not be met, (c) the Term Loans are accelerated for any reason or (d) the Interim Order or the Final Order is stayed, vacated or overturned (provided that a Termination Date shall not be deemed to have occurred pursuant to this clause (d) until the Arrangers have given the Borrower one day prior written notice of the occurrence of a Termination Date pursuant to this clause (d) and if and for so long as (x) the rights and interests of the Lenders and the Arrangers are not adversely affected by such Order being stayed or overturned as reasonably determined by the Arrangers, and (y) the Order was stayed or overturned over the objections of the Debtors and the Debtors are continuing to contest such matters before the Bankruptcy Court, and provided, further, that for the avoidance of doubt nothing in this clause (d ) shall extend the time limit set forth in clause (a) above), then, a "**Termination Date**" shall be deemed to have occurred and each Lender shall be refunded directly from the Escrow Account its pro rata share of 100% of the aggregate principal amount of the loans *plus* accrued interest thereon from the closing date through and including the Termination Date. The remaining balance, if any, in the Escrow Account will be distributed to the Borrower. |
| Interest Rates: | At the Borrower's option: <br>  (i) the Base Rate plus 4.50% *per annum*; *provided* that the Base Rate will be |

| | |
|---|---|
| |         deemed to be not less than 3.50% per annum at any time; or<br>(ii)    the reserve adjusted Eurodollar Rate plus 5.50% *per annum*; *provided* that the reserve adjusted Eurodollar Rate will be deemed to be not less than 2.50% per annum at any time. |
| Final Maturity: | Five years after the closing date. |
| Amortization: | Payable in equal quarterly amounts of 1% *per annum* with the balance payable on the maturity date |
| Security: | Prior to the date of the release of the Facility Proceeds from the Escrow Account (the "**Account Release Date**"), all amounts outstanding under the Credit Documents will be secured by a first-priority lien on the Escrow Account and the Facility Proceeds and all other amounts contained in the Escrow Account and any other Collateral (as defined below) that it is possible to grant a security interest in prior to the Account Release Date.<br><br>From and after the Escrow Release Date, the New Credit Facility will be secured by security interests in all of the following (collectively, the "**Collateral**") provided by the respective obligor thereunder: (a) second-priority security interests in personal property of the Borrower and each Guarantor consisting of accounts receivable and deposit accounts, certain assets related thereto and all products and proceeds of the foregoing (the "**ABL Collateral**"), (b) first-priority pledges of each of Spansion Inc's and Spansion Technology's equity interests in the Borrower and all the equity interests held by the Borrower or any Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting stock (if any) and 65% of the voting equity interests of any first-tier foreign subsidiary), (c) subject to certain customary permitted first-priority liens, first-priority security interests in, and mortgages on, substantially all real property and equipment of the Borrower and each Guarantor and (d) subject to certain customary permitted liens, first-priority security interests in substantially all other tangible and intangible assets of the Borrower and each Guarantor, including, without limitation, inventory, cash, securities accounts, investment property, contract rights, intellectual property (subject to certain exceptions |

| | |
|---|---|
| | and disposal rights to be agreed), other general intangibles, commercial tort claims, letter of credit rights, intercompany debt and proceeds of the foregoing (but excluding the auction rate securities pledged in connection with the Credit Line Agreement entered into by the Borrower with UBS Bank USA on December 29, 2008). The Collateral excluding the ABL Collateral is herein referred to as the "**Term Collateral**". |
| Mandatory Prepayments: | (a) 100% of the net cash proceeds from (i) extraordinary receipts or (ii) asset sales or other dispositions of property, other than net cash proceeds from the foregoing clauses (i) and (ii) that are reinvested in the business within 270 days (or have been committed by binding agreement to be reinvested with 270 days and actually are reinvested within 365 days) after any extraordinary receipt, asset sale or other disposition of property of the Borrower or any of its subsidiaries (including insurance and condemnation proceeds), subject to thresholds and exceptions to be agreed;<br>(b) 50% of excess cash flow of the Borrower and its subsidiaries with step-downs to be agreed upon achievement and maintenance of certain financial performance measures to be determined;<br>(c) (i) 100% of the net cash proceeds received by the Borrower or any of its subsidiaries from the issuance or incurrence of debt, other than certain permitted debt to be agreed upon (such permitted debt to include, the ABL Facility, and certain intercompany debt) and (ii) in a percentage to be agreed, net cash proceeds received by the Borrower or any of its subsidiaries from the issuance or incurrence of certain debt permitted to finance receivables in amounts to be agreed; and<br>(d) 50% of the net cash proceeds received from the issuance of equity securities of Spansion Inc., Spansion Technology (or any other direct of indirect parent of the Borrower), the Borrower or any of its subsidiaries (but not including the proceeds of intercompany capital contributions among the Borrower and its subsidiaries or among subsidiaries of the Borrower), with step-downs to be agreed upon achievement and maintenance of certain financial performance measures to be determined. |
| Voluntary Prepayments: | Permitted in whole or in part at a price equal to:<br>(i) until the first anniversary of the closing date, |

