# EXHIBIT B

## Redacted Fee Letter and Term Sheet

| | |
|---|---|
| **BARCLAYS BANK PLC**<br>**BARCLAYS CAPITAL INC.**<br>**745 Seventh Avenue**<br>**New York, New York 10019** | **MORGAN STANLEY SENIOR FUNDING, INC.**<br>**1585 Broadway**<br>**New York, New York 10036** |

<u>CONFIDENTIAL</u>

January 11, 2010

Spansion Inc.; and
Spansion LLC
915 DeGuigne Drive
Sunnyvale, CA 94088

Attention: Randy Furr, EVP, Chief Financial Officer

Fee Letter

Ladies and Gentlemen:

This Fee Letter sets forth certain fees payable by **Spansion LLC** ("**Spansion**" or "**you**") in connection with the structuring and arrangement of the Term Facility contemplated pursuant to the term sheet attached hereto as Exhibit A (the "**Term Sheet**") provided by Barclays Capital ("**Barclays Capital**"), the investment banking division of Barclays Bank PLC and Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**" and together with Barclays Capital, the "**Arrangers**", "**we**", "**our**" or "**us**"), to Spansion. By signing this Fee Letter you agree to engage Morgan Stanley to use its commercially reasonable efforts to act as an arranger in respect of the Term Facility and to pay (or cause to be paid) the fees set forth herein in accordance with the other terms and conditions set forth herein. Unless otherwise defined herein, capitalized terms used herein shall have the meanings given to them in the Term Sheet.

1.      **Mandate Letter**

Reference is hereby made to that certain Mandate Letter, dated November 23, 2009, between Barclays Capital Inc. and Spansion Inc. (the "**Mandate Letter**"). Pursuant to Section 1 of the Mandate Letter, Barclays Capital Inc. hereby consents to the participation by Morgan Stanley as an Arranger for the Term Facility.

2.      <u>**Senior Secured Term Loan Facility**</u>

In addition to fees to be paid as set forth in the Term Sheet, the Borrower shall pay or cause to be paid to the Arrangers an aggregate arrangement fee (the "**Arrangement Fee**") in an amount equal to *REDACTED* of the aggregate principal amount of the Term Facility (the "**Facility Amount**"), of which *REDACTED* of such Arrangement Fee shall be paid to Barclays Capital and *REDACTED* of such Arrangement Fee shall be paid to Morgan Stanley. A portion of the Arrangement Fee equal to *REDACTED* of the Facility Amount will be paid to the Arrangers in immediately available funds on the Closing Date. The remaining portion of the Arrangement Fee equal to *REDACTED* of the Facility Amount will be paid to the Arrangers in immediately available funds on (and subject to the occurrence of)

1

the Account Release Date. The portion of the Arrangement Fee payable on the Closing Date shall not be refundable under any circumstances if the Account Release Date does not occur or if a Termination Date does occur. **REDACTED**

### 3. Administrative Agent Fee

Borrower also agrees to pay (or cause to be paid) to the Administrative Agent, solely for its own account, a non-refundable agency fee equal to **REDACTED**, payable annually in advance on the Closing Date for the twelve-month period following the Closing Date and on each anniversary of the Closing Date until all Loans and all obligations with respect thereto have been paid in full or for so long as any Lender shall have any commitment thereunder.

### 4. Fees Generally; Expenses

All fees payable hereunder shall be payable in U.S. dollars in immediately available funds to each of the Arrangers, or any of their respective affiliates, for each Arrangers' own account or as directed by it, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with customary gross-up for withholding taxes, if any). Once paid, no fee shall be refundable under any circumstances.

Spansion also agrees to periodically reimburse us for our reasonable out-of-pocket costs and expenses, including expenses associated with syndication of the Term Facility, our due diligence efforts and the reasonable fees and disbursements of one common counsel and our advisors, together with any sales, use or similar taxes, arising in connection with any matter referred to in the Term Sheet or this Fee Letter, whether or not the Closing Date or the Account Release Date occurs or any Credit Documents are executed and delivered or any extensions of credit are made under the Term Facility.

### 5. Indemnification

In consideration for the services to be provided by the Arrangers hereunder, Spansion hereby agrees to indemnify and hold harmless each of the Arrangers, their affiliates and their respective directors, officers, employees, advisors and other representatives (each, an "**Indemnified Party**") against any and all losses, claims, damages, expenses and liabilities, joint or several (collectively, "**Liabilities**"), to which an Indemnified Party may become liable, arising out of or otherwise relating to this Agreement, including, without limitation, in connection with the enforcement of Spansion's obligations under this Agreement (collectively, the "**Indemnity Coverage**"), unless a court of competent jurisdiction determines in a final, non-appealable judgment (or a settlement tantamount thereto) that the Liabilities directly resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party. Spansion further agrees to reimburse each Indemnified Party promptly upon request for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for the defense of or providing evidence in, any action, claim, suit, proceeding or investigation, whether pending or threatened (each and collectively, an "**Action**"), arising out of or otherwise relating to the Indemnity Coverage. Spansion also agrees that no Indemnified Party shall have any liability of any nature to Spansion or any other person asserting any Action on behalf of or in right of Spansion, whether arising out of or otherwise relating to the Indemnity Coverage, unless a court of competent jurisdiction determines in a final, non-appealable judgment (or a settlement tantamount thereto) that such Liabilities resulted directly from the gross negligence, bad faith or willful misconduct of such Indemnified Party.

