# EXHIBIT A

**Term Sheet**

# TERM SHEET

January 7, 2010

The Term Sheet summarizes the terms upon which the parties have agreed to settle certain disputes as provided herein, subject to the approval of the courts supervising their respective insolvency proceedings. It is the parties' intention to work in good faith to finalize with all deliberate speed a series of binding agreements reflecting these terms (the "Definitive Agreements"), including, but not limited to (a) a form of License Agreement (the ("License Agreement"); (b) a form of Foundry Agreement (the "Foundry Agreement"); (c) a form of Transition Services Agreement (the "TSA"); (d) a form of Settlement Agreement; (e) a form of Asset Purchase Agreement or other form of agreement acceptable to the parties (the "APA") and (f) a form of Bailment Agreement (the "Bailment Agreement").

- The parties will execute the Foundry Agreement on the following terms and conditions:
    - Pricing: 50,000 Yen/unsorted wafer

    - JV3 loading:
        - Minimum of 200,000 wafers (110nm, 130nm and 170nm technology) in aggregate over 6Q's
        - Allocation of wafers per quarter is as follows: 35,000 wafers per quarter for 1Q2010 through 4Q2010; and 30,000 wafers per quarter for 1Q2011 and 2Q2011.
        - Spansion Japan to supply upside of up to 20 percent of minimum quarterly commitment upon the reasonable request of Spansion US. Any orders for wafers in excess of the allocated amount for any quarter shall not be counted towards the minimum 200,000 wafer commitment above.
        - The process for ordering and shipping wafers under the Foundry Agreement will be based on a quarterly purchase order issued by Spansion US at least 60 days in advance of each quarter (except that the initial purchase order will be issued as promptly as practicable following the approval of the Definitive Agreements). Except to the extent set forth in this Term Sheet, the terms and conditions of such purchase orders shall be agreed upon by the parties in advance of finalization of the Definitive Agreements.
        - The commitment to purchase wafers from Spansion Japan shall be effective for the term of the Foundry Agreement notwithstanding any sale of JV3 (except in the case of a sale of JV3 to a competitor of Spansion US, in which case such

commitment shall automatically terminate upon sale of JV3). For purposes of this Term Sheet, the term "competitor" shall be as defined in the Foundry Agreement which shall include any of the following: NOR or NAND Flash memory manufacturers that compete or may compete with Spansion US in the NOR/NAND stand-alone product area, including, but not limited to, Numonyx B.V., Samsung Electronics Co., Ltd., Toshiba Corporation, Hynix Semiconductor Inc., Intel Corporation, Micron Technology. Inc., IM Flash Technology LLC and SanDisk Corporation plus any integrated device manufacturers of any non-volatile memory products.

- o Sort services:
    - In order to efficiently utilize the sort services it has herein committed to take together with its owned sort capacity, Spansion US will have the ability to move probe cards freely among sort locations so long as it meets the floor revenue requirement of $8.9M per quarter set forth below. Upon termination of the sort services, upon request, Spansion Japan will return any of Spansion US's probe cards still in its possession to Spansion US. For avoidance of doubt, under no circumstances will Spansion Japan not be entitled to the $8.9M floor revenue commitment by Spansion US because Spansion Japan was unable to perform or unable to timely perform sort services because probe cards needed by Spansion Japan to perform the sort services outlined above were not in its possession. At all times during the term of the Foundry arrangement, probe cards owned by Spansion Japan will remain the property of Spansion Japan, and upon termination of the sort services or the sale of JV3 or SP1, as applicable, upon request, Spansion US will return any of Spansion Japan's probe cards still in its possession to Spansion Japan.
    - Spansion US to purchase sort services from Spansion Japan based on hourly rates specified below to achieve an agreed floor revenue to Spansion Japan of not less than $8.9M/Q in the aggregate
    - $27/hr for Q2/52 tester and V3308 tester
    - $50/hr for V5400 tester
    - $60/hr for BIST FOX tester
    - With respect to the sort services provided by SP1, automatically terminates upon sale of sorting services at SP1, provided that Spansion US must receive 2 months prior written notice of such termination.
    - With respect to the sort services provided by JV3, commitment to purchase sort services shall be effective for the term of the Foundry Agreement notwithstanding any sale of JV3 (except in

2

  the case of a sale of JV3 to a Spansion US competitor (as such term is used in the Foundry Agreement), in which case such commitment shall automatically terminate upon sale of JV3).

