## EXHIBIT C

**License Agreement**

## INTELLECTUAL PROPERTY LICENSE AGREEMENT

THIS INTELLECTUAL PROPERTY LICENSE AGREEMENT (the "Agreement") is entered into as of January __, 2010, and effective as of the Effective Date, by and between SPANSION JAPAN LIMITED, having its registered place of business at 2, Takaku-Kogyodanchi, Aizuwakamatsu-shi, Fukushima 965-0060, Japan ("Spansion Japan") and SPANSION LLC, having its principal office at 915 Deguigne Drive, Sunnyvale, CA 94088, U.S.A. ("Spansion"), and sets forth the terms and conditions by which Spansion Japan receives an intellectual property license from Spansion for certain specified activities at Spansion Japan's JV3 facility and related sales activities, and in return pays Spansion an agreed-upon royalty based on Spansion Japan's resulting manufacturing and sales activities.

WHEREAS, on February 10, 2009, Spansion Japan filed a proceeding under the Corporate Reorganization Law (Kaisha Kosei Ho) of Japan to obtain protection from Spansion Japan's creditors (the "Spansion Japan Proceeding") and successively the Spansion Japan Proceeding was formally commenced on March 3, 2009, when the Tokyo District Court entered the commencement order and appointed the incumbent representative director of Spansion Japan as trustee;

WHEREAS, on March 1, 2009, Spansion filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case"); and

WHEREAS, the parties have determined to enter into this Agreement in connection with and as required by the Settlement Agreement (the "Settlement Agreement") dated as of January __, 2010, by and between Spansion and Spansion Japan.

NOW, THEREFORE, in consideration of the promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **DEFINITIONS.**

Whenever used in this Agreement, the terms set forth in this Section 1 shall have the meanings ascribed to them below.

**1.1** **"Complementary Products"** means low-density or mid-density stand-alone Non-volatile Memory product offerings mutually agreed upon in writing by the parties from time to time, for royalties or other compensation to be agreed upon by the parties at the time, that do not compete with Licensed Products. Without limiting the foregoing, the products identified in Exhibit A attached hereto as JV3 Project 1 and Project 2 will be Complementary Products.

**1.2** **"Confidential Information"** means any and all technical and non-technical information one party provides the other hereunder that is either indicated to be proprietary or confidential information of the disclosing party or which by its nature the receiving party would reasonably deem such information to be confidential or proprietary, regardless of marking, including trade secret, know-how and proprietary information, firmware, mask works, designs,

schematics, techniques, software code, technical documentation, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to the disclosing party, its present or future products, sales, suppliers, customers, employees, investors or business, whether in written, oral, graphic or electronic form.

   1.3   **"Effective Date"** means the later of the following dates: (a) the date upon which approval of this Agreement is provided by the Tokyo District Court in connection with the Spansion Japan Proceeding; and (b) the date upon which approval of this Agreement is provided by the court having jurisdiction over the Chapter 11 Case.

   1.4   **"Foundry Agreement"** means the Third Amended and Restated Foundry Agreement between the parties effective on the Effective Date.

   1.5   **"Gross Sales"** means the gross amount actually received by Spansion Japan for the sale of a Licensed Product to any third party, excluding any amount in respect of a sale of returned Licensed Products or any amount refunded in respect thereof.

   1.6   **"Intellectual Property Right"** means any patent, copyright, trade secret, know-how, or any other intellectual property right or proprietary right whether registered or unregistered, and whether now known or hereafter recognized in any jurisdiction, excluding any trademark or similar rights.

   1.7   **"JV3"** means the Spansion Japan manufacturing facility located in Aizuwakamatsu, Japan and designated as of the Effective Date as JV3.

