

450 Lexington Avenue
New York, New York 10017
212.850.2800 Phone
212.850.2929 Fax
andrewskurth.com

Jonathan Levine
212.850.2816 Phone
212.813.8158 Fax
jonathanlevine@andrewskurth.com

March 8, 2010

**VIA ELECTRONIC FILING AND HAND DELIVERY**
Honorable Kevin J. Carey, Chief Judge
United States Bankruptcy Court
824 North Market Street
5th Floor
Wilmington, DE 19801

    Re:    <u>In re Spansion, Inc., et al.</u>, Case No. 09-10690 (KJC) - - Post Trial Submission

Dear Judge Carey:

The Ad Hoc Committee of Convertible Noteholders (the "Convert Committee") respectfully submits the post-trial submission attached hereto as Appendix A to demonstrate why the Court cannot confirm the Plan in its present form.

                                          Respectfully,

                                          Jonathan Levine

# APPENDIX A

## Letter Statement From the Convertible Noteholders Committee ("CNC")

The evidence establishes that Debtors' Total Enterprise Value (TEV) and Distributable Value (DV) are at least at the midpoint values of $1.281B and $1.846B. (See Exhibit B for detailed breakdown). The evidence further establishes that efforts by Debtors' and the Senior Noteholders' (the "SNHs") to undervalue Debtors must be rejected.[a]

**Motives.** Debtors' motives to suppress value are unsurprising—to reach a deal that facilitated a quick exit from bankruptcy while maximizing management stock options and grants.[1] This first meant taking the FRNs "take it or leave it" deal with an implied negotiated TEV of around $750M[2], which fed into a negotiated DV of $1.03B.[3] Debtors (and their FA Gordian) were willing to take that deal even though they contemporaneously knew that it provided the FRNs with more than a 100% recovery.[4] To make it confirmable, however, required a valuation that fit the deal's parameters. Gordian complied. Its valuation considerations in the October Disclosure Statement ("DS") described a plan that only provided 100% recovery to the FRN's[5] even though (i) Gordian believed otherwise[6], and (ii) the valuation conclusions in the DS were significantly below Gordian's value ranges in its March, April, July, August and October 2009 analyses.[7] Even after Debtors decided not to pursue that un-confirmable plan, but instead to pursue a new plan supported by the SNHs and Silver Lake, Gordian's valuation didn't change.[8] Why? Because the SNHs/Silver Lake deal was premised on a similarly low TEV.[9] Thus, Gordian's current midpoint TEV remains about the same, at $775M.[10] As part of the new deal, the SNHs and Silver Lake also agreed to keep in place Debtors' stock grant/option plan.[11] While Debtors failed to offer relevant evidence justifying the richness of that plan, ample evidence demonstrates how keenly aware Debtors' management is of the plan's potential value.[12] The lower the Plan Equity Value for Spansion at emergence the greater the potential for immediate profits to Debtors' management.[13] Nor is the potential for tremendous gain in Spansion's stock post-emergence lost on Silver Lake, which has amassed a significant position in Debtors via its ownership of Senior notes, the ChipMoss trade claim and the backstop agreement.[14] That potential, of course, also serves as their motivation to undervalue Debtors to the detriment of the CNC.

**Use of Uncertainty.** Debtors and the SNHs have coupled business uncertainty with biased, inconsistent and selective valuation methodologies to drive down TEV and DV. For example, at the request of the FRNs and the Committee[15], Debtors embarked on the Headwinds exercise to identify and quantify contingent risks, which were then "pitched" to these creditors and baked into the DS as the "Contingency Case" as a means to lower value.[16] Gordian and Blackstone used the Contingency Case to lower their valuation ranges. Jefferies did not, but instead relied solely on Debtors' unbiased Base Case projections that resulted from Debtors' bottoms-up, two-month, rigorous business planning process.[17] Jefferies' reliance on the Base Case is bolstered by Debtors' 2009 Q2-Q4 Base Case-beating performance[18] (which Debtors knew would mean a higher TEV[19]), as well as by Debtors' 2010 budget, which projects revenue and EBITDA nowhere close to Debtors' Contingency Case.[20] When the purpose of an assumption is to drive

---

[a] Although not intended to be all-inclusive, attached as Exhibit A hereto is a list of record citations in support of the facts described in this letter.

