**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL: (212) 849-7000 FAX: (212) 849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7270

WRITER'S INTERNET ADDRESS
susheelkirpalani@quinnemanuel.com

March 8, 2010

Via Electronic Filing and By Hand
Honorable Kevin J. Carey, Chief Judge
United States Bankruptcy Court
824 North Market Street
5th Floor
Wilmington, DE 19801

Re: In re Spansion, Inc. et al. (the "Debtors"), Case No. 09-10692 (KJC)
United States Bankruptcy Court for the District of Delaware (the "Court")

Dear Judge Carey:

In accordance with the Court's instructions at the March 2, 2010 conclusion of the confirmation hearing held in the above-referenced chapter 11 cases, Esopus Creek Value L.P. ("Esopus"), Plainfield Special Situations Master Fund II Limited, Plainfield Liquid Strategies Master Fund Limited, and Plainfield OC Master Fund Limited (collectively, "Plainfield"), in their capacities as holders of convertible notes of Spansion, Inc.,[1] respectfully submit this post-trial letter brief, in order to highlight certain matters we believe it is critical for the Court to consider in determining whether to confirm the Debtors' Second Amended Joint Plan of Reorganization (the "Plan"). As set forth herein, the evidence adduced at the confirmation hearing does _not_ support confirmation of the Plan, unless the Plan is construed as having been filed in good faith -- a construction that is predicated upon the New Employee Incentive Plan being subject to Court approval and subject to modification to make the terms thereof reasonable and consistent with Delaware bankruptcy precedent.

As the Court is well aware, during the five month period leading up to the confirmation hearing, the Debtors have been portraying their business and future prospects differently to different audiences.

The first audience consists of the Court and stakeholders at the bottom of the Debtors' capital structure. This audience has been led to believe the Debtors' business is deteriorating rapidly, has no opportunities for growth, and is operating in a shrinking market that is fast approaching a "steady state" (i.e., a point at which their profitability and cash flows will plummet precipitously). This is the portrayal set forth in the Debtors' Disclosure Statement, which was approved by the Bankruptcy Court by order dated December 14, 2009.

The second audience, consisting of the Debtors' senior secured lenders, ratings agencies and potential sources of exit financing, has been told a far different story. The second audience has

---

[1] For the avoidance of doubt, Esopus and Plainfield, members of the Ad Hoc Equity Committee of Spansion, Inc., file this objection in their capacity as holders of convertible notes.

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017 | TEL (213) 443-3000 FAX (213) 443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712

03604.61692/3349836.3

been told about "significant near-term growth opportunities" that exist in the Debtors' market, future growth opportunities that may enable the Debtors to greatly exceed their Base Case, and that the "steady state" is not expected to occur for at least six years, but more likely closer to nine to ten years, according to the Debtors' statements.

The Debtors' portrayals of their business prospects to these two audiences are so strikingly different, they are impossible to reconcile. This leads to the conclusion that the Debtors may have been engaged in an effort to mislead either (i) the Court and stakeholders at the low end of the capital structure, who have limited visibility into the Debtors' financial affairs and who presumably will have no ongoing relationship with the Debtors, or (ii) the group consisting of senior secured creditors, ratings agencies and potential financiers, who by virtue of the positions, have virtually unlimited access to information regarding the Debtors' financial affairs, and who will have ongoing relationships with the Debtors. In light of the significant proposed equity stake the Debtors' management would be given in the reorganized company, and the benefits to management of a depressed valuation, it is easy to determine where the Debtors' motivations would lead them. Given the disparity in the information available to the two groups, it is also easy to ascertain which audience would be easier to mislead. The Court recognized this at the confirmation hearing, noting that at the November 30, 2009 hearing on the motion to appoint an official equity committee, the Court had only been provided "half of the story."

Accordingly, in reviewing the valuation information presented during the confirmation hearing, Esopus and Plainfield respectfully request that Your Honor (i) carefully analyze the Debtors' disparate portrayals of their business to the two audiences mentioned above, and the impact on valuation if the more favorable portrayal prevails, and (ii) bear in mind the powerful incentives that would motivate the Debtors' management to withhold information about upside opportunities and seek confirmation of the Plan based upon a depressed enterprise value. Esopus and Plainfield believe that once this information is fully considered, it will also become clear that the Debtors' valuation (and that of the Senior Noteholders) are based on self-serving, hand-picked data points, rather than complete information, and that such valuations are unreliable. It is only after these factors are considered that the Debtors' true enterprise value will be revealed.

