## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **SPANSION, INC.**, *et al.*[1] | : | |
| Debtors | : | Case  No. 09-10690 (KJC) |
| | : | |

| | | |
|---|---|---|
| U.S. Bank National Association, as trustee, | : | |
| Plaintiff, | : | Adv. Pro. No. 09-52274 |
| | : | |
| vs. | : | |
| | : | |
| Wilmington Trust Company, Spansion, | : | |
| Inc., Spansion Technology LLC, Spansion | : | |
| LLC, Cerium Laboratories LLC and | : | |
| Spansion International, Inc. | : | |
| Defendants | | |

## OPINION ON CONFIRMATION[2].

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

At a hearing held before this Court on February 24, 25, and 26, 2010, and March 1 and 2,

2010 (the "Confirmation Hearing"), a combined record was made for the following matters:

---

[1]The Debtors being jointly administered in this case pursuant to an Order dated March 4, 2009, are: Spansion, Inc., a Delaware corporation; Spansion Technology, LLC, a Delaware limited liability company; Spansion LLC, a Delaware limited liability company; Cerium Laboratories, LLC, a Delaware limited liability company; and Spansion International, Inc., a Delaware corporation (the "Debtors" or "Spansion").

[2]This Opinion constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(K), (L) and (O).

(i)      The request for confirmation of the Debtors' Second Amended Joint Plan of Reorganization (as amended);[3]

(ii)     The *Ad Hoc* Committee of Convertible Noteholders' Emergency Motion for Order (a) Vacating Order Approving Debtors' Disclosure Statement Pursuant to Fed.R.Bankr.P. 9024 and Adjourning Confirmation Hearing and (b) Directing Appointment of Trustee or Examiner Pursuant to 11 U.S.C. §§1104(a)(1) and (2) and 1104(c)(2) (D.I. 2391) (the "Motion to Vacate"); and

(ii)     The Plaintiff's Motion for Summary Judgment in *U.S.Bank National Association, as Trustee v. Wilmington Trust Company et al* (Adv. No. 09-52274)(D.I. 14) (the "Summary Judgment Motion").

A number of parties filed objections to confirmation of the Plan. Some objections were resolved prior to the Confirmation Hearing, but the objections that remained were filed by: (1) the *Ad Hoc* Committee of Convertible Noteholders (the "Convert Committee")(D.I. 2479 and 2715), (2) the *Ad Hoc* Committee of Equity Security Holders ("AHEC")(D.I. 2476), (3) Joseph Rubino[4] (D.I. 2522), (4) Tessera, Inc. ("Tessera") (D.I. 2469), (5) The John Gorman 401(k) ("Gorman") (D.I. 2474), (6) U.S. Bank, National Association, as trustee to the Senior Noteholders ("US Bank") (D.I. 2468), (7) the United States Trustee (the "UST") (D.I. 2493), and (8) the Wilmington Trust Company, as indenture trustee for the 2.25% Exchangeable Debentures

---

[3]As described below, the Debtors' Second Amended Joint Plan of Reorganization was amended on various dates prior to the Confirmation Hearing. The Debtors argue that the revisions do not materially or adversely affect the recoveries of creditors, or, any creditors that are affected have already rejected the plan and, therefore, re-solicitation the plan and disclosure statement is not required. After all of the amendments, the plan version before me for confirmation is the Debtors' Second Amended Joint Plan of Reorganization (as Amended) dated February 23, 2010 (D.I. 2915)(the "Plan").

[4]Neither Mr. Rubino nor anyone on his behalf appeared at the Confirmation Hearing to press this objection and, accordingly, it is overruled for his failure to appear and prosecute his objection. (Tr. 3/1/2010 at 322). Moreover, Mr. Rubino's pleading appears to object to venue in Delaware, good faith in proposing the Plan, and treatment of unsecured creditors. Venue is proper pursuant to 28 U.S.C. §1408. His other objections are also overruled on the merits for the reasons set forth in this decision.

2

due 2016 ("Wilmington Trust") (D.I. 2493).[5]

The parties filed post-hearing submissions on March 8, 2010. For the reasons set forth below, I conclude that (i) the Debtors' Plan cannot be confirmed in its present form, (ii) the Convert Committee's Motion to Vacate will be denied, and (ii) the Summary Judgment Motion will be granted and judgment entered in favor of US Bank.

## BACKGROUND

(1)     Overview of the Debtors' Business.

The Debtors are semiconductor device companies which design, develop, manufacture, market and sell Flash memory products and solutions. Spansion's products are integrated into a broad range of electronic products, including mobile phones, consumer electronics, automotive electronics, networking and telecommunications equipment, servers and computer peripherals. (Ex. D-5, Second Amended Disclosure Statement For Debtors' Second Amended Joint Plan of Reorganization dated December 16, 2009 (the "Disclosure Statement") at 15.)

Flash memory is a "non-volatile" memory solution, meaning that it retains its contents even after the power is shut off, allowing memory contents be retrieved at a later time. (*Id.* at 17.) There are two main types of Flash memory: NOR and NAND.[6] (*Id.* at 18.) Spansion

---

[5]Wilmington Trust also filed a joinder to the Convert Committees' objection (D.I. 2561), Gorman filed a joinder to the AHEC objection (D.I. 2560), and the Convert Committee filed a joinder to Wilmington Trust's objection (D.I. 2840).

[6]The Disclosure Statement describes these two types of semiconductor memory as follows:

The terms NOR and NAND refer to the architecture of the connections between the memory cells of the device which produce the different characteristics of the two memory types . . . . NAND offers a number of desirable attributes: it is relatively inexpensive, a small device can hold a great amount of information, and its performance characteristics are particularly well suited to data storage such as music, pictures, video, etc. The market for NAND Flash memory has grown rapidly in recent years owing to the growing popularity of devices that consumers can

designs, develops, manufactures, markets and sells NOR Flash memory products and solutions, and in 2008, together with Numonyx, accounted for 64% of the NOR Flash memory market. (Ex. C-1 at 7.)

In fiscal year 2008, the net sales of wireless applications (such as mobile phones) and embedded applications (such as gaming, set top boxes, DVD Players and automotive and industrial electronics) each represented about 50% of the Debtors' total net sales. (Disclosure Statement at 20.) The Debtors are currently restructuring their business to focus their energies on the embedded market, while winding down their participation in the less profitable wireless market. (Tr. 2/24/2010 at 24:1-5 (Devost).)

(2)    The Chapter 11 Case

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on March 1, 2009. Throughout this case, the Debtors have made operational adjustments and negotiated with various creditor constituencies, some more than others, to attain a financial restructuring, as well. Early in this case, the Debtors' negotiations involved discussions

---

use to access their personal media in a portable, battery-powered format.
. . . .
NOR Flash memory has different characteristics than NAND Flash memory. . . . Though NOR Flash memory is more expensive than NAND for comparable densities [capacity], it is also available in much lower densities with lower prices than NAND and for this reason alone is preferred in many applications that do not require the greater storage capacity of NAND. At higher densities similar to NAND, the high reliability and ease of use of NOR, in addition to its ability to support a more efficient and cost effective memory sub-system in certain applications, make it a favored solution. These characteristics continue to drive NOR Flash memory use in embedded applications. For example modern automobiles are dependent on NOR Flash memory for engine control, transmission control, ABS systems, anti roll systems and a multitude of other operations in the vehicle. The majority of cell phones continue to use NOR Flash memory. The telecommunication, networking, consumer electronics, and industrial control industries rely on NOR Flash memory.

(Disclosure Statement at 20.)

primarily with the *ad hoc* consortium of certain Senior Secured Floating Rate Notes Due 2013 (the "FRNs")[7] and the Official Committee of Unsecured Creditors, appointed by the United States Trustee (the "Creditors' Committee"). In September 2009, the FRNs, the Creditors' Committee and the Debtors agreed to proposed terms for a plan of reorganization, resulting in the Debtors' filing of the Debtors' Joint Plan of Reorganization dated October 26, 2009 (the "Initial Plan"), and accompanying disclosure statement.[8]   However, in November 2009, the Creditors' Committee withdrew its support for the Initial Plan.  Negotiations continued and other creditor groups became more involved in the case, including an informal group of certain holders of the 11.25% Senior Notes due 2016 (the "Senior Noteholders"), the Convert Committee, and AHEC.[9]

The Debtors filed amended versions of their plan of reorganization, including the Debtors' Second Amended Joint Plan of Reorganization Dated December 16, 2009 (D.I. 2032) (the "December 16 Plan") and the Disclosure Statement (Ex. D-5).

By order dated December 18, 2009, over various objections, including a call to slow the confirmation process, the Court entered the Order (I) Approving Disclosure Statement, (II) Scheduling Confirmation Hearing, (III) Approving Solicitation and Other Procedures, Including Fixing the Voting Record Date and Establishing Deadlines for Voting on the Plan and Objecting to the Plan, and (IV) Approving the Solicitation Package and Forms of Notice (D.I. 2042) (the

---

[7]As of the petition date, the FRNs were owed approximately $625 million in principal amount, and approximately $8.3 million in interest.  (Disclosure Statement at 25.)

[8]This plan was characterized by some at the Confirmation Hearing as the "take it or leave it" plan.

[9]By memorandum and order dated December 18, 2009, I denied AHEC's request for appointment of an official equity committee. *In re Spansion*, 421 B.R. 151 (Bankr.D.Del. 2009).  AHEC, nonetheless, has continued its active participation in the case.

"Disclosure Statement Order"). Among other things, the Disclosure Statement Order established deadlines for plan voting and for filing plan objections, and scheduled a hearing, beginning February 11, 2010, to consider confirmation of the Plan (which was later adjourned to the dates of the Confirmation Hearing).[10]

In anticipation of confirmation, the Debtors continued to negotiate with creditors in an attempt to resolve disputes and objections to the Plan. The Debtors entered into settlements with Samsung Electronics Co., Ltd. ("Samsung") to establish a reserve for Samsung's general unsecured claim [D.I. 2332 and 2519], and with Spansion Japan Limited ("Spansion Japan")[11] with respect to the significant administrative expense claim asserted by Spansion Japan [D.I. 2340 and 2552]. The Debtors and various parties participated in a judicial mediation (not with the undersigned) with respect to valuation issues on February 5 and 8, 2010, but no settlement resulted.

Also, in anticipation of confirmation, the Court held a hearing on January 29, 2010 to consider the Debtor's motion to estimate the maximum amount of Tessera's administrative claim, and issued a bench ruling on February 9, 2010, estimating Tessera's administrative claim in the amount of $4,232,986.13. On February 12, 2010, the Court heard the Debtors' motion to

---

[10]On December 21, 2009, the Senior Noteholders filed a motion seeking a standstill of certain dates in the Disclosure Statement Order (D.I. 2065) (the "Standstill Motion"). At the Confirmation Hearing, the Senior Noteholders advised the Court that the Standstill Motion was being adjourned. (Tr. 2/24/10 17:14-20). As a result of the Court's decision here, the Standstill Motion will be dismissed as moot.

[11]Spansion Japan Limited, a Japanese corporation and wholly-owned subsidiary of Spansion LLC, commenced its own proceeding under the Corporate Reorganization Law (Kaisha Kosei Ho) of Japan on February 10, 2009, and its foreign representative commenced a chapter 15 proceeding in this Court on April 30, 2009 (Case No. 09-11480). Consequently, Spansion LLC has lost control of its former subsidiary.

6

determine proper classification of Spansion Japan's rejection damages claim, and issued a bench ruling on February 19, 2010, determining that Spansion Japan's rejection damages claim must receive the same treatment as other unsecured claims.

As a result of the continued negotiations and court rulings, the Debtors filed a Plan Supplement to the December 16 Plan, which was amended numerous times.[12] To incorporate the various modifications, the Debtors filed amended plans, culminating with the Debtors' Second Amended Joint Plan of Reorganization (As Amended) dated February 23, 2010 (D.I. 2915)(the "Plan").

[Remainder of page intentionally left blank]

---

[12]The Debtors filed their Plan Supplement (D.I. 2356) on January 19, 2010, the First Addendum to the Plan Supplement (D.I. 2410) on January 22, 2010, the Second Addendum to the Plan Supplement (D.I. 2692) on February 8, 2010, the Third Addendum to the Plan Supplement (D.I. 2857) on February 22, 2010, the Fourth Addendum to the Plan Supplement (D.I. 2919) on February 23, 2010, the Fifth Addendum to Plan Supplement (D.I. 2984) on March 1, 2010, the Sixth Addendum to Plan Supplement (D.I. 3140) on March 19, 2010, and the Seventh Addendum to Plan Supplement (D.I. 3190) on March 26, 2010.