| | |
|---|---|
| | 101% of the principal amount of the borrowings being prepaid; and (ii) after the first anniversary of the closing date, at par. |
| Representations and Warranties: | Usual and customary or as otherwise deemed appropriate by the Arrangers. |
| Covenants: | Usual and customary affirmative, negative and financial covenants or as otherwise deemed appropriate by the Arrangers. |
| Closing Conditions: | Include, among others; <br> (i)      Delivery of certain financial information; <br> (ii)      Entry by the Debtors into a backstop agreement with respect to the Rights Offering and at least $105,400,000 of proceeds from the Rights Offering shall have been deposited into an escrow or similar account; <br> (iii)      Certain limitations on the amount of cash, and the timing of payments, to resolve disputes with Spansion Japan Limited; <br> (iv)      No material adverse change since December 28, 2008 (other than as a result of the Chapter 11 Cases as described in the disclosure statement for the Plan); <br> (v)      Entry of the Interim Order in form and substance satisfactory to the Arrangers; <br> (vi)      All fees and costs required to be paid on the closing date shall have been paid; <br> (vii)      The Borrower shall have used commercially reasonable efforts to have been assigned (i) a corporate credit rating by S&P and a corporate family rating by Moody's and (ii) a credit rating for the Term Facility by S&P and Moody's. <br> (viii)      The Debtors' credit line agreement with UBS shall be in full force and effect; and <br> (ix)      Other usual and customary closing conditions including acceptable documentation. |
| Conditions to Release of Facility Proceeds from Escrow Account: | Include, among others: <br> (i)      All closing conditions remain satisfied; <br> (ii)      The Court shall have entered an order confirming the Plan in form and substance satisfactory to the Arrangers and the order shall have become final and non-appealable; <br> (iii)      Any modifications to, or documentation to effect, the Plan shall be acceptable to the Arrangers and no provision of the Plan or such modification shall have been waived, amended, supplemented or otherwise modified in any material respect that is adverse to the Lenders or the Arrangers; |

| | |
|---|---|
| | (iv)    Upon emergence from the Chapter 11 Cases, the Borrower and its subsidiaries shall have no indebtedness other than as set forth in Exhibit B to the Term Sheet;<br>(v)    All costs, fees, expenses and compensation then due to the Lenders or the Arrangers shall have been paid in full;<br>(vi)    The Debtors' debt to consolidated pro forma EBITDA ratio shall be no greater than 2.10 to 1.00;<br>(vii)    The Debtors shall have minimum liquidity in an amount set forth in Exhibit B to the Term Sheet; and<br>(viii)    Simultaneously with the release of the Facility Proceeds, the Borrower shall (a) have received proceeds of approximately $105,400,000 from the consummation of the Rights Offering and (b) have commitments under a revolving credit facility of $65,000,000 and (c) the Borrower shall have sufficient funds to consummate the Plan.<br>(ix)    The Borrower shall have used commercially reasonable efforts to have been assigned (i) a corporate credit rating by S&P and a corporate family rating by Moody's and (ii) a credit rating for the Term Facility by S&P and Moody's. |
| Governing Law: | New York |

24.    The Debtors believe that the terms of the Term Sheet and Fee Letter are fair, reasonable and in the best interests of their estates and creditors. The fees and other protections provided under the Term Sheet and Fee Letter are also sensible in that they compensate the Arrangers for the integral role they will undertake in structuring, arranging, and syndicating the Credit Facility.    Accordingly, the Debtors request that the Court grant the Motion.

**RELIEF REQUESTED**

25.    By this Motion and pursuant to sections 105(a), 363(b) and 364 of the Bankruptcy Code, the Debtors seek entry of the Interim Order and the Final Order approving the Term Sheet and the Fee Letter and authorizing them to (i) enter into and close the New Credit Facility on substantially the terms set forth in the Term Sheet with the Facility Proceeds to be

funded into the Escrow Account pending this Court's consideration of the Plan at the Confirmation Hearing, (ii) pay interest on the Facility Proceeds held in the Escrow Account at the rate set forth in, and pursuant to the other terms and conditions of, the Term Sheet and (iii) pay those fees associated with the New Credit Facility that are required to be paid upon closing of the New Credit Facility as set forth in the Fee Letter.