Spansion agrees that the indemnification and reimbursement commitments set forth herein shall apply whether or not any Indemnified Party is a formal party to any such Action and the rights of the

Indemnified Parties referred to herein shall be in addition to any other rights that any Indemnified Party may otherwise have against Spansion. Spansion agrees that, without the Arranger's prior written consent, it will not agree to any settlement of, compromise or consent to the entry of any judgment in or other termination of any Action (each and collectively, a "**Settlement**") in respect of which indemnification could be sought hereunder unless (i) such Settlement includes an unconditional release of each Indemnified Party from any liabilities arising out of such Action and does not include any findings of fact or admissions of culpability as to the Indemnified Party and (ii) the parties agree that the terms of such Settlement shall remain confidential. Spansion further agrees that the Indemnified Parties are entitled to retain one separate counsel (in addition to local counsel) of their choice in connection with any single Action in respect of which indemnification or reimbursement may be sought hereunder, provided that an Indemnified Party will have the right to retain separate counsel to represent such Indemnified Party who may be subject to liability arising out of any claim in respect of which Indemnified Coverage may be sought hereunder if and to the extent the representation of two or more Indemnified Parties by the same counsel would be inappropriate due to actual or potential differing interests between them.

6. **General**

Spansion acknowledges that this Fee Letter is neither an expressed nor an implied commitment by the Arrangers or any their respective affiliates to act in any capacity with respect to the Term Facility or to underwrite, purchase or make any loans in connection therewith.

Please note that this Fee Letter is exclusively for the information of the board of directors and senior management of, and attorneys and advisors for, Spansion and may not be disclosed to any other person or entity except (i) after providing written notice to the Arrangers to the extent permitted, pursuant to applicable law or compulsory legal process, including without limitation a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee, (ii) to your officers, directors, agents and advisors who are directly involved in the consideration of the Term Facility to the extent such persons agree to hold the same in confidence, (iii) to professionals or advisors representing creditor committees in respect of the Borrower, provided such professionals or advisors are party to a confidentiality agreement in connection with such representation, (iv) to the extent consented to in writing by the Arrangers and (v) in a filing with or confidential submission to the Bankruptcy Court, provided that in any filing all fees set forth in this Fee Letter are redacted and the materials to be filed are in form and substance acceptable to the Arrangers.

This Fee Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile or other electronic transmission will be effective as delivery of a manually executed counterpart hereof.

In addition, please note that the Arrangers and their respective affiliates do not provide tax, accounting, or legal advice.

This Fee Letter shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law. The provisions of this Fee Letter shall survive the syndication of the Term Facility and the execution, expiration or termination of the Credit Documents (including any extensions thereof).

**ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS FEE LETTER OR THE TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO. THIS FEE LETTER SHALL BE GOVERNED BY AND**

**CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS.** Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of (i) the Supreme Court of the State of New York, New York County, located in the Borough of Manhattan and (ii) the United States District Court for the Southern District of New York and any appellate court from any such court, in any action or proceeding arising out of or relating to the transactions contemplated by this Fee Letter or the Term Sheet or the performance of services hereunder or thereunder, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent that it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Fee Letter or the Term Sheet or the transactions contemplated hereby or thereby or the performance of services hereunder or thereunder in any such New York State or Federal court and (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto agrees to commence any such action, suit or proceeding either in the United States District Court for the Southern District of New York or in the Supreme Court of the State of New York, New York County located in the Borough of Manhattan.

[Remainder of page intentionally left blank]

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which shall become a binding agreement upon our receipt.

Very truly yours,

**BARCLAYS BANK PLC**

By:

Name: Ian Palmer
Title: Managing Director

**MORGAN STANLEY SENIOR FUNDING, INC.**

By:

Name:
Title:

With respect to Section 1 and Section 2 of this Fee Letter only:

**BARCLAYS CAPITAL INC.**

By:

Name: Ian Palmer
Title: Managing Director

*Signature Page Fee Letter*

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which shall become a binding agreement upon our receipt.

Very truly yours,

**BARCLAYS BANK PLC**

By:_____
    Name:
    Title:

**MORGAN STANLEY SENIOR FUNDING, INC.**

By:_____
    Name: _ANDREW EARLS_
    Title: _VP_

With respect to Section 1 and Section 2 of this Fee Letter only:

**BARCLAYS CAPITAL INC.**

By:_____
    Name:
    Title:

*Signature Page Fee Letter*

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which shall become a binding agreement upon our receipt.

Very truly yours,

**BARCLAYS BANK PLC**

By:_____
    Name:
    Title:

**MORGAN STANLEY SENIOR FUNDING, INC.**

By:_____
    Name:
    Title:

With respect to Section 1 of this Fee Letter only:

**BARCLAYS CAPITAL,** the investment banking division of Barclays Bank PLC

By:_____
    Name:
    Title:

**ACCEPTED AS OF THE DATE ABOVE:**

**SPANSION LLC**

By:_____
    Name: _Randolph W. Furr_
    Title: _EVP & CFO_

**EXHIBIT A**

CONFIDENTIAL

**$450,000,000 Senior Secured Term Loan Facility**
**Summary of Principal Senior Secured Facility Terms and Conditions**

*This Summary of Principal Terms and Conditions (this "**Term Sheet**") outlines certain terms of an exit financing senior secured term loan facility for Spansion LLC. This Term Sheet does not purport to summarize all of the terms, conditions, covenants, representations, warranties and other provisions that would be contained in the definitive agreements with respect to this transaction. This document is an indicative summary of the terms and conditions of the transaction described herein and may be amended, superseded or replaced by subsequent summaries. The final terms and conditions of the transaction will be set out in full in the applicable binding transaction document(s) related to the Term Facility, including the Escrow Agreement (each as defined below) (the "**Credit Documents**").*

*This Term Sheet has been prepared by Barclays Capital, the investment banking division of Barclays Bank PLC and Morgan Stanley Senior Funding, Inc. ("**MSSF**"), for information purposes only.*