- o In the event that Spansion Japan fails in a material way (excluding failures due to manufacturing or other problems not within the control of Spansion Japan) either to deliver wafers or perform sort services on a timely basis or which do not meet acceptable minimum quality specifications, and it is determined, pursuant to an agreed dispute resolution procedure or otherwise, that such failure was within Spansion Japan's control, then for any such failure, (a) Spansion US shall be entitled to refuse delivery and not to pay for untimely, undelivered or unacceptable quality wafers or sort services and Spansion US's minimum commitment with respect to any untimely, undelivered or unacceptable quality wafers and/or sort services shall be deemed extended by one quarter for each such failure and (b) Spansion Japan shall pay to Spansion US (x) in the case of untimely, undelivered or unacceptable quality wafers, 25,000 Yen/wafer which is untimely, undelivered or of unacceptable quality and (y) in the case of untimely, unperformed or unacceptable quality sort services, 50% of the applicable sort cost per hour based on capacity not timely provided. With respect to any payments required by Spansion Japan under the prior sentence, Spansion US shall be entitled to offset such amounts against any payments due to Spansion Japan under this Term Sheet. The agreed alternative dispute resolution procedure shall require that business people at the operations level meet and confer in good faith to resolve the dispute, followed by escalation to a senior officer of each party to negotiate in good faith, followed further by the submission of any remaining disputes to an independent, third-party mediator acceptable to both parties, before either party can exercise remedies based on any such failure.

- o Spansion Japan shall be free to sell JV3 at any time provided that Spansion US must receive 2 months prior written notice of such sale.

- o Payment term: Within 45 days from the end of each month.

➢ Spansion Japan agrees to perform on these terms plus other agreed terms (including, without limitation, wafer production, distribution, R&D[1] etc.) pending court approval of settlement in US and Japan

---

[1] In accordance with the amended R&D Agreement being discussed between Spansion US and Spansion Japan.

3

- Bailment Agreement to be resolved as part of Definitive Agreements.

- Spansion Japan's failure to perform its obligations in any material way (excluding failure to perform or delay as described in the liquidated damages provision set forth above) under these terms shall permit Spansion US to terminate Foundry arrangement set forth above.

- Any wafers sold to Spansion US in accordance with purchase order covering period through January 8, 2010 shall not be included for purposes of determining minimum commitment set forth herein.

➢ Technical support: In consideration and upon receipt of a payment of 500 million Yen or the US$ equivalent of 500 million Yen, calculated as of and payable as of the date no later than three business days following approval of the Definitive Agreements, Spansion Japan will provide to Spansion US technical support and data for a period of up to 18 months relating to any request for specifically-identified information that is within the possession or control of Spansion Japan and that Spansion US cannot reasonably procure without the assistance of Spansion Japan, including, but not limited to:

  - 45nm and 65nm process and recipe data; and
  - Customer qualification of 110nm process

➢ Pursuant to the mutually agreeable terms of the APA, Spansion US will purchase Spansion Japan's Kawasaki business (distribution and R&D) on agreed terms for $12.5 million (except for Kawasaki resources that support Aizu business), payable at closing. Subject to any applicable consent rights or other restrictions on transfer, Spansion Japan will also assign to the newly formed Japanese subsidiary of Spansion US any contracts or agreements related to the Kawasaki business including but not limited to the agreements listed on Exhibit A. For avoidance of doubt, the Kawasaki business being sold by Spansion Japan to Spansion US does not include any of the inventory, accounts receivable or accounts payable of Spansion Japan's Kawasaki business, which assets and liabilities will remain with Spansion Japan. The aforementioned payment is due upon closing of the Spansion Japan Kawasaki business at which time the Kawasaki personnel (other than the personnel that support the Aizu business but including Aizu personnel who support LLC's worldwide quality function) will transfer and become employees of Spansion US's new Japan subsidiary. Such closing shall occur at a mutually agreeable time, but no later than 30 days after execution of the Definitive Agreements. It is anticipated that it will be necessary for the parties to perform certain transition services, as agreed in the TSA, in connection with the closing under the APA.

➢ Spansion US will grant Spansion Japan a good faith right of first offer for 170nm, 130nm and 110nm wafer demand in excess of Fab 25 capacity for a

4

term of at least 2 1/2 years beginning in 3Q2011. Thereafter, Spansion US and Spansion Japan will discuss in good faith additional arrangements for the shipment of wafers by Spansion Japan to Spansion US in light of market demand.