   1.8   **"Licensed Products"** means Spansion Japan integrated circuits, devices or other products at Process Nodes of 90nm or greater that either (a) include Non-volatile Memory and are based upon or incorporate the Spansion Technology, or (b) otherwise require or use the Spansion Technology in their design or manufacture. The density of the memory array for any Licensed Product may not exceed 256MB. Without limiting the foregoing, **"Licensed Products"** include (i) stand-alone Non-volatile Memory products (for offer for sale and sale only to Spansion and Spansion's sales channels), (ii) products that incorporate Non-volatile Memory and other elements, including Non-volatile Memory embedded logic products, such as Flash memory embedded microcontrollers; and (iii) discrete logic products or analog products that use the Spansion Technology but do not incorporate or embed any Non-volatile Memory and are not otherwise competitive with any current Spansion product offerings.

   1.9   **"Multi-Chip Products"** or **"MCPs"** mean integrated circuits, devices or other products that include one or more of any memory die combined with one or more other semiconductor device die.

   1.10   **"Non-volatile Memory"** means semiconductor memory that does not lose its data after power is removed from the system or device containing such memory.

   1.11   **"Process Node"** means a specific geometry loosely based on minimum line width at which semiconductor devices, and the photomasks or reticles used in the manufacture of those devices, are manufactured (*e.g.*, a 110nm process node).

2

**1.12** **"Spansion Competitor"** means any of the following: (a) any provider of stand-alone Non-volatile Memory, including (as of the date hereof) Numonyx, Samsung, Toshiba, Hynix Semiconductor, Intel, Micron, IM Ventures, Macronix, Sharp, Sanyo, Atmel, Winbond, SST, ST Micro, Rohm/Oki, Fujitsu, Powerchip, Promos and Matsushita; (b) any providers of products that include significant amounts of Non-volatile Memory such as microcontrollers, including (as of the date hereof) NEC, Fujitsu, Matsushita, Toshiba, Asahi, Sony, Renesas, Infineon, Freescale, ON and MicroChip; and (c) any developers of innovative Non-volatile Memory technology, including (as of the date hereof) Ovonyx, Genusion, EverSpin, Crocus, Grandis, Avalanche Technology, Infineon, Magsil, Micromem, Unity Semiconductor, Celis, Ramtron, Symtrix, Adesto, Axon and Nantero.

**1.13** **"Spansion Technology"** means collectively, the design, manufacturing and process know-how provided to Spansion Japan from time to time by Spansion and actually implemented or used by Spansion Japan at JV3, or otherwise used by Spansion Japan to make Licensed Products at JV3, prior to the Effective Date. **"Spansion Technology"** also includes Spansion's design for floating gates in existence as of the Effective Date and any related process technology. Spansion Japan acknowledges and agrees that except as to the manufacture of stand-alone Non-volatile Memory Licensed Products on behalf of Spansion as set forth below, the Spansion Technology does not include any of Spansion's proprietary "mirror bit" technology and except for the manufacture of stand-alone Non-volatile Memory Licensed Products on behalf of Spansion as set forth below, no license is granted under this Agreement to Spansion's proprietary "mirror bit" technology or any Intellectual Property Rights therein.

## 2. LICENSE GRANTS; OWNERSHIP.

### 2.1 License by Spansion.

(a) Subject to the terms and conditions of this Agreement, Spansion hereby grants to Spansion Japan under Spansion's applicable Intellectual Property Rights a royalty-bearing, non-exclusive, non-transferable license, without right to sublicense, to use the Spansion Technology to make Licensed Products at JV3, and to offer to import, export, offer to sell and sell Licensed Products worldwide.

(b) Subject to the terms and conditions of this Agreement, Spansion further grants to Spansion Japan, a royalty-free, non-exclusive, non-transferable license, without right to sublicense, to reproduce, modify and create derivative works of the Spansion Technology (**"Spansion Japan Improvements"**) solely at JV3 with the equipment already installed at JV3 as of the Effective Date or such other equipment as Spansion Japan may elect to install at JV3 and only for use in or for the manufacture of Licensed Products.