1

down value, as were contingency case assumptions here, courts have rightly concluded (as did Jefferies) that such projections can be ignored.[21]

Contrast how Debtors treated the uncertainty of contingent risks with how they treated uncertainty of contingent upsides a/k/a their "tailwinds." For most of this bankruptcy, including in the DS and at the Equity committee hearing, Debtors have been very "careful at discussing any tailwinds."[22] It wasn't until Debtors decided to change strategies and take out the FRNs that they began trumpeting their "tailwinds" as "significant near-term growth opportunities" to the rating agencies and potential private and public lenders.[23] At Confirmation, Debtors fell back once again to calling their tailwinds "what-ifs" and "iffy."[24] These tailwinds are real, and Debtors, the SNHs and Silver Lake know it.[25] In fact, one tailwind has already come to fruition enough for Debtors to estimate its present value at $53M despite what Debtors told this Court in November.[26] Although not included in Jefferies' opinion of TEV, Debtors' estimate of potential 2012 revenue of $340M has the potential to incrementally increase TEV by as much as $286M.[27]

Debtors and the SNHs also used uncertainty of the "Out Years" (i.e. the period after the Base Case 3-year projections) to drive down TEV and DV. The Out Years construction assumes that Spansion will be "fabless," which the evidence established won't happen for another 5-10 years, or longer.[28] Nevertheless, Debtors and Gordian used the Out Years to take Debtors' current prediction of stabilized annual EBITDA of between $280M and $300M all the way down to $189M for the Base Case and $124M for the Contingency Case in the Out Years.[29] Compounding the effect of this downward adjustment and contrary to the evidence, Blackstone assumed the Out Years begin in 2013, and Spansion essentially falls off a cliff in that year, and Gordian appears to do the same, although it is difficult to tell based on its convoluted report.[30] Jefferies, on the other hand, assumed a 7-year transition to the Out Years for its valuation, which is consistent with the evidence.[31]

Uncertainty was also used to reduce or eliminate sources of value to be added to DV. For example, for most of this proceeding, Debtors refused to place a value on the Samsung litigation even though Gordian advised Debtors well before the first DS that it would have to take the value of that litigation into account.[32] Debtors did the same thing for NOL value, which Gordian did not include in DV until its January 2010 report.[33] Similarly, Gordian did not include value for the Samsung litigation in DV until its January 2010 report, but even then at a suppressed value range of $20M-$50M. When negotiating with the FRNs, however, Debtors ascribed a value of $100M to the Samsung litigation,[34] and Debtors' liquidation expert report uses the Samsung litigation as a proxy to value Samsung's IP at a mid-point of $70M.[35] Moreover, in a November email to Mr. Sarkisian, Gordian put Plan Equity Value at $478.2M including $100M for the Samsung litigation and Debtors' NOL's.[36] Neither Mr. Owsley nor Debtors could explain why the DS placed no value for the Samsung litigation or NOLs.[37]

Another source of value that we now know exists comes from Debtors' NAND technology. Debtors omitted mentioning this upside opportunity (or any growth opportunity) at the November Equity Committee hearing. Yet two weeks later Debtors trumpeted NAND and other growth opportunities to the rating agencies.[38] Gordian put value on that IP asset for the first time in its January 2010 expert report, but, again, it did so at a suppressed range of $15M-$50M. Debtors themselves placed a net present value of $53M on this aspect of their NAND technology.[39]

HOU:3000034.9

Debtors and the SNHs also omitted the Sunnyvale property or the unused equipment in it as a source of value, even though that sub-micron facility is closed.[40] Mr. Owsley's excuse? The property is purportedly a "toxic waste site."[41] Yet, the evidence showed that Debtors are indemnified for any remediation that may be needed.[42] We also learned that Debtors are considering a sale of the Sunnyvale property after they emerge from bankruptcy, and that in October 2009 they received a $42M offer for the property.[43] The evidentiary record includes value for the equipment in the range of $16.6M-$21.6M, and the underlying property at a range of $25-$42M.[44]

**Valuation Methodologies.** When assessing the choices made by the three valuation experts, the Court will see clear evidence supporting the methodologies and assumptions used by Jefferies and undercuting the biased, selective choices made by Gordian and Blackstone.