## *Discussion*

1. **The Base Case is the Only Reliable Case.** In connection with the confirmation hearing, both the Debtors and the group of holders of senior notes due 2016 (the "Senior Noteholders") submitted expert reports that relied, in part, on the "Contingency Case" described in the Debtors' disclosure statement. In contrast to the self-serving statements found in these expert reports, however, the **evidence** adduced at the confirmation hearing clearly established that there is no basis for the Contingency Case. To the contrary, the evidence shows that the only reliable projections regarding the Debtors' business are those that comprise the "Base Case." Accordingly, the valuation reports of Henry Owsley of the Gordian Group (the Debtors' expert) and Michael Genereux of the Blackstone Group (the Senior Noteholders' expert) are flawed and must be disregarded.

The evidence adduced at trial made clear that the Base Case was the product of a thorough, bottoms-up analysis of the Debtors' business, that was prepared and carefully vetted by management, without interference from creditor groups or their outside advisors. Transcript of Feb. 24, 2010 hearing ("Feb. 24 Transcript"), at page 25, line 8 through page 26, line 13 (testimony of Donald Devost). Indeed, the Base Case was prepared as part of a rigorous process over a two month period. Id., page 53, lines 10-14). It was re-validated by projections prepared by Spansion in December 2009, id., page 61, line 17 to page 62, line 6), and presented to the ratings agencies. Mr. Devost confirmed that the presentation to the ratings agencies, which was premised on the Base Case and identified future growth opportunities, was intended "to convey the

complete picture, the base case, the down-side, and the potential growth." Id., page 91, line 21 to page 93, line 6.

The validity of the Base Case is supported by additional evidence, namely, the testimony of Randy Furr, the Debtors' CFO, regarding the leadership program Mr. Furr hosted for some of Spansion's top employees in November 2009, and the presentation materials prepared by the Debtors in connection with this program. See Convert Committee Exhibit 44 (the "Leadership Presentation"). Specifically, on cross examination, Mr. Furr testified that in setting incentive compensation targets, management prepares a bottoms up budget that is discussed with the Board of Directors, with the budget premised on "quality earnings." To determine "quality earnings," Mr. Furr acknowledged, it is important to back out one-time revenue enhancing items and restructuring costs. Mr. Furr admitted that although the Leadership Presentation backed out restructuring costs, there were no one-time revenue items to back out. Feb. 24 Transcript, page 239, lines 9-13; see Leadership Presentation, at 30. As a result, Mr. Furr acknowledged that Spansion's revenue results for 2009 – which exceeded the Base Case – represented "quality earnings." This testimony directly refutes the hopelessly self-serving assertions of Donald Devost that Spansion's 2009 results were based on amorphous "temporary," one-time or non-recurring events, such as an alleged "Chinese stimulus plan." The testimony of Mr. Furr, the senior member of Spansion's management, is supported by the Leadership Presentation and is far more credible than the testimony of the junior ranking Mr. Devost.

Equally compelling is the fact that notwithstanding all of the obstacles (or "headwinds") Spansion faced – including market share loss due to bankruptcy, loss of customers as a result of "second-sourcing", the multi-faceted dispute with Spansion Japan, as well as disputes with Tessera and Elpida – in 2009, Spansion exceeded its plan for both revenue and EBITDA in each of the second, third, and fourth quarters of 2009. Feb. 24 Transcript, page 60, lines 14-16). This was not simply a case of Spansion catching a lucky break here or there. When asked about the contingencies on which the Contingency Case was based, Mr. Devost testified that "[v]irtually all of them have occurred in some form," but admitted that Spansion had been able to mitigate the impact of these items. Feb. 24 Transcript, page 33, lines 22-24. The fact that Spansion was able to exceed its Base Case despite the occurrence of "virtually all" of these contingencies puts to rest any notion that the Contingency Case has any validity, and makes clear that it was never anything more than a contrivance fabricated by outside advisors as a means of driving down enterprise value. Evidence of this is found in the fact that Spansion's management never told Henry Owsley, the Debtors' valuation expert, to put any weight on the contingency case. Transcript of February 26, 2010 hearing ("Feb. 26 Transcript"), at page 157, line 12 to page 158, line 7 (testimony of Henry Owsley).