(3)    <u>Summary of Selected Plan Provisions</u>[13]

A summary of the classification scheme in the Debtors' Plan and, as applicable, whether those classes eligible to vote accepted or rejected the Plan, follows:

| <u>Class</u> | <u>Designation</u> | <u>Impairment</u> | <u>Entitled to Vote</u> | <u>Reject or Accept Plan</u> |
|---|---|---|---|---|
| 1 | Secured Credit Facility Claims | Impaired | Yes | Accept |
| 2 | UBS Credit Facility Claims | Unimpaired | No* | |
| 3 | FRN Claims | Impaired | Yes | Accept |
| 4 | Other Secured Claims | Unimpaired | No* | |
| 4A | Travis County, Texas Tax Claims | Unimpaired | No* | |
| 5A | Senior Notes Claims | Impaired | Yes | Accept |
| 5B | General Unsecured Claims | Impaired | Yes | Accept |
| 5C | Exchangeable Debentures Claims | Impaired | Yes | Reject |
| 6 | Convenience Class claims | Unimpaired | No* | |
| 7 | Non-Compensatory Damages Claims | Impaired | No** | |
| 8 | Interdebtor Claims | Impaired | No** | |
| 9 | Old Spansion Interests | Impaired | No** | |
| 10 | Other Old Equity | Unimpaired | No* | |
| 11 | Other Old Equity Rights | Impaired | No** | |
| 12 | Securities Claims | Impaired | No** | |
| 13 | Non-Debtor Intercompany Claims | Impaired | No** | |

*Unimpaired classes deemed to accept the Plan.
**Impaired classes deemed to reject the Plan.

(Plan, §§2.4, 2.5, 2.6.)

---

[13]Capitalized terms not otherwise defined herein are defined in the Plan.

The Plan obligations to be paid on or, as soon as practicable, after the Effective Date include a cash distribution to the FRNs pursuant to a cash-out option under the Plan, payments to holders of allowed Administrative Expense, Priority and Convenience Claims, and payment of certain Secured Claims. (Memorandum in Support of Confirmation, D.I. 2690, ¶92.) The cash necessary for the Debtors to make the payments required by the Plan is available from existing cash balances, the operations of the Debtors or the Reorganized Debtors, the Exit Financing Facility, the New Spansion Debt (if issued or incurred), the Rights Offering, and other cash available to the Debtors, as applicable. (Plan, §6.2.)

The "Rights Offering" is a rights offering of New Spansion Common Stock in an amount of up to $109,375,000 to be offered to the Holders of Class 5A, 5B, or 5C Claims that are deemed allowed and are in an amount equal to or greater than $100,000 for purposes of voting of on the Plan.[14] (Plan, §1.1 (137) and (139), see also §6.10.) The Plan provides that the Debtors may elect to enter into a Backstop Rights Purchase Agreement with a Backstop Party in connection with the Rights Offering. (Plan, §1.1(14) and (15).) The purpose of the Backstop Rights Purchase Agreement is to ensure that the total equity offering is fully subscribed. (Tr. 2/24/10 at 147:17-19 (Sarkisian).) On December 17, 2009, the Debtors filed a motion seeking authority to enter into a Backstop Rights Purchase Agreement with Silver Lake Sumeru, L.P. ("Silver Lake"), and approval of the fees associated therewith (D.I. 2039) (the "Backstop Motion"). The Convert Committee objected to the Backstop Motion and, after a hearing on January 7, 2010, the Court overruled the objection and granted the relief requested in the

---

[14]"New Spansion Common Stock" means shares of common stock or other ownership interests of Reorganized Spansion, Inc., par value of $0.01 per share, to be issued or reserved for issuance by Reorganized Spansion, Inc. on or after the Effective Date of the Plan. (Plan, §1.1 (99).)

Backstop Motion (D.I. 2198). As of the Confirmation Hearing, the Rights Offering, with the participation of Silver Lake as the Backstop Party, (the "Silver Lake Rights Offering") was fully subscribed and the monies in escrow. (Tr. 2/24/10 at 151:21-25 (Sarkisian).)

Section 7.3 of the Plan sets forth the terms of the "New Employee Incentive Compensation Programs," which reserves 9,005,376 shares of New Spansion Common Stock for issuance under an equity incentive plan for employees, management, and the directors of the Reorganized Debtors (the "Equity Incentive Plan"). (Plan, §7.3.)

Sections 11.3 and 11.4 of the Plan set forth broad releases by the Debtors and by holders of claims and interests, which are discussed in more detail *infra*. (the "Plan Releases").

(4)    The alternative rights offering.

On January 15, 2010, and as supplemented on January 20, 2010, members of the Convert Committee made an alternative equity financing proposal to the Debtors, offering $112 million at a price of $19.21 per share, which represents a 12% discount of the implied equity value derived from a $1.5 billion enterprise value for the Debtors (the "Alternative Rights Offering"). A letter dated January 20, 2010 was sent to the Debtors' counsel (i) advising of the proposed Alternative Rights Offering, (ii) attaching a proposed Amended Exit Financing Agreement, and (iii) advising that the Convert Committee's attorneys held in escrow executed signature pages for the subscriptions in the total amount of $112 million. (*See* Ex. G to the Convert Committee's Preliminary Objection to the Plan (D.I. 2469).)

10

## DISCUSSION

A.    **The Convert Committee's Motion to Vacate.**

The Convert Committee's Motion to Vacate, which was joined by AHEC,[15] asks this

Court to vacate the Disclosure Statement Order due to the number of "fundamental

misrepresentations" contained in the Disclosure Statement.  In particular, the Convert Committee

and AHEC (the "Movants") argue that "the assumptions underlying the low valuation case set

forth in the Disclosure Statement are intentionally, i.e., knowingly, disingenuous and

misleading." (Motion to Vacate, ¶4.)  In addition, the Motion to Vacate seeks appointment of an

examiner pursuant to Bankruptcy Code §1104(c)(2), or a trustee pursuant to §1104(a)(1) and (2),

to investigate the misrepresentations.  On February 22, 2010, the Convert Committee filed a

supplement to the Motion to Vacate (D.I. 2877), asserting that the Debtors refused to consider

the Convert Committee's alternative equity financing proposal in good faith.

The Debtors and the Senior Noteholders (the "Respondents") objected to the Motion to

Vacate (D.I. 2630 and D.I. 2631.)  The Respondents argue that the Motion to Vacate is a

litigation tactic to derail confirmation and leverage the Movants' "limited economic position." [16]

The Respondents further argue that the true nature of the Motion to Vacate is, in substance, a

dispute the Debtors' value that is more appropriately heard as part of the Convert Committee's

---

[15]On January 25, 2010, AHEC filed the Joinder of Ad Hoc Committee of Equity Security Holders to the "Ad Hoc Committee of Convertible Noteholders' Emergency Motion For Order (A) Vacating Order Approving Debtors' Disclosure Statement and Adjourning Confirmation Hearing and (B) Directing Appointment of Trustee or Examiner Pursuant to 11 U.S.C. §§1104(a)(1) and (2) and 1104 (c)(2)" (D.I. 2420)(the "AHEC Joinder").

[16]It has been said that in such vigorously disputed cases,  "[j]unior creditors invoke expensive and time-consuming procedures merely to extract a payout exceeding their entitlements."  Douglas G. Baird & Donald S. Bernstein, *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain*, 115 YALE L.J. 1930, 1932 (2006).

objection to Plan confirmation.

The Motion to Vacate first seeks to vacate the Disclosure Statement Order pursuant to Fed.R.Civ.P. 60(b)(3), made applicable hereto by Fed.R.Bankr.P. 9024, which provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." To prevail on a Rule 60(b)(3) motion, "the movant must show that the adverse party engaged in fraud or other misconduct, and this conduct prevented the movant from fully and fairly presenting his case." *Linear Tech. Corp. v. Monolithic Power Sys., Inc.,* 2009 WL 3805567, *3 (D.Del. Nov. 12, 2009). *See also In re Chipwich, Inc.,* 64 B.R. 670, 676 (Bankr.S.D.N.Y. 1986) ("A motion to vacate an order for fraud in its procurement pursuant to Fed.R.Civ.P. 60(b)(3) must be proved by clear and convincing evidence.")

I note that many of the Movants' arguments were considered and rejected during the hearing on approval of the Disclosure Statement.   However, to the extent the Movants allege new evidence of the Debtors' misconduct, I will consider the Motion to Vacate.

As evidence that the Disclosure Statement Order was procured with intentional and material misrepresentations, the Convert Committee relies upon written materials provided by the Debtors and their advisors at presentations to prospective lenders and ratings agencies, and other public statements, which the Convert Committee argues present an analysis of the Debtors' business that is materially inconsistent with the information provided in the Debtors' Disclosure

Statement.[17]  Specifically, the Convert Committee alleges that the Disclosure Statement (i) relies heavily on projections that are based upon an inordinate number of overstated risks, which the Debtor now admits are irrelevant, and fails to disclose revenue opportunities or present an "upside case" for the Debtors' future prospects,[18] (ii) fails to attribute any value to certain assets, such as the intellectual property portfolio, probable litigation recoveries, and net operating losses, and (iii) fails to disclose the Debtors' true growth strategy, which has been described to audiences at the Presentations as a "business model targeting profitable growth" or characterizing the Debtors as "a dominant player in an attractive and emerging market." (Motion to Vacate, ¶¶ 9-12.)  AHEC joins in the foregoing, and adds that during discovery in November 2009, the Debtors denied having developed any "upside case." Yet, AHEC argues, the Debtors presented "upside case projections" to creditors in September 2009 and, more recently, in the Presentations. (AHEC Joinder, ¶¶7-10.)

The Debtors retort that the Convert Committee and AHEC are taking comments out of context and distorting the record. First, the Debtors note that they have not abandoned the Contingency Case Projections in connection with their asserted enterprise value, although some of the risks identified in those projections have been reduced. For example, some of the risks and costs associated with Spansion Japan are no longer speculative due to the settlement

---

[17]The Convert Committee specifically refers to the presentation given by the Debtors' management to rating agencies on December 10, 2009 (the "Rating Agency Presentation")(Ex. C-55), and the presentation given by the Debtors' management to potential lenders on January 12, 2010 (the "Lender Presentation") (Ex. C-61 and Ex. C-62) (jointly, the "Presentations").

[18]Much of the valuation battle centered around the Debtors' "Base Case Projections" - - projections intended to reflect the expected future performance of the Debtors - - and the "Contingency Case Projections" - - projections reflecting certain risks which might adversely impact the Debtors' future performance. The projections are described in more detail, *infra*.

(although the amount of Spansion Japan's substantial prepetition rejection damages claim ($761,238,570) is still an open issue).[19] While the Debtors advised potential lenders that they were focused on the Base Case Projections, they acknowledged that other risks identified in the Contingency Case Projections remain. (Ex. C-62 at 33-35.) Second, the Debtors have been reluctant to place a value on certain assets the Movants deem "material," due to uncertainty whether any value will be realized from those assets. The most recent valuation by the Debtors' expert, however, values some of those assets, such as the NOLs and potential litigation recoveries, in determining Distributable Value.[20] (Ex. D-1, at 23). Finally, certain growth opportunities identified in the Presentations were not included in the projections because the Debtors view these opportunities as speculative. While not conceding any puffery, the Debtors noted that the hypothetical revenue numbers that could arise from the potential growth opportunities were prepared by the marketing department, and "have not been subjected to any financial analysis to determine necessary capital and resource expenditures and the ultimate

---

[19]On October 9, 2009, the Debtors filed a motion for an order authorizing the rejection of the Second Amended and Restated Foundry Agreement dated March 30, 2007 between Spansion LLC and Spansion Japan (the "Rejection Motion") (docket no. 1293). On November 19, 2009, this Court entered an order approving the Rejection Motion (docket no. 1716).

[20]In his expert report, Henry Owsley of Gordian Group, LLC writes that he was asked to analyze the value available for distribution to the Debtors' constituencies (the "Distributable Value"), which he defined as: (i) the estimated value of the Reorganized Debtors' operations on a going-concern basis (the "Enterprise Value"); plus (ii) the value associated with other specific assets not reflected as part of the Debtors' operations on an on-going basis (for example, the value associated with certain auction rate securities, proceeds from the sale of a facility in China, net operating losses, anticipated litigation recoveries, and others); less (iii) estimated administrative and priority expense claims (whether assumed to be paid at the Effective Date or thereafter); less (iv) payments related to the settlement with Spansion Japan not otherwise reflected in the projections or in the administrative and priority expenses.

14

impact, if any, on the Debtors' EBITDA."[21]  (Debtors post-hearing submission, D.I. 3061, at 2, citing Tr. 2/24/10 at 72-73 (Devost).)

The Movants criticize the Debtors' overly optimistic emphasis on future opportunities - - or "tailwinds" - - when speaking of their aspirations for the company to potential lenders or ratings agencies, while relying on more conservative, less optimistic financial projections in the Disclosure Statement and Plan. The Disclosure Statement, however, states that the Debtors "identified a number of risks *and opportunities* that could impact the Debtors' ability to perform consistently with the Base Case [projections]."  (Disclosure Statement at 61)(emphasis added). At bottom, what the Movants resist are the underlying assumptions in the Debtors' enterprise valuation.  Such objections are appropriately considered as objections to confirmation.  The record does not support a conclusion that the Debtors obtained approval of the Disclosure Statement based upon misconduct and intentional misrepresentations.

The Motion to Vacate also seeks appointment of an examiner, pursuant to Bankruptcy Code §1104(c)(2), to investigate the Debtors' alleged intentional and material misrepresentations.[22]  Section 1104(c)(2) provides:

> (c)    if the court does not order the appointment of a trustee under this section, then at any time before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, **the court shall order** the appointment of an examiner to conduct an investigation of the debtor **as is appropriate**, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if - -

---

[21]"EBITDA" is an acronym for "Earnings Before Interest, Taxes, Depreciation and Amortization."