## BASIS FOR RELIEF REQUESTED

### A. Entry Into The New Credit Facility Will Facilitate Plan Confirmation And Is A Sound Exercise Of Business Judgment

26. Section 364(c) of the Bankruptcy Code generally allows a debtor-in-possession to incur new secured debt where obtaining unsecured debt is not possible.[9]

27. Section 363(b)(1) of the Bankruptcy Code also provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a debtor-in-possession may use, sell or lease property of the estate outside the ordinary course of business if: (i) it has an articulated business justification, (ii) it provides adequate notice to all creditors and (iii) a hearing is held. *See In re Delaware & Hudson Railway Co.,* 124 B.R. 169, 176 (D. Del. 1991) (setting forth standard for section 363 of the Bankruptcy Code); *see also, Fulton State Bank v. Schipper (In re Schipper),* 933 F.2d 513, 515 (7th Cir. 1991) (setting forth standard for section 363 of the Bankruptcy Code).

28. Courts have uniformly held that approval of a proposed use of property

---

[9]    Section 364(c) of the Bankruptcy Code provides:
(c) If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
    (1) with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
    (3) secured by a junior lien on property of the estate that is subject to a lien.

pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1066 (2d Cir. 1983); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *Official Committee of Subordinated Bondholders v. In re Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (upholding debtor's decision so long as it was attributable to "any rational business purposes"). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

29.     The present situation is unique in that the Debtors are not seeking financing under section 364(c) to continue their business operations during the pendency of the Chapter 11 Cases. Rather, the Debtors seek such financing in order to exercise the Plan's Cash Out Option. Typically, an exit financing such as the New Credit Facility would be considered by the Court at the confirmation hearing of a plan of reorganization. However, due to the requirements of the Plan, the Facility Proceeds need to be placed in the Escrow Account prior to February 12, 2010. Because the Confirmation Hearing is scheduled to commence on February 11, 2010, and extend into February 12, 2010, it is not possible to defer consideration of the New Credit Facility until the Confirmation Hearing. In fact, to ensure compliance with the conditions and requirements for the Cash Out Option under the Plan, the Debtors must endeavor to close the New Credit Facility well before the start of the Confirmation Hearing so that the Facility Proceeds can be deposited into the Escrow Account in accordance with the requirements of the Plan before the February 12, 2010 deadline.

30.     Thus, while the Debtors cannot use the Facility Proceeds prior to the effective date of the Plan (and in fact such usage is expressly conditioned on this Court's consideration and confirmation of the Plan), the Debtors will be required to close the New Credit Facility, and the Facility Proceeds will be funded (albeit into the Escrow Account) during the pendency of the Chapter 11 Cases and prior to confirmation of the Plan.

31.     Prior to the effective date of the Plan, the New Credit Facility will be secured only by the Escrow Account and the Facility Proceeds and other funds contained therein. If for any reason the Plan is not confirmed or consummated or any requirement for the release of the Facility Proceeds is not satisfied or waived, then the Facility Proceeds held in the Escrow Account will be returned to the lenders with any interest that has accrued on such loans. Therefore, by this Motion, the Debtors are not seeking to prime the liens of any of their current secured lenders or encumber any already encumbered assets.

32.     Because the New Credit Facility is necessary for the Debtors to exercise the Cash Out Option, which in turn is in the best interest of the Debtors, their estates and their creditors, sound business justifications support the New Credit Facility, and the Debtors have satisfied the standard set forth in section 363(b) and 364(c) of the Bankruptcy Code. Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 BR. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The Debtors have explored their options to consummate the Cash Out Option and have concluded that the New Credit Facility is the best option available to them. In addition, the Debtors submit the terms of the New Credit Facility as set forth in the Term Sheet and Fee Letter are reasonable, fair and appropriate.

33.     It is not uncommon for debtors in large chapter 11 cases to seek and obtain approval prior to their confirmation hearings to enter into exit financing arrangements, agree to pay exit financing providers' fee and expenses, and grant indemnities such as the ones described in this Motion. *See, e.g., In re Delta Air Lines, Inc.*, No. 05-17923 (ASH) (Bankr. S.D.N.Y. Apr. 17, 2007); *In re Owens Corning*, No. 00-3837 (Bankr. D. Del. July 20, 2006); *In re Meridian Auto Sys.-Composites Operations, Inc.*, No. 05-11168 (Bankr. D. Del. June 14, 2006). Chapter 11 debtors frequently make use of exit financing to repay outstanding obligations under debtor-in-possession financing facilities, make one-time payments due upon the occurrence of the effective date under a plan of reorganization, and fund post-emergence operations. As discussed above, the Debtors intend to use the Facility Proceeds for precisely for such a purpose—that of exercising the Cash Out Option.