*This Term Sheet shall not constitute a commitment to provide any of the Term Facility (as defined below) or any other financing described herein. No transaction or services related thereto is contemplated without Barclays' and MSSF's subsequent formal agreement. Each of Barclays and MSSF is acting solely as principal and not as advisor or fiduciary. Accordingly you must independently determine, with your own advisors, the appropriateness for you of the transaction before investing or transacting. Neither Barclays nor MSSF accepts any liability whatsoever for any consequential losses arising from the use of this document or reliance on the information contained herein.*

| | |
|---|---|
| Borrower: | Spansion LLC, a Delaware limited liability company ("**Spansion**" or the "**Borrower**") upon Emergence (as defined below). |
| Transaction: | The Borrower, together with its parents, Spansion Inc., a Delaware corporation, ("**Spansion Inc.**") and Spansion Technology LLC ("**Spansion Technology**") and several of their affiliates (the "**Debtors**"), have commenced voluntary bankruptcy cases under Chapter 11 of Title 11 of United States Code, 11 U.S.C. Section 101 *et seq* in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and their cases are jointly administered under case No. 09-10690 (the "**Cases**"). The Borrower and the other Debtors expect to be reorganized pursuant to a Chapter 11 plan of reorganization (the "**Plan**"). |
| | In connection with such reorganization, on the effective date of the Plan (the "**Plan Effective Date**") in order to finance, in part, the distributions to be made under the Plan, to pay the fees and expenses associated therewith |

and to provide for working capital and general corporate purposes of the Borrower and its affiliates (the "*Plan Financing Requirements*"), the Borrower intends to obtain (i) debt financing consisting of the Term Facility (as defined below) and an asset based revolving credit facility in an aggregate principal amount of up to $65,000,000 (the "*ABL Facility*") and (ii) approximately $105,400,000 pursuant to an offering of rights (the "*Rights Offering*") for shares of common stock in Reorganized Spansion Inc. (as such term is defined in the Plan,) which Rights Offering shall be backstopped by (x) Silver Lake Sumeru, L.P. and/or its affiliates and managed accounts, or (y) a third party selected by the Debtors and reasonably acceptable to the Arrangers.

It is currently anticipated that the Borrower's emergence from bankruptcy and the Plan Effective Date shall occur in February or March 2010 (the "*Emergence*"). In connection with the anticipation of the Emergence and upon satisfaction or waiver of the conditions set forth on Exhibit A (the "*Closing Conditions*"), the Lenders, the Borrower, the Guarantors and the other parties party thereto shall execute and deliver the definitive loan documentation (the "*Closing*") and the Lenders shall fund the loans under the Term Facility (the "*Loans*") and the gross proceeds of such Loans together with certain other amounts available to the Borrower will be deposited into an interest bearing escrow account with an escrow agent, in each case acceptable to the Arrangers and the Borrower (the "*Escrow Account*") on the Closing Date (as defined below), and any fees due and payable to the Arrangers and their counsel or professionals due on the Closing Date shall be paid to such parties on the Closing Date, in each case pursuant to the terms of the Credit Documents. On or before the Closing Date, the Borrower, the Collateral Agent and the Escrow Agent shall enter into an escrow agreement on terms reasonably satisfactory to the Borrower and the Arrangers (the "*Escrow Agreement*"). The Escrow Account will be will be subject to an exclusive lien in favor of the Collateral Agent on behalf of the Lenders. The date upon which the Closing Conditions are met is referred to herein as the "*Closing Date*"). Prior to the date as of which all conditions to release of the funds from the Escrow Account to the Borrower set forth on Exhibit B are met (the "*Account Release Conditions*"), none of the amounts deposited in the Escrow Account will be available to the Borrower or any of its subsidiaries or affiliates. Immediately after the gross proceeds are deposited in the Escrow Account, amounts therein will be held in accordance with the terms of the Escrow

| | |
|---|---|
| | Agreement, provided that amounts sufficient to pay the portion of the Closing Fee and Arrangement Fee (as defined in that certain Fee Letter, dated as of even date hereof, between Barclays Bank, Morgan Stanley (each as defined below) and the Borrower) due on the Closing Date will be available to make such payments. |
| Joint Lead Arrangers and Joint Bookrunners: | Barclays Capital ("*Barclays Capital*"), the investment banking division of Barclays Bank PLC and Morgan Stanley Senior Funding, Inc. ("*Morgan Stanley*"), will act as joint lead arrangers and joint bookrunners for the Term Facility described below (in such capacity, each an "*Arranger*" and together, the "*Arrangers*"), and will perform the duties customarily associated with such roles. |
| Administrative Agent and Collateral Agent: | Barclays Bank PLC, acting through one or more of its branches or affiliates ("*Barclays Bank*"), will act as sole and exclusive administrative agent and collateral agent (collectively, in such capacities, the "*Administrative Agent*" and the "*Collateral Agent*", respectively) for a syndicate of banks, financial institutions and other institutional lenders selected by the Arrangers in consultation with the Borrower (each a "*Lender*" and collectively, the "*Lenders*"), and will perform the duties customarily associated with such roles. |
| Syndication Agent: | Morgan Stanley will act as sole syndication agent (the "*Syndication Agent*", and together with the Administrative Agent and the Collateral Agent, the "*Agents*") and will perform the duties customarily associated with such role. |
| Documentation Agent: | Barclays Bank, will act as the documentation agent (the "*Documentation Agent*") and will perform the duties customarily associated with such role. |
| Term Facility: | A senior secured term loan facility in an aggregate principal amount of up to $450,000,000 (the "*Term Facility*"). |
| Purpose/Use of Proceeds: | The proceeds of the Term Facility, together with cash proceeds from the Rights Offering and other amounts available to the Borrower, will be used by the Borrower, on the date of the release of such funds from the Escrow Account (subject to the Account Release Conditions) (the "*Account Release Date*"), as follows: (i) approximately $633,000,000 to fully discharge the claims of holders of the Senior Secured Floating Rate Notes due 2013, (ii) amounts necessary to pay Administrative Expense Claims |

| | |
|---|---|
| | and Priority Claims (each as defined in the Plan) and (iii) amounts necessary to pay fees and expenses related to the Term Facility described herein. |
| Availability: | Upon the Closing and the satisfaction of the Closing Conditions, the Lenders will fund into the Escrow Account the gross proceeds of the Loans in accordance with the terms of the Credit Documents. |
| Escrow Account Deposits by the Borrower: | On the Closing Date the Borrower shall deposit additional cash into the Escrow Account in an amount sufficient to cover and the maximum amount of interest that could accrue on the Loans through and including the 60th day after the Closing Date. |
| Termination: | If (a) the Account Release Conditions are not met within 60 days of the Closing Date, (b) the Borrower, prior to such date, informs the Lenders in writing that such conditions shall not be met, (c) the Term Loans are accelerated for any reason or (d) the Bankruptcy Court order approving the fees and transactions contemplated hereunder is overturned, vacated or stayed (provided that a Termination Date shall not be deemed to have occurred pursuant to this clause (d) until the Arrangers have given the Borrower one day prior written notice of the occurrence of a Termination Date pursuant to this clause (d) and if and for so long as (x) the rights and interests of the Lenders and the Arrangers are not adversely affected by such Order being stayed or overturned as reasonably determined by the Arrangers, and (y) the Order was stayed or overturned over the objections of the Debtors and the Debtors are continuing to contest such matters before the Bankruptcy Court, and provided, further, that for the avoidance of doubt nothing in this clause (d ) shall extend the time limit set forth in clause (a) above) then, a "*Termination Date*" shall be deemed to have occurred and each Lender shall be refunded directly from the Escrow Account its pro rata share of 100% of the aggregate principal amount of the Loans *plus* accrued interest thereon from the Closing Date through and including the Termination Date. The remaining balance in the Escrow Account will be distributed to the Borrower. |
| Interest Rates and Fees: | As set forth on Annex I hereto. |
| Final Maturity and Amortization: | The Term Facility will mature on the date that is five years after the Closing Date, and will be payable in equal quarterly amounts of 1% *per annum* with the balance payable on the maturity date of the Term Facility. |

| | |
|---|---|
| Guarantees: | All obligations of the Borrower under the Term Facility and under any interest rate hedging arrangement in respect of the Term Facility entered into with an Agent, an Arranger, an entity that is a Lender at the time of such transaction, or any affiliate of any of the foregoing (*"Hedging Arrangements"*) will be unconditionally guaranteed (the *"Guarantees"*) by Spansion Inc., Spansion Technology and each of their existing and subsequently acquired or organized wholly-owned, direct or indirect, domestic subsidiaries (other than the Borrower) (collectively, the *"Guarantors"*). |
| Security: | The Term Facility, the Guarantees and any Hedging Arrangements will be secured by valid and perfected security interests in all of the following (collectively, the *"Collateral"*) provided by the respective obligor thereunder: (a) second-priority security interests in personal property of the Borrower and each Guarantor consisting of accounts receivable and deposit accounts, certain assets related thereto and all products and proceeds of the foregoing (the *"ABL Collateral"*), (b) first-priority pledges of each of Spansion Inc's and Spansion Technology's equity interests in the Borrower and all the equity interests held by the Borrower or any Guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting stock (if any) and 65% of the voting equity interests of any first-tier foreign subsidiary), (c) subject to certain customary permitted first-priority liens, first-priority security interests in, and mortgages on, substantially all real property and equipment of the Borrower and each Guarantor and (d) subject to certain customary permitted liens, first-priority security interests in substantially all other tangible and intangible assets of the Borrower and each Guarantor, including, without limitation, inventory, cash, securities accounts, investment property, contract rights, intellectual property (subject to certain exceptions and disposal rights to be agreed), other general intangibles, commercial tort claims, letter of credit rights, intercompany debt and proceeds of the foregoing clauses (a) through (d) (but excluding the auction rate securities pledged in connection with the Credit Line Agreement entered into by the Borrower with UBS Bank USA on December 29, 2008). The Collateral excluding the ABL Collateral is herein referred to as the *"Term Collateral"*. The secured parties under the ABL Facility shall have first-priority security interests in the ABL Collateral and second-priority security interests in the Term Collateral (other than the amounts on deposit in the Escrow Account) and so long as any obligations are outstanding |

| | under the ABL Facility, the administrative agent for the ABL Facility will control at all times, all remedies and other actions related to the ABL Collateral, and that the secured parties under the Term Facility (and related Hedging Arrangements) will not be entitled to any action with respect to the ABL Collateral. |
|---|---|
| | The priority of the security interests in the Collateral and related secured creditors' rights in respect of the Term Facility and the ABL Facility will be set forth in an intercreditor agreement reasonably acceptable to the Arrangers and the Lenders. The intercreditor agreement will provide, among other things, that so long as any obligations are outstanding under the Term Facility, the Administrative Agent will control at all times all remedies and other actions related to the Term Collateral, and that the secured parties under the ABL Facility will not be entitled to take any action with respect to the Term Collateral. |
| | From the Closing Date to the Account Release Date all amounts deposited in the Escrow Account will be part of the "Term Collateral" and the Collateral Agent, on behalf of the Lenders, will have a valid and perfected first priority security interest therein. |
| | All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, reasonably satisfactory to the Lenders and the Arrangers (including, in the case of real property, customary items such as title insurance and surveys reasonably satisfactory to the Lenders and the Arrangers), and none of the Collateral shall be subject to any other liens, subject to customary and other exceptions to be agreed upon and except to the extent securing the ABL Facility on a first-priority basis in respect of all ABL Collateral and on a second-priority basis in respect of all Term Collateral (other than the amounts on deposit in the Escrow Account). Perfection steps with respect to foreign intellectual property will not be required where the Arrangers determine in their reasonable discretion that the costs of perfection materially outweigh the benefits provided. |
| | If it is not possible to grant a security interest on any part of foregoing Collateral on or prior to the Account Release Date, then the Collateral for the Term Facility will be limited to the Escrow Account and any other Collateral that it is possible to grant a security interest in from the Closing Date to the Account Release Date, in which case the security interest in any Collateral that |

| | |
|---|---|
| | cannot be granted prior to the Account Release Date will become effective upon and as a condition to the release of the funds in the Escrow Account to the Borrower on the Account Release Date. |
| Mandatory Prepayments: | (a) 100% of the net cash proceeds from (i) extraordinary receipts or (ii) asset sales or other dispositions of property, other than net cash proceeds from the foregoing clauses (i) and (ii) that are reinvested in the business within 270 days (or have been committed by binding agreement to be reinvested with 270 days and actually are reinvested within 365 days) after any extraordinary receipt, asset sale or other disposition of property of the Borrower or any of its subsidiaries (including insurance and condemnation proceeds), shall be applied to prepay the Loans, subject to thresholds and exceptions to be agreed; |
| | (b) 50% of excess cash flow (to be defined in the Credit Documents and to be calculated for fiscal year 2010 from the beginning of the first full fiscal quarter immediately following Emergence) of the Borrower and its subsidiaries shall be applied to prepay the Loans, with step-downs to be agreed upon achievement and maintenance of certain financial performance measures to be determined; |
| | (c) (i) 100% of the net cash proceeds received by the Borrower or any of its subsidiaries from the issuance or incurrence of debt, other than certain permitted debt to be agreed upon (such permitted debt to include, the ABL Facility, and certain intercompany debt) and (ii) in a percentage to be agreed, net cash proceeds received by the Borrower or any of its subsidiaries from the issuance or incurrence of certain debt permitted to finance receivables in amounts to be agreed, shall, in each case, be applied to prepay the Loans; and |
| | (d) 50% of the net cash proceeds received from the issuance of equity securities of Spansion Inc., Spansion Technology (or any other direct of indirect parent of the Borrower), the Borrower or any of its subsidiaries (but not including the proceeds of intercompany capital contributions among the Borrower and its subsidiaries or among subsidiaries of the Borrower) shall be applied to prepay the Loans; with step-downs to be agreed upon achievement and maintenance of certain financial performance measures to be determined. |
| | In addition, upon the occurrence of a Termination Date |

| | |
|---|---|
| | the Term Facility, plus all accrued interest earned and unpaid through such date shall become immediately due and payable in full.

Notwithstanding the foregoing, each Lender under the Term Facility shall have the right to reject its pro rata share of any mandatory prepayments described above (other than in connection with a prepayment as a result of the occurrence of a Termination Date), in which case the amounts so rejected shall be offered to each non-rejecting Lender thereunder. Any proceeds or amounts remaining may be retained by the Borrower.

All mandatory prepayments will be applied without penalty or premium (except for breakage costs if any) and shall be applied to the remaining scheduled amortization payments and the payment at final maturity, in each case under the Term Facility on a *pro rata basis.* |
| <u>Voluntary Prepayments:</u> | Voluntary prepayments of borrowings under the Term Facility will be permitted in whole or in part, in minimum principal amounts to be agreed upon, at any time on or prior to the first anniversary of the Closing Date at a price equal to 101% of the principal amount of such borrowings being prepaid plus all accrued and unpaid interest plus breakage costs, if any, and thereafter at any time without premium or penalty (except for breakage costs if any). Voluntary prepayments of the Term Facility will be applied to the remaining scheduled amortization payments and the payment at final maturity, in each case under the Term Facility on a *pro rata* basis. |
| | |

| Representations and Warranties: | The Term Facility will contain representations and warranties as are usual and customary for financings of this kind generally or as are otherwise deemed appropriate by the Arrangers for this transaction in particular, with customary materiality and other qualifications and exceptions to be agreed, including, without limitation: financial condition and solvency; due organization and authorization; execution; delivery and enforceability of the Credit Documents; no material adverse change (to be defined in a manner to be agreed); corporate existence and compliance with law; authorization and ownership of capital stock; no restricted payments; no legal bar; litigation; material contracts; no default under contractual obligations; title to properties; liens; intellectual property; payment of taxes; compliance with laws and regulations, including margin regulations, investment company act, flood insurance regulations, environmental laws and labor and ERISA laws; subsidiaries; use of proceeds; accuracy of information; creation and perfection of security interests; senior indebtedness; consents and approvals; status as senior debt; full disclosure; PATRIOT Act, OFAC and anti-terrorism law compliance; delivery of documents; projections and brokers. |
|---|---|
| Covenants: | The Term Facility will contain such affirmative and negative covenants by the Borrower and its subsidiaries as are usual and customary for financings of this kind generally or as are otherwise deemed appropriate by the Arrangers for this transaction in particular, subject to customary materiality and other exceptions and qualifications to be agreed upon, including, without limitation: delivery of financial statements and other reports; notices of defaults; material litigation and other material events to be agreed; payment of obligations; maintenance of existence; payment of taxes; maintenance of properties; maintenance of insurance; books and records; inspections; compliance with laws and material agreements; environmental matters; licenses and permits; hedging; subsidiaries; additional collateral and guarantors; commercially reasonable efforts to maintain corporate level and facility level ratings; margin regulations; further assurances with respect to security interests and additional guarantors; cash management systems; and limitations with respect to other indebtedness, liens, asset sales, fundamental changes, dispositions, restricted payments (dividends, redemptions, distributions and voluntary payments on certain debt), investments (with terms for joint ventures and permitted acquisitions to be agreed), modifications of |

| | |
|---|---|
| | debt instruments, transactions with affiliates, sales and leasebacks, interest rate protection or other hedge agreements reasonably satisfactory to the Arrangers (including a requirement to maintain Hedging Arrangements satisfactory to the Administrative Agent in respect of the Term Facility in amounts to be agreed), changes in fiscal periods, negative pledge clauses, perfection and compliance certificates, lines of business, amendments of material agreements and organizational documents and activities of Spansion Inc. and Spansion Technology. |
| Financial Covenants: | The Term Facility will have the following financial covenants applicable to Holdings and its subsidiaries on a consolidated basis: a minimum interest coverage ratio, a maximum leverage ratio and maximum permitted capital expenditures for each fiscal year in which Loans are outstanding under the Term Facility (with roll-over provisions for the following fiscal year to be agreed). |
| Events of Default: | The Term Facility will include the following events of default (and, as appropriate, grace periods and materiality thresholds): failure to make payments when due; noncompliance with covenants; defaults under other material agreements or instruments of indebtedness; breaches of representations and warranties; bankruptcy; material monetary and non-monetary judgments; ERISA; impairment of security interests in collateral; invalidity of guarantees or loan documents; "change of control" (to be defined in a mutually agreed upon manner); non-compliance by Spansion Inc. or Spansion Technology with certain limitations. |
| Conditions Precedent to the Closing: | The execution of the Term Facility and the funding of the gross proceeds of the Loans into the Escrow Account will be subject to the satisfaction in full, or waiver by the Lenders, of the Closing Conditions. |
| Conditions Precedent to the Release: | The release of the funds in the Escrow Account to the Borrower under the Term Facility will be subject to the satisfaction in full, or waiver by the Lenders, of the Account Release Conditions. |
| Assignments and Participations: | The Lenders may assign all or, in an amount of not less than $1,000,000, any part of their respective shares of the Term Facility to their affiliates or one or more banks, financial institutions or other entities that are eligible assignees (to be described in the Credit Documents), provided that no assignments may be made to the Borrower or any of its affiliates, which (other than in the |

| | |
|---|---|
| | case of assignments made by or to Barclays Bank) are acceptable to the Administrative Agent; *provided* that assignments made to Lenders and their affiliates will not be subject to the above described consent or minimum assignment amount requirements. The Lenders will also have the right to sell participations, subject to customary limitations on voting rights, in their respective shares of the Term Facility. |
| Amendments and Requisite Lenders: | No amendment, modification, termination or waiver of any provision of the Credit Documents shall be effective without the written concurrence of Lenders holding more than 50.0% of total commitments or exposure under the Term Facility (the "**Requisite Lenders**"), except that the consent of each Lender adversely affected thereby shall be required with respect to, among other things, adverse changes in matters relating to the interest rates, maturity, amortization, pro rata provisions or order of payments provisions, certain collateral issues and the definition of Requisite Lenders. |
| Taxes, Reserve Requirements and Indemnitees: | The Term Facility will have customary provisions that all payments are to be made free and clear of any taxes, imposts, assessments, withholdings or other deductions whatsoever. Foreign Lenders shall furnish to the Administrative Agent appropriate certificates or other evidence of exemption from U.S. federal tax withholding. <br><br> The Borrower will indemnify the Lenders against all increased costs of capital resulting from reserve requirements in respect of Eurodollar Loans to the extent not taken into account in the calculation of the reserve adjusted Eurodollar Rate. |
| Cost and Yield Protection: | Usual for facilities and transactions of this type, including customary tax gross-up provisions. The documentation will include customary provisions for replacing a lender seeking indemnity for increased costs or grossed-up tax payments or failing to fund a commitment. |
| Indemnity: | The Term Facility will provide customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the Arrangers, the Administrative Agent and the Lenders. Such indemnification provisions shall provide, among other things, that the Administrative Agent, the Collateral Agent, the Syndication Agent, the Documentation Agent, the Arrangers and the Lenders (and their affiliates and each of their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, |

| | |
|---|---|
| | attorneys and controlling persons and each of their respective heirs, successors and assigns) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party, as determined by final non-appealable judgment of a court of competent jurisdiction or a settlement tantamount thereto).<br><br>The Borrower will pay (i) all reasonable out-of-pocket expenses of the Administrative Agent, the Collateral Agent, the Syndication Agent, the Documentation Agent, and the Arrangers associated with the syndication of the Term Facility and the preparation, negotiation, execution, delivery and administration of the Credit Documents and any amendment, waiver or modification with respect thereto (including the reasonable fees, disbursements and other charges of counsel and the charges of IntraLinks) and (ii) all out-of-pocket expenses of the Administrative Agent, the Collateral Agent, the Syndication Agent, the Documentation Agent, the Joint Lead Arrangers, the Joint Bookrunners and the Lenders (including the fees, disbursements and other charges of one common counsel (subject to exceptions in the event of a conflict)) in connection with the enforcement of the Credit Documents or in any bankruptcy case or insolvency proceeding (including advisors and professionals engaged by the Administrative Agent or the Arrangers in connection with enforcement proceedings). |
| Governing Law and Jurisdiction: | The Term Facility will provide that the Borrower will submit to the exclusive jurisdiction and venue of the federal and state courts of the State of New York and will waive any right to trial by jury. New York law will govern the Credit Documents. |
| Counsel to the Arrangers and Administrative Agent: | Dewey & LeBoeuf LLP. |

Interest Rate:

The principal amount outstanding under the Term Facility will bear interest, at the Borrower's option, as follows:

(i)     at the Base Rate plus 4.50% *per annum*; *provided* that the Base Rate will be deemed to be not less than 3.50% per annum at any time; or

(ii)     at the reserve adjusted Eurodollar Rate plus 5.50% *per annum*; *provided* that the reserve adjusted Eurodollar Rate will be deemed to be not less than 2.50% per annum at any time.

As used herein, the terms **"Base Rate"** and **"reserve adjusted Eurodollar Rate"** will have meanings customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for Loans bearing interest at the reserve adjusted Eurodollar Rate will be customary and appropriate for financings of this type. Upon the occurrence and during the continuance of any event of default, interest will accrue (i) on the outstanding principal amount of any Loans at a rate of 2.0% *per annum* plus the rate otherwise applicable to such Loan and (ii) in the case of any other amount (including interest or premium) not paid when due, at a rate of 2.0% *per annum* plus the non-default rate then applicable to Base Rate Loans and will be payable on demand. Prior to the Account Release Date all Loans will be Base Rate Loans.

Interest Payments:

Quarterly for Loans bearing interest with reference to the Base Rate; except as set forth below, on the last day of selected interest periods (which shall be one, two, three and six months) for Loans bearing interest with reference to the reserve adjusted Eurodollar Rate (and at the end of every three months, in the case of interest periods of longer than three months); and upon prepayment, in each case payable in arrears and computed on the basis of a 360-day year with reference to the reserve adjusted Eurodollar Rate (365/366-day year with respect to Loans bearing interest with reference to the Base Rate).

Closing Fee:

The Borrower shall pay to each Lender party to the Term Facility or their designated affiliates, for their respective accounts, a closing fee (the "*Closing Fee*") in an amount not to exceed **REDACTED** of the aggregate principal

amount of each Lender's commitment under Term Facility. ***REDACTED*** of the amount of such fee shall be payable on or before the Closing Date and the remaining balance of such fee shall be payable on or before the Account Release Date.

## Summary of Conditions Precedent to Closing

*This Summary of Conditions Precedent outlines the Closing Conditions referred to in the Term Sheet, of which this Exhibit A is a part. Certain capitalized terms used herein are defined in the Term Sheet.*

(a) The Arrangers shall have received (i) copies of audited consolidated financial statements of the Borrower for each of the last three fiscal years ended December 28, 2008, (ii) copies of interim unaudited financial statements for the Borrower for each of the three fiscal quarters during the nine-month period ended September 27, 2009, each of which shall have been subject to review by the Borrower's independent registered accounting firm under the standards of the Public Company Accounting Oversight Board (United States) and (iii) a *pro forma* consolidated balance sheet and related *pro forma* consolidated statement of income of the Borrower and its subsidiaries for, and as of the end of, the four-quarter period most recently ended prior to the Closing Date for which financial statements are required hereunder after giving *pro forma* effect to the Emergence and any other material transactions effected during or subsequent to such period. The consolidated *pro forma* EBITDA of the Borrower (calculated after giving *pro forma* effect to the Emergence in accordance with Regulation S-X subject to such additions or deletions from Regulation S-X as reasonably determined by the Arrangers) for the last three fiscal quarters ended December 27, 2009, calculated on an annualized basis (the "***Consolidated pro forma EBITDA***") shall not be less than $255,000,000.

(b) The Borrower will have entered into binding transaction documents with a Backstop Party (as defined in the Plan, which shall be Silver Lake Sumeru, L.P. and/or its affiliates and managed accounts, or a third party selected by the Debtors and reasonably acceptable to the Arrangers) relating to the Rights Offering, evidencing such Backstop Party's commitment to act as a backstop purchaser to purchase any Remaining Rights Offering Shares (as defined in the Plan) with terms that satisfy the requirements of Exhibit D to the Plan and are reasonably satisfactory in form and substance to the Arrangers. Proceeds of approximately $105,400,000 from the Rights Offering will have been deposited into an escrow or similar account, subject to release terms reasonably satisfactory to the Arrangers and no more restrictive than those in the Credit Documents.

(c) The total consideration required to resolve any legal disputes related to Spansion Japan Limited's administrative expense claims shall not exceed ***REDACTED***, and not more than ***REDACTED*** of such amount shall be payable within the first 90 days after the Account Release Date. The total cash consideration required to resolve any other legal disputes related to Spansion Japan Limited shall not exceed ***REDACTED***.

(d) The Arrangers shall be reasonably satisfied that the Borrower has complied with all other customary closing conditions, including, without limitation: (i) the delivery of customary legal opinions, corporate records and documents from public officials and officer's certificates; (ii) evidence of authority; (iii) obtaining material third party and governmental consents necessary in connection with the financing and (iv) absence of litigation affecting transactions.

(e) The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-

money laundering rules and regulations, including, without limitation, the PATRIOT Act, on or prior to the Closing Date.

(f) All representations and warranties of the Borrower and its affiliates that are party to any Credit Document shall be true and correct (subject to a materiality standard in certain instances to be agreed) and there shall be no default or event of default under any of the Credit Documents.

(g) There shall not have been, since December 28, 2008 (the date of the most recent audited financial statements for the Borrower furnished to us), any material adverse change (to be defined in a manner to be agreed) in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Borrower and its subsidiaries taken as a whole (other than as a result of the Cases as described in the Disclosure Statement related to the Plan dated December 16, 2009).

(h) The Borrower shall have used commercially reasonable efforts to be assigned a corporate family rating by Moody's Investor Service, Inc. ("**Moody's**") and a corporate credit rating by Standard & Poor's Rating Group, a division of The McGraw Hill Corporation ("**S&P**").

(i) The satisfactory negotiation, execution and delivery of the Credit Documents, including, but not limited to the intercreditor agreement, substantially consistent with the terms set herein.

(j) All documents and instruments required to perfect or evidence the Administrative Agent's security interest in the Collateral under the Term Facility (including, without limitation, delivery of customary UCC financing statements or amendments, lien searches, stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing and shall be held in escrow by the Administrative Agent to be filed or recorded, as applicable, on the Account Release Date.

(k) The Bankruptcy Court shall have entered an order, in a form acceptable to the Arrangers, (i) approving the payment of the costs, fees, expenses and other compensation and commitment fees to the Lenders and the Arrangers and (ii) authorizing the Debtors to take all actions reasonably necessary to enter into and consummate the financings contemplated under the Credit Documents and in the ABL Facility and the Rights Offering.

(l) All costs, fees, expenses and other compensation due on the Closing Date to the Lenders or the Arrangers under the Credit Documents shall have been paid in full.

(m) The UBS Credit Line Agreement and documents related thereto shall be in full force and effect and in form and substance reasonably satisfactory to the Arrangers.

## ACCOUNT RELEASE CONDITIONS

### Summary of Conditions Precedent to Release

*This Summary of Conditions Precedent outlines the Account Release Date Conditions referred to in the Term Sheet, of which this Exhibit B is a part. Certain capitalized terms used herein are defined in the Term Sheet.*

(a) All of the Closing Conditions shall have been previously satisfied or waived by the Lenders and shall remain satisfied in full.

(b) All representations, warranties of the Borrower and its subsidiaries that are party to any Credit Document made on the Closing Date shall be true and correct (subject to a materiality standard in certain instances to be agreed) as if made on the Account Release Date and there shall be no default or event of default under any of the Credit Documents or under any other material indebtedness of Spansion Inc., Spansion Technology, the Borrower or its subsidiaries.

(c) There shall not have been, since December 28, 2008 (the date of the most recent audited financial statements for the Borrower furnished to us), any material adverse change (to be defined in a manner to be agreed) in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of Borrower and its respective subsidiaries (other than as a result of the Cases as described in the Disclosure Statement related to the Plan dated December 16, 2009).

(d) A Final Order (as defined in the Plan) shall have been entered confirming the Plan (in a form and substance satisfactory to the Arrangers and otherwise consistent in all material respects with the transactions described in the Credit Documents) and the Final Order shall be in full force and effect and shall not have been stayed or subject to a motion to stay. The terms and conditions of the Plan shall be in form and substance reasonably satisfactory to the Arrangers and the documentation to effect the Plan shall have terms and conditions reasonably satisfactory to the Arrangers and no material provision of the Plan or such documentation shall have been waived, amended, supplemented or otherwise modified in any material respect that is adverse to the Lenders or the Arrangers without consent of the Arrangers, it being understood for the avoidance of doubt, that (i) any change regarding the fees or compensation payable to the Lenders or the Arrangers shall be deemed adverse to such parties and shall be subject to their approval and (ii) the terms and conditions of the Debtors' Second Amended Joint Plan of Reorganization dated December 16, 2009 are in form and substance satisfactory to the Arrangers.

(e) Upon Emergence, other than (i) the loans and other extensions of credit under the ABL Facility, (ii) upon Release, the Term Facility, (iii) capital lease obligations, (iv) amounts payable to satisfy claims from Spansion Japan Limited not to exceed **REDACTED** in cash, less cash paid on Emergence, (v) certain intercompany indebtedness in the case of amounts owed by the Borrower or any Guarantor not to exceed $8,000,000, (vi) indebtedness under the UBS Credit Line Agreement and documents related thereto not to exceed $68,400,000 and (vii) other indebtedness to be agreed, the Borrower and its subsidiaries shall have no indebtedness or preferred stock issued or outstanding and all liens or security interests related thereto shall have been terminated or released, in each case on terms satisfactory to the Arrangers.

(f) All costs, fees, expenses and other compensation due to the Lenders or the Arrangers under the Credit Documents shall have been paid or concurrently with the Release will be paid in full.

(g) The ratio of (i) total indebtedness of the Borrower and its subsidiaries on a consolidated basis as of the Closing Date after giving *pro forma* effect to the Emergence to (ii) *Consolidated pro forma EBITDA* shall not be greater than 2.10 to 1.00 (excluding any deferred payments constituting indebtedness with respect to any claim payments related to a settlement with Spansion Japan Limited, not to exceed **REDACTED**, *less* the amount of payments made up to and including the date of Emergence). As of the Account Release Date, after giving effect to the Emergence, the Borrower shall have liquidity (defined as Unrestricted Cash (to be defined in a manner reasonably satisfactory to the Arrangers) *plus* available borrowings under the ABL Facility) of not less than (i) $140,000,000 (which will exclude the effect of any claim payments related to a settlement with Spansion Japan Limited made within the first 90 days after the Account Release Date) and (ii) $100,000,000 (which will include any claim payments related to a settlement with Spansion Japan Limited).

(h) The Arrangers shall be reasonably satisfied that the Borrower has complied with all other customary closing conditions, including, without limitation: (i) the delivery of customary legal opinions, corporate records and documents from public officials and officer's certificates; (ii) evidence of authority; (iii) obtaining material third party and governmental consents necessary in connection with the financing; (iv) absence of litigation affecting transactions; (v) perfection of liens securing the Term Facility; (vi) delivery of satisfactory commitments for title insurance and (vii) a certificate from the chief financial officer of the Borrower certifying that, the Borrower and its subsidiaries, on a consolidated basis following emergence, will be solvent.

(i) Simultaneously with the Release of the Term Facility, the Borrower shall (i) have received proceeds of approximately $105,400,000 from the consummation of the Rights Offering and (ii) have commitments under the ABL Facility of $65,000,000, which proceeds and availability, together with the proceeds from borrowings made on the Account Release Date pursuant to the Term Facility and other cash available to the Borrower, shall be sufficient to consummate the transactions contemplated under the Plan, extinguish all existing indebtedness (other than indebtedness permitted to remain outstanding pursuant to clause (e) above) and pay all related fees, commissions and expenses. The terms of the Rights Offering and the ABL Facility (including the exhibits and schedules) and all related documents shall be reasonably satisfactory to the Arrangers and no amendment, modification or waiver of any term thereof or any condition to the Borrower's obligations thereunder (other than any such amendment, modification or waiver that is not adverse to any interest of the Lenders) shall be made or granted, as the case may be, without the prior written consent of the Arrangers.

(j) All documents and instruments required to perfect or evidence the Administrative Agent's security interest in the Collateral under the Term Facility (including, without limitation, delivery of customary UCC financing statements or amendments, lien searches, stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing and shall be filed or recorded, as applicable, on the Account Release Date.

(k) The Borrower shall have used commercially reasonable efforts to have been assigned (i) a corporate credit rating by S&P and a corporate family rating by Moody's and (ii) a credit rating for the Term Facility by S&P and Moody's.

Exhibit B-2

(l) All conditions to release in the Escrow Agreement governing the escrow account shall have been met, which conditions that are for the benefit of the Arrangers shall be materially consistent with (and not more restrictive than) the Accounts Release Conditions.