- In settlement of all of the disputes between Spansion Japan and Spansion US, and subject to and in addition to the considerations set forth in this Term Sheet, Spansion US shall pay to Spansion Japan the sum of $45 million, payable as follows: $10 million on March 31, 2010, $12.5 million on June 30, 2010, $12.5 million on September 30, 2010 and $10 million on December 31, 2010. Notwithstanding anything herein to the contrary and for the avoidance of doubt, any amounts due between Spansion Japan and Spansion US for the period of October 27, 2009 through and including January 8, 2010, shall be resolved, settled and any net amount paid in accordance with the terms of the purchase orders governing such period.

- Intellectual Property: The parties will execute the License Agreement on terms mutually agreeable to the parties.

- Transition Services: The parties will execute the TSA with respect to the temporary continuation and ultimate termination of certain technology and other support on terms mutually agreeable to the parties.

- Spansion US shall support Spansion Japan's reorganization plan in Spansion Japan's corporate reorganization proceeding in Japan provided it is consistent in all respects with this Term Sheet, and Spansion US will not file any pleading, motion or request for relief without the prior written consent of Spansion Japan. With regards to Spansion US's plan of reorganization, Spansion Japan shall be entitled to take any action or file any motion, pleading or response to the plan to address the plan's current classification and treatment of Spansion Japan's rejection damage claims against Spansion US, as well as the alleged failure of such plan to establish a reserve for Spansion Japan's rejection damage claims.

    o In the event that Spansion US modifies its plan (a) to include all of the relevant terms in this Term Sheet and (b) to treat all of Spansion Japan's rejection damage claims as Class 5 general unsecured claims under the plan and provides Spansion Japan a reserve for the full amount of all such rejection damage claims, in the event that Spansion US circulates to Spansion Japan an approved disclosure statement with respect to its plan that is consistent in all respects with the foregoing, Spansion Japan shall support confirmation of Spansion US's plan of reorganization and vote all of its claims in support of such plan of reorganization and Spansion Japan will not file any pleading, motion or request for relief without the prior written consent of Spansion US.

5

- The claims of Spansion US against Spansion Japan arising prior to February 9, 2009 (the "Spansion US Prepetition Claims") will be deemed allowed unsecured nonpriority claims in the bankruptcy proceeding of Spansion Japan, but not entitled to receive any distribution on account of such claims, and Spansion US agrees to vote such claims in favor of Spansion Japan's plan of reorganization consistent with this Term Sheet. Except as set forth in this Term Sheet, all claims of Spansion Japan and Spansion US against each other shall be expunged, released and satisfied. Notwithstanding anything in this Term Sheet to the contrary, (a) Spansion Japan shall retain its rejection damage claims against Spansion US in respect of the rejection of the Second Amended Foundry Agreement or the rejection of any other executory contract or agreement between Spansion US and Spansion Japan (collectively, the "Rejection Damage Claims"); (b) Spansion US (on behalf of itself and its bankruptcy estate) shall retain all of its rights and defenses against the Rejection Damage Claims, including, but not limited to, (x) any liability that Spansion Japan may have to Spansion US under chapter 5 of the Bankruptcy Code and (y) its right to argue that it is entitled to reduce the Rejection Damage Claims by up to $85 million on account of the Spansion US Prepetition Claims against the Rejection Damage Claims; and (c) Spansion Japan shall retain all of its rights and defenses to oppose any claim or defense to the Rejection Damage Claims, including, but not limited to, under chapter 5 of the Bankruptcy Code or Spansion US's alleged right to reduce the Rejection Damage Claims by up to $85 million on account of the Spansion US Prepetition Claims by Spansion US or any other party in interest in Spansion US's bankruptcy case.

- Upon execution of the Definitive Agreements, the parties will file as promptly as possible all such pleadings or papers as may be necessary to seek approval from their respective bankruptcy court of such agreement in all respects.

- The effectiveness of the Definitive Agreements shall be conditioned upon (a) GE consenting to the Definitive Agreements in all respects, (b) GE withdrawing and/or consenting to the withdrawal of all claims, pleadings and papers filed by GE in Spansion US's chapter 11 case and (c) confirmation of Spansion US's plan of reorganization.

## Exhibit A

- Kawasaki Lease
- Telecommunications leased line
- Purchase and Sale Agreement
- Sub-Distributor Appointment Agreement
- License to "AKID" (to be utilized when/if foundry relationship ends
- Office equipment leases
- Maintenance agreements
- Software licenses