### 2.2 License Restrictions.

(a) Spansion Japan's right to offer to sell or sell Licensed Products that are stand-alone Non-volatile Memory products, or that are otherwise competitive with Spansion's Non-volatile Memory product offerings set forth in Exhibit B hereto and such other product offerings with respect to which Spansion provides Spansion Japan with at least three (3) months notice, shall be limited to offering to sell and selling such Licensed Products only to (i) Spansion

in accordance with the Foundry Agreement and (ii) to distributors, OEMs or resellers specifically designated in writing by Spansion (subject to Spansion Japan's consent, such consent not to be unreasonably conditioned, delayed or withheld). To the extent that any Licensed Products do not constitute stand-alone Non-volatile Memory products, but instead are products that incorporate Non-volatile Memory along with other elements (as described in Section 1.8), then Spansion Japan agrees that it will first offer Spansion the right to distribute such Licensed Products on a most-favored customer basis. Any such Licensed Products that Spansion elects to distribute shall not be subject to the royalty payment obligation under Section 3.1. Spansion shall have a reasonable period, not to exceed 30 days, to elect to distribute such Licensed Products and the parties shall negotiate in good faith the terms by which Spansion would distribute such Licensed Products. If Spansion does not elect to distribute such Licensed Products, Spansion Japan shall have the right to sell such Licensed Products to third parties in such manner as Spansion Japan may determine, subject to the terms and conditions of this Agreement.

(b) Except to the minimum extent that applicable law prevents limiting such rights, Spansion Japan shall not modify, adapt, translate or prepare derivative works of the Spansion Technology except as expressly set forth in Section 2.1(b) above.

(c) Without limiting the foregoing, Spansion Japan agrees that Spansion Japan shall not remove, obscure, or alter any Spansion or other proprietary rights notice affixed to or contained within the Spansion Technology.

2.3    **No Trademark License.** No right or license is granted under or to any Spansion trademark, trade name, service mark, service name, trade dress, logo or similar right under this Agreement.

2.4    **Grant-Back License.** Spansion Japan grants Spansion a non-exclusive, fully-paid, royalty-free, non-transferable, worldwide, perpetual and irrevocable license, with right of sublicense, under and to any Intellectual Property Rights of Spansion Japan to use, make, have made, import, export, offer to sell and sell all products and services incorporating or based upon the Spansion Japan Improvements, and to practice any methods embodied in the Spansion Japan Improvements. Spansion Japan agrees to provide Spansion written notice within 30 days following the end of each calendar quarter describing any Spansion Japan Improvements made during such quarter. Upon request from Spansion, Spansion Japan will provide Spansion documentation describing any such Spansion Japan Improvements in sufficient detail to enable Spansion to use such Spansion Japan Improvements in accordance with the license granted above.

2.5    **Technology Audit.** Spansion will have the right to engage at its own expense an independent auditor reasonably acceptable to Spansion Japan to examine Spansion Japan's technology development and usage to determine Spansion Japan's compliance with the license terms, including development and delivery of Spansion Japan Improvements. Any such audit may be made only after providing Spansion Japan with prior written notice of the reasons for seeking such audit and no more frequently than annually. Such auditor shall be subject to confidentiality obligations in respect of any information reviewed in connection with such audit and such auditor shall report to Spansion only with respect to its determination of Spansion Japan's compliance with the license terms, including any grant-back and delivery obligations

relating to Spansion Japan Improvements. In the event that the auditor determines that Spansion Japan has not delivered any Spansion Japan Improvements as required by this Agreement, Spansion Japan shall promptly deliver such Spansion Japan Improvements to Spansion.

### 2.6 Ownership.

(a) **Spansion Technology.** Spansion Japan acknowledges that as between the parties any and all Intellectual Property Rights in and to the Spansion Technology are and shall remain the property of Spansion or Spansion's suppliers, and Spansion Japan shall not at any time during or after the expiration or termination of this Agreement in any way question or dispute the ownership thereof by Spansion or Spansion's suppliers. Nothing in this Agreement shall be deemed a transfer of any ownership rights in Spansion Technology or related Intellectual Property Rights to Spansion Japan. All rights not expressly granted herein are reserved.

(b) **Spansion Japan Improvements.** Subject to the grant back license set forth above, as between the parties, Spansion Japan shall own the Spansion Japan Improvements and all Intellectual Property Rights therein. All rights not expressly granted herein are reserved.

2.7 **Independent Development.** Nothing in this Agreement limits Spansion Japan's rights to create products or technology that do not incorporate Spansion Technology or use Spansion Technology to make such products or technology; provided, however, that no such product or technology is licensed by Spansion pursuant to this Agreement. In the event that Spansion Japan creates any products independent of use of the Spansion Technology, then unless such development was the result of a joint development effort with a third party, Spansion Japan agrees to discuss in good faith with Spansion the opportunity to sell such products on mutually-acceptable terms.

### 3. PAYMENTS AND TAXES.

### 3.1 Royalties.

(a) Except as set forth in Section 3.1(b) or Section 3.2, Spansion Japan shall pay Spansion non-refundable royalties for all sales or dispositions of Licensed Products other than direct sales of Licensed Products to Spansion. The royalties will equal Five Percent of Gross Sales for Licensed Products at the 90nm Process Node for the initial term, and Four Percent for each renewal term; and Three Percent of Gross Sales for (a) Licensed Products at the 110nm Process Node and (b) Complementary Products (to the extent they incorporate Spansion Technology) unless otherwise agreed upon by the parties in writing. Spansion Japan shall pay such royalties within sixty (60) days after the end of each Spansion fiscal quarter beginning with the quarter in which Spansion Japan first ships a Licensed Product.

(b) If (i) one or more Licensed Products are incorporated by Spansion Japan in die form in an MCP, (ii) such MCP also contains one or more elements in die form that do not constitute Licensed Products, and (iii) such MCP is sold or disposed of by Spansion Japan to one or more third parties, the applicable royalty payable by Spansion Japan to Spansion for sale or disposition of such MCP shall be calculated by applying the applicable royalty rate set forth in Section 3.1(a) to the difference between the Gross Sales price for such MCP and the actual purchase price for the non-Licensed Product elements of such MCP paid by Spansion Japan. If

Spansion Japan makes such non-Licensed Product elements of an MCP rather than purchasing such non-Licensed Product elements from a third party, then the actual direct manufacturing cost of such non-Licensed Product element shall be deducted from the Gross Sales price when establishing the basis for calculating the applicable royalty.

**3.2** **Commissions.** Notwithstanding Section 3.1, the parties may agree from time to time in writing that the resale of certain low-margin Licensed Products by Spansion shall be subject to commission payments from Spansion Japan rather than payment of royalties by Spansion Japan. The parties shall separately agree in writing on a case-by-case basis regarding Licensed Product sale opportunities that will be more appropriate for a sales commission model rather than a royalty-payment model. If the parties do not agree, then the royalty obligations set forth in Section 3.1 shall apply.

**3.3** **Payment.** All royalty and commission payments shall be accompanied by a report detailing the basis for and calculation of the applicable payment. All payments shall be made in United States Dollars.

**3.4** **Taxes.** The prices specified in this Agreement are exclusive of any sales, use, excise, value added or similar taxes, and of any export and import duties, which may be levied upon or collectible by Spansion (excluding taxes based on Spansion's net income) as a result of the licensing and delivery of the Spansion Technology. Spansion Japan agrees to pay and otherwise be fully responsible for any such taxes and duties, or penalties relating thereto, unless in lieu thereof Spansion Japan provides Spansion with an exemption certificate acceptable to the relevant governmental authorities. Further, in the event that Spansion Japan is required to withhold taxes imposed upon Spansion for any payment under this Agreement by virtue of the statutes, laws, codes or governmental regulations of a country in which Products are sold, then such payments will be made by Spansion Japan on behalf of Spansion by deducting them from the payment then due Spansion and remitting such taxes to the proper authorities on a timely basis, and the payments provided for under this Agreement will be adjusted appropriately, provided that Spansion Japan supplies Spansion with official documentation and/or tax receipts on such withholdings supporting such taxes and such payments as may be required by Spansion for its tax records as soon as practical after the date on which such payment is due Spansion under this Agreement.

## 4. REPORTING; AUDITS.

**4.1** **Record Retention.** Spansion Japan will keep complete and accurate records pertaining to sales of and royalty calculations for Licensed Products. Spansion Japan will maintain such records for at least a five year period following the year in which any such payments were made hereunder.

**4.2** **Audit Request.** Spansion will have the right to engage at its own expense an auditor reasonably acceptable to Spansion Japan to examine Spansion Japan's records pertaining to sales of Products and the calculation of royalties owed to Spansion under this Agreement. Spansion will provide Spansion Japan at least 15 days' prior written notice of such audit and may conduct audits no more than once every six months.

5. **WARRANTY DISCLAIMER.**

   **5.1 Disclaimer of Warranty.** EACH PARTY HEREBY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS, IMPLIED, OR STATUTORY, RELATING TO THE SPANSION TECHNOLOGY OR THE LICENSED PRODUCTS, INCLUDING ANY WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Nothing contained in this Agreement shall be construed as either a warranty or representation by Spansion as to the validity or scope of any Spansion patents.

6. **CONFIDENTIALITY.**

   **6.1 Confidential Information.** Both parties will maintain in confidence all Confidential Information disclosed by the other party (the "**Disclosing Party**"). A receiving party hereunder (the "**Receiving Party**") will not use, disclose or grant use of such Confidential Information except as expressly authorized by this Agreement. To the extent that disclosure to a third party is authorized by this Agreement, a Receiving Party will obtain prior agreement from such third party to whom disclosure is to be made to hold in confidence and not make use of such information for any purpose other than those permitted by this Agreement. A Receiving Party will use at least the same standard of care as it uses to protect its own information of comparable importance to ensure that its employees, agents and consultants do not disclose or make any unauthorized use of such Confidential Information. The Receiving Party will promptly notify the Disclosing Party upon discovery of any unauthorized use or disclosure of such Confidential Information. Notwithstanding any other provision in this Agreement to the contrary, the obligations set forth in this Section 6 shall survive any termination or expiration of this Agreement for a period of five years.

   **6.2 Exceptions.** The obligations of confidentiality contained in Section 6.1 will not apply to the extent such Confidential Information:

   **(a)** was already known to the Receiving Party, other than under an obligation of confidentiality, at the time of disclosure by the Disclosing Party;

   **(b)** was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party;

   **(c)** became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Receiving Party in breach of this Agreement;

   **(d)** was disclosed to the Receiving Party, other than under an obligation of confidentiality, by a third party who had no obligation to the other party not to disclose such information to others;

   **(e)** was developed independently by the Receiving Party without any use of Confidential Information; or

   **(f)** is required to be disclosed by applicable law.

## 7. TERM AND TERMINATION.

**7.1 Term.** This Agreement shall continue in full force and effect for a period of two years from the Effective Date, unless terminated earlier as set forth below. The term of the Agreement will be extended for up to three additional one-year terms unless at least one year prior to the end of any term, either party notifies the other party in writing of its intention not to renew this Agreement for an additional term; provided, that neither party shall unreasonably exercise its right not to renew this Agreement for any of the three additional one-year terms.

**7.2 Termination.** This Agreement may be terminated early by a non-breaching party, if the other party materially breaches this Agreement and does not cure such breach within 30 days following receipt of written notice from the non-breaching party of such breach. In addition, Spansion may terminate this Agreement upon any termination of the Foundry Agreement for cause by Spansion or if the Foundry Agreement is terminated as a result of JV3 being acquired by a Spansion Competitor (as such term is defined in the Foundry Agreement), in each case pursuant to the terms of the Foundry Agreement.

**7.3 Consequences of Termination.** Upon any termination of this Agreement, the licenses granted by Spansion to Spansion Japan herein shall terminate and Spansion Japan shall immediately cease to use all Spansion Technology or other Spansion Confidential Information. Termination of this Agreement shall not affect any license granted by Spansion Japan to Spansion hereunder, nor shall it affect any payment obligations accruing hereunder.

**7.4 Survival.** Notwithstanding any termination or expiration of this Agreement, the provisions of Sections 1, 2.4, 2.5 (for a period of five years), 2.6, 3, 4.1, 4.2 (for a period of five years), 5, 6, 7.3, 7.4 and 8 shall survive any termination of this Agreement.

## 8. GENERAL

**8.1 Termination of Previous Agreements.** The parties hereby agree that the Research and Development Agreement by and between FASL Japan Limited and FASL LLC dated February 23, 2004, is hereby terminated. The provisions set forth therein as surviving termination shall survive in accordance with the terms of such Agreement. The parties also agree that the Technology License Agreement by and between FASL Japan Limited and FASL LLC, dated as of March 15, 2004, is hereby terminated and superseded and replaced in its entirety by this Agreement.

**8.2 Relationship.** It is agreed and understood that neither party is the agent, representative or partner of the other party and neither party has any authority or power to bind or contract in the name of or to create any liability against the other party in any way or for any purpose pursuant to this Agreement. It is understood that Spansion Japan is an independent contractor. Each party expressly reserves the right to enter other similar agreements with other parties on the same or on different terms.

**8.3 Assignment.** Neither this Agreement nor any rights or licenses granted to Spansion Japan hereunder, shall be assignable or transferrable whether voluntarily or involuntarily or by operation of law, in whole or in part, and including as a result of a change of control, without the prior written consent of Spansion, provided that Spansion Japan may assign

its rights and obligations under this Agreement to the successor-in-interest or transferee of Spansion Japan's assets as may be contemplated by Spansion Japan's plan of reorganization if such successor-in-interest or transferee is not a Spansion Competitor. Any consent by Spansion to an assignment not explicitly permitted under this Section 8.3 shall be in Spansion's sole discretion if the proposed successor in interest, transferee, assignee or new controlling entity is a Spansion Competitor or does not agree to assume all of Spansion Japan's obligations under the Foundry Agreement, but Spansion will not unreasonably withhold consent if the potential successor in interest, transferee, assignee or new controlling entity is not a Spansion Competitor and agrees to assume all of Spansion Japan's obligations under the Foundry Agreement. Spansion may assign or transfer this Agreement and all licenses granted to it hereunder without the prior written consent of Spansion Japan. In the event of a permitted assignment, transfer or change of control under this Section 8.3, the assigning party will have no further obligations arising after the date of the assignment with respect to this Agreement, provided that the assignee agrees in writing to assume and be bound by the terms, conditions and obligations of such party hereunder. Any purported assignment, transfer, or change of control not in compliance with this Section 8.3 shall be null and void from the beginning.

**8.4** **Waiver.** Failure or neglect by either party to enforce at any time any of the provisions hereof shall not be construed nor shall be deemed to be a waiver of such party's rights hereunder nor in any way affect the validity of the whole or any part of this Agreement nor prejudice such party's rights to take subsequent action.

**8.5** **Notices.** All notices required or permitted to be given hereunder shall be in writing by first class certified or registered airmail, postage prepaid, if confirmed or acknowledged, to the addresses specified below or to such other address as may be specified in writing by the addressed party to other party in accordance with this Section 8:

if to Spansion:

> 915 Deguigne Drive
> Sunnyvale, California 94088, U.S.A
> Tel.
> Attn: General Counsel

if to Spansion Japan:

> 2 Takaku-Kogyodanchi
> Aizuwakamatsu-shi, Fukushima, 965-0060, Japan
> Tel.
> Attn: Trustee

Each such notice or other communication shall for all purposes be treated as effective or as having been given as follows (i) if delivered in person, when delivered; (ii) if sent by airmail, at the earlier of its receipt or at 5 p.m., local time of the recipient, on the seventh day after deposit in a regularly maintained receptacle for the disposition of mail or air mail, as the case may be; and (iii) if sent by recognized courier service, on the date shown in the written confirmation of delivery issued by such delivery service. Either party may change the address and/or addressee(s) to whom notice must be given by giving appropriate written notice at least 14 days prior to the date the change becomes effective.

**8.6    Severability.**    In the event that any clause, sub-clause or other provision contained in this Agreement shall be determined by any competent authority to be invalid, unlawful or unenforceable to any extent, such clause, sub-clause or other provision shall to that extent be severed from the remaining clauses and provisions, or the remaining part of the clause in question, which shall continue to be valid and enforceable to the fullest extent permitted by law.

**8.7    Headings; Construction.**    The headings to the clauses, sub-clause and parts of this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. Any ambiguity in this Agreement shall be interpreted equitably without regard to which party drafted the Agreement or any provision thereof. The terms "this Agreement," "hereof," "hereunder" and any similar expressions refer to this Agreement and not to any particular Section or other portion hereof. The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, will be deemed to be followed by the words "without limitation" and "discretion" means sole discretion.

**8.8    Governing Law.**    The rights and obligations of the parties under this Agreement shall be governed in all respects by the laws of the State of California exclusively, as such laws apply to contracts between California residents performed entirely within California.

**8.9    Compliance with Law.**    In performing its duties under this Agreement, each party shall at all times comply with all applicable international, federal, state and local laws and shall not engage in any illegal or unethical practices, including without limitation the Foreign Corrupt Practices Act of 1977 and any anti-boycott laws, as amended, and any implementing regulations.

**8.10    Entire Agreement.**    This Agreement supersedes any arrangements, understandings, promises or agreements made or existing between the parties hereto prior to or simultaneously with this Agreement and constitutes the entire understanding between the parties hereto.  Without limiting the foregoing, the parties hereby acknowledge and agree that any licenses to Intellectual Property Rights and trademarks or similar rights owned or controlled by Spanson are set forth only in this Agreement and the Foundry Agreement, and that all other grants of Intellectual Property Rights by Spanson to Spanson Japan are set forth in this Agreement and the Foundry Agreement, and this Agreement and the Foundry Agreement expressly replace and supersede all grants of Intellectual Property Rights previously granted by Spanson to Spanson Japan prior to the Effective Date, including as set forth in (i) the Technology License Agreement by and between FASL Japan Limited and FASL LLC, dated as of March 15, 2004, and (ii) the Second Amended and Restated Foundry Agreement between Spanson and Spanson Japan, dated as of March 30, 2007.  Except as otherwise provided herein, no addition, amendment to or modification of this Agreement shall be effective unless it is in writing and signed by and on behalf of both parties.

**IN WITNESS WHEREOF,** this Agreement is hereby executed by a duly authorized representative of each party.

**SPANSION JAPAN**                    **SPANSION**

By:_____    By:_____
    Name:                              Name:
    Title:                             Title:
    Date:                              Date:

## EXHIBIT A

### Complementary Products

As of the Effective Date, no Complementary Products have been agreed upon.

Exhibit B

Spansion Products

NOR Flash Memory, including but not limited to SPI NOR

NAND Flash Memory

One-Time-Programmable (OTP) Memory

Read-Only Memory (ROM)

Multi-Chip Products (MCPs) that include one or more of any of the above product die combined with one or more other semiconductor device die.