**Comparable Company Analysis.** Jefferies used as comparables 12 solid state memory companies. After benchmarking those companies against Spansion, Jefferies derived **both EBITDA and revenue** multiples using an average of the fourth quartile trading multiples of the comparable companies.[45] Although Jefferies was attacked for comparing NOR and non-NOR companies, Jefferies' concluded mean EBITDA and revenue multiples (3.7x and 1.3.x, respectively)[46] were actually **lower** than Blackstone's concluded EBITDA and revenue multiples (3.9x and 1.6x, respectively)[47] and, to the extent decipherable, in line with Gordian's calculated EBITDA and revenue multiples.[48] Jefferies then applied the trading multiples **both** to Spansion's 2010 EBITDA and revenue, weighting them at 66.7% and 33.3%, respectively.[49] The resulting TEV range in Jefferies' report was $1,017M to $1,398.[50] Jefferies made an upward adjustment at Confirmation to a range of $1,062M to $1,457M to reflect the fact that Debtors' 2010 EBITDA included a one-time adjustment for the Spansion Japan Settlement.[51] The 2010 EBITDA projection now used by Jefferies is consistent with Gordian's use of Debtors' unrevised Base Case 2010 EBITDA projection and Mr. Devost's testimony that the settlement was indeed a "one-time adjustment."[52]

In contrast, Blackstone and Gordian ignored revenue multiples in their Comp Co analyses while at the same time **exclusively relying on revenue multiples in their Comparable Transactions ("Comp Trans") analyses.**[53] Why the inconsistency? Because inclusion of revenue multiples in their Comp Co analyses would raise their valuation ranges and put them in line with Jefferies. There is no legitimate excuse for Blackstone and Gordian (in its final report) to selectively use revenue multiples in this fashion. The use of revenue multiples in a Comp Co analysis is commonplace, and, as Mr. Morgner testified, has been endorsed by academicians and Wall Street.[54] This is not surprising given that many courts, including Judge Sontchi, have endorsed Jefferies' methodology; that is, to use revenue multiples even if they are weighted less than EBITDA multiples.[55] In fact, except for his final report, Mr. Owsely included revenue multiples when calculating value ranges for Debtors under Comp Co analyses,[56] and even Silver Lake utilized revenue multiples in its decision to invest in Spansion.[57] Of the valuation experts (Houlihan, Oppenheimer, Gordian, Blackstone and Jefferies), Blackstone is the only expert that completely ignored revenue multiples in valuing Debtors under a Comp Co analysis.[58] Yet, as we learned, Mr. Generaux did not ignore revenue multiples in his valuations of Delta Airlines.[59]

A final point here (which also is relevant to the Comp Trans analysis) relates to Gordian's strip-out, appearing for the first time in its January 2010 report, of EBITDA from Debtors' wireless

3

(or E-Mobility) business in connection with its Comp Co analysis and strip-out of wireless revenues in connection with its Comp Trans analysis.[60] Mr. Owsley is alone in these assumptions, showing further bias and selectivity.[61] Moreover, Gordian's assumptions contradict the evidence and Debtors' projections that wireless revenue and EBITDA decreases are not lost forever, but instead will be replaced with different revenue and EBITDA as Debtors focus on the embedded portion of the NOR market.[62] Mr. Owsely's belated strip-out of wireless revenue and EBITDA simply ignores those facts. Of course, the end result is to lower significantly Gordian's valuation ranges.[63]

**Discounted Cash Flow ("DCF")** The first difference between Jefferies and the other experts is how they calculated Debtors' free cash flows ("FCF's"). Jefferies calculated Debtors' FCF's using only Debtors' Base Case projections. Gordian and Blackstone included Debtors' Contingency Case in their assumed FCF's. Jefferies, Gordian and Blackstone then discounted Debtors' FCF's at discount rates of 13.8%, 14.7% and 15%, respectively.

Next came the calculation of Debtors' terminal value---an effort complicated by Debtors' Out Years construction. All three experts calculated terminal value by using a perpetuity growth method, but there are material differences in the way they did so. The primary difference is when the experts first assume the drastic revenue and EBITDA reductions of the Out Years. As discussed above, Jefferies incorporated a 7-year step-function to the Out Years thereby reducing FCF's ratably from 2012 through 2019. Jefferies then applied a mid-point growth rate of 1.5% beginning in 2019. In contrast, Blackstone assumed that the Out Years will begin in 2013 thereby reducing FCF's all the way down to the Out Years levels for 2013, and, although convoluted, Gordian appears to have done the same thing.[64] They both then applied a mid-point terminal growth rate of 0% beginning in 2013.[65]

In applying their DCF methodologies, the experts made judgment calls over which they are criticizing each other. Blackstone and Gordian argue that Jefferies' use of an unlevered asset beta of .89 and a levered equity beta of 1.18 was too low, but they ignore the fact that Jefferies added a company-specific risk premium of 4%.[66] On the other hand, Jefferies disagrees with Blackstone's and Gordian's decision not to run Debtors' Net Operating Losses (NOL's) through their DCF's but instead to treat them as non-operating assets. Had Jefferies followed Blackstone's and Gordian's way, and just treated NOL's as non-operating assets added on to TEV, **Jefferies' overall range of TEV would be $21M higher.**[67] Jefferies' DCF also differed in two other ways. First, because Debtors' statutory tax rate is 35%, and Debtors utilized that rate in their Base Case projections, Jefferies used that rate in its DCF.[68] Without any evidentiary support and contrary to Gordian's prior valuation analyses,[69] Gordian and Blackstone both used a 40% tax rate at Confirmation. Their reason? Debtors told them to do so.[70] The impact to Blackstone's and Gordian's TEV by using a higher tax rate was between $40 to $50 million.[71] Second, Jefferies added back stock based compensation to Debtors' FCF's because it is unquestionably a non-cash charge.[72] Without any explanation, however, Blackstone and Gordian failed to do so -- improperly lowering their respective valuations by another $25 million.[73]

**Comp Trans Analysis.** At Confirmation, Mr. Morgner described the five transactions that the Jefferies team (including its industry expert) selected as comparables and explained why the revenue and EBITDA multiples associated with those transactions were appropriate proxies for Debtors' value (after a weighting of 10%).[74] For example, Mr. Morgner explained that one

4

comparable was Spansion's own acquisition of Saifun, a company that owned IP assets that are a central part of Spansion's technology product offering going forward.[75] Debtors and the SNHs presented no evidence to challenge the appropriateness of Jefferies' selections; instead, all they argued was that Jefferies' range was too high. According to Debtors and the SNHs, for this analysis (as opposed to Comp Co), the Court should consider only revenue multiples. And, consider them for only two transactions-- the transaction in which Numonyx became a joint venture ("Numonyx I") and Micron's recently announced acquisition of Numonyx ("Numonyx II").

The Court will have to discern which experts' Comp Trans analysis is the most credible, consistent and reasonable. Just like it did with its Comp Co analysis, Jefferies calculated **both EBITDA and revenue multiples** concluded from the comparable transactions and applied them to Debtors' annualized 2009 EBITDA and revenue (based on Q2 and Q3 results).[76] In contrast to their Comp Co analyses, Blackstone and Gordian only applied revenue multiples even though relevant EBITDA information provided by Numonyx itself was readily available.[77]

In this regard, Gordian and Blackstone's bias is highlighted by their selective treatment of available information regarding Numonyx. Despite Debtors' superiority over Numonyx in terms of **REDACTED**,[78] the parties agree that Numonyx is a close comparable and that Numonyx II is a highly relevant proxy for Debtor's value.[79] In fact, Blackstone thought so highly of Numonyx I that it relied solely on a single revenue data point from that transaction for 1/3rd of Debtors' value in its report.[80] Although a private company, in February 2009, Debtors obtained detailed 2008 actual and 2009 projected revenue and EBITDA data prepared by Numonyx in connection with merger discussions.[81] At Confirmation, Mr. Devost testified that he reviewed the Numonyx data and it was consistent with his prior modeling of Numonyx's historical and projected financial performance.[82] Moreover, the 2009 revenues that Numonyx projected in the due diligence package came within **REDACTED** of Numonyx's actual 2009 revenues.[83] Despite having this relevant Numonyx-prepared data, Gordian and Blackstone chose to ignore it -- and in the case of Mr. Genereux, he chose not to even look at it.[84] Why the lack of curiosity? Because Debtors and the SNHs know that this very relevant data, if applied to Numonyx II, would result in a much higher TEV for Debtors than they are currently willing to admit. The Court, however, should not ignore these data points. Following the same methodology from its report, (i.e. using a weighting of EBITDA and revenue of 66.7% and 33.3%, respectively,) Jefferies calculated an implied TEV for Debtors of $**REDACTED**, which is well within the Comp Trans valuation range previously described in the Jefferies' report.[85]