Finally, it is important to note that the risks in achieving the Debtors' business plan were already taken into account when the Base Case was established. This is also true of the valuation analysis set forth in the expert report of Richard Morgner of Jefferies & Co., which relied exclusively (and appropriately) on the Base Case. The suggestion by Michael Genereux of the Blackstone Group that the discount rate used by Mr. Morgner in his DCF analysis should be adjusted, see Feb. 26 Transcript, page 101, line 21 to page 101, line 1, is simply misplaced, and would result in "double-counting" of the risks associated with Spansion's business, artificially and improperly driving down enterprise value.

2. **Management Incentive Plan Is an Overly-Aggressive Attempt to Grab Value**

The evidence at the confirmation hearing confirmed unequivocally that the Debtors' proposed equity incentive plan (the "Management Incentive Plan") was an aggressive plan, and that the Debtors pursued this aggressive plan on the advice of Henry Owsley. Transcript of March 1, 2010 hearing, page 41, line 6 to page 42, line 3. Utilizing this approach, it was possible that management could receive up to 20 percent of the stock of the reorganized debtors. Id., page 41,

lines 11-16. No other evidence was adduced at trial as to how the Management Incentive Plan was created, and the testimony of Todd Sirras, the Debtors' proffered expert on employee compensation issues, was unpersuasive and largely irrelevant. However, evidence was presented that the Debtors' management was aware that by utilizing a depressed enterprise value, management stood to profit handsomely from the stock granted under the Management Incentive Plan. Feb. 24 Transcript, page 231, line 21 to page 234, line 9 (testimony of Randy Furr).

### 3. Unless the Management Incentive Plan is Modified, the Plan Fails the Good Faith Test

By utilizing a depressed valuation and incorporating the overreaching Management Incentive Plan, the Debtors' Plan fails to satisfy the good faith requirement of Bankruptcy Code section 1129(a)(3). Should the Court determine that the Plan otherwise satisfies the requirements for confirmation, the Court nonetheless should condition confirmation on the Debtors' agreement to modify the Management Incentive Plan to reduce by 50% the amount of shares that are distributed in connection with the Plan. Alternatively, consistent with a finding of good faith, the Court may deem the Plan as seeking approval of the Management Incentive Plan as reasonable, and modify the same. The number of shares available for distribution pursuant to the stock options that may be granted under the Management Incentive Plan need not be adjusted since the opportunity for mischief in connection with the stock options is far less than in connection with the direct stock grant. The effect of so modifying the Management Incentive Plan is illustrated on Exhibit A annexed hereto. The Court clearly has authority to condition confirmation of the Plan. See In re Walker, 165 B.R. 994, 1000 (E.D. Va. 1994) (holding that "the imposition of conditions, such as those here at issue, on the proponents of a plan is among the powers available to the Bankruptcy Court so long as those conditions are responsive to and a logical outgrowth of issues raised by the creditors and as to which notice and opportunity for hearing have been given."); In re TH New Orleans, 188 B.R. 799, 808-09 (E.D. La. 1995) (citing Walker and affirming confirmation of plan where bankruptcy court had conditioned approval upon certain modifications which debtor then made).

### 4. The Jefferies Midpoint Enterprise Value, Validated by the Alternative Rights Offering, Plus Additional Sources of Value, Provides the Appropriate Distributable Value

The Jefferies midpoint enterprise value is validated by the alternative rights offering proposed by the convertible noteholder group and provides the best starting point for determining distributable value under the Plan. Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.), 84 B.R. 278, 284 (Bankr. D. Mass.1988) (stating "[i]t is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value"); aff'd In re First Software Corp., 107 B.R. 417 (D. Mass. 1989); see In re American Furniture Outlet USA, Inc., 209 B.R. 49 (Bankr. M.D. N.C. 1997) (citing First Software and noting that "[w]hen evaluating the relative weight of the evidence in this case, the court feels it is appropriate to keep a constant eye towards Chief Judge Gabriel's unassailable maxim that 'what a willing buyer will pay a willing seller is the absolute best indication of fair market value.'").

In addition to being validated by the fully funded, unconditional alternative rights offering, the Jefferies valuation, unlike the other valuations, is premised solely on the Base Case. Adding the sources of additional value listed on Exhibit A annexed hereto (which are not the subject of any serious dispute), the total distributable value should be sufficient to provide a significant distribution to convertible noteholders. See Exhibit A (AHEC Closing Demonstratives).

### 5. The Plan Impermissibly Seeks to Deprive Creditors of the Right to Pursue Objections to Claims, Including the Disputed ChipMOS Claim

Section 9.2 (4) of the Plan states, in pertinent part: "After the Effective Date ... only the Claims Agent shall have the authority to File, prosecute, settle, compromise, withdraw or litigate to

judgment objections to Disputed Classes 5A – 5DC Claims, Claims Agent Avoidance Actions or 510(c) Actions …." This section impermissibly seeks to deprive creditors of their statutory right to object to claims. This provision was added to the Plan through an amendment that occurred well <u>after</u> the Debtors' disclosure statement was approved and <u>after</u> the deadline for confirmation objections. This revision is material as it seeks to deprive creditors of a significant statutory right that helps ensure fairness in chapter 11 proceedings, and guards against Debtor favoritism of select creditors. The provision thus violates due process, as well as the adequate disclosure requirements of section 1125 of the Bankruptcy Code and must be stricken.

Moreover, the provision improperly seeks to vest all claims objection powers in a "Claims Agent" that has absolutely no fiduciary duties to creditors, the Debtors or their estates. Although the Plan grants the Claims Agent authority to pursue claim objections, the Claims Agent has no duty to object to any claim, even if the claim is totally baseless. See Plan §9.2(8) (stating that although the Claims Agent has power to bring objections and settle claims, "nothing contained herein shall be deemed to obligate the Claims Agent to take any such actions, all of which shall be determined by the Claims Agent in its sole and absolute discretion."). The provision is wholly improper, and the undersigned intend to appeal any confirmation order that seeks to deprive creditors of the fundamental due process guaranteed by the Bankruptcy Code. Simply put, the interests of convertible noteholders are not adequately represented by the Claims Agent designated under the Plan, and due process dictates that the Plan may not strip creditors of their statutory right to pursue claims objections, including the pending claim objection filed on March 3, 2010, by Esopus and Plainfield, to the $305 million claim filed by ChipMOS Technologies, Inc.

### 6. **The Trial Record Contains No Basis for Deemed Substantial Consummation of the Plan**

The very last sentence of the proposed confirmation order submitted by the Debtors, if not stricken, would result in the deemed substantial consummation of the Plan on the effective date. This sentence provides: "On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code." This provision is offensive, and is a clear attempt by the Debtors to render moot any potential appeals that may result from confirmation of their controversial plan. There is, however, no legal basis for "deemed" substantial consummation of a chapter 11 plan. Moreover, as a practical matter, it will undoubtedly take many weeks or even months for the Debtors to substantially consummate the Plan. Significant claims remain to be resolved, and it will be impossible to distribute a significant portion of the new common stock in the reorganized debtors until these claims have been resolved. Thus, under these facts, the request for a "deemed" substantial consummation is particularly egregious and must be stricken from the confirmation order.

For all the foregoing reasons, Esopus and Plainfield respectfully request that the Court deny confirmation of the Plan.

Respectfully,

| | |
|---|---|
| SAUL EWING LLP | QUINN EMANUEL URQUHART, OLIVER & HEDGES, LLP |
| _____ | _____ |
| Mark Minuti (DE No. 2659) | Susheel Kirpalani (admitted *pro hac vice*) |
| 222 Delaware Avenue, Suite 1200 | Scott C. Shelley (admitted *pro hac vice*) |
| P.O. Box 1266 | 51 Madison Avenue, 22nd Floor |
| Wilmington, DE 19899 | New York, NY 10010 |
| Telephone: (302) 421-6840 | Telephone: (212) 849-7000 |

*Co-counsel to Esopus and Plainfield*