[22]The Convert Committee asks, first, for appointment of an examiner under §1104(c)(2) or, in the alternative, appointment of a trustee under §1104(a)(1) or (2).

(1)     such appointment is in the interests of creditors, any equity security
        holders, and other interests of the estate; or
(2)     the debtor's fixed, liquidated, unsecured debts, other than debts for goods,
        services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. §1104(c)(2) (emphasis added). It is not disputed that the §1104(c)(2) debt threshold is

met in this case. The Movants, therefore, argue that §1104(c)(2) requires appointment of an

examiner. *See, e.g., In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990) (appointing an

examiner because the plain meaning of the statute provides that a bankruptcy court "shall" order

the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5

million, if the trustee requests one).

        While some courts have agreed that the language of §1104(c)(2) mandates appointment

of an examiner if the $5,000,000 debt threshold is met, courts also have decided that "it is well-

established that the bankruptcy court has considerable discretion in designing an examiner's

role." *Loral Stockholders Protective Comm. v. Loral Space and Commc'n, Ltd. (In re Loral*

*Space and Commc'n, Ltd.)*, 2004 WL 2979785, *5 (S.D.N.Y. Dec. 23, 2004). *See also In re*

*Erickson Retirement Communities, LLC*, 2010 WL 881727, *2 (Bankr.N.D.Tex. March 5, 2010)

("[If] the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no

discretion. The only judicial discretion that comes into play is in defining the scope of the

examiner's role/duties."). Collier on Bankruptcy recognizes this conflict, opining that the

language of §1104(c)(2) is mandatory, but noting that the provision "was not intended and should

not be relied on to permit blatant interference with the chapter 11 case or the plan confirmation

process." 7-1104 Collier on Bankruptcy ¶1104.03[2] (2009).

        The statute requires appointment of an examiner "to conduct an investigation of the

debtor *as is appropriate*" if the debtor's unsecured debts exceed $5 million. (*Id.*)(emphasis

added.) In *Winston Indus., Inc. v. Lancer Homes, Inc. (In re Shelter Resources Corp.)*, 35 B.R.

304, 305 (Bankr.N.D.Ohio 1983), the Court decided:

> No evidence has been offered to this Court indicating fraud, mismanagement or
> irregularities in the management of the debtor or the debtor-in-possession. . . . It is the
> opinion of this Court, therefore, that confronted with the facts and circumstances that
> presently exist in this particular case, to slavishly and blindly follow the so-called
> mandatory dictates of Section 1104(b)(2) [now, §1104(c)(2)] is needless, costly and non-
> productive and would impose a grave injustice on all parties herein.

Some courts have appointed examiners with no duties to reconcile the mandatory appointment/

discretionary duty conflict of §1104(c)(2). In *Erikson*, the Court wrote:

> [T]his court, were there no standing/waiver problem on the part of the [movant], would
> be hard pressed to find any useful purposes for an examiner. Much like Judge Schmidt
> did in the case of *In re Asarco, LLC,* No. 05-21207, docket entry 7081 (Bankr.S.D.Tex.
> March 4, 2008), this court (in light of the mandate of Section 1104(c)) would . . . appoint
> an examiner with no duties, unless and until otherwise ordered by the court.

2010 WL 881727 at *6.[23] I find no sound purpose in appointing an examiner, only to

significantly limit the examiner's role when there exists insufficient basis for an investigation. To

---

[23]Faced with similar inappropriate requests for examiners in cases that met the debt threshold,
courts have found other reasons to deny the requests. In *In re Bradlees Stores, Inc.*, 209 B.R. 36
(Bankr.S.D.N.Y. 1997), the Court wrote that the request for an examiner was "inappropriate, improper,
and improvident," (*Bradlees*, 209 B.R. at 40), but did not decide whether the language of §1104(c)(2)
was mandatory, because it held that the movants waived any right under §1104(c)(2) by allowing the
debtors to conduct a thirteen-month investigation at significant cost to the estate, and, therefore, the
examiner's investigation would be duplicative, needless and wasteful. In *Erikson*, the Court held that the
movant lacked standing to request an examiner because, in a subordination agreement, the movant had
waived its right to file any action until the senior lenders were paid in full. *Erikson*, 2010 WL 881727 at
*5. The *Erikson* Court decided the motion for an examiner was:
> unmistakably aimed at slowing down the confirmation process and gaining leverage to enhance
> or create recoveries for the Subordinated Creditors. This is the very type of obstructionist
> behavior that the [subordination] agreements are intended to suppress.
*Id.* The *Erikson* Court further noted that appointment of an examiner was not in the best interests of the
creditors or the estate, because the issue before it concerned a dispute about whether value was properly
allocated between two debtors. *Id.* at *6. The Court wrote that it would hear evidence and decide the
value issue at confirmation. *Id.*

appoint an examiner with no meaningful duties strikes me as a wasteful exercise, a result that

could not have been intended by Congress.

> Collier on Bankruptcy notes:
>
> Section 1104(c)(2) is the only remnant of the "public company" exception contained in
> the original Senate bill, S. 2266. The Senate bill would have provided for the mandatory
> appointment of a trustee in "public company" cases, which were defined as cases in
> which unsecured debt totalled[sic] at least $5,000,000 and there were not less than 1,000
> security holders. The requirement that the court appoint an examiner if requested in any
> case where the specified debts exceed $5,000,000 was included in the Code as part of the
> compromise under which the "public company" provisions were deleted.

7-1104 Collier on Bankruptcy ¶1104.03[2] (2009). This provision was designed "to provide

extra protection to stockholders of public companies through the mechanism of an independent

fiduciary." *Loral*, 2004 WL 2979785 at *4. Here, due to the Debtors' enterprise value, equity is

entitled to no distribution under the Plan. Moreover, while not an official committee, AHEC has

been extraordinarily active in this chapter 11 proceeding and has advocated vigorously views of

equity.

   The record before me does not provide sufficient evidence of conduct that would make an

investigation of the Debtors "appropriate," but rather reveals deep and heated differences of

opinion about the value of the Debtor companies. Moreover, the allegations of bad faith against

the Debtors' management for rejecting the Convert Committee's Alternative Rights Offering

provides a classic confirmation dispute, rather than grounds for an investigation by an examiner.

Throughout this case, the Creditors Committee and various *ad hoc* committees have vigorously

represented the interests of unsecured creditors.   All of the parties have had ample opportunity to

conduct - - and have conducted - - extensive discovery, and to investigate the Debtors.

18

Appointment of an examiner at this time, based on this record, is neither warranted nor appropriate, and would cause undue cost to the estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case. The request for appointment of an examiner pursuant to §1104(c)(2) will be denied.

The Movants alternatively seek appointment of a trustee pursuant to Bankruptcy Code §1104(a)(1) and (2), which provide:

> (a)    At any time after commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee - -
> > (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; [or]
> > (2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The Third Circuit Court of Appeals has held that appointment of a chapter 11 trustee is an extraordinary remedy that is the exception, and not the rule. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989). For the same reasons as set forth above in relation to §1104(c)(2), I conclude that appointment of a trustee would not be in the best interests of the estate or its creditors, and would unduly delay confirmation and cause the Debtors to incur unnecessary costs.[24]

For the reasons set forth above, the Motion to Vacate, in all of its parts, will be denied.

---

[24]If the Debtors are unable to amend the Plan consistent with this Opinion, it may be that a request for appointment of a chapter 11 trustee is then warranted. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998).

B.    **Plan Confirmation**

1.    Plan Confirmation Requirements and Remaining Objections.

The Debtors' Plan can be confirmed only if it complies with the requirements of

Bankruptcy Code §1129. As I noted in *Exide Technologies*:

> The plan proponent bears the burden of establishing the plan's compliance with
> each of the requirements set forth in §1129(a), while the objecting parties bear the
> burden of producing evidence to support their objections. *Matter of Genesis
> Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr.D.Del. 2001); *Matter of
> Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr.D.N.J.
> 2000)(citations omitted). In a case such as this one, in which an impaired class
> does not vote to accept the plan, the plan proponent must also show that the plan
> meets the additional requirements of §1129(b), including the requirements that the
> plan does not unfairly discriminate against dissenting classes and the treatment of
> the dissenting classes is fair and equitable. *Id.*

*In re Exide Tech.*, 303 B.R. 48, 58 (Bankr.D.Del. 2003).

The main issues raised in the remaining objections to confirmation of the Debtors' Plan

include the following:

(i)     whether the Plan proponents have under-valued the Debtors, thereby unfairly
        impairing unsecured creditors and violating §1129(a)(3) and §1129(b)(1) and (2);

(ii)    whether the Equity Incentive Plan provides too much value to the management
        and  employees of the Reorganized Debtors, at the expense of unsecured creditors,
        especially when the value of the Equity Incentive Plan is determined in light of a
        proper valuation of the Debtors, thereby violating §1129(a)(3) and §1129(b)(1)
        and (2);

(iii)   whether the Debtors wrongfully refused to consider the Alternative Rights
        Offering proposed by the Convert Committee, which would provide greater
        recovery to unsecured creditors, thereby violating §1129(a)(3) and §1129(b)(1)
        and (2);

(iv)    whether the Debtors provided false and misleading information in the Plan and
        Disclosure Statement regarding the Debtors' future prospects, thereby violating

§1129(a)(2);[25]

(v)     whether the proposed Plan Releases violate applicable bankruptcy law, thereby violating §1129(a)(1);

(vi)    whether the Debtors improperly refused to consider Tessera's multiple votes on the Plan, based upon Tessera's multiple claims against the Debtors, thereby violating §1129(a)(1);

(vii)   whether the Debtors' proposed treatment of Tessera's administrative claim violates §1129(a)(9); and

(viii)  whether the Plan unfairly proposes that only the "Claims Agent" will have authority to file objections to disputed unsecured claims, thereby depriving other creditors of their statutory right to object to claims and violating §1129(a)(1), (3) and §1129(b)(1) and (2).

The role of the Court in a contested confirmation is to ensure that the proposed plan is fair and equitable to the dissenting class, which includes finding that no class will be paid more than the allowed amount of their claims. 11 U.S.C. §1129(b)(1), 7-1129 Collier On Bankruptcy ¶1129.05 [3] (2009) ("Put another way, if equity is to be eliminated, . . . then equity holders can force a valuation of the reorganized debtor to ensure that whoever does receive the equity interests in that entity will not be overcompensated.")

It has been aptly observed that "entity valuation is much like 'a guess compounded by an estimate.'" *Id.* quoting Peter Coogan, *Confirmation of a Plan Under the Bankruptcy Code*, 32 Case W.Res.L.Rev. 301, 313 n. 62 (1982).[26] "Regardless of the method used, the result will rarely, if ever, be without doubt or variation. As the [United States] Supreme Court has put it:

---

[25]This objection is overruled for the same reasons I deny the Motion to Vacate, *supra.*

[26]Put another way, "[i]n Chapter 11, a single, non-expert judge is expected to value the reorganizing business on the basis of the testimony of experts who, far from being impartial, are advocates for competing points of view." Baird, *supra.* n. 16, at 1936.

Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance."

7-1129 Collier on Bankruptcy ¶1129.05 [3][c] quoting *Consolidated Rock Prods. Co. v. DuBois*,

312 U.S. 510, 526, 61 S.Ct. 675, 684-85, 85 L.Ed. 982, 991 (1941).

The Debtors argue that the Plan is confirmable no matter what value the Court determines for the Debtors. However, a number of other issues surrounding confirmation, specifically whether the Plan is offered in good faith, as required by §1129(a)(3), and is fair and equitable to the dissenting class, as required by §1129(b)(1), require an analysis of the Debtors' value. As directed by the Supreme Court in *Consolidated Rock*, my determination of value must be informed by the record before me.

Some plan objectors argue that the Debtors' value is best determined by referring to the active market for buying claims. There is some evidence before me about the amounts being paid for the various types of claims (Tr. 3/1/2010 at 301:2 - 11 (Morgner)); however, there is no evidence beyond the mere statement of certain trading prices. There is no record on the number of trades, over what period of time such trades occurred, how open the market is to participants or other factors that may be relevant. At least one court has determined that preconfirmation claims trading is not an accurate measure of a debtor's value. *See In re Mirant Corp.*, 334 B.R. 800, 832 (Bankr.N.D.Tex. 2005).

Instead, in this case, value must be determined by relying on the expert opinions in the record. As noted by Judge Peck in the *Iridium* decision, I recognize that, in a contested matter

such as this, the hired experts often approach their valuation task from an advocate's point of

view. *Statutory Comm. Of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating*

*LLC)*, 373 B.R. 283, 291 (Bankr.S.D.N.Y. 2007). *See also In re Mirant Corp.*, 334 B.R. at 814-

15 ("That experts may be anxious to serve the interests of the parties retaining them is neither

startling nor enough reason to disregard their testimony . . . . It simply means the court must be

cautious itself, avoiding undue optimism while at the same time ensuring that assumptions and

data used for valuing [the debtor] give full value to the business as rehabilitated through chapter

11.") Therefore, bearing in mind the allegations regarding the underlying motives of the

competing parties, together with my assessment of each witness's competency and credibility, I

turn to evaluation of the competing expert opinions.

2.      Valuation.

Three expert witnesses testified at the Confirmation Hearing about the Debtors'

valuation.[27]  The Debtors' witness, Henry Owsley of the Gordian Group, LLC ("Gordian"),

concluded that the Debtors' total enterprise value falls within the range of  $700 million to $850

million. (Ex. D-1 at 17.)  The Senior Noteholders' witness, Michael J. Genereux of The

Blackstone Group ("Blackstone"), concluded that the Debtors' total enterprise value falls within

the range of $799 million to $944 million. (Ex. SN-1 at 42.)  The Convert Committee's witness,

Richard W. Morgner of Jefferies & Company, Inc. ("Jefferies") concluded that the Debtors' total

---

[27]Also included in the record, although not discussed in detail, were two expert reports relied upon at the November 30, 2009 hearing to consider AHEC's motion appoint an official equity committee: (i) an expert report of Houlihan Lokey, prepared at the request of the FRNs, which determined that the Debtors' enterprise value fell within a range of $671 million and $833 million (Ex. SN-28 at 32), and (ii) an expert report of Oppenheimer & Company, Inc., prepared at the request of AHEC, which determined, through a discounted cash flow analysis, that the Debtors could have a value in a range as high as $1.264 billion to $3.231 billion (Ex. SN-26 at 8.)

enterprise value falls within the range of $1.054 billion and $1.419 billion. (Ex. C-1 at 4.)

In arriving at their respective valuation conclusions, the experts used three customary valuation methodologies: discounted cash flow analysis, publicly traded company analysis (or the "comparable company" analysis), and comparable M&A transaction analysis.

(a)    Base Case Projections vs. Contingency Case Projections.

The Debtors prepared two sets of projections during the bankruptcy case. In April and May 2009, the Debtors developed the "Base Case" forecast of financial statements, which represented management's best estimate as of May 2009 of the Debtors' future performance over the 2010 to 2012 period. (Disclosure Statement at 60-61; Tr. 2/24/10 at 21:14 - 26:20 (Devost).) The Base Case Projections were prepared to include "a realistic plan [the Debtors] could achieve, essentially make it a balanced plan, aggressive but achievable." (Tr. 2/24/10 22:6-9 (Devost).) Thereafter, the Debtors identified a number of risks that would impact the Debtors' ability to achieve the results of the Base Case Projections and, in July 2009, the Debtors' financial advisors (Gordian) worked with management to develop a "Contingency Case" forecast by refining the Debtors' view of potential downsides to the 2010 business plan, as well as extending the downside analyses to the 2011 and 2012 forecast years (Disclosure Statement at 62; Tr. 2/24/10 29:6 - 30:7 (Devost).) The risks identified by the Debtors included a downturn in the Pachinko business,[28] market share loss due to the bankruptcy filing, increased competition, litigation, and the claims of Spansion Japan. (Ex. D-15.)

---

[28]Pachinko is a gaming business that is popular in Japan. Various gaming machines are built using significant quantities of NOR Flash memory chips. The Debtors believe that, as a result of the chapter 11 cases, they are losing a large market share in this business as customers seek other sources for the products. (*See* Disclosure Statement, Ex. C "Projections" at C-7; Tr. 2/24/10 at 32:16-25 (Devost).)

The Convert Committee argues that the Contingency Case Projections are no longer relevant, and criticizes the Gordian and Blackstone valuations for improperly including the Debtors' Contingency Case Projections in their analyses to lower the value ranges. The Base Case Projections are more reliable, the Convert Committee argues, because the Base Case resulted from a bottoms-up, two-month, rigorous business planning process. Moreover, in the second through fourth quarters of 2009, the Debtors performed even better than forecast in the Base Case Projections. (Ex. D-8 at 49; Tr. 2/24/10 at 58:12 - 60:18 (Devost).) Jefferies, therefore, did not include the Contingency Case Projections in its valuation.

The Debtors argue in reply that, although they have focused on the Base Case Projections, most of the risks identified in the Contingency Case Projections continue to be present and have a significant negative impact on the business. (Tr. 2/24/10 at 65:11-17, 98:23 - 99:5 (Devost).) At the Confirmation Hearing, it was demonstrated that some of the risks associated with the Contingency Case, such as those arising from the Debtors' relationship with Spansion Japan, have been mitigated. (Tr. 2/24/10 at 33:23 - 35:6 (Devost).) However, other risks - - including the Debtors' loss of market share while in bankruptcy, the Debtors' loss of a significant part of the Pachinko business in Japan, and increased competition in certain products - - remain outstanding. (Ex. D-15; Tr. 2/24/10 at 32:14 - 33:22 (Devost).)

The Convert Committee also criticizes the lack of an "upside" case to offset the risks identified in the Contingency Case Projections. The Convert Committee relies upon more recent statements by the Debtors regarding "growth opportunities" that are not reflected in the Base Case or Contingency Case Projections. However, the Debtors included growth assumptions in their Base Case Projections, despite forecasts by industry analysts that the NOR market is

25

declining. (Ex. SN-D1.) The Debtors also presented testimony that the growth opportunities are speculative and long-term and, therefore, have not yet been quantified. (Tr. 2/24/10 at 65:11 - 21, 99:6-12 (Devost).)

The Gordian valuation weighted the Base Case Projections at 75% and the Contingency Case Projections at 25%. (Ex. D-1 at 54.) The Blackstone valuation also used both projections, weighting the Base Case at 85% and the Contingency Case at 15%. Based on the record before me, I conclude that both Gordian and Blackstone properly included the Contingency Case Projections in their analyses, but justifiably accorded those projections less weight than the Base Case Projections.

(b)  Comparable Company Analysis: Revenue Multiple.

Another issue that distinguishes the expert reports from one another is the use of revenue multiples in calculating value under the comparable company analysis. Both Gordian and Blackstone claim that Jefferies incorrectly used a revenue multiple in its comparable company analysis, which significantly increased the valuation. (Ex. D-27 at 11; Ex. SN-D5.) Gordian and Blackstone used only EBITDA multiples in their comparable company analysis. Jefferies argued that a combination of both multiples should be used. Mr. Genereux of Blackstone opined that an EBITDA multiple (or cash flow multiple) was more appropriate for valuing the Debtors, explaining:

> [C]ompanies are valued based upon how profitable they are. If you generate cash flow you're worth more. If you generate less cash flow, you're worth less. Companies don't trade on revenue volume. They trade on profitability. . . . [T]his company has a consistent track record for generating cash flows . . .it's expected to generate cash flow going forward even though the industry's declining. But, cash flows are there, and if cash flows are there I believe that's the appropriate for valuing a company on a public market multiple basis.

26

(Tr. 2/26/10 at 106:14-23 (Genereux).)[29]   The valuation calculated in Jefferies' comparable

company analysis using the EBITDA multiple is somewhat consistent with the other experts'

valuations, showing a range between $871 million and $1.140 billion. (Ex. D-27 at 11; Ex. SN-

D5.)   However, when the revenue multiple is applied, the Jefferies' comparable company

analysis increases the valuation range to $1.309 billion and $1.913 billion. (*Id.*)  This variance is

too great to ignore. Jefferies weighted the comparable company analysis (which combined both

the EBITDA and revenue multiple calculations) at 45% in its opinion of the Debtors' enterprise

value. (Ex. C-1 at 4.)  I agree with the Debtors and Senior Noteholders that Jefferies' use of the

revenue multiple caused its comparable company analysis, and overall valuation, of the Debtors

to be too high.

      (c)    Discounted Cash Flow issues.

      The parties have criticized each other's discounted cash flow analyses (or "DCF"),

arguing that certain subjective assumptions manipulated the valuations to be either too high or

too low.  For the reasons stated previously, both Gordian and Blackstone appropriately

considered both the Base Case and Contingency Case Projections in their DCF analyses.

      An important piece of the DCF analysis is a determination of the discount rate, or the

---

[29]Mr. Genereux also opined that there are situations in which a revenue multiple would be
appropriate in a comparable company analysis. (*See* Tr. 2/26/10 at 108:13 - 109:9.) *See also* D-78,
Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any
Asset, Chapter 20 (2d ed. 2002) ("For new economy firms that have negative earnings, multiples of
revenues have replaced multiples of earning in many valuations. . . .The biggest disadvantage of focusing
on revenues is that it can lull you into assigning high values to firms that are generating high revenue
growth while losing significant amounts of money.  Ultimately, a firm has to generate earnings and cash
flows for it to have value.")

weighted average cost of capital ("WACC").[30] *See Mirant,* 334 B.R. at 839 ("The WACC is the key component for calculating a value using the DCF Method.")  Gordian calculated the WACC at 15%, Blackstone at 14.7%, and Jefferies at 13.8%.[31]  The parties agree that "the lower the WACC, the higher the value." (Tr. 2/26/10 at 82:4-6 (Genereux), Tr. 3/1/10 at 272:1-4 (Morgner).)  One of the first steps in calculating the cost of equity portion of the WACC is selecting a peer group of publicly traded companies to establish a "beta."[32]  Both Gordian and Blackstone criticized Jefferies' beta analysis because it relied upon 12 "comparable" companies engaged in the sale of memory semiconductor products, yet only two of those companies are engaged specifically in the NOR business.[33]   (*See* Ex. C-1 at 52; Tr. 2/26/10 at 87:11 - 88:9 (Genereux), Tr. 3/1/10 at 272:23 - 274:4 (Morgner), Ex. D-27 at 14.)  The effect of using the overly broad peer group is to lower the WACC.  (Tr. 2/26/10 at 89:18-22 (Genereux).)

A second important piece of the DCF analysis is the terminal value.  Blackstone applied a

---

[30]The DCF has been described as a forward-looking method that "measure[s] value by forecasting a firms' ability to generate cash ." *Exide,* 303 B.R. at 63 quoting Peter V. Pantaleo and Barry W. Ridings, *Reorganization Value,* 51 Bus.Law. 419, 427 (1996.) DCF is calculated by adding together (i) the present value of the company's projected distributable cash flows (i.e., cash flows available to all investors) during the forecast period, and (ii) the present value of the company's terminal value (i.e., the value of the firm at the end of the forecast period.) *Id.* The WACC is based upon a combined rate of the cost of debt capital and the cost of equity capital. *Id.* at 64.

[31]Ex. SN-D2 shows that Jefferies' 13.8% WACC was also lower than that used in other expert valuation analyses submitted previously in this case, including the Houlihan Lokey report (16%), and the Oppenheimer report (14%). *See, supra.* n. 25.

[32]A "beta" "reflects the risk associated with an equity investment in the firm relative to the risk of an investment in the equity market as a whole." Pantaleo, *supra* n. 30, at 434.

[33]The Convert Committee argues that Jefferies' beta analysis also included a company-specific risk premium to raise the cost of equity and offset any disparity with the "comparable" companies. (Tr. 3/1/10 at 216:6-17 (Morgner).) However, the other experts also included risk premiums. (Ex. SN-1 at 53; Ex. D-1 at 52.)

perpetuity growth rate range of negative 2.5% to positive 2.5%, which has a midpoint of 0% growth rate, in its terminal value.[34] (Ex. SN-1 at 55; Tr. 3/1/10 94:20 - 95:20 (Genereux).) Mr. Genereux testified that the 0% perpetuity growth rate assumes that the Debtors' market share is growing, even as the NOR markets are shrinking. (Id.) Gordian's terminal growth rates were identical. (Ex. D-1 at 13.) Jefferies' applied a perpetuity growth rate range of 0% to 3%, with a midpoint of 1.5%. (Ex. C-1 at 19.) A perpetuity growth rate of 1.5% appears to be at odds with the industry projections of negative growth rates for the NOR products. (Tr. 3/1/10 at 96:11 - 18 (Genereux).) The higher the perpetuity growth rate, the higher the terminal value. (Tr. 2/26/10 at 265:12-16 (Morgner).)

Another item of contention in calculating the DCF is the "out-years projection." [35] Jefferies' out-years projection gradually reduced the Debtors' free cash flows over a period from 2012 through 2019. (Ex. C-1 at 49.) Blackstone relied upon management's out-years analysis, which reduces revenue and EBITDA beginning in 2013.[36] (SN-1 at 55,57.) The Convert Committee argues that the Debtors' out-years projections incorrectly assume an abrupt reduction of revenue and EBITDA beginning in 2013, because that assumes that the Debtors will be

---

[34] A perpetuity growth method of calculating the company's terminal value assumes that the company's cash flow is expected to continue after the end of the forecast period. (Pantaleo, supra. n. 30, at 429.

[35] A discounted cash flow analysis necessarily requires an analysis of the company's cash flow projections over a forecasted period, or what is described here as the "out years projection." The length of the forecast period will vary, depending on the circumstances. Although there is no specific rule on the length of a forecast period, "the goal is to forecast through a complete business cycle until a steady state of growth or maturity is reached, at which point the terminal value can be calculated." Pantaleo, supra. n. 30, at 431.

[36] Although the Convert Committee argues that Gordian also used out-year projections starting at 2013, Gordian's report indicates that it performed a sensitivity analysis illustrating that the operating impact of the out-years analysis does not occur for seven years. (D-1 at 15, ¶44.)

outsourcing 100% of its manufacturing beginning 2013.[37]  Instead, Management's testimony

reveals that the outsourcing will occur over a 5-10 year period. (Tr. 2/26/10 at 139:23 - 141:20

(Genereux), Tr. 2/24/10 at 77:23 - 78:12 (Devost).)  This testimony is not consistent with using

2013 as the out-year, employed by Blackstone, but is more in line with the gradual decrease of

EBITDA, over a period ending with 2019 as the out-year, employed by Jefferies.

Blackstone prepared a sensitivity analysis showing that the effect of using the Jefferies'

gradual out-years projection with Blackstone's WACC (14.7%) and perpetuity growth rate (0%)

resulted in an enterprise value of $965 million. (Ex. SN-D4.)  The range for Blackstone's DCF,

based on 2013 out-years projection (and using the WACC of 14.7% and 0% perpetuity growth

rate), was $770 million to $928 million. (Ex. S-1 at 52.)  Accordingly, Blackstone's use of the

2013 out-years projection, rather than a gradual out-years projection over a longer time period,

lowered its valuation conclusion, although not too drastically.

Jefferies also argued that Gordian and Blackstone used the wrong tax rate in calculating

their DCF analyses.  Gordian and Blackstone used a tax rate of 40% based upon the Debtors'

projections, while Jefferies used a tax rate of 35% based upon the Debtors' current tax rate. (Ex.

D-1 at 54, Ex. C-1 at 49, Ex. S-1 at 53.)  Jefferies argues that using the lower tax rate would

result in a $40 million to $50 million difference in the DCF value. (Tr. 3/1/10 at 217:24 - 218:2

---

[37]Management (Donald Devost, the vice president of finance and acting treasurer for the Debtors) explained that the drop in EBITDA starting 2013 reflects a changed business model, in which the Debtors' fabrication is outsourced. (Tr. 2/24/10 at 78:1 - 8 (Devost).) He testified that the Debtors have one fabrication facility in Austin, Texas. (*Id.* at 28:8-9.) That facility can manufacture chips at certain nanometers, mostly 110, 90 and 65 nanometers. (*Id.* at 28:10-18.) The Debtors have determined that it is not economically feasible to expand or modify the facility to keep up with the technology and fabricate chips "beyond a 65 nanometer note." (*Id.*) Eventually, the Debtors will no longer use the Austin, Texas facility, but will completely outsource the chip fabrication.

(Morgner).) Unfortunately, none of the parties provided sufficient evidence to demonstrate which tax rate is appropriate.

      (d)     Comparable M&A Transactions.

      Each of the experts also performed a comparable M&A transaction analysis in valuing the Debtors.[38] While the parties disagreed whether different transactions relied upon by the experts were truly relevant, they all agreed that certain transactions concerning Numonyx are very relevant to valuing the Debtors, even if limited information was available, because Numonyx is a private company. Numonyx is the Debtors' main competitor in the NOR market. One expert compared the two as alike as "Coke and Pepsi." (Tr. 2/26/10 at 112:11-16; 113:15-22 (Genereux).)

      There were two Numonyx transactions that the parties considered. The first transaction, announced in 2007 and closed in 2008, resulted from Intel's and STMicroelectronics' combination of their respective NOR and NAND assets, with financing from Francisco Partners, to form Numonyx. (Ex. D-1 at 11.) The second, announced in February 2010, was Micron Technology, Inc.'s ("Micron") acquisition of Numonyx. (Tr. 2/26/10 at 114:7-8 (Genereux).) In its report, Gordian determined an implied revenue multiple from the first Numonyx transaction in the range of 0.60x to 0.72x. (D-1 at 11.) Blackstone calculated the same revenue multiples from the first Numonyx transaction. (S-1 at 49.) Jefferies' looked at five different M&A transactions involving "memory companies," and calculated a revenue multiple range of 1.2x to 1.7.x. (Ex. C-1 at 21.) Mr. Genereux testified that the Jefferies analysis introduced a set of companies that

---

[38]In a comparable M&A transaction analysis, the expert determines a multiple based upon recent merger and acquisition transactions involving comparable companies in the industry and then applies that multiple to the target company.

were not comparable. (Tr. 2/26/10 at 121:22 - 122:3 (Genereux).)

After limited information was made available about the second Numonyx transaction,

Blackstone updated its comparable M&A transaction analysis and calculated the revenue

multiple in a similar range of 0.59x to 0.71x. (Ex. SN-D6.) Jefferies agreed that a revenue

multiple of 0.68x would be implied from the second Numonyx transaction, but argued that there

was insufficient information available to rely upon the Numonyx transactions alone. (Ex. C

Dem-4.) Mr. Genereux, however, testified that the Numonyx information was reliable because it

based upon information provided by its acquirer, Micron, a public company, to its investors. (Tr.

2/26/10 at 115:8 - 117:10 (Genereux); Ex. S-7.)

Jefferies also criticized Gordian's and Blackstone's use of a revenue multiplier for the

comparable M&A transaction analyses, arguing instead that a mix of revenue and EBITDA

multiples should be used.[39] (See Ex. C-1 at 21.) Mr. Genereux explained that the use of a

revenue multiple was necessary in comparing the Numonyx transactions because it was the only

information available. (Tr. 2/26/10 at 112:25 - 113:22 (Genereux).)[40]

---

[39] Jefferies found this switch to revenue multiples particularly ironic since it was criticized for using revenue multiples instead of EBITDA multiples in its comparable company analysis.

[40] The transcript includes the following exchange between Genereux and Senior Noteholders' counsel:

Q: [W]hy did you use a revenue multiple here when valuing the Numonyx transaction?
A: Because it was available. . . . this transaction was very, what I would describe as, private. . . [T]here were two revenue numbers that were cited at the time the transaction was announced, and that was the only two pieces of data that we had to be able to calculate a multiple.
Q: Mr. Genereux, if you were forced to use a revenue multiple analysis then why consider the Numonyx transaction at all?
A. To ignore Numonyx would be foolish and reckless. . . . It would be like me valuing Pepsi and ignoring Coke. . . [D]espite limited data, to ignore Numonyx and ignore this data point would be, I think, reckless. This is the company you want to look at when you're benchmarking Spansion.

Tr. 2/26/10 at 112:25 - 113:22 (Genereux.)

The enterprise value as determined by the Blackstone's updated comparable M&A transaction analysis was $695 million to $835 million. (Ex. SN-D6.)  This range falls within the enterprise value range calculated by Blackstone using the other methodologies. (Ex. SN-1 at 42.) Gordian's comparable M&A transaction analysis resulted in an enterprise value range of $497 million to $712 million when applied to the Debtors' 2010 revenues, and a range of $598 million to $808 million when applied to the Debtors' 2012 and out-years' revenues.  The enterprise value as determined by Jefferies' comparable M&A transaction analysis was $1.690 billion to $2.098 billion. (Ex. C-1 at 21.)  This enterprise value range is so far above the ranges calculated by Jefferies' other methodologies that its soundness, and, therefore, its usefulness is doubtful. Jefferies must have considered this, too, because it accorded only 10% weight to the comparable M&A transaction analysis in its final summary of valuation. (Ex. C-1 at 4.)

 (e) <u>Value Conclusion.</u>

After weighing the experts' testimony, and after consideration of the criticisms raised by the parties to each other's expert reports, I conclude that Blackstone's valuation was appropriately weighted and rested on assumptions that, of the three reports, were the most sound for determining the Debtors' worth at this time and in this industry.  Blackstone's report was more transparent than Gordian's, whose explanations were not as clear, and more in line with common valuation practices than Jefferies' report.  The Blackstone report was not flawless, however, and may have resulted in a slightly higher valuation if Blackstone's out-years projection (in the DCF analysis) was adjusted to account for a more gradual decline in EBITDA, consistent with management's testimony.  I conclude that the Debtors' enterprise value falls within the higher end of the total enterprise valuation determined by Blackstone.  Based upon

this record, I conclude that the enterprise value of the Debtors is in the range of $872 million to $944 million.

The parties also calculated a "distributable value" for the Debtors, which was determined by adding sources of additional value (that is, certain auction rate securities, net operating losses, potential litigation recoveries, proceeds from the sale of the Suzhou facility, cash projected to be on hand at emergence, and NAND value) to the enterprise value to arrive at a gross distributable value. (*See* Ex. S-1 at 43; Ex. D-1 at 24; Ex. C-1 at 4.)[41]  The sum of the Spansion Japan settlement and the projected administrative and priority claims are then subtracted to arrive at a net distributable value. (*Id.*)  Adding to Blackstone's figures for the sources of additional value (which are not materially in dispute, *see* Ex. SN-1 at 43) in the amount of $496 million to the enterprise value range ($872 million to $944 million), results in an gross distributable value range of $1.368 billion to $1.440 billion.  Subtracting the estimated administrative claims of $121 million, results in a net distributable value range of $1.247 billion to $1.319 billion. (*Id.*)

3.    In light of the foregoing valuation, does the plan treat Class 5C (which rejected the Plan) fairly and equitably?

The distributable value range as determined above indicates that the Plan treats Class 5C Claims fairly and equitably.  Relying on the figures in Ex. SN-D13, and assuming, without deciding, that the Senior Noteholders claims are in the total amount of $282 million, and that the general unsecured creditor claims pool is in the lower amount of $640 million, then there are

---

[41]Jefferies does not list the net operating losses as a source of additional value since the NOLs are included in its enterprise value conclusion. Blackstone also added in the Rights Offering of $105 million to its net distributable value.

insufficient funds for the Class 5C Exchangeable Debentures Claims to share in the recovery. At this lower range of claim amounts, the estimated value threshold for Class 5C to share in the recovery requires a net distributable value of $1.526 billion. (Ex. SN-D13 at 2.) Therefore, based on this valuation, the Plan treats all of the unsecured creditors fairly and equitably.

4.    Is the Equity Incentive Plan offered in good faith?

The objecting parties argue that the Plan has not been proposed in good faith, as required by §1129(a)(3), because the Equity Incentive Plan is not reasonable and, therefore, is not consistent with the objectives and purposes of the Bankruptcy Code. *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.")  The objecting parties argue that the Equity Incentive Plan is so generous that it is proposed with ulterior motives, that is, to enrich management at the expense of the unsecured creditors by reserving a large percentage of equity for employees, including management, that will be worth a great deal more than disclosed after the Debtors' emergence from chapter 11 .

In the *Granite Broadcasting* decision, the Court wrote:

The issue of compensation and benefits provided to executive management in connection with Chapter 11 cases is a sensitive one that involves the interests of creditors, stockholders and all other stakeholders, as well as the public interest. Congressional concern with executive compensation in chapter 11 cases is evidenced by §503(c) of the Bankruptcy Code, added by the 2005 Amendments, and by the very recent hearings on the issue. *See, e.g.*, Hearings before the Subcommittee on Commercial and Administrative Law of the House Judiciary Committee, 110th Cong., 1st Sess., Apr. 17, 2007.

*In re Granite Broadcasting Corp.*, 369 B.R. 120, 138 (Bankr.S.D.N.Y. 2007). The *Granite Broadcasting* Court decided that there was "no evidence that the Plan provisions relating to . . . compensation and benefits are unusual or unreasonable based on the market or other plans of reorganization." *Id.*

The Debtors argue that the Equity Incentive Plan is an important part of the Plan that will allow the company to be competitive in attracting and keeping talented employees upon its emergence from chapter 11. Equity is often used as a meaningful part of an employee's compensation package in the technology industry and, particularly, for companies in the Silicon Valley. (Tr. 3/1/10 at 134:21 - 135:3 (Sirras).) While I accept the premise that equity is a meaningful part of employee compensation in this industry, I review whether this particular proposal is permissible.

The Debtors provided testimony of Todd Sirras, of Semler Brossy Consulting Group, who advises companies on strategic compensation issues, including the use of equity incentive plans in a compensation program. (Tr. 3/1/10 at 119:20 - 120:2 (Sirras).) Sirras reviewed the Equity Incentive Plan which reserves 9,005,367 shares for the Equity Incentive Plan, amounting to 13.2 % of the total common shares outstanding. (*Id.* at 137:14-17.) Of that amount, approximately 5.2% of the total common shares are "full value" shares, while the balance are reserved as options that would be issued by the board at market rate. (*Id.* at 137:18 - 138:3. *See also* Ex. D-2 at 4.)

Mr. Sirras opined that the Equity Incentive Plan was reasonable and appropriate. He reviewed different market references - - including a "peer group" of the Debtors, companies emerging from bankruptcy, and recent initial public offerings in the S&P Technology sector - -

36

and determined that "appropriate" incentive plans reserved common shares in a range of 11.9% to 16.3% of common shares outstanding. (Ex. D-2 at 7-11.) Based upon this data, he concluded that the percentage of shares reserved in the Debtors' Equity Incentive Plan was reasonable. (Tr. 3/1/10 at 142:4-13 (Sirras).)

However, the objecting parties questioned the market reference groups underlying Mr. Sirras' analysis. In particular, they noted that the peer group of companies was selected by the compensation committee of the Debtors' board in June 2009, rather than selected by the compensation expert. (*Id.* at 141:21-23, 169:17 - 170:4.) Moreover, and probably more importantly, the benchmark group of bankruptcy companies emerged from chapter 11 in the period between 2003 and 2006. (Ex. D-2 at 8.) That there have been dramatic - - and most certainly adverse - - changes in the economy and the marketplace since that time frame is beyond dispute. The world of executive/employee compensation has not gone unaffected by these events. The objecting parties introduced Exhibit CDEM-11, which sets forth a list of companies emerging from chapter 11 in Delaware after January 2009. This exhibit reflects that the equity allocation for management in the more recent chapter 11 cases averaged 8.5% of the outstanding common shares. (Ex. CDEM-11.) The Debtors respond that Exhibit CDEM-11 is of limited relevance to this analysis, because it includes only two technology companies. However, I conclude that the evidence is sufficient to call into question the reliability and relevance of the market references used in the Sirras report.

The objecting parties also argue that the Equity Incentive Plan is not offered in good faith because the Debtors' have purposefully lowered enterprise valuation to receive a windfall from the Equity Incentive Program after Plan confirmation, based upon the assertion that the

37

reorganized Debtors' shares will trade at a much higher value than that advanced by the Debtors. The Debtors argue in response that the Equity Incentive Plan shares' value does not depend upon this Court's conclusions about valuation, but will depend upon the New Spansion Common Stock's trading price at the time shares are actually issued. It is true that the post-Effective Date market is not bound by this Court's determination of enterprise value, which ultimately, may or may not prove to be an accurate measure of value, but the Debtors' argument that, for purposes of confirmation of the Plan, the Court should ignore its own conclusion of enterprise value as it relates to near-term future share price for shares covered by the Equity Incentive Plan is counterintuitive.

Here, the record does not demonstrate sufficiently that the Equity Incentive Plan is usual or reasonable for this market at this time. Therefore, to achieve confirmation of a plan with an equity incentive component, the Debtor must devise an incentive scheme that garners uniform support from its constituencies or is demonstrably reasonable and within the market.

5.      Whether the Debtors wrongfully refused to adopt the Alternative Rights Offering?

The objecting parties, in particular the Creditors' Committee, also have argued that confirmation of the Debtors' Plan should be conditioned upon the Debtors' acceptance of the Alternative Rights Offering proposed by the Convert Committee.    The Creditors' Committee, the Convert Committee, AHEC, and others argue that the $112 million Alternative Rights Offering is superior to the Silver Lake Rights Offering. They argue that the Debtors' failure to accept the Alternative Rights Offering is evidence of the Debtors' bad faith in proposing the Plan (because, *inter alia*, it imputes a higher share value than asserted by the Debtors).

In response, the Debtors assert that they are entitled to have the Plan judged as a whole for satisfaction of the requirements of §1129: creditors are not free to pick the provisions they like and excise the provisions they dislike. The Debtors note that the Plan has been proposed, voted on, and the Confirmation Hearing has been completed within the exclusivity period of Bankruptcy Code §1121(b), as extended by order of this Court.[42] The purpose of the exclusivity period is to provide a debtor, at the outset of a chapter 11 case, with "the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr.S.D.N.Y. 1988) citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 221-222 (1978), U.S. Code Cong. & Admin. News 1978, pl. 5787. The Debtors write that compelling them to reconceptualize their reorganization would deprive the Debtors of their exclusive right to formulate and propose their manner of reorganization as they see fit, subject, of course, to the limitations of the Bankruptcy Code. (Debtors' Response to Statement of Position of Official Committee of Unsecured Creditors, D.I. 2863 at ¶12.) I agree. *See In re Adelphia Commc'n Corp.,* 336 B.R. 610, 676 (Bankr.S.D.N.Y. 2006) citing *In re Geriatrics Nursing Home, Inc.*, 187 B.R.128, 134 (D.N.J. 1995)(noting that a creditor constituency's unhappiness or dissatisfaction with a debtor's proposed plan, without more, does not constitute cause to end exclusivity and undermine the debtor's chance of obtaining confirmation of its plan during that period).

Even assuming the Alternative Rights Offering provides "a better deal" for some

---

[42]By Order dated February 18, 2010, the Court established March 8, 2010 as the deadline for the period during which only the Debtors may solicit votes to accept or reject a proposed plan of reorganization. (D.I. 2811.) The Debtors filed a fourth motion to extend exclusivity on March 8, 2010 (D.I. 3066), requesting extension of exclusivity to April 30, 2010. This motion is set for an April 26, 2010 hearing.

creditors, the Debtors' refusal to accept the proposal does not, on its own, demonstrate "bad

faith." As noted in the confirmation opinion in *Celotex*:

> This Court's responsibility with respect to consideration of the Plan is to consider as a matter of law (i) whether the Plan Proponents have met their burden under the Bankruptcy Code, (ii) whether each impaired class has accepted the Plan and (iii) the merits of any timely filed objections to the Plan. The Court need not and ought not consider if a proposed plan is the "best" plan of reorganization that could be promulgated, providing for the highest return to creditors of the Debtors' Estates. Instead, the Chapter 11 process is controlled by the various constituencies in a case, including holders of Claims and Interests. It is not the Bankruptcy Court's role to substitute its judgment for the judgment of the various classes of creditors who have voted overwhelmingly in favor of the Plan. Accordingly, the Bankruptcy Court is not required to compare the Plan to a hypothetical plan. Therefore, in order to meet their obligations under Section 1129(a)(7) of the Bankruptcy Code, Plan Proponents must prove that the distribution to creditors under the Plan is no less valuable, as of the Effective Date of the Plan, than the distribution such creditors would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

*In re Celotex Corp.*, 204 B.R. 586, 611-12 (Bankr.M.D.Fla. 1996). The Debtors provided

evidence, which was not challenged, that creditors will receive more under the Plan than would

be available if the Debtors were liquidated in a chapter 7 case. (*See* Ex. D-3.) It is not

appropriate to substitute the judgment of the objecting creditors over the business judgment of

the Debtors, who have determined that the Silver Lake Backstop Agreement is preferable for the

Debtors' reorganization. The Debtors chose Silver Lake as a Backstop Party for the Rights

Offering based on its extensive operating experience and management roles at other technology

companies. (Disclosure Statement at 84, Tr. 2/24/10 at 159:11 - 160:2 (Sarkisian).)[43] The

Debtors also were concerned that choosing the Alternative Rights Offering would have an

---

[43]In particular, the Disclosure Statement states: "Silver Lake's principals possess a wealth of operating experience and have had management roles at companies including IBM, Cisco, Sun Microsystems, Hewlett-Packard, Oracle, Adobe, Force Computers, and including memory semi-conductor companies such as SMART Modular Technologies, Samsung, and AMD." (Disclosure Statement at 84.)

adverse impact on the timing of confirmation, specifically that it might require a resolicitation of votes on the Plan and a new confirmation hearing, all of which would push confirmation after April 8, 2010, which is the expiration date for the Exit Financing Facility.[44]  (*Id.* at 134:21 - 25.) Further, the Debtors claimed that substituting the Alternative Rights Offering might cause many creditors who have voted in favor of the Plan to abandon their support of the Plan.  (*Id.* at 136:13-137:8.)

The objecting parties have attacked the motives of the Debtors' management in dealing with Silver Lake.  However, the record does not support a finding that management's cooperation with Silver Lake throughout this process involved any self-dealing or improper motives.  There is no credible evidence that Silver Lake has been "orchestrating" the Debtors' reorganization or has tried to manipulate plan voting. Prior to the Confirmation Hearing, Silver Lake did not attend any board meetings and was not involved in day-to-day management of the company. (Tr. 2/24/10 at149:13-21 (Sarkisian).) However, post-confirmation, Silver Lake is expected to be involved in the Reorganized Debtors' business.  Silver Lake will designate a person to serve on the Reorganized Debtors' board of directors. (Plan, §7.2.) The Debtors' management admitted they selected Silver Lake as the Backstop Party based, in part, upon their in-depth knowledge and experience and expertise in managing technology companies. If the Alternative Rights Offering were chosen, it is likely that Silver Lake would not agree to serve on the board. (Tr. 2/25/10 at 137:10 - 138: 17 (Sarkisian).)

---

[44]The objectors' argue that the Plan is "self-correcting" because it refers to a rights offering in general terms, or allows the Debtors the option of having no rights offering and, therefore, does not require new solicitation and voting for a substitute rights offering. Even if true, this does not require the Debtors to accept an alternative proposal.

41

The objecting parties argue that Silver Lake's acquisition of a partial interest in the large unsecured claim of ChipMos Technologies, Inc. (the "ChipMos Claim"), and the Debtors' failure to object to that claim, is further proof of improper motives to allow Silver Lake to take control the Debtors' Rights Offering and enrich itself to the detriment of other unsecured creditors. However, the record shows that Silver Lake did not acquire an interest in the ChipMos claim until January 25, 2010, more than six weeks after the December 14, 2009 Rights Offering Record Date (i.e., the date by which Holders of Class 5A, 5B and 5C Claims were determined eligible to participate in the Rights Offering). Moreover, the Order authorizing the Debtors to enter into the Backstop Agreement with Silver Lake was not entered until January 7, 2010 - - well after the Rights Offering Record Date. Therefore, there is no evidence that the Debtors' decision not to object to the ChipMos Claim prior to Rights Offering Record Date had any connection to Silver Lake. The Debtors admitted that they were aware that Silver Lake was bidding to acquire part of the ChipMos claim, and that the Debtors even "put in a good word" with ChipMos on behalf of Silver Lake, because the Debtors determined that it would be favorable to have the large ChipMos claim "in the hands of a stable long term holder, like Silver Lake." (Tr. 2/25/10 at 141:13 - 142:23 (Sarkisian).) If ChipMos was going to sell its claim, the Debtors believed it would be better for Silver Lake to own it than "someone who was going to try and leverage that position for their own short term gain." (*Id.* at 143:4 - 21.)

This case is illustrative of what has been and is now occurring in many of the larger chapter 11 cases filed in this Court: "Trading of claims in advance of Chapter 11 or shortly afterward ensures that [various constituencies in Chapter 11] consist largely of seasoned professionals who specialize in recapitalizing distressed businesses." Baird, *supra.* n. 16, at

1938. "The contest is most often among seasoned investors (banks hedge funds, and other institutional investors) who hold debt at different levels of the debtor's capital structure." *Id.* at 1933. The history of this chapter 11 proceeding is replete with evidence of behavior by such parties clearly designed to further competing strategies. Nowhere is this more apparent than in connection with the disclosure and confirmation process, but I cannot conclude, on this record, that the Debtors' rejection of the Alternative Rights Proposal demonstrates a lack of good faith in seeking confirmation of the Plan. Absent some demonstrable impropriety in the confirmation process, it is not for the Court to supplant the Debtors' business judgment with its own.

6.      Whether the proposed Plan Releases violate applicable bankruptcy law?

Some of the objecting parties (specifically including the Convert Committee, the UST, and Gorman) argue that the Plan cannot be confirmed because the Plan Releases contained in sections 11.3 and 11.4 violate applicable bankruptcy law, specifically Bankruptcy Code §524(e), and are not fair and equitable, or in the best interests of the Debtors' estates.[45]

(a)      The Debtors' Release.

Section 11.3 of the Plan (the "Debtor Release") sets forth the terms of the Debtors' release of certain parties, including (without limitation) (i) the Debtors' current directors, officers and employees, and the Debtors' current and former professionals (including attorneys, financial advisors, investment bankers, accountants, etc); (ii) the Creditors' Committee and its professionals; (iii) secured creditors, the FRNs, and their advisors; (iv) the Backstop Party and its advisors, directors, officers, and employees; (v) the Debtors and their affiliates, and their officers,

---

[45]Section 524(e) of the Bankruptcy Code provides in pertinent part: "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. §524(e).

directors, employees, and advisors; and (vi) the Senior Noteholders and their advisors (the "Debtor Releasees") of any and all claims occurring on or prior to the Plan's Effective Date that relate in any way to the Debtors, the Reorganized Debtors, the chapter 11 case, the Plan and Disclosure Statement.[46]

Section 11.3 is a release of claims belonging to the Debtors and the bankruptcy estate. Courts in this district have held that a plan may provide for releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case. *In re Zenith Elec.Corp.* , 241 B.R. 92, 110 (Bankr.D.Del. 1999).[47] Moreover, a debtor may release claims in a plan pursuant to Bankruptcy Code §1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.[48] *In re DBSD North*

---

[46]This description of the release in Section 11.3 summarizes its provisions. Spansion Japan and its officers, directors and advisors are specifically excluded from the "Debtor Releasees."

[47]When deciding whether a plan may include a debtor's release of non-debtor third parties, notwithstanding section 524(e), a court may consider the following:
(1)     the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
(2)     substantial contribution by the non-debtor of assets to the reorganization;
(3)      the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
(4)     an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and
(5)     provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Zenith*, 241 B.R. at 110 citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D.Mo. 1994). *See also Exide*, 303 B.R. at 72. The *Master Mortgage* Court recognized that these factors are neither exclusive nor are they a list of conjunctive requirements. *Master Mortgage*, 168 B.R. at 935. Instead, they are helpful in weighing the equities of the particular case after a fact-specific review. *Id.*

[48]Section 1123(b)(3)(A) provides in pertinent part: "[A] plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. §1123(b)(3)(A). Although there is no evidence of any potential claims here, it is not unreasonable for the Debtors to provide a broad release of its claim in return for creditors' agreement to the Plan.

*America, Inc.*, 419 B.R. 179, 217 (Bankr.S.D.N.Y. 2009).

Here, four of the five classes of creditors entitled to vote on the Plan voted overwhelmingly in favor of the Plan. (Ex. D-71.) Unlike *Exide*, in which the plan release would have barred continuation of an adversary proceeding brought by the creditors' committee against prepetition lenders, the record does not reflect that there is any pending litigation in this case that would be discontinued by such a release. *See Exide*, 303 B.R. at 73. *See also DBSD*, 419 BR at 217 (approving a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released).

The Debtor Releasees were actively involved in negotiating and formulating the Plan. It is a valid exercise of the Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan. *DBSD*, 419 B.R. at 217.

(b)     The Third Party Release.

Section 11.4 of the Plan (the "Third Party Release") provides for a release of the Debtor Releasees by (i) any entity that voted to accept the Plan or is presumed to have voted for the Plan under §1126(f) (i.e., unimpaired classes), (ii) each entity who obtains a release under the Plan, (iii) and each entity that held, holds, or may hold a Claim or Interest (as applicable law allows) (the "Release Obligors") of any and all claims existing as of the Plan's Effective Date.[49]

The Debtors argue that the release provision does not make the Plan unconfirmable, because it only releases claims "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date." (Plan, §11.4.) I am aware that some confirmed chapter 11 plans include release provisions styled this way. There is some allure

---

[49]The Third Party Release specifically excludes any causes of action in Adversary No. 09-52274.

to the Debtors' suggestion to leave to a future date the issue of enforcement (i.e., permissible breadth) of the release - - and there may be some circumstances under which that is appropriate. Here, there are specific objections to inclusion of a broad release of non-debtor third parties in the Plan. I am, therefore, required to resolve them.

In *Continental*, the Third Circuit declined to establish a rule governing conditions under which a non-consensual third party releases would be permissible. *In re Continental Airlines,* 203 F.3d 203, 213-14 (3d Cir. 2000). However, the Court recognized that other circuits have allowed releases in extraordinary circumstances. *Id.*, 203 F.3d at 212. In *Continental*, the Court determined that the "hallmarks of permissible non-consensual releases - - fairness, necessity to the reorganization, and specific factual findings to support these conclusions" - - were absent. *Id.,* 203 F.3d at 214.

In *Genesis*, the Court evaluated whether a non-consensual release fit the "hallmarks" discussed in *Continental*, by considering whether: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release. *Genesis,* 266 B.R. at 607-08. *See also Exide*, 303 B.R. at 75. Even so, the *Genesis* Court continued to be mindful of *Continental's* citation to cases "which warned against the exercise of unfettered discretion to discharge nondebtors from liability, and explained that a permanent injunction limiting the liability of nondebtor parties is a rare thing that should not be considered absent a showing of exceptional circumstances." *Genesis,* 266 B.R. at 608 quoting *Continental*, 203 B.R.

at 213, n. 9.

The United States Trustee objects to the Third Party Release to the extent it binds parties who have not taken affirmatively any action to accept the release (including those who are "deemed" to have accepted the Plan and all other entities who hold Claims or Interests). Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan. *In re Specialty Equip. Co., Inc.*, 3 F.3d 1043, 107 (7th Cir. 1993). The UST objection criticizes the form of ballot, arguing that even unimpaired classes should be able to fill out a ballot and "opt out" of the release. This specific procedure was proposed in connection with the motion for approval of the voting procedures, yet the issue was not the subject of any objection raised at the December 14, 2009 hearing. Further, I note that no creditor or interest holder whose rights are affected by the "deemed" acceptance language has objected to the Plan. While I recognize - - and fully appreciate - - the importance of the UST's supervision of the administration of bankruptcy cases pursuant to 28 U.S.C. §586 and her right to be heard chapter 11 cases pursuant to Bankruptcy Code §307, the silence of the unimpaired classes on this issue is persuasive. This aspect of the Third Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release. I will overrule the objection to the extent that the UST opposes applying the Third Party Release to those parties who are "deemed" to have accepted the Plan.

However, the portion of the Third Party Release that applies to all holders of Claims or Interests requires further examination. In addition to the UST objection, the Convert Committee and Gorman also objected to the Third Party Release. The Debtors argue that this part of the Third Party Release is critical to the success of the Reorganized Debtors, particularly to prevent

47

management from being distracted from "running the Debtors' highly technical operations." (Debtors' Omnibus Reply, D.I. 2688, at 12.) The Debtors claim that all of the Debtor Releasees provided contributions to the Debtors' Plan "both financially and through countless hours of planning, negotiating, and development, often at great personal sacrifice on behalf of management, professionals, and their families, which sacrifice is not otherwise compensated by their salaries." (*Id.*.) Further, the Debtors argue that secured creditors will receive a full recovery under the Plan, and unsecured creditors will receive significant value (through New Spansion Common Stock), in excess of typical chapter 11 cases of similar size and complexity. (*Id.*.)

While I have little doubt that many of the Debtor Releasees undertook substantial (and certainly sometimes exhausting) efforts to formulate and negotiate the current (and former) Plans, I do not believe that those contributions rise to the level of the critical financial contribution contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases. *See Continental*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"), *Genesis*, 266 B.R. at 606-07 ("[T]he officers, directors and employee have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.") Further, relieving the Reorganized Debtors and their management from the distractions of litigation does not make the non-consensual releases "necessary to the reorganization."

Finally, secured creditors receiving a full recovery under the Plan and unsecured creditors receiving value in the form of equity (which is more than they would receive in a liquidation) may

48

provide, under appropriate circumstances, sufficient value in exchange for the releases. The objecting parties, however, are not receiving anything under the Plan.[50] For these reasons, the proposed non-consensual Third Party Release does not pass muster under *Continental*.

7.    Tessera's Objections.

Tessera objected to the Plan on two grounds. First, Tessera argues that the Plan violates §1129(a)(9)(A) because it does not establish a reserve for Tessera's alleged administrative claim. Second, Tessera argues irregularities in voting solicitation and tabulation require a re-solicitation of votes for the Plan.

Tessera initially challenged the feasibility of the Plan due to its assertion of an administrative claim in an amount of more than $100 million, based upon patent infringement claims asserted against the Debtors in litigation proceeding in the District Court for the Northern District of California and before the United States International Trade Commission. Prior to the Confirmation Hearing, the Debtors filed a motion asking the Court to estimate the amount of Tessera's alleged administrative claim for purposes of demonstrating Plan feasibility under §1129(a)(11) (D.I. 2272)(the "Tessera Estimation Motion"). On February 9, 2010, I issued a bench ruling estimating the amount of Tessera's alleged administrative expense claim at $4,232,986.13. Tessera withdrew its feasibility objection, but asserts that the Plan must either provide for immediate payment of its administrative claim or set aside a reserve in the amount of the estimated claim. Section 1129(a)(9)(A), provides in pertinent part, that a court shall confirm a plan if it meets the following requirement:

---

[50]This is not to say that under the Bankruptcy Code's priority scheme, applicable pre-petition agreements,  and this Court's determination of the Debtors total enterprise value that these parties are entitled to any distribution.

(9)     Except to the extent that the holder of a particular claim has agreed to a different
        treatment of such claim, the plan provides that - -
        (A)     with respect to a claim of a kind specified in section 507(a)(2) [including
                administrative expense claims allowed under section 503(b)] . . . on the
                effective date of the plan, the holder of such claim will receive on account
                of such claim cash equal to the allowed amount of such claim.

11 U.S.C. §1129(a)(9)(A).   The Debtors argue in response that, by withdrawing its feasibility

objection, Tessera implicitly conceded that the Debtors will have the ability to pay the alleged

administrative claim.   Further, the Debtors argue, persuasively, that the evidence regarding the

Debtors' future financial stability shows that the Debtors will have the ability to pay this

administrative expense claim when it is finally determined.

        Section 1129 (a)(9)(A) requires a debtor to pay an administrative claim holder, on the

plan's effective date, "cash equal to the allowed amount of such claim." This necessitates a

determination of an "allowed amount" of that claim.   At the same time, the Code grants a right to

priority of payment to administrative claimants.   This priority should not be subject to the risk that

the newly reorganized debtor lacks the funds or the motivation to resolve the outstanding dispute.

In *Adelphia*, the Court ordered the debtors to set aside a reserve for a disputed administrative

claim to "go effective" under the plan.   *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 419

(Bankr.S.D.N.Y. 2003).   This is a reasonable compromise of the competing concerns.

Accordingly, I conclude that, in this case, the Debtors can satisfy the confirmation requirement of

§1129(a)(9)(A) by setting aside a reserve in the amount of Tessera's estimated claim.

        Tessera's second objection to the Plan asserts that the Debtors failed to properly count

Tessera's three plan ballots, which were based upon Tessera's three asserted unsecured claims,

because the Debtors deemed the ballots to be duplicative.   The Debtors respond that they acted in

50

accordance with paragraph 9 of the Disclosure Statement Order, which provided:

> A creditor which holds multiple Claims that are deemed to be "allowed" for voting purposes against a single Debtor or multiple Claims against multiple Debtors, all of which Claims are based upon or relate to the same or similar indebtedness or obligations, whether by reason of guarantee, indemnity agreement, joint and several obligation or otherwise, shall be entitled to vote only the largest of all such similar Claims.

(Disclosure St. Order, ¶9.)  The Debtors reasonably determined that Tessera's claims were "similar" and treated them in accordance with the procedures set by the Disclosure Statement Order.  Furthermore, the Debtors demonstrated that, even assuming Tessera were permitted to vote its three claims separately, the Plan voting outcome for Class 5B would not change.  (Ex. D-80.)  Class 5B would still accept the Plan in the requisite number and amount of claims. (*Id.*)  Therefore, I will overrule Tessera's second objection to the Plan.

8.    Whether the proposal to limit the right to object to unsecured claims to the appointed "claims agent" violates applicable bankruptcy law?

AHEC argues that the Plan does not comply with the provisions of the Bankruptcy Code because it deprives creditors of their right to object to claims under §502(a).  AHEC also argues that this provision is a material change added after approval of the Disclosure Statement and the deadline for Plan confirmation objections.

Section 9.2(4) of the Plan states, in pertinent part: "After the Effective Date, . . . only the Claims Agent shall have the authority to File, prosecute, settle, compromise, withdraw or litigate to judgment objections to Disputed Classes 5A-5C Claims, Claims Agent Avoidance Actions or 510(c) Actions. . . ."

While it is undisputed that §502(a) grants creditors the right to object to claims, it has been recognized that "the needs of orderly and expeditious administration do not permit the full and

unfettered exercise of such right." 4-502 Collier on Bankruptcy ¶502.02[d] (2009) citing 1983

Advisory Committee Note to Fed.R.Bankr.P. 3007. I conclude, based upon this record, that

appointment of a claims agent to file such objections after confirmation is not unusual and is

reasonable for the orderly and expeditious administration of disputed claims in accordance with

the Plan. This objection will be overruled. If any creditor believes the claims agent is acting

improperly, it can always file a motion so advising the court and requesting appropriate relief.

9.      Plan Confirmation Conclusion.

        For the reasons stated above, the Debtors' Plan cannot be confirmed in its present form

because (i) the Debtors have not demonstrated that the Equity Incentive Plan is being proposed in

good faith, and is fair and equitable to creditors, (ii) the Third Party Release in Section 11.4 of the

Plan violates applicable bankruptcy law, and (iii) the Debtors must set aside a reserve in the

estimated amount of Tessera's administrative claim to meet the requirement of §1129(a)(9)(A).

All other objections to the Plan are overruled.


C.      Motion for Summary Judgment in Adv. No. 09-52274

        As part of the Confirmation Hearing, the Court agreed to hear oral argument on the

Motion for Summary Judgment pending in Adversary Proceeding No. 09-52274.[51]   This

---

[51]Wilmington Trust filed a motion to dismiss the adversary complaint pursuant to Fed.R.Civ.P.
12(b)(1) and Fed.R.Bankr.P. 7012(b)(1), or in the alternative, for abstention pursuant to 28 U.S.C.
§1334(c)(1) (D.I. 5)(the "Motion to Dismiss"). US Bank objected to dismissal (D.I. 14) and oral
argument on the Motion to Dismiss was held on January 7, 2010. Wilmington Trust argued that this
Court did not have jurisdiction to decide the adversary proceeding because it involves a dispute between
two non-debtor parties that would not affect the administration of the bankruptcy estate. See, e.g., Saul,
Ewing, Remick & Saul v. Provident Sav. Bank, 190 B.R. 771, 775 (D.Del. 1996)("[D]isputes between
parties other than the debtor generally do not invoke the court's "related to" jurisdiction of §1334 unless
the action would have some effect on the bankruptcy estate.")
        An earlier version of the Debtors' plan provided that the shares of New Spansion Common Stock

52

adversary proceeding was filed on October 19, 2009, by U.S. Bank, as Senior Trustee, against

Wilmington Trust, as Subordinate Trustee, seeking a declaration pursuant to 28 U.S.C. §2201 that

the Senior Noteholders (Class 5A) are entitled to receive the Debtors' distribution of New

Spansion Common Stock to the Exchangeable Debentures holders (Class 5C) pursuant to the

Subordinated Indenture (defined below). A Subordinated Indenture provision states that a

distribution of "Permitted Junior Securities" is not subject to the agreement's subordination

---

allocated to holders of the Exchangeable Debentures of Class 5C would be distributed into an escrow
fund pending determination by a court of competent jurisdiction of the intercreditor dispute regarding
subordination. By order dated January 8, 2010, further consideration of the Motion to Dismiss was
deferred pending consideration of the Summary Judgment Motion and Plan confirmation.

    The Plan now under consideration provides, instead, that the New Spansion Common Stock
allocated to Class 5C Exchangeable Debenture claimants will be distributed to Class 5A Senior Note
Claims. (See Plan, §3.7 and §3.18). The Second Circuit Court of Appeals determined that a bankruptcy
court has subject matter jurisdiction when it enforces a contractual subordination agreement as part of the
plan confirmation process, writing:

> Fixing the order of priority of creditor claims against a debtor is an integral and historic
> bankruptcy function, and without this power the bankruptcy court would be rendered powerless
> to rehabilitate a debtor.   While enforcing subordination agreements is not listed as a core
> proceeding, the power to prioritize distributions has long been recognized as an essential element
> of bankruptcy law. . . . As the bankruptcy court here correctly noted:
>
>> It is hard to imagine an issue that is more at the heart of the bankruptcy process than is
>> this.  Enforcement of a contractual subordination agreement clearly involves the
>> adjustment of the debtor-creditor relationship, determinations of the priority of liens, and
>> administration of the estate and so falls within the ambit of 28 U.S.C. §157(b)(2)(A),
>> (K), and (O).

Resolution Trust Co., Inc. v. Best Products Co., Inc. (In re Best Products, Inc.), 68 F.3d 26, 31-32 (2d
Cir. 1995) citing In re Best Products Co. , Inc., 168 B.R. 35, 66-67 (Bankr.S.D.N.Y. 1994). See also
Boyer v. Simon (In re Fort Wayne Telstat, Inc.), 403 B.R. 590 (Bankr.N.D. Ind. 2009) in which the court
wrote:

> [A]n action under §510 seeking . . . to enforce a subordination agreement comfortably fits within
> the court's jurisdiction.  To the extent §510 is seen as creating the basis for the action, it would
> come within the scope of the "arising under title 11" jurisdiction of §1334(b).  To the extent
> §510 does not create a right, but, instead, provides the vehicle by which a non-bankruptcy right
> of subordination may be enforced in a bankruptcy case, it would come within the scope of the
> "arising in . . . a case under title 11" jurisdiction of §1334(b).  Either way, the court has
> jurisdiction."

Id. at 593. I conclude that I have core jurisdiction to consider this adversary. The Motion to Dismiss is
denied.

provisions. (*See* Subordinated Indenture, §11.10.) The parties interpret the term "Permitted Junior Securities" differently, particularly, whether it includes the New Spansion Common Stock that the Debtors will distribute to unsecured creditors under the Plan.

US Bank seeks a declaration from the Court that the New Spansion Common Stock that the Debtors propose to distribute under the Plan is not a "Permitted Junior Security," as defined in the Subordinated Indenture.[52] The Plan provides that the holders of Class 5C - - Exchangeable Debentures Claims - - will be treated as follows:

> Subject to Section 3.18 below, each Holder of an Allowed Class 5C Claim will receive such Holder's Unsecured Claims Pro Rata share of 46,247,760 shares of New Spansion Common Stock.

Plan, §3.7. But, Section 3.18 of the Plan provides, in pertinent part:

> Unless the Confirmation Order provides otherwise and unless and until all Allowed Class 5A Claims have been satisfied in full in accordance with the provisions of the Exchangeable Debentures Indenture and the Senior Notes Indenture, no Distribution shall be made on account of Class 5C Claims to the Indenture Trustee for the Exchangeable Debentures or the Holders of Exchangeable Debentures Claims. Accordingly, unless the Confirmation Order provides otherwise, the Pro Rata portion of any Distribution allocable to Allowed Class 5C Claims shall be distributed to Holders of Allowed Class 5A Claims unless and until all Allowed Class 5A Claims have been satisfied in full in accordance with the provisions of the Exchangeable Debentures Indenture and the Senior Notes Indenture.

Plan, §3.18.[53]

---

[52]US Bank also filed an objection to confirmation of the Plan (D.I. 2468) raising, for the most part, the same issues as the adversary proceeding: namely, that the Plan is not confirmable unless it gives effect to the subordination provisions in the Subordinated Indenture by requiring the Debtors to distribute all shares of New Spansion Common Stock allocated to the holders of the Exchangeable Debentures to the Senior Noteholders.

[53]The "Exchangeable Debentures Indenture," the term used in the Plan, is the same as the "Subordinated Indenture," the term used here.

(1)    Background - The Governing Documents.

US Bank is the successor trustee under that certain Indenture dated as of December 21,

2005 (the "Senior Notes Indenture"), originally among Spansion LLC, as issuer, (the "Issuer")

Spansion, Inc. and Spansion Technology Inc, as guarantors (the "Guarantors"), and Wells Fargo

Bank, N.A., as trustee, pursuant to which the Issuer issued those certain 11.25% Senior Notes due

2016 in the original aggregate principal amount of $250 million (the "Senior Notes".)

Wilmington Trust is the successor indenture trustee under that certain Indenture dated as of June

12, 2006 (as amended and supplemented on August 14, 2006) (the "Subordinated Indenture")

originally by and among the Issuer, the Guarantors, and Wells Fargo, as trustee.    Pursuant to the

Subordinated Indenture, the Issuer issued those certain 2.25% Senior Exchangeable Debentures

due 2016 in the original aggregate principal amount of $207 million (the "Exchangeable

Debentures".)

The Subordinated Indenture sets forth the terms by which the Exchangeable Debentures

are subordinated to the Senior Notes:

> The Indebtedness evidenced by the [Exchangeable] Debentures is subordinated in right of payment, to the extent and in the manner provided in this Indenture, to the prior payment of all Senior Indebtedness.  The subordination provisions are for the benefit of and enforceable by the holders of the Senior Indebtedness.[54]

(Subordinated Indenture, §11.01.)  Section 11.02 of the Subordinated Indenture sets forth certain

rules that govern if the Issuer (here, the Debtors) distribute assets in a bankruptcy, reorganization,

or related proceeding, providing:

> [U]ntil the Senior Indebtedness is paid in full, any distribution to which Holders would be entitled but for these subordination provisions shall instead be made to holders of Senior

---

[54]There is no dispute that the Senior Indebtedness includes the Senior Notes.

Indebtedness as their interests may appear.

(Subordinated Indenture, §11.02(2).)  The dispute, here, arises out of a provision regarding

"payments in Permitted Junior Securities," which provides, in pertinent part:

> Notwithstanding anything to the contrary,
> . . . .
> (ii)    distributions to Holders in the form of Permitted Junior Securities of the Issuer
>
> are not subordinated to the prior payment of any Senior Indebtedness or otherwise subject
> to these subordination provisions, and none of the Holders will be obligated to pay over
> any such payments or distributions to any holder of Senior Indebtedness.

(Subordinated Indenture, §11.10.)  "Permitted Junior Securities" is defined as follows:

> **Permitted Junior Securities**" means, as to the Issuer or a Guarantor, as the case may be,
> any securities of the Issuer or such Guarantor, as the case may be, that constitute either (x)
> capital stock of the Issuer or the Guarantor, as the case may be, or (y) Indebtedness of the
> Issuer or the Guarantor, as the case may be, subordinated in right of payment to all Senior
> Indebtedness of the Issuer or Guarantor, as relevant, then outstanding to at least the same
> extent as the [Exchangeable] Debentures are subordinated as provided in this Indenture.

(Subordinated Indenture, §1.01.)  This is sometimes known as the "X-Clause."

    (2)    Discussion

       In support of its position that it is entitled to any distribution otherwise payable to the

Class 5C Noteholders, US Bank cites my prior decision, *Kurak v. Dura Automotive Sys. Inc. (In

re Dura Automotive Sys., Inc.)*, 379 B.R. 257 (Bankr.D.Del. 2007), and the cases relied on therein,

particularly *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber

Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) and  *In re Envirodyne Indus., Inc.* 29 F.3d 301 (7th

Cir. 1994).  Three courts decided that the X-Clause at issue should be read in the context of the

entire subordination agreement and determined that common stock being distributed in a plan to

creditors did not fall within the X-Clause and was not exempt from the various indentures'

subordination provisions. *Metromedia*, 416 F.3d at 139-40, *Envirodyne*, 29 F.3d 305-06, *Dura*,

379 B.R. at 270.[55]

In response, Wilmington Trust argues that the plain language defining "Permitted Junior

Security" in the Subordinated Indenture specifies that capital stock (such as the New Spansion

Common Stock) is exempt from the subordination provisions.

As I recognized in *Dura*, each X-Clause is different and must be considered in the specific

context of the applicable contract. *Dura*, 379 B.R. at 270. Upon consideration of the definition of

_____

[55]In *Metromedia*, the Court explained the use and purpose of an X-Clause as follows:
> Helpful guidance is found in the American Bar Foundations'
> *Commentaries on Model Debenture Indenture Provisions* (1971)
> [hereinafter *Commentaries*]. In a nutshell, when subordinated and senior
> note holders are given securities under a plan of reorganization, an X-
> Clause allows the subordinated note holder to retain its securities only if
> the securities given to the senior note holder have higher priority to
> future distributions and dividends (up to the full amount of the senior
> notes.) This provides for full payment of the senior notes before any
> payment of the subordinated notes is made. In such a case, the senior
> note holder enjoys unimpaired the priority to payment that it had under
> its notes, *i.e.*, payments on the subordinated note holder's securities are"
> subordinate...to the payment of all Senior Indebtedness." *See*
> *Commentaries, supra*, § 14-5, at 570 (X-Clause is triggered where
> "mortgage bonds, preferred stock or similar higher class security" are
> provided to senior note holders and "common stock" is provided to
> subordinated note holders because "this kind of distribution gives
> practical effect to the subordination and therefore turnover is not
> required"); Ad Hoc Committee for Revision of the 1983 Model
> Simplified Indenture, *Revised Model Simplified Indenture*, 55 Bus. Law.
> 1115, 1221 (2000)("If Senior Debt were to receive preferred stock and
> the subordinated debt were to receive common stock, for example, where
> the preferred stock precluded distributions to common stockholders until
> the preferred stock was redeemed, the X-Clause would permit that
> distribution.") This approach assures that the junior creditor remains
> fully subordinated without requiring it to yield assets that are not
> required for full payment of the senior creditor and that would therefore
> make a round-trip to the senior creditor and back with the attendant
> delay, friction, and transaction cost.

*Metromedia*, 416 F.3d at 139-140 (footnote omitted).

"Permitted Junior Securities" in the Subordinated Indenture, I cannot conclude that setting off "capital stock" separates the term from the remaining words and clauses in the definition. "Capital stock" is modified by the concluding language "subordinated in right of payment. . . . ." The X-Clause must not be considered on its grammatical structure alone, but also within the context of the entire agreement, which is more reflective of the parties' intent that, except in limited circumstances, no payment can be made to the holders of the Exchangeable Debentures until (i) the Senior Noteholders are paid in full, or (ii) the Senior Noteholders consent. *Id.* The language in the Subordinated Indenture is even clearer here than the X-Clause at issue in *Dura*. Therefore, applying the same reasoning as in *Dura,* I conclude that the New Spansion Common Stock is not a "Permitted Junior Security" and is not exempt from the subordination provisions.

Alternatively, Wilmington Trust argues that summary judgment is not appropriate if the Court determines that the Subordinated Indenture is ambiguous (which is not the case), or because there are disputed issues of fact regarding the value of the shares and whether the Senior Noteholders will be paid in full.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056. US Bank seeks summary judgment on the legal issue of whether the New Spansion Common Stock is a Permitted Junior Security. I need not now determine whether the Senior Noteholders will actually be paid in full by virtue of the Plan distribution. If this issue ripens into an actual dispute, resolution may be left for another time and, perhaps, another forum. Therefore, I conclude that summary judgment is

58

appropriate and will be entered in favor of US Bank.

## CONCLUSION

For the reasons set forth above, I conclude that (i) the Motion to Vacate will be denied, (ii) the Plan cannot be confirmed in its present form, (iii) the Senior Noteholders' Standstill Motion will be dismissed as moot, (iv) the Defendant's Motion to Dismiss in Adversary Proceeding No. 09-52274 will be denied, and (v) the Motion for Summary Judgment in Adversary Proceeding No. 09-52274 will be granted in favor of the Plaintiff, US Bank.

An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: April 1, 2010

59