34.     Section 105(a) further empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." A bankruptcy court's use of its equitable power to "to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs. Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989), *citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

35.     The Debtors have determined, in the exercise of their reasonable business judgment, that in order to meet the proposed timetable for confirmation of the Plan, the New Credit Facility is necessary, reflects market terms for similar agreements, and contains customary contract provisions. Further, the Debtors and the Arrangers negotiated the Term Sheet in good faith and at arm's length. Indeed, the New Credit Facility is an important component of the Debtors' plans to reorganize.

36.    In light of the foregoing, the Debtors respectfully submit that their contemplated decision to enter into the New Credit Facility on the terms set forth in the Term Sheet is supported by their sound business judgment and is in the best interests of their estates.

**B.    The Fees Provided Under The Fee Letter Are Reasonable And Represent Good Faith Negotiations At Arm's Length**

37.    As detailed above, section 363(b)(1) of the Bankruptcy Code allows a debtor-in-possession to use, sell, or lease, other than in the ordinary course of business, property of the estate where it has articulated and valid business purpose, provides adequate notice and hold a hearing. *See In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). Approval of a proposed use of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1066 (2d Cir. 1983); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *Official Committee of Subordinated Bondholders v. In re Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (upholding debtor's decision so long as it was attributable to "any rational business purposes").

38.    The Fees set forth in the Term Sheet and Fee Letter are fair, accepted within the industry, are necessary for the Debtors to secure the New Credit Facility and represent the sound exercise of the Debtors' business judgment in negotiating an agreement that is favorable to the Debtors and their estates. The Debtors also submit that the filing of the Term Sheet and Fee Letter under seal is proper as described more fully in the Seal Motion. The Debtors will provide unredacted copies of the Term Sheet and Fee Letter under seal to the Court, the Office of the United States Trustee, Counsel to the Creditors Committee, Counsel to the Ad

Hoc FRN Consortium, Counsel to the Ad Hoc Convertible Note Committee, Counsel to the Ad Hoc Equity Committee and Counsel to the Ad Hoc Senior Note Committee, so long as each party's respective counsel have signed a relevant confidentiality agreement.

## CONCLUSION

39.     As discussed above, based on arms-length negotiations between the parties, the Debtors have negotiated terms that represent the best method of obtaining the New Credit Facility which will ultimately facilitate the confirmation of the Plan.  As such, the New Credit Facility, on the terms set forth in the Term Sheet and the Fee Letter, is a prudent and effective method of facilitating the Cash Out Option while meeting the proposed timetable for confirmation of the Plan.

40.     Accordingly, after careful analysis and in the exercise of their business judgment, the Debtors have determined and respectfully submit that the relief requested in this Motion is in the best interests of their estates and creditors.

## NOTICE

41.     No trustee or examiner has been appointed in the Chapter 11 Cases.  The Debtors will provide notice of this Motion to: (a) the United States Trustee; (b) Barclays and Morgan Stanley; (c) counsel to the administrative agent for the Debtors' prepetition lenders; (d) counsel to the *ad-hoc* committee of holders of Spansion LLC's Senior Secured Floating Rate Notes due 2013, Robert J. Stark, Brown Rudnick LLP, Seven Times Square, New York, NY 10036; (e) the Trustee for Spansion's Senior Secured Floating Rate Notes due 2013; (f) UBS Bank USA; (g) counsel for the Creditors Committee; (h) the Internal Revenue Service; and (i) any party in interest that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

42.     A copy of the Motion is available on the Court's website at www.deb.uscourts.gov and at http://chapter11.epiqsystems.com/spansion.

## COMPLIANCE WITH LOCAL RULE 4001-2

43.     The New Credit Facility does not contain any provisions that are required to be highlighted pursuant to Local Rule 4001-2(a)(i).

## NO PRIOR APPLICATION

44.     No prior motion for the relief requested herein has been made to this Court or any other court.

*[Remainder of Page Left Blank Intentionally]*

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Interim Order, substantially in the form attached hereto as Exhibit A, and the Final Order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: January 11, 2010
       Wilmington, Delaware

Respectfully submitted,

/s/ *Michael R. Lastowski*
Michael R. Lastowski (No. 3892)
Richard W. Riley (No. 4052)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: mlastowski@duanemorris.com
       rwriley@duanemorris.com
       slross@duanemorris.com

and

Michael S. Lurey (Admitted *Pro Hac Vice*)
Gregory O. Lunt (Admitted *Pro Hac Vice*)
Kimberly A. Posin (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: Michael.Lurey@lw.com
      Gregory.Lunt@lw.com
      Kim.Posin@lw